MACDONALD & ASSOCIATES
IAIN A. MACDONALD (SBN 051073)
HEATHER A. CUTLER (SBN 217837)
221 Sansome Street
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Appellant,
HUGO NERY BONILLA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: | District Case No. CV 08-1062 WHA |
| HUGO NERY BONILLA, | |
| Debtor. | |
| | Adversary Proceeding No. 07-03079 |
| ATR-KIM ENG FINANCIAL CORPORATION and ATR-KIM ENG CAPITAL PARTNERS, INC., | (Bky. Ct. Case No. 07-30309) |
| | Chapter 7 |
| Plaintiffs, | REQUEST OF APPELLANT HUGO NERY BONILLA FOR CERTIFICATION OF APPEAL TO THE NINTH CIRCUIT COURT OF APPEAL |
| vs. | |
| HUGO NERY BONILLA, | |
| Defendant. | |

TO THE HONORABLE WILLIAM H. ALSUP, UNITED STATES DISTRICT COURT JUDGE FOR THE NORTHERN DISTRICT OF CALIFORNIA:

Appellant Hugo Nery Bonilla hereby requests that this court certify this matter for direct appeal to the Ninth Circuit Court of Appeals pursuant to 28 U.S.C. § 158(d)(2) based on the following:

I.    INTRODUCTION

This is an appeal from a bankruptcy court order that conflicts with well-settled precedent of both the United States Supreme Court and the Ninth Circuit Court of Appeals concerning the meaning of 11 U.S.C. § 523(a)(4), which excepts from discharge debts incurred "for fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Bankruptcy law narrowly applies this exception only to those instances where the debtor was a fiduciary pursuant to an express or statutory trust.[1] Because the bankruptcy "fresh start" policy requires that exceptions to discharge be construed strictly against the objecting creditor, the traditional application of § 523(a)(4) is quite narrow, as follows:

> "§ 523(a)(4) is aimed only at the express trust situation in which the debtor either expressly signified his intention at the outset of the transaction, or was clearly put on notice by some document in existence at the outset, that he was undertaking the special responsibilities of a trustee to account for his actions over and above the normal obligations that contracting parties have to each other in a commercial transaction."[2]

The bankruptcy court explicitly departed from precedent and bankruptcy policy by expanding the "express or statutory trust" factor to include those situations in which the debtor's fiduciary duties are "substantially similar" to those of a trustee of an express or technical trust, even where there is none. Accordingly, the court's Partial Summary Judgment, based upon the court's ruling that as a director of a Delaware corporation, Bonilla was a "fiduciary" under § 523(a)(4), must be reversed.

Under 28 U.S.C. § 158(d)(2), this appeal is proper for certification to the Ninth Circuit because (1) there is no controlling decision on the issue of whether a Delaware director is a "fiduciary" under § 523(a)(4) from the Ninth Circuit or from the United States Supreme Court, (2) there are conflicting decisions on this issue among the bankruptcy courts and (3) because an immediate appeal to the Ninth Circuit will materially advance the progress of the debtor's case as well as the proceeding.

/ / /

/ / /

/ / /

---

[1] See e.g. *Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1189 (9th Cir. 2001); *Newsom v. Moore (In re Moore)*, 186 B.R. 962, 974 (Bankr. N.D. Cal. 1995).

[2] *Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 160 (Bankr. Md. 1999), citing *Bamco 18 v. Reeves (In re Reeves)*, 124 B.R. 5, 10 (Bankr. D. N.H. 1990); see also 4 Collier On Bankruptcy (15th ed. rev.) at ¶ 523.05.

REQUEST FOR CERTIFICATION TO THE NINTH CIRCUIT COURT OF APPEAL

## II.    HISTORY OF THE DISPUTE BETWEEN ATR AND BONILLA

This history of this case shows that Bonilla's debt to ATR does not implicate 11 U.S.C. § 523(a)(4) because there was no express trust situation between Bonilla and ATR, whereupon Bonilla "either expressly signified his intention at the outset of the transaction, or was clearly put on notice by some document in existence at the outset, that he was undertaking the special responsibilities of a trustee to account for his actions over and above the normal obligations that contracting parties have to each other in a commercial transaction."[3]  Instead, ATR's claim arises from a judgment entered on December 21, 2006 by Delaware Chancery Court ("the Delaware Judgment") in the matter of *ATR-Kim Eng Financial Corporation and ATR-Kim Eng Capital Partners, Inc. v. Carlos R. Araneta, et al.*, Delaware Court of Chancery No. ICV.A. 489-A, subjecting Bonilla jointly and severally liable to Plaintiffs ATR-Kim Eng Financial Corporation and ATR-Kim Eng Capital Partners, Inc. (collectively, "ATR") for approximately $24.5 million.  (Exhibit "A" (*ATR-Kim Eng Financial Corporation and ATR-Kim Eng Capital Partners, Inc. v. Carlos R. Araneta, et al.*, Delaware Court of Chancery No. ICV.A. 489-A).)  The Delaware Chancery Court found that, as director of corporation known as PMHI, Bonilla did not participate in, approve of, or directly profit from wrongdoing by the majority shareholder.  (Ex. "A").  Bonilla's liability stems from the Court's finding that he breached his duty of loyalty to PMHI by failing to "monitor the potential that others within the organization will violate their duties," which, in turn, imposes upon directors a duty to try "'in good faith to assure that a corporate information and reporting system, which the board considers to be adequate, exists.'"  Ex. "A" at p.19, citing *Caremark, Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996).  In other words, the Chancery Court ruled that Bonilla breached the general corporate fiduciary duties imposed on all corporate directors, but did not make findings that he was a trustee of the corporate funds, nor that he did violated the terms of previously-agreed upon agreement between the directors and the shareholders whereupon the directors are impressed with special responsibilities beyond those of all other corporate directors.

---

[3] *In re Heilman*, 241 B.R. 137, 160, citing *In re Reeves*, 124 B.R. 5, 10.

REQUEST FOR CERTIFICATION TO THE NINTH CIRCUIT COURT OF APPEAL

1    Bonilla filed chapter 7 bankruptcy because ATR's judgment of $24.5 million far exceeded

2    the amount that he could ever be expected pay.  Bonilla is a hard-working man who has been

3    employed for 20 years by LBC Holdings, U.S.A. Corporation and LBC Mundial Corporation,

4    businesses engaged in money remittance and cargo shipment.  His monthly net income of $7,498

5    supports his large family, and is barely enough to cover his family's monthly expenses.

6    On July 23, 2007, ATR filed the underlying adversary proceeding.  (Ex. "B" (Complaint)).

7    Bonilla promptly moved to dismiss ATR's fourth claim for relief, which alleges that the Delaware

8    Judgment is non-dischargeable under § 523(a)(4), on the grounds that ATR did not and cannot allege

9    the elements required under § 523(a)(4).  (Ex. "C" (Memorandum of Points and Authorities

10   Supporting Motion to Dismiss Complaint)).  Specifically, the Chancery Court did not find that

11   Bonilla was a fiduciary to ATR pursuant to an express or statutory trust under Delaware state law.

12   Rather, the Chancery Court found that Bonilla breached his fiduciary duties to ATR under Delaware

13   corporate law.  Those duties fell within the realm of the broad and general definition of a fiduciary,

14   which is inapplicable to the dischargeability context and are not sufficient to support a § 523(a)(4)

15   claim.[4]

16   In support of his motion to dismiss, Bonilla analyzed the two cases which have ruled on the

17   issue of whether a director of a business incorporated in Delaware is a "fiduciary" under § 523(a)(4),

18   namely, *Miramar Resources, Inc. v. Arthur Shultz (In re Arthur Shultz)*, 208 B.R. 723 (Bankr. M.D.

19   Fl. 1997) and *Miramar Resources, Inc. v. Zachary L. Shultz (In re Zachary Shultz)*, 205 B.R. 952

20   (Bankr. N.M. 1997), and argued that only the *Arthur Shultz* decision complied with precedent

21   mandating a finding of fiduciary duties imposed under an express trust under a § 523(a)(4) claim for

22   relief.  The *Arthur Shultz* court reviewed and analyzed Delaware corporate law, and found that

23   "there is Delaware case law that states 'corporate officers and directors, while technically not

24   trustees, stand in a fiduciary relation to the corporation and its stockholders.'"  *Arthur Shultz* at 729,

25   citing *Bovay v. H.M. Byllesby & Co*, 27 Del. Ch. 381, 38 A.2d 808, 813 (Del. 1944)(citing *Guth v.*

26

27   [4] "The broad, general definition of fiduciary – a relationship involving confidence, trust and good faith – is inapplicable to the dischargeability context."  *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986).

28

1  *Loft, Inc.*, 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939).  "Therefore, as a director of Miramar,

2  Defendant may have been a fiduciary, but not a trustee under traditional Delaware corporate

3  doctrine."  *Arthur Shultz* at 729.   The court concluded that Delaware law does not impose an express

4  or statutory trust on corporate directors and thus, § 523(a)(4) is inapplicable.

5        The *Arthur Shultz* court ultimately ruled that the only situation in which a Delaware director

6  may be deemed a "fiduciary" under § 523(a)(4) is in cases where the Delaware Trust Fund Doctrine,

7  which arises when a corporation becomes insolvent as a result of the director's wrongdoing, is

8  implicated.  But Bonilla disputes this analysis because the Delaware Trust Fund Doctrine imposes a

9  *constructive trust*, rather than a true trust, as an equitable remedy where corporate directors profit

10  from their wrongdoing.[5]  Thus, even if the Delaware Trust Fund Doctrine is implicated, it does not

11  meet the § 523(a)(4) strict requirement for an express or statutory trust.[6]

12        Bonilla also argued that the second case on point, *Miramar Resources, Inc. v. Zachary L.*

13  *Shultz (In re Zachary Shultz)*, 205 B.R. 952 (Bankr. N.M. 1997), which ruled that Delaware directors

14  are "fiduciaries" under § 523(a)(4), does not comport with the strict "express trust" requirement of §

15  523(a)(4).  The *Zachary Shultz* court determined that the "express trust" requirement is simply not

16  required in § 523(a)(4) suits against corporate directors.  *Zachary Shultz* at 958, citing *In re Snyder*,

17  101 B.R. 822, 835 (Bankr. Mass. 1989).  Instead, § 523(a)(4) denies discharge of a debt owed by a

18  corporate director if the debt was "created by the person who was already a fiduciary at the time the

19  debt was created.'"  *Zachary Shultz* at 958, citing *In re Snyder*, 101 B.R. at 835.

20        ATR opposed Bonilla's motion to dismiss, urging the court to adopt a new test for liability

21  under § 523(a)(4), namely, that a debt may be deemed nondischargeable if "trust-like" duties were

22  imposed by state common-law.  (Ex. "D" (Memorandum of Points and Authorities in Opposition to

23  Defendant's Motion to Dismiss Fourth Cause of Action Pursuant to Federal Rule of Civil Procedure

24

25  [5] *Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529, 535 (Bankr. N.D. Cal. 2003).

26  [6] "We have adhered to this construction in interpreting the scope of 11 U.S.C. § 523(a)(4), refusing to deny discharge to
    those whose fiduciary duties were established by constructive, resulting and implied trusts."  *In re Hemmeter*, 242 F.3d
27  at 1189-90, citing *Runnion v. Pedrazzini (In re Padrazzini)*, 644 F.2d 756, 758 (9th Cir. 1981) and *Schlecht v. Thornton
    (In re Thornton)*, 544 F.2d 1005, 1007 (9th Cir. 1976).

28

12(b)(6))).  ATR stated that its "trust-like duties" test is supported by *Lewis v. Scott (In re Lewis)*, 97

F.3d 1182 (9th Cir. 1996), which ruled that Arizona *partners* are fiduciaries under § 523(a)(4), and

that Delaware law imposes trust-like duties on its corporate directors.  ATR distinguished *In re*

*Cantrell*, 329 F.3d 1119 (9th Cir. 2003), which determined that California corporate directors are not

fiduciaries under § 523(a)(4), on the grounds that duties imposed on California corporate directors

are grounded in agency law, but which did not mention a "trust-like duties" test.  In contrast, the

duties imposed on Delaware corporate directors are grounded in trust law.  ATR failed to explain

that *Cantrell* did not make this distinction and failed to explain why, if the Ninth Circuit has adopted

a "trust-like duties" test, it has not applied this test even once in the twelve years since *Lewis* was

issued.

On October 16, 2007, the bankruptcy court issued an order denying Bonilla's motion to

dismiss.  (Ex. "E" (Order Denying Defendant's Motion To Dismiss Plaintiff's Fourth Claim For

Relief)).  The court also issued a Memorandum Re Defendant's Rule 12(b)(6) Motion (Ex. "F"),

setting forth the court's findings of fact and conclusions of law.  The Memorandum appears to state

that Delaware law is in conflict on the issue of whether a corporate director is a trustee: while the

court found that "numerous Delaware decisions refer to directors as trustees", the court also found

that "Delaware court decisions do not, however, equate corporate directors with trustees in all

respects."  The Memorandum fails to address the fact that in *Bovay v. H.M. Byllesby & Co.*, 27

Del.Ch. 381, 393, 38 A.2d 808 (1944), the Delaware Supreme Court clarified that directors are not

trustees.  But under limited circumstances, such as upon a corporation's insolvency or, as in the

*Keenan* matter, upon their wrongdoing, a court may impose trustee duties on directors.  The

Memorandum does not cite Delaware law imposing higher or trustee duties on its corporate directors

outside of the insolvency or wrongdoing exceptions.

In support of its decision to adopt the "substantially similar" test, which no decision from the

United States Supreme Court or the Ninth Circuit Court of Appeals has even mentioned, the court

relied upon *Lewis*, 97 F.3d 1182.  The Memorandum states that *Lewis* was grounded in "state-court

decisions that imposed on partners the duties of loyalty, honesty, and fair dealing," case law

describing a partner's duties as similar to a trustee's, and statements in COLLIER ON BANKRUPTCY

that "the duties of the fiduciary need only be 'substantially similar' to those imposed on trustees." But by relying so heavily on *Lewis*, the court overlooked several material facts, namely: (1) that *Lewis* does not state that pursuant to its decision, the Ninth Circuit is now deviating from its established, narrow interpretation of "fiduciary" under § 523(a)(4) by adopting a more expansive "substantially similar" test; (2) that even if Lewis adopted a "substantially similar" test, then *Lewis* is an anomaly in the Ninth Circuit, as no other Ninth Circuit case has applied this test; (3) that *Cantrell*, discussed in both parties' briefs, refused to extend its decisions pertaining to partners under § 523(a)(4) to corporate directors; (4) that *Lewis* simply followed the Ninth Circuit's prior decision in *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir. 1986), in which the Ninth Circuit found that under California law, all partners are trustees over the assets of the partnership and thus, that California partners are fiduciaries under § 523(a)(4); and (5) that *Lewis* was grounded on uncontroverted Arizona partnership state law.

Based on the foregoing, Bonilla moved for reconsideration (Ex. "G"), which ATR opposed (Ex. "H"). ATR also filed a Motion For Summary Judgment on its fourth claim for relief (Ex. "I"), and both matters were set for hearing on December 14, 2007.

At the hearing, the court denied Bonilla's motion for reconsideration, and granted ATR's motion for summary judgment. Thereafter, the court issued a Memorandum Re Defendant's Motion for Reconsideration and Plaintiffs' Motion for Summary Judgment (Ex. "J"), an Order Denying Defendant's Motion For Reconsideration and Granting Plaintiffs' Motion For Summary Judgment On Fourth Cause Of Action (Ex. "K"), as well as a Partial Summary Judgment on Fourth Cause of Action and Rule 54(b) Certification (Ex. "L"), which Bonilla appealed on January 9, 2008.

## III.   CERTIFICATION TO THE NINTH CIRCUIT COURT OF APPEALS IS PROPER UNDER 28 U.S.C. § 158(d)

### A.   28 U.S.C. § 158(d) Mandates Certification To The Ninth Circuit

The Ninth Circuit *shall* have jurisdiction over an appeal:

if … the district court … acting on its own motion or on the request of a party to the judgment … certif[ies] that
(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions;
or
(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;
*and* if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § 158(d)(2)(A), italics added.  Although Bonilla only needs to establish that subsections (i) and (ii) are indicated, or, alternatively, that subsection (iii) is indicated, he will establish that in fact, all three subsections of § 158(d)(2)(A) are indicated and thus, certification to the Ninth Circuit is proper, as follows:

    i.    <u>There Is No Controlling Decision From The Ninth Circuit Or The Supreme Court Of The United States On The Issue Of Whether A Delaware Corporate Director Is A "Fiduciary" Within The Meaning Of 11 U.S.C. § 523(a)(4)</u>

The issue on appeal in this is whether a Delaware corporate director, such as the Appellant, qualifies as a "fiduciary" within the meaning of 11 U.S.C. § 523(a)(4).  It is undisputed that neither the Ninth Circuit Court of Appeals nor the United States Supreme Court have reviewed or determined whether a director of a corporation incorporated in Delaware is a "fiduciary" within the meaning of 11 U.S.C. § 523(a)(4).

Accordingly, subsection (i) of 28 U.S.C. § 158(d)(2)(A) is satisfied.

    ii.    <u>The Judgment Involves Questions Of Law Requiring Resolution Of Conflicting Decisions</u>

With respect to the first issue, two courts have decided whether a Delaware corporate director is a "fiduciary" under 11 U.S.C. § 523(a)(4):

a.    *Miramar Resources, Inc. v. Arthur C. Shultz (In re Arthur Shultz)*, 208 B.R. 723 (Bankr. M.D. Fl. 1997)(Delaware directors are not "fiduciaries" under 11 U.S.C. § 523(a)(4)).

b.    *Miramar Resources, Inc. v. Zachary L. Shultz (In re Zachary Shultz)*, 205 B.R. 952 (Bankr. N.M. 1997)(Delaware directors are "fiduciaries" under 11 U.S.C. § 523(a)(4))

Accordingly, both subsections (i) and (ii) of 28 U.S.C. § 158(d)(2)(A) are satisfied, and thus, Bonilla has established that certification to the Ninth Circuit is appropriate.  But certification is proper under subsection (iii) as well:

/ / /

iii.    Immediate Appeal From The Judgment May Materially Advance The Progress Of The Proceeding In Which The Appeal Is Taken

Immediate appeal from the court's judgment will materially advance the progress of the adversary proceeding, which pertains to the dischargeability of a $24 million judgment against Bonilla.  The parties have stipulated to stay enforcement of the judgment pending resolution of the appeal, but requiring the parties to wait until the district court renders a decision on the matter, followed by an inevitable appeal to the Ninth Circuit, will be highly burdensome to both parties in this matter.

Based on the foregoing, Bonilla has established that certifying this appeal to the Ninth Circuit is warranted under 28 U.S.C. § 158(d)(2)(A).

B.    The Request For Certification Is Properly Filed With The District Court Because The Appeal Is Pending Before the District Court

A matter is deemed to be "pending" in either the bankruptcy court, Bankruptcy Appellate Panel, or the district court "until the docketing, in accordance with Rule 8007(b), of an appeal taken under 28 U.S.C. § 158(a)(1) or (2)."  Fed. R. Bankr. Proc. 8001(f)(2).  Rule 8007(b), which pertains to the docketing of the appeal, states that "when the record is complete for purposes of the appeal, the clerk shall transmit a copy thereof forthwith to the clerk of the district court or the clerk of the bankruptcy appellate panel."

On January 31, 2008, the bankruptcy clerk filed the Notice of Transfer of Appeal to District Court and on February 12, 2008, the bankruptcy court filed its notice of transmittal of record on appeal to the district court.  Accordingly, this matter is pending before the district court, and thus, the request for certification is properly filed with the district court.

C.    The Request For Certification Is Timely

Under 28 U.S.C. § 158(d)(2)(E), "[a]ny request … for certification shall be made not later than 60 days after the entry of the judgment, order, or decree."  The bankruptcy court entered the Partial Summary Judgment being appealed on January 2, 2008, and thus, the deadline to file the request is March 2, 2008.  Accordingly, this request, having been filed on February 26, 2008, is timely.

/ / /

IV.    <u>CONCLUSION</u>

Based on the foregoing, certification to the Ninth Circuit is proper under 28 U.S.C. § 158(d)(2)(A).  The bankruptcy court's decision to adopt its "substantially similar" test, rather than complying with precedent from the United States Supreme Court and the Ninth Circuit requiring that the moving party establish that the debtor was a fiduciary pursuant to an express or technical trust, constitutes a radical departure from established law which will have enormous impact on all Delaware corporate directors.  This is thus a matter of high importance to corporate directors everywhere, necessitating immediate review by the Ninth Circuit.  Accordingly, Appellant prays that this court grant his request for certification to the Ninth Circuit.

DATED:  February 26, 2008                    MACDONALD & ASSOCIATES


By:    _____/s/_____
       Heather A. Cutler, Attorneys for Defendant,
       Hugo Nery Bonilla



Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**C**
ATR-Kim Eng Financial Corp. v. Araneta
Del.Ch.,2006.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
ATR-KIM ENG FINANCIAL CORPORATION, and
ATR-KIM ENG CAPITAL PARTNERS, INC.,
Plaintiffs,
v.
Carlos R. ARANETA, Hugo Bonilla, Liza Berenguer
and Marites Vicente, Defendants,
andPMHI HOLDINGS CORPORATION, (f/k/a LBC
Global Corporation), a Delaware corporation, Nom-
inal Defendant.
No. CIV.A. 489-N.

Submitted: Oct. 9, 2006.
Decided: Dec. 21, 2006.

Steven T. Margolin, Esquire, Richard D. Heins, Es-
quire, Ashby & Geddes, Wilmington, Delaware; Sid-
ney Todres, Esquire, Epstein Becker & Green P.C.,
New York, NY, for Plaintiff.
Richard D. Allen, Esquire, Thomas W. Briggs, Jr.,
Esquire, Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, for Defendants.

MEMORANDUM OPINION
STRINE, Vice Chancellor.

*I. Introduction*

**\*1** Plaintiffs ATR-Kim Eng Financial Corp. ("ATR
Financial") and ATR-Kim Eng Capital Partners, Inc.
("ATR Capital") (collectively, "ATR") own 10% of
the shares of a holding company-PMHI Holdings
Corp. (f/k/a LBC Global Corp.) (the "Delaware Hold-
ing Company"). ATR claims that defendant Carlos
Araneta, who controlled the remaining 90% of the
Delaware Holding Company's equity and served as
chairman of its board, caused the corporation to
transfer its key assets-its ownership of several busi-
nesses worth over $35 million (the "LBC Operating
Companies")-to members of his family in violation of

his fiduciary duties. The Delaware Holding Company
was formed precisely to enable ATR to share with
Araneta in the benefits of owning the LBC Operating
Companies. But, after Araneta denuded the Delaware
Holding Company of those assets, ATR was left with
only a minority stock ownership position in a
floundering joint venture that it had undertaken with
Araneta, a position that is worth very little. Mean-
while, Araneta and his family were left with sole con-
trol of the LBC Operating Companies, which, from
the record, appear to be thriving.

Furthermore, ATR claims that the other members of
the board of directors of the Delaware Holding Com-
pany, defendants Hugo Bonilla and Liza Berenguer,
are jointly and severally liable for this harm because
they failed to take any steps to monitor Araneta and
prevent his self-dealing. Bonilla was the head of
Araneta's operations in the United States, and Ber-
enguer served as the Chief Financial Officer of his
worldwide enterprise. They essentially admit that
they regarded themselves as mere employees of
Araneta and failed to take any steps to fulfill their fi-
duciary duties to the Delaware Holding Company. As
directors, they were charged with protecting the in-
terests of their corporation and its stockholders. Yet,
Bonilla and Berenguer allowed Araneta to do
whatever he wanted, without any examination of
whether his conduct benefited the Delaware Holding
Company and all of its stockholders, rather than
simply Araneta personally.

In this post-trial opinion, I find that Araneta breached
his duty of loyalty by impoverishing the Delaware
Holding Company for his own personal enrichment.
Bonilla and Berenguer also breached their duty of
loyalty. Having assumed the important fiduciary du-
ties that come with a directorship in a Delaware cor-
poration, Bonilla and Berenguer acted as-no other
word captures it so accurately-stooges for Araneta,
seeking to please him and only him, and having no
regard for their obligations to act loyally towards the
corporation and all of its stockholders. Such behavior
is not indicative of a good faith error in judgment; it
reflects a conscious decision to approach one's role in
a faithless manner by acting as a tool of a particular

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT    A

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

stockholder rather than an independent and impartial fiduciary honestly seeking to make decisions for the best interests of the corporation. Although it is clearly the case that Araneta is the most culpable of the defendants, Bonilla and Berenguer are accountable for their complicity in his wrongful endeavors.

*2 To the point of Araneta's misconduct, the sad reality is that his behavior as a director of the Delaware Holding Company and as a defendant in this litigation clearly manifests: (1) an intent on his part to defraud and injure ATR by consummating a de facto liquidation of the Delaware Holding Company in which its value was siphoned out entirely to the Araneta family, to the exclusion of ATR; (2) a willingness to put an innocent administrative employee of his at risk by falsely suggesting that she alone (rather than Araneta, Bonilla, and Berenguer as a group) comprised the board of directors of the Delaware Holding Company at the time Araneta impoverished it, all in a cynical attempt to avoid this court's jurisdiction and accountability for his own actions; (3) a contempt for the judicial process by providing a false and incomplete response to a legitimate demand for books and records under 8 *Del. C.* § 220; (4) a desire to obstruct the efficient procession of this litigation by making the discovery process unduly expensive and by failing to promptly produce required discovery; and (5) a shamelessness about telling lies so extreme as to make it impossible to address all of the numerous false statements and assertions he made both from his own lips and through theories he provided to his counsel.

Because of the difficulty of implementing a remedy that would undo the de facto liquidation of the Delaware Holding Company that Araneta effected, I enter an order requiring Araneta to pay to ATR a judgment based on the price ATR originally paid for its 10% equity stake in the Delaware Holding Company, plus pre-judgment and post-judgment interest pegged to a cost of capital determined by reference to an agreement between Araneta and ATR that provides the most reliable benchmark of the interest rate required to make ATR whole and to avoid unjustly enriching Araneta. This judgment may well understate the relief due ATR, as it appears that the LBC Operating Companies are booming. But ATR is

willing to accept this more limited remedy and it is the most efficient means of providing it fair recourse.

Given Araneta's egregious misconduct both before and during this litigation, fee shifting under the bad faith exception to the American Rule is in order. Only through such an award will ATR be made whole for the excessive costs it had to incur in order to address Araneta's faithless acts, and only through such an award will Araneta's misuse of a Delaware corporation be rectified. The fee shifting award will also extend to any collection efforts ATR must expend in attempting to collect on this judgment.

Bonilla and Berenguer will be held jointly and severally liable for the monetary judgment but not for the fee-shifting award.

## II. *Factual Background*

These are the facts as I find them after trial.[FN1]

> FN1. Citations to plaintiffs' exhibits ("PX ___"), defendants' exhibits ("DX ___"), or the trial transcript ("Tr. at ___") are illustrative. Other portions of the record often support the same findings.

### A. *Overview Of The Key Arrangements Between Araneta And ATR*

Before describing the origins of the current dispute between ATR and Araneta in more detail, it is useful to provide a basic overview of the parties and how they came to form the Delaware Holding Company.

*3 Araneta first met ATR's chairman Ramon Arnaiz when they were in kindergarten in the Philippines. During their school days, Araneta and Amaiz became close friends. After many years of friendship, the two fell out of touch as each embarked on his own career.

Araneta left the Philippines to attend college in the United States. After completing his studies, Araneta returned home to work in his family's business-an empire of companies run from the Philippines that share the initials LBC in their names (collectively, "LBC").[FN2] Araneta gained prominence by developing LBC Express, Inc. (f/k/a LBC Air Cargo), a Phil-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ippine version of Federal Express, into an international money remittance business that facilitates and profits from wire transfers made by Filipino expatriates who have gone abroad to make a living but continue to support their families still living in the Philippines. As a result of his efforts, Araneta came to dominate and control LBC and is the ultimate manager for the thousands of employees working for LBC and the hundreds of locations owned by LBC around the globe.[FN2]

> FN2. LBC Development Corp., a corporation organized and existing under the laws of the Philippines, was the primary holding company for the Araneta family businesses before the events giving rise to this dispute. Through this entity, the Aranetas owned the non-U.S. LBC Operating Companies that provided courier and money remittance services in the Philippines and to Filipino expatriates working in other nations. These entities include the following companies and their subsidiaries: LBC Domestic Franchise Co., Inc., LBC Express, Inc., LBC Mabuhay Development Philippine Corp., LBC International, Inc., and LBC Development Bank. The Aranetas also own LBC Holdings USA Corp. (overseen by defendant Bonilla), which serves Filipinos working in the United States.

> FN3. Although Araneta has at various times used his children to directly hold stock in the LBC Operating Companies, his children are subject to his will as to these matters. Araneta exercises de facto and clear control over his family's worldwide holdings.

Meanwhile, Arnaiz went into the financial services field. He gained prominence by spearheading the revitalization of a major financial firm's Hong Kong office. Following that success, Arnaiz ("A"), along with Manuel Tordesillas ("T") and Lorenzo Roxas ("R"), founded ATR, a Philippine corporation licensed to provide investment and financial services From its creation, ATR has been essentially a capital provider, helping businesses raise capital and investing its own funds (and those of its investors) in various enterprises.

In the late 1990s, Araneta and Arnaiz reunited. At that time, Araneta turned to Arnaiz and ATR for investment banking assistance on behalf of his LBC enterprise. Initially, Araneta engaged ATR to search for capital and to prepare LBC for a public offering. After a while, however, the relationship changed.

In 1999, ATR began investigating an opportunity to purchase a controlling interest in The Professional Group Plans, Inc., a corporation that sold "pre-need" insurance policies designed to cover expenses (such as educational and health costs) that buyers expected to face in the future (the "Pre-Need Company").[FN4] Seeing potential synergies in this industry between ATR's financial acumen and LBC's logistical network, which was well-positioned to attract Filipino customers who had traditionally purchased these policies, Arnaiz offered to structure the investment in the Pre-Need Company as a joint enterprise with Araneta. After some negotiation, Araneta agreed to participate in the deal ATR proposed.

> FN4. According to Araneta, "A pre-need company is like ... an insurance plan except that an insurance plan is something that you sell but you don't know when the event will happen. In the case of the pre-need, it's the same thing but a date is set." Tr. at 20. "In other words, you keep on paying monthly maybe for 20 years; and if anything happens to you within that 20-year period you can make a claim for your health or for your education." Id.

Based on this understanding, ATR and Araneta executed two contracts-an "Undertaking Agreement" [FN5] and a "Joint Venture Agreement" [FN6]-that set out the terms of their relationship and laid the groundwork for the Delaware Holding Company's incorporation. Through the Joint Venture Agreement, ATR and Araneta bought a controlling interest in the Pre-Need Company, and as part of this transaction, ATR advanced $3.922 million on Araneta's behalf (the "Advances").[FN7] In exchange for the Advances, Araneta pledged, in the Undertaking Agreement, to contribute the LBC Operating Companies along with

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

his newly acquired interest in the Pre-Need Company to a new holding company and to issue to ATR a 10% minority interest in that entity.[FN8]

FN5. PX 1.

FN6. PX 2.

FN7. The joint investment in the Pre-Need Company was made through one of ATR's subsidiaries, Professional Mutual Holdings, Inc. ("Professional Holdings") in which both Araneta and ATR had acquired 50% interests at a price of 37.5 million pesos (about $937,500) each. Using its 75 million pesos in contributed capital as well as an additional 239 million pesos nominally contributed on equal terms by ATR and Araneta (119.5 million pesos each), Professional Holdings purchased 80% of the Pre-Need Company. In this transaction, ATR advanced Araneta's portion as well as its own. As a result, Araneta owed ATR 157 million pesos (approximately $3.922 million).

FN8. The Undertaking Agreement specifically provided that Araneta would transfer the following assets to the Delaware Holding Company:
(i) LBC Domestic Franchise Co., Inc. and its subsidiaries; (ii) LBC Express, Inc. and its subsidiaries; (iii) LBC Mabuhay Development Philippine Corp. and its subsidiaries; (iv) LBC Holdings USA Corp. and its subsidiaries; (v) LBC International, Inc. and its subsidiaries (including all remittance businesses outside of LBC Holdings USA Corp.); (vi) LBC Development Bank; (vii) the foreign exchange business arising from the remittance transactions involving any and all of the above companies.
PX 1 at 2. For simplicity's sake, I refer to these as the LBC Operating Companies.

*4 To protect ATR's investment in the LBC Operating Companies, the Undertaking Agreement granted ATR contractual protections, including the right to a seat on the board of directors of any holding company that Araneta ultimately formed as well as a five-year put option, which, when exercised, required Araneta to buy out ATR's interest at the higher of (i) the issue price of ATR's shares plus a premium of between 22% and 25% per year, or (ii) the adjusted book value of ATR's shares.[FN9] Likewise, to safeguard their joint investment in the Pre-Need Company, ATR and Araneta executed a Stockholders Agreement which they attached to their Joint Venture Agreement (the "Stockholders Agreement")[FN10]. The Stockholders Agreement evenly divided the eight (out of ten) board seats secured by ATR's and Araneta's joint 80% interest in the Pre-Need Company, and unanimously appointed Topax Colayco, the residual 20% shareholder in the Pre-Need Company, to be its President and CEO.

FN9. ATR also had an option to require Araneta to cede the shares the Advances had purchased as well as all rights and interests secured by the Advances if within a period of three months from the closing of the Joint Venture Agreement the LBC Operating Companies were not transferred into the holding company. Although it is undisputed that the holding company was not formed or funded within three months, ATR chose not to exercise this option.

FN10. DX 1 at Annex "A".

Although the Undertaking Agreement did not require that the holding company it contemplated be a Delaware, or even an American, entity, Araneta perceived the United States as a favorable jurisdiction in which to raise capital and viewed Delaware as a tax haven. In particular, Araneta viewed a Delaware entity as a vehicle that could be used to access the American capital markets through an initial public offering of stock. As a result, in January 2000, Araneta incorporated the Delaware Holding Company and presented ATR with 3,000 of its shares (10%) while personally retaining control over the residual 27,000 shares (90%). Likewise, Araneta appointed and dominated the Delaware Holding Company's board of directors, which consisted of himself, defendant Berenguer (Araneta's niece and the CFO of the LBC group of companies), and defendant Bonilla (the head

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

of LBC's U.S. operations).[FN11]

> FN11. Tr. at 109-15. I also note that ATR was not permitted to exercise its contractual right to appoint a director. By letter dated June 24, 2003, Arnaiz explained, "We were never provided regular, updated financials and a board seat ... in spite of our repeated request[s]." PX 51.

Thus, after 1999, ATR and Araneta were entwined in several ways: (1) they were contractually linked through the Undertaking Agreement, the Joint Venture Agreement, and the Shareholders Agreement; (2) they shared equal shareholder and directorial interests in the Pre-Need Company; (3) they possessed inverse majority and minority shareholder interests in the Delaware Holding Company; and perhaps most importantly, (4) Araneta and ATR were tied together through Araneta's friendship with Arnaiz.

### B. *The Personal Nature Of This Dispute*

ATR's claims against Araneta boil down to an allegation that he abused his position of control over the Delaware Holding Company. Specifically, ATR claims that Araneta transferred the LBC Operating Companies from the Delaware Holding Company to his children for no consideration without notice to ATR and without following the process required by Delaware law.

Araneta does not dispute that the LBC Operating Companies are now owned by his family or that ATR has no interest in those assets through its minority ownership of the Delaware Holding Company. He merely claims never to have transferred ownership of the LBC Operating Companies to the Delaware Holding Company in the first place. He says that ATR knew that. What he never says is why ATR would have made a nearly $4 million payment to acquire 10% of an entity with no valuable assets. Further, in the event that I conclude that he is lying when he says that the Delaware Holding Company never owned the LBC Operating Companies, Araneta offers only the half-hearted and wholly-illogical defense that he was permitted to reclaim the LBC Operating Companies without payment through an accounting "offset" be-

cause he was the one who initially contributed the LBC Operating Companies to the Delaware Holding Company.

*5 To understand how a case as stark as this actually resulted in a trial, rather than a voluntary settlement by Araneta, it is useful to return to Araneta's relationship with his old friend, Ramon Arnaiz. That's right, this case is personal.

Araneta has known Arnaiz since they were five years old. As Araneta testified, he and Arnaiz were "very, very close friends, buddy buddies" who sat next to each other in classes and had parents who played mahjong together several times a week while they were growing up.[FN12] Although Araneta and Arnaiz went to different colleges, and ultimately into different careers, "whenever [they] saw each other [before this dispute], it was really a warm[ ] meeting ."[FN13]

> FN12. Tr. at 16.

> FN13. Tr. at 17.

But, as a result of their business dealings, Araneta's friendship with Arnaiz has ended. Araneta testified that he considers this case a "personal fight" between himself and Ramon Arnaiz.[FN14] He stated in his deposition and confirmed at trial that he did not think his co-directors had "anything to do with this tie-up with ATR."[FN15] And, perhaps most tellingly, he admitted on cross examination that at least "to some extent" this litigation was "over the disintegration of [his] friendship" with Arnaiz.[FN16]

> FN14. Tr. at 104.
>
> FN15. *Id.*
>
> FN16. *Id.*

That disintegration began in November 2002 when ATR sold its 50% interest in Professional Holdings, the corporation that owned 80% of the Pre-Need Company. Having closely aligned himself with Arnaiz and ATR, Araneta felt betrayed by that action. In compliance with the Shareholders Agreement, which secured ATR's right to sell its Professional Holdings shares as long as Araneta was given a right of first re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

fusal, ATR offered its shares to Araneta, but he re-
fused to purchase them.[FN17] After Araneta declined,
ATR sold its interest to Topax Colayco (the "Colayco
Sale") giving Colayco co-equal control with Araneta
over Professional Holdings and thus over Profession-
al Holdings's 80% control bloc in the Pre-Need Com-
pany. But, because Colayco already owned
directly owned the residual 20% of the Pre-Need Company that Pro-
fessional Holdings did not, Araneta understandably
viewed himself as having less leverage than Colayco
in this dynamic.

> FN17. See PX 44 (offering shares); Tr. at 59
> (rejecting offer); see also DX 1 at Annex
> "A" § 5 (describing rights and restrictions
> regarding transfers of Professional Holdings
> shares).

Notwithstanding ATR's contractual right to sell its in-
terest in Professional Holdings and Araneta's own
failure to exercise his right of first refusal, Araneta
felt victimized by Amaiz and ATR and blamed them
for subjugating him to the role of a minority investor
under Colayco's de facto control. Even though
Colayco had been a longstanding 20% shareholder in
the Pre-Need Company, had managed its day-to-day
operations as its President and CEO with Araneta's
consent, and had served on the board of the Pre-Need
Company with Araneta from the time Araneta first
invested in the Pre-Need Company, Araneta testified
that he felt as though he was "stuck running this com-
pany with a stranger."[FN18] Most important, he felt
that ATR had done the sticking.[FN19]

> FN18. Tr. at 86-90; DX 1 at Annex "A" §
> 3.03.

> FN19. Araneta testified, "When [ATR] de-
> cided to get out of the business, I said 'My
> God, that's the very essence why I got in-
> volved in this business.... I don't understand
> the pre-need business.... The very person
> you're selling it to, I don't even know. I
> came to know him because of you.... How
> can you do this to me?" Tr. at 60-61.

Araneta allowed this hostility to affect his manage-
ment of the Delaware Holding Company. After the

Colayco Sale, Araneta withheld information, effect-
ively closed the lines of communication with ATR,
and eventually transferred all of the LBC Operating
Companies out of the Delaware Holding Company.

### C. The Discovery Of Araneta's Misconduct

*6 Araneta began to exact his revenge soon after the
Colayco Sale was completed. In the months that fol-
lowed, ATR repeatedly requested information on the
condition of the Delaware Holding Company in
which it still had nearly $4 million invested. But
Araneta summarily rebuffed those requests. Araneta
testified that any request ATR made for information
during the entire 2003 calendar year went ignored be-
cause he was "no longer talking to them because [he
was] upset with Mr. Amaiz."[FN20] Throughout the
first half of that year, lawyers in the Philippines ex-
changed letters regarding the "ongoing fight"
between Araneta and Arnaiz, but were unable to re-
solve the matter.[FN21]

> FN20. Tr. at 235.

> FN21. Tr. at 233.

Fed up, ATR, through its attorneys, sent a formal
books and records demand letter to Araneta on July
18, 2003.[FN22] In that letter, ATR exercised its right
as a stockholder of a Delaware corporation to request
financial statements of the Delaware Holding Com-
pany as well as documents showing the Delaware
Holding Company's ownership of the LBC Operating
Companies and Araneta's interest in the Pre-Need
Company.[FN23] In hopes of a response, ATR sent ad-
ditional demand letters to the Delaware Holding
Company's corporate secretary at its registered ad-
dress and to Araneta's attorney in the Philippines on
the same day as it sent its letter to Araneta.[FN24]
These additional demand letters sought to review the
Delaware Holding Company's stock ledger, the re-
cords of all business transactions of the corporation,
and the minutes of every meeting of the stockholders
and directors of the Delaware Holding Corporation
since its incorporation.[FN25]

> FN22. PX 53 at 1-3. ATR copied Araneta's
> son, his lawyer, and the head of LBC's U.S.
> operations, defendant Bonilla, on this de-

Not Reported in A.2d                                                                                   Page 7
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

mand. *Id.* at 3.

FN23. *Id.* at 4-9.

FN24. *Id.* (copying Araneta, his son, and Bonilla on each).

FN25. *Id.*

Each of ATR's demand letters warned that ATR would file suit to protect its interests if its demands were denied.[FN26] Yet, even knowing legal action was imminent, Araneta testified that he was "so angry with Mr. Arnaiz" that he "ignored these letters" and prevented ATR from gaining the information it sought.[FN27] Starved for information, ATR filed an action under 8 *Del. C.* § 220 in this court on October 27, 2003. But still irked by ATR's decision to sell its interest in Professional Holdings, Araneta "deliberately ignored" that lawsuit and instructed Bonilla not to provide the requested information. FN28

> FN26. *See* PX 53 at 2 ("If we do not receive any response from you within ten (10) days ... we shall be constrained to initiate the appropriate legal actions ... to protect our client's interests."); *id.* at 5, 8 (providing similar warnings).

> FN27. *Id.* at 238.

> FN28. *Id.* at 239. Specifically, when discussing the § 220 litigation with Bonilla, Araneta told him, "Don't mind it." *Id.*

Only after being ordered by this court to turn over the records requested by ATR did Araneta do so. On January 14, 2004, Araneta produced a "Compliance" FN29 that purported to include all available documents but totaled only nine pages and failed to include many essential corporate papers.[FN30] The nine pages that Araneta did produce, however, included three documents that caused ATR great concern. Those documents-two balance sheets and a purported resolution of the board of directors-led ATR to believe that Araneta had conducted a de facto (and non-pro rata) liquidation of the Delaware Holding Company's assets and that Araneta was attempting to es-

cape responsibility for that act.

FN29. PX 54.

> FN30. In response to the pithy Compliance, ATR was permitted to depose Mr. Bonilla under 10 *Del. C.* § 368. That deposition uncovered several documents that had not been previously disclosed including the bylaws of the corporation, the corporate kit, and various financial and tax-related working papers. Finding that the corporation had not complied with its December 22 order, the court awarded ATR its attorneys' fees in prosecuting the § 220 action. Araneta's inappropriate behavior continued throughout the present litigation wherein he was repeatedly non-responsive, delayed the proceeding, and had to be admonished for exhibiting "close to contemptuous behavior" and having committed a "clear violation" of applicable rules by engaging in a "persistent pattern [of] flouting obligations that he owes under the rules of this Court and, frankly, under the Delaware General Corporation Law." *See* 4/20/04 Hearing Tr. at 10, 57, 59, 61, 67 (noting that "the horsing around, the inappropriate behavior, began long ago").

The two balance sheets that manifest the de facto liquidation are dated March 2003 and December 2003, respectively. Under Philippine accounting conventions, as adopted by the parties, both balance sheets reflect "investments" and "liabilities" in an unusual way. On the Delaware Holding Company's books, "investments" referred to the LBC Operating Companies and the Professional Holdings shares purchased for Araneta by ATR's Advances, which were to be owned by the Delaware Holding Company under the terms of the Undertaking Agreement. "Liabilities" represented the pro rata amounts due to Araneta and ATR as a result of the equity positions that each gained for their capital contributions. As of March, the Delaware Holding Company's balance sheet reflected approximately $36 million in "investments" and approximately $39 million in "liabilities." But, by December, the balance sheet showed only $937,500 in "investments" and $3.922

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

million in "liabilities." These financial statements indicated that during the last nine months of 2003 Araneta stripped the Delaware Holding Company of the LBC Operating Companies. The only operating asset he left in the Delaware Holding Company was ownership of the de facto minority position in the Pre-Need Company.

*7 A board of directors resolution Araneta produced in the Compliance is relevant to considering Araneta's intentions. In that document, dated May 22, 2003, Araneta putatively resigns his directorship along with Berenguer and Bonilla effective that day. In their stead, Araneta's secretary, Vicente, was supposedly appointed that day as the President and sole director of the Delaware Holding Company. As I discuss later, Vicente never assumed those positions and Araneta, Bonilla and Berenguer never left the Delaware Holding Company board. Araneta seems to have created this fiction in order to set up a phony defense to this court's jurisdiction and to claim that Vicente was responsible for any misfeasance at the Delaware Holding Company after May 22, 2003-a futile exercise in "plausible deniability."

### D. The Parties' Claims

Based on the balance sheets unearthed in the § 220 action, ATR filed this lawsuit on June 3, 2004. ATR's complaint alleges direct and derivative injuries caused by the removal of the LBC Operating Companies, which were valued at nearly $36 million, from the Delaware Holding Company between March and December 2003. ATR claims that it was harmed as a stockholder of the Delaware Holding Company when Araneta effectively made a $36 million liquidation payment to his family without following the required process and without distributing to ATR its pro rata portion thereof. ATR also alleges that the corporation itself was injured by this transaction because it received no substantial consideration for the transfer of substantially all of its assets to the Araneta family.

In response, Araneta mounted three shifting defenses. First, he raised a "scapegoat" jurisdictional defense based on his purported resignation from the board of directors.[FN31] Further, in the event his jurisdictional

argument proved unpersuasive, Araneta attempted to explain that contrary to his own contemporaneous admissions in e-mails, letters, and financial statements-and, yes, even tax filings-the LBC Operating Companies were never transferred into the Delaware Holding Company in the first instance because of tax issues.[FN32] Ultimately, in his deposition and at trial, perhaps recognizing the difficulties inherent in this "believe-me-now-I-was-lying-then" tax defense, Araneta proffered a half-hearted justification for the transfer of assets as an "offset" against the "liability" his family was owed for having contributed those assets.[FN33] If his implausible excuses were not expending ATR's and this court's limited resources and impeding ATR's just claim for recompense, Araneta's brazen and abundant falsehoods might be amusing. Because they have these costs, they are appalling.

> FN31. Araneta raised this defense in his very first pleading, a Motion to Dismiss or Stay filed in July 6, 2004. Araneta also made this argument as his first affirmative defense in his Answer dated August 2, 2004.

> FN32. This "tax defense" first appeared with along with the jurisdictional defense in Araneta's Motion to Dismiss or Stay. Over the two years since then, this argument gained prominence, becoming the focus of Araneta's pre-trial briefing.

> FN33. See Tr. at 253-58 (referencing deposition testimony).

#### 1. Araneta's Scapegoat Defense

In May 2003, Araneta claims that the composition of the board of directors of the Delaware Holding Company changed. Araneta asserts, based on a purported board resolution dated May 22, 2003 (the "May 2003 Resolution"), that he, Bonilla and Berenguer resigned as directors, and were replaced by one of his employees at LBC in the Philippines, Marites Vicente.

*8 Vicente is the assistant to the executive secretary to the chairman at LBC, which means that she reports directly to Araneta's secretary and ultimately to Araneta himself.[FN34] In this position, Vicente did the typing and filing for Araneta and his in-house at-

Not Reported in A.2d                                                                                          Page 9
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

torneys, who included Ronaldo Tugonon, and sat at a desk just outside Araneta's office.[FN35] As part of her responsibilities, Vicente testified that she was regularly called upon to sign documents, many of which she did not understand, at the request of her bosses-Araneta and his attorneys.[FN36] For her work, Vicente earned a salary of 11,500 pesos (less than $300) per month. Valuing her job, Vicente never refused to perform the tasks her superiors asked her to perform, and in the three years she had worked for LBC, she never mustered the courage to ask Araneta for a raise even though she believed she deserved one.[FN37] In this light, Vicente admits that her signature appears on the Compliance, the May 2003 Resolution, and other corporate documents, but she denies that she understood those documents or ever knowingly became a director and officer of the Delaware Holding Company as Araneta has suggested.[FN38]

> FN34. Vicente at 5-6.

> FN35. Vicente at 4-5.

> FN36. *See, e.g.,* Vicente at 43-45, 47, 50, 58.

> FN37. Vicente at 3-4, 23-24.

> FN38. *See, e.g.,* Vicente at 42-50, 57-58

Araneta's contention that Vicente was appointed as a director and officer of the Delaware Holding Company is likewise without support in the record. Neither the actions nor testimony of Araneta, Bonilla, Berenguer or Vicente are consistent with a complete overhaul of the board of directors of the Delaware Holding Company in May 2003. Vicente testified that she was never a director or officer of the Delaware Holding Company and that she was "surprised" to learn that she was listed as having those positions .[FN39] In fact, Vicente did not even know the name of the Delaware Holding Company and did not have any idea what the May 2003 Resolution was when it was shown to her.[FN40] Perhaps this should have been unsurprising because at his deposition, Araneta testified that he had appointed Vicente to those roles because "[s]he was there" and "[s]he looked timid."[FN41] Bonilla and Berenguer were likewise unaware of Vicente's appointment to

the board. Berenguer testified that she did not learn of Vicente's apparent appointment until October or November of 2004. [FN42] Bonilla agreed that it was "news to [him] upon receiving [the Compliance containing the May 2003 Resolution while testifying] that [Vicente] was the president and director of the company." [FN43] Even Araneta did not acknowledge the role he purportedly assigned to Vicente-failing to name her as one of his co-directors at his deposition.[FN44]

> FN39. Vicente at 56.

> FN40. Vicente at 37-38, 46-47.

> FN41. Araneta Dep. at 264.

> FN42. Berenguer at 193.

> FN43. Bonilla I at 85.

> FN44. Tr. at 259-60.

The actions of Araneta, Bonilla, and Berenguer further manifested their ongoing service as directors after May 22, 2003. On May 23, 2003, the very day after he claims to have resigned, Araneta himself approved a board resolution-which he signed as a director!-to change the name of the Delaware Holding Company (the "Name Change").[FN45] Soon thereafter, Bonilla received a copy of the Name Change, and proceeded to prepare, sign, and file a certificate amending the Delaware Holding Company's charter on June 17, 2003, in accordance with the Name Change.[FN46] Moreover, in his mind, Bonilla continued to serve as a director of the Delaware Holding Company until December 2003. [FN47] Consistent with the notion that the leadership of the Delaware Holding Company remained unchanged until late 2003 or early 2004, Berenguer testified that she was still acting in her fiduciary capacity in January 2004. [FN48] Finally, even Araneta supported this notion when he stated that his co-directors at the time he prepared a balance sheet dated December 31, 2003 were Berenguer and Bonilla, but not Vicente.[FN49]

> FN45. PX 54 at 7.

> FN46. PX 54 at 6.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 10

FN47. Bonilla I at 44-45.

FN48. *See* Berenguer at 139-45; Berenguer Ex. 2, at 21 (establishing that Berenguer signed a stock certificate as an officer of the Delaware Holding Company on January 9, 2004). I do note that Berenguer's testimony regarding her board service was a bit uncertain. She testified that she resigned from the boards of all companies except LBC Development and LBC Development Bank sometime during the period from April or May 2003 through December 2003. But, she was unable to be more specific about her resignation from the Delaware Holding Company's board than to agree that she believed she resigned "at some point after May 2003," and that she thought it might have been "[a]ny time from May ... to August." Berenguer at 82-83.

FN49. Tr. at 259-60.

*9 Thus, only the date on the May 2003 Resolution itself seems to indicate that a transition of the board of directors occurred at the Delaware Holding Company on May 22, 2003. Yet, even this resolution is suspect. At trial, ATR presented evidence that the substance, format, and notary stamps used in preparing this resolution were consistent with it being created in January 2004-at the same time as the Compliance-rather than in May 2003-a day before the Name Change.<u>FN50</u> Specifically, the Name Change refers to the Delaware Holding Company as "LBC Global Corporation," uses a type-written fill-in-the-blank format, and bears a notary stamp from Ronaldo Tugonon in a bolded, sans-serif font.<u>FN51</u> Meanwhile, both the certification of share ownership submitted in the Compliance and dated January 9, 2004 (the "Certification") and the May 2003 Resolution employ a fully-completed word-processed format, refer to the Delaware Holding Company as "PMHI Holdings Corporation (formerly LBC Global Corporation)," and carry a faded notary stamp from Tugonon in a serif typeface.<u>FN52</u> Perhaps most striking is that when confronted with these documents Araneta did not vehemently deny a charge of fabrication; instead, he claimed a convenient lack of memory.<u>FN53</u>

FN50. In his post-trial briefing, Araneta submitted the affidavit of Ronaldo Tugonon, the LBC in-house attorney who notarized each of the documents in question, which asserts that Tugonon maintained two offices and two notary stamps, and that his notary logs support the contemporaneous notarization of the May 2003 Resolution, rather than it being back-dated. Def. Post-Trial Br. Ex. 3. I do not consider this post-trial affidavit or its exhibits because it was submitted after the close of evidence at a time when ATR was unable to cross-examine Tugonon or test the merits of his affidavit. *See Stigliano v. Anchor Packing Co.*, 2006 WL 3026168, *1 (Del.Super.Ct.2006) (concluding that a post-deposition affidavit was hearsay and "not sufficiently trustworthy to allow its admission" when it had not been "tested by cross-examination"). I further note that the two-cities-two-stamps position Tugonon advances is hardly unassailable given that the "PTR" lines at the end of each notary stamp list the city of Pasay. *See* PX 59. Moreover, Tugonon's credibility is also suspect because he was likely involved, at the very least, in having Vicente sign documents in a capacity to which she was never properly appointed, which she did not understand, and which she never knowingly assumed.

FN51. PX 59.

FN52. *Id.*

FN53. Tr. at 142.

The timing of the May 2003 Resolution and the date of its appearance in this case also support ATR's claim of fabrication because this chronology establishes a motive for the creation of such a document. The May 2003 Resolution first appeared in the January 2004 Compliance-nearly six months after ATR's July 2003 demand letters put Araneta on notice of impending litigation and nearly three months after the § 220 action was filed-at a time when Araneta must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have realized that this court would not permit him to ignore ATR's demands. Moreover, when the May 2003 Resolution was produced in the Compliance, it was accompanied by balance sheets indicating that the removal of the LBC Operating Companies occurred between May 31, 2003 and December 31, 2003-after Araneta's purported resignation.[FN54] On that basis, Araneta asserted jurisdictional defenses and attempted to shift responsibility to Vicente.

> FN54. See PX 54.

In light of all the evidence presented, it is possible that the May 2003 Resolution is a back-dated fabrication. Regardless, it is clear that none of the actual Delaware Holding Company directors stood behind it. Each continued to act as a Delaware Holding Company officer and director after that date. As important, it is undisputed that Vicente never accepted appointment to the Delaware Holding Company board and was not properly appointed at any board meeting, by any stockholder vote, or by any other recognized corporate procedure.[FN55] As such, I find the board of the Delaware Holding Company at all relevant times consisted of Araneta, Bonilla, and Berenguer. Consequently, I hold that as a factual matter Vicente was never a director of the Delaware Holding Company.

> FN55. See Berenguer at 200-01 (confirming that the Delaware Holding Company did not have board meetings after January 2001, when its incorporation and funding were completed, and that there was never a formal meeting of the stockholders of the Delaware Holding Company at any time).

## 2. Araneta's Tax Defense

*10 Araneta's assertion that the Delaware Holding Company was never fully funded or operational is also one I reject as false. Araneta states that he never transferred the LBC Operating Companies to the Delaware Holding Company and that certain post-registration requirements necessary to commence business operations were never completed. As such, he contends that the plan to create and utilize the Delaware Holding Company to implement the Un-

dertaking Agreement was abandoned in May 2000 as a result of certain adverse tax consequences of that proposal. But, these tax issues were resolved by December 2000-before the Delaware Holding Company was incorporated, before Araneta confirmed the Delaware Holding Company's ownership of the LBC Operating Companies, and before Araneta caused the Delaware Holding Company to file tax returns containing that same information.

Araneta bases his tax argument on the receipt of an opinion letter from a tax specialist that identified material tax obligations that would arise if the LBC Operating Companies were transferred into the Delaware Holding Company. That letter dated May 10, 2000 expressed the opinion that:
The proposal to make [LBC], a Philippine corporation, into a subsidiary of [the Delaware Holding Company] (a U.S. corporation) by an exchange of shares raises a number of concerns ... [because] corporations formed in the U.S. are taxed by the U.S. on their worldwide income, generally at a 34% or 35% rate on income above $100,000, though with limited crediting of the foreign tax they pay on foreign income.... On the other hand, the U.S. generally has no tax claim on the profits of non-US subsidiaries of non-US corporations.[FN56]

> FN56. DX 21 at 4. Araneta also testified that he was informed that the initial transfer of assets into Delaware would create a tax liability in excess of $7.4 million. Tr. at 35 ("[T]here was a big mistake in incorporating-in putting assets in Delaware because of a very exorbitant or huge tax problem that my family or LBC was going to absorb. At some point, the amount ... was, in the tune of 7.4 to $8 million, rough estimates.").

As a result of these adverse tax consequences, Araneta testified that the Delaware Holding Company was abandoned as the implementation device and his focus shifted towards creating a holding company in Hong Kong.[FN57]

> FN57. Tr. at 222.

ATR contends that any tax issue Araneta had with the

Not Reported in A.2d                                              Page 12
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

use of the Delaware Holding Company in the months surrounding May 2000 was resolved before the end of that year. Manuel Tordesillas, ATR's chief executive officer and one of the parties who signed the Undertaking Agreement, testified that he was not made aware of any tax issues that prevented the transfer of assets to the Delaware Holding Company until the start of this litigation.[FN58] Further, because the Undertaking Agreement placed the responsibility on Araneta and LBC to organize and fund the Delaware Holding Company, Tordesillas explained that ATR was not involved in these implementation issues.[FN59]

> FN58. Tr. at 289.

> FN59. Tr. at 299-300, 383. This is unsurprising because the primary funding for the Delaware Holding Company was the transfer of assets controlled by Araneta, not ATR.

Moreover, by December 2000, ATR solicited and obtained Araneta's confirmation that he had incorporated and funded the Delaware Holding Company as part of ATR's negotiation of the sale of its 10% interest in the Delaware Holding Company to Philtread Tire & Rubber Company ("Philtread"). In connection with this sale, ATR informed Araneta of the need to complete the transactions required by the Undertaking Agreement. On December 8, 2000, Arnaiz emailed Araneta saying, "[T]o date, LBC is not in compliance with our agreement that requires LBC to set up a holding company incorporating under it all its subsidiaries."[FN60] That same day, Araneta responded:

> FN60. PX 7 at 2.

*11 PLEASE BE INFORMED THAT WE HAVE ALREADY INCORPORATED THE HOLDING COMPANY FOR YOUR ENTRY AS PER OUR PREVIOUS AGREEMENTS ........ WE HAVE ALSO RESOLVED WITH OUR TAX CONSULTANTS THE MANNER OF THE TRANSFER OF SOME ASSETS TO THE HOLDING CO[.], WE SHOULD WITHIN A WEEK OR TWO BE ABLE TO ISSUE IN THE NAME OF ATR [ITS] TEN

PERCENT OWNERSHIP AND TOGETHER WITH IT THE STOCK CERTIFICATE CORRESPONDING TO THE TEN PERCENT.[FN61]

> FN61. PX 7 at 1 (capitals and ellipses in original).

Three days later, on December 11, 2000, Araneta reiterated:
THE HOLDING COMPANY THAT WILL OWN THE "ARANETA" INTERESTS IN 100% LBC HOLDINGS USA, 100% LBC DEVELOPMENT AND 50% OF PROFESSIONAL MUTUAL HOLDINGS INC. IS LBC GLOBAL.... WE [ARE] REQUIRING LBC HOLDINGS USA AND LBC DEVELOPMENT TO ISSUE THE NECESSARY CERTIFICATES IN FAVOR OF LBC GLOBAL CORPORATION.[FN62]

> FN62. PX 8 at 1.

These emails are devastating to Araneta's claims that tax problems forced the abandonment of the Delaware Holding Company in early-to-mid 2000 and that as a result of those alleged tax problems, no assets were ever transferred to the Delaware Holding Company. Rather than demonstrate a continuing reluctance or refusal to transfer assets, the emails indicate that by December 11, 2000, any tax problems relating to the transfer of the LBC Operating Companies to the Delaware Holding Company had been resolved such that Araneta was issuing the necessary certificates to effect this transfer.[FN63]

> FN63. See PX 7, 8.

In addition to his December 2000 emails, Araneta personally confirmed that the Delaware Holding Company owned the LBC Operating Companies on two separate occasions in 2001. On January 22, 2001, Araneta signed a deed of adherence letter (the "Deed of Adherence") in both his personal capacity and as chairman of LBC Development attesting to the transfer of the LBC Operating Companies to the Delaware Holding Company.[FN64] Six months later, on July 26, 2001, Araneta executed, in his personal capacity and on behalf of the Delaware Holding Company, a confirmation letter (the "Confirmation Letter") clari-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

fying the Deed of Adherence and providing a balance sheet indicating that assets were owned by the Delaware Holding Company as of March 31, 2001.FN65

FN64. PX 20.

FN65. PX 27.

The Deed of Adherence explicitly confirmed the formation and funding of the Delaware Holding Company. It verified that:

[T]he holding company referred to as LBC HoldCo [the Delaware Holding Company] in the Undertaking Agreement has now been duly incorporated under the laws of the State of Delaware, U.S.A. and is named "LBC Global Corporation" which now owns, directly or indirectly, the Professional Holdings Shares, the Professional Holdings Advances, all the shares and interest in LBC and all the shares and interests in the companies and businesses which are owned and controlled by [Araneta], as follows:

(i) LBC Domestic Franchise Co., Inc. and its subsidiaries;

(ii) LBC Express, Inc. and its subsidiaries;

(iii) LBC Mabuhay Development Philippine Corporation and its subsidiaries;

(iv) LBC Holdings USA Corp. and its subsidiaries;

*12 (v) LBC International, Inc. and its subsidiaries (including all remittance businesses outside of LBC Holdings USA Corporation);

(vi) LBC Development Bank;

(vii) the foreign exchange business arising from the remittance transactions involving any and all of the above companies.FN66

FN66. PX 20 at 1-2.

Likewise, the Deed of Adherence included Araneta's consent to ATR's transfer of its interest in the Delaware Holding Company to Philtread and ATR's affiliation with Philtread going forward.

The drafting history of the Deed of Adherence reinforces Araneta's contemporaneous representations. Araneta originally agreed to provide the Deed of Adherence in the Undertaking Agreement, and confirmed that intention on January 9, 2001 in an email

to ATR.FN67 He received an initial draft of the Deed of Adherence on January 10, 2001, and an electronic version the following day.FN68 Araneta and his attorneys revised the Deed of Adherence and sent it back to ATR for comments.FN69 ATR further revised the document to provide for ownership "directly or indirectly" of the assets by the Delaware Holding Company and to clarify language allowing the transfer of the assets to a Hong Kong entity only "provided, that all the assets ... shall *remain* owned and held by a single holding company, and that ATR shall in any event own and hold 10% of the capital stock of the same holding company." FN70 Neither Araneta nor his attorneys amended or renounced the claim that the LBC Operating Companies had, in fact, been transferred to the Delaware Holding Company, and Araneta executed the final version of the Deed of Adherence guaranteeing ATR's right to 10% of those assets.

FN67. Tr. at 170-71.

FN68. PX 15.

FN69. PX 18.

FN70. PX 19 at 1-2 (emphasis added).

The Confirmation Letter signed six months later reaffirmed the formation of the Delaware Holding Company and its ownership of the assets in both its text and in the balance sheet it incorporated as an attachment. The Confirmation Letter clearly stated:

As contemplated in the Undertaking Agreement and the [Deed of Adherence], LBC Global Corporation [i.e., the Delaware Holding Company] ... now owns directly or indirectly, the Professional Holdings Shares, the Professional Holdings Advances, all the shares and interest in LBC Development Corporation and the companies and businesses listed in the Undertaking Agreement which are owned and controlled by Mr. Carlos R. Araneta.FN71

FN71. PX 27 at 1.

Likewise, the balance sheet dated March 31, 2001 that was attached to the Confirmation Letter illustrated the Delaware Holding Company's recognition

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

of both its ownership of the LBC Operating Companies as assets and its pro rata liabilities to the Araneta family and ATR as described in the text of the letter.FN72 On the balance sheet, LBC Holdings USA, LBC Development, and Araneta's Professional Holdings shares are all listed under assets as "Investments" having a value of $36,235,500 at cost.FN73 Likewise, the balance sheet shows "Liabilities" of $39,220,000, represented as $3,922,000 "due to" ATR as well as a $35,298,000 "accounts payable" entry for the Araneta family.FN74 These "Liabilities" correspond exactly to the relative ownership of the Delaware Holding Company-10% to ATR and the remaining 90% to Araneta.

> FN72. The Confirmation Letter explained the unique accounting methods used for the contribution of the assets. ATR and Araneta's contributions, although infusions of cash generating equity ownership interests, were recognized as liabilities due to the shareholders under a Philippine accounting practice. The Confirmation Letter clarified that the liabilities reflected on the balance sheet as a result of this transaction were payable pro rata based on percentage share ownership, much like dividends would be paid on equity. Specifically, the Confirmation Letter explained that "[a]ny conversion of all or any portion of the liabilities into equity shall be effected by LBC Global pro rata in proportion to the outstanding amount owed to each of the holders thereof," and "[a]ny full or partial payment or prepayment by LBC Global of the liabilities shall be made to all holders thereof pro rata in proportion to the amount owed to them respectively." PX 27 at 1-2.

> FN73. *Id.* at Annex "A."

> FN74. *Id.*

*13 In addition to Araneta's representations of the Delaware Holding Company's ownership of the assets, disclosures and financial statements by others affiliated with the Delaware Holding Company con-firm that the corporation held controlling interests in the LBC Operating Companies from 2001 through 2003. Berenguer created a balance sheet identical to the one discussed above on July 19, 2001 in preparation for its inclusion in the Confirmation Letter.FN75 Victor Marquez, the Delaware Holding Company's accountant, distributed another copy of that very same balance sheet in the corporation's financial statements dated March 2001 and March 2002 FN76 and proffered it under the pains and penalties of perjury to the State of Delaware and the federal government as part of the corporation's tax returns filed for 2001 and 2002.FN77 In fact, no financial statement prepared between the balance sheet incorporated in the July 2001 Confirmation Letter-which Berenguer testified to have double checked before submitting FN78-and the balance sheet dated May 31, 2003 prepared by Araneta and submitted in connection with his Compliance in the § 220 action that preceded this dispute ever showed any combination of assets, liabilities, and equity inconsistent with the Delaware Holding Company's ownership of the LBC Operating Companies.

> FN75. PX 23. Berenguer also testified to the Delaware Holding Company's ownership of the LBC Operating Companies on at least seven different occasions during her testimony. *See* Berenguer at 88-89, 155, 174, 177, 186, 201, 281.

> FN76. *See* PX 25; PX 47.

> FN77. *See* PX 41; PX 50.

> FN78. Berenger testified that she was "double careful" in reviewing the figures on the balance sheet, and that she "cross-checked them against the letter" before she or Araneta signed off on them. Berenguer at 153-55.

On the basis of this contemporaneous record and as a predicate to my ultimate decision in this case, I conclude that the Delaware Holding Company owned the LBC Operating Companies. Correspondingly, I find that Araneta's testimony to the contrary was self-serving and untruthful.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 15
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

### 3. *Araneta's Offset Defense*

Araneta's final defense is a semantic attempt to disguise the unfairness of his removal of the LBC Operating Companies. To explain the differences in the March 2003 and December 2003 balance sheets, Araneta testified that he had "offset" the roughly $36 million in assets he had removed from the Delaware Holding Company, i.e., the LBC Operating Companies, against the liability the Delaware Holding Company showed as "payable" to his family in the same amount. [FN79] He maintains that the Delaware Holding Company is better off as a result of this transaction because of this decrease in its liabilities. [FN80] But, Araneta still claims control over 90% of the equity in the Delaware Holding Company and never indicated that the assets had been transferred to any other holding company in which ATR would have a minority interest. [FN81]

> FN79. When asked whether he had "offset the LBC assets-LBC Holdings and LBC Development-which added up to roughly 36 million ... against the Araneta advance liability that equaled the same 36 million," Araneta answered, "Yes. I think so, yes." Tr. at 253-54. Moreover, Araneta agreed that he "didn't consult with anyone when [he] did that." *Id.* at 254.

> FN80. *Id.*

> FN81. *Id.*

This "offset" defense does not withstand even minimal scrutiny. Despite the nomenclature on the financial statements, which characterize the contributions of the Advances and the LBC Operating Companies as "liabilities" rather than "equity," there is no dispute that the LBC Operating Companies were contributed in exchange for Araneta's 90% equity interest. Moreover, the Deed of Adherence and Confirmation Letter explain that any distributions out of the Delaware Holding Company would be paid pro rata on the majority and minority equity investments. No pro rata payment was made to ATR, and Araneta did not forfeit his equity position in the Delaware Holding Company when he cashed out the assets that he

initially contributed. Thus, this scenario is even further removed than a non-pro rata exchange accompanying the retirement of the majority equity stake, which would liquidate one investor's stake and leave the remaining investor in complete control of the remaining assets. Here, the majority investor claims not to have given up his equity position even though it withdrew the entirety of its investment.

*14 It is illogical that ATR would be in a better position owning 10% of what had essentially become a shell corporation than it had been in while indirectly owning a share of the LBC Operating Companies. After the removal of the LBC Operating Companies, ATR's interest in the Delaware Holding Company was essentially a 10% stake in Araneta's minority position in the Pre-Need Company. [FN82] If such a result were permitted to stand, it would unjustly enrich Araneta because after removing the same assets that he initially contributed he would have gained an indirect interest in the Pre-Need Company for nothing. That result is untenable, especially because ATR paid the costs of acquiring the Pre-Need Company out of its coffers in 1999. Thus, no legitimate offset could have taken place.

> FN82. Tr. at 256-58.

Factually, then, Araneta's "offset" argument is without basis. Unlike some scenarios in which there may be a dispute as to the values given or received, this is a straightforward self-dealing case in which Araneta took something for nothing. His secretive conduct reinforces this point. [FN83] Thus, I find the factual predicate for Araneta's "offset" argument has not been satisfied.

> FN83. Araneta admitted that he alone decided to carry out this transaction without consulting with anyone, without notifying the other directors, and without informing ATR. Tr. at 254, 260.

### E. *The Philippine Litigation Front*

After ATR filed its § 220 action in Delaware and was met with Araneta's first instance of litigation abuse, it was sued by Araneta in the Philippines. In that action, Araneta sought, among other relief, the annulment of

the Undertaking Agreement and Joint Venture Agreements on the grounds that ATR fraudulently concealed the implications, risks and consequences involved in the acquisition of the Pre-Need Company.FN84 In response, ATR sought a declaration of validity and judicial approval of the Colayco Sale.

> FN84. Def. Post-Trial Br. Ex. 1 at 1. Jurisdiction for this contractual dispute was established in the Philippines based on forum selection clauses in both the Joint Venture Agreement and Undertaking Agreement providing: "Each of the parties irrevocably consents to the exclusive jurisdiction of the courts of the National Capital Judicial Region with respect to any action or proceeding relating to this Agreement." PX 1 at 5; DX 1 at 8.

In the end, Araneta lost his case in the Philippines decisively. The Regional Trial Court refused to annul any of the contracts between the parties.FN85 In upholding the validity of the Joint Venture Agreement and the Undertaking Agreement, the Regional Trial Court found that "there was no incident present in the case that would destroy the freedom of Araneta to enter in the agreements" and described Araneta's grounds for annulment to be "sham and contrived." FN86 It dismissed Araneta's complaint and entered judgment for ATR on January 24, 2006.

> FN85. Def. Post-Trial Br. Ex. 1 at 4.

> FN86. Id. at 3-4.

Following that decision, Araneta moved for reconsideration and ATR moved to enforce its rights under § 5 of the Undertaking Agreement, which granted ATR a put option whereby ATR could require Araneta to purchase its interest in the Delaware Holding Company. After reviewing the claims, on May 8, 2006, the Regional Trial Court reaffirmed the validity of the Undertaking Agreement and amended its previous decision to include the implementation of the provisions of § 5 of the Undertaking Agreement.FN87 As such, the court found Araneta "liable for the aggregate subscription or issue price of

the [Delaware Holding Company] shares and the premium of 25% per annum." FN88 Araneta, of course, appealed that judgment. The parties indicate that the appellate process in the Philippines could take many years to complete.

> FN87. Def. Post-Trial Br. Ex. 2 at 2.

> FN88. Id. at 3.

### III. Legal Analysis

*15 With this backdrop in mind, I begin my analysis with Araneta's suggestion that this court is not the proper forum for ATR's claims. I next turn to Araneta's disloyal conduct and false disclosures while serving as the dominant director and controlling stockholder of the Delaware Holding Company. Then, I focus on the other directors-Bonilla and Berenguer-and take up the questions regarding their responsibility to monitor Araneta's conduct. Finally, I address the appropriate relief to be awarded, including whether to grant ATR's request for an award of imposition of attorneys' fees and costs.

### A. Delaware Is The Proper Forum For ATR's Claims

Araneta contends that the entirety of his dispute with ATR should have been resolved in the Philippines under the terms of the forum selection clauses of the Joint Venture Agreement and the Undertaking Agreement. But, in this court, ATR has premised its claims entirely on the fiduciary duties Araneta, Berenguer, and Bonilla owed to it as directors of a Delaware corporation, not on any other contractual duties that may exist between the parties. As such, this court may properly decide ATR's Delaware law claims.

Under the teaching of *Parfi Holding AB v. Mirror Image Internet, Inc.,* FN89 ATR was not required to press its Delaware law claims in the Philippines, as they do not "depend on the existence" of the Undertaking Agreement or Joint Venture Agreement for their viability.FN90 When sued by Araneta in the Philippines, ATR had no practical choice but to invoke its contractual remedies as defenses. By doing so, ATR did not waive claims it had against Araneta that are grounded in other legal and equitable duties Araneta owed to it that were not contractual in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

nature.

> FN89. 817 A.2d 149 (Del.2002).

> FN90. *See id.* at 155-57 (explaining that "fiduciary duties ... consist of a set of rights and obligations that are independent of any contract" and can only be limited in their assertion by contractual provisions when "the claims based on fiduciary duties touch on the obligations created in the [contract]").

Here, ATR simply seeks to finish the process it began in July 2003, before Araneta filed his action in the Philippines, when it first began to pursue Araneta for breaching his duties as the director of a Delaware corporation. The existence of the Philippine litigation provides Araneta no defense. If he wished to escape this court's jurisdiction in responding to claims against him as a Delaware director, he needed to secure an explicit right to that effect. He did not do so and this court is available to ATR for it to seek redress as a stockholder of a Delaware corporation. Because ATR's claims alleging breaches of fiduciary duty by Araneta-as well as his co-directors Bonilla and Berenguer-arise independently of the parties' contracts, ATR does not seek an impermissible double recovery.

### B. *Araneta Breached His Duty Of Loyalty By Stripping The Delaware Holding Company Of Its Major Assets For No Consideration*

ATR's allegations against Araneta are clear-cut claims of self-dealing by a controlling shareholder and director of a Delaware corporation. Araneta does not contest that he was the controlling shareholder of the Delaware Holding Company, and I have already found that his factual argument that he was not a director at all relevant times is without merit. Similarly, I have found as a fact that Araneta removed from the Delaware Holding Company its primary assets-its ownership of the LBC Operating Companies. In its financial statements and tax filings, the Delaware Holding Company had valued this ownership interest at over $36 million.[FN91] Yet, by the end of 2003, this value had disappeared from the Delaware Holding Company's books. To where did Araneta remove

the assets? To his family. What did the Delaware Holding Company receive in exchange? Effectively nothing. Araneta did not even reduce his 90% interest in the Delaware Holding Company when he repossessed the very assets that had secured that interest in the first place. Araneta simply took the LBC Operating Companies back in a fit of pique.

> FN91. *See* Tr. at 254.

**\*16** The standard of review to evaluate this self-dealing is, of course, the entire fairness standard.[FN92] As a director, Araneta had a duty of loyalty to the Delaware Holding Company to act in the best interests of the corporation and its shareholders and in a manner such that there would be "no conflict between [his] duty and [his] self-interest."[FN93] Thus, as the director who conceived of and carried out the transfer of the LBC Operating Companies from the Delaware Holding Company to members of his family for no value, Araneta bore the burden of establishing the fairness of this transaction.[FN94]

> FN92. *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.").

> FN93. *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939).

> FN94. *See Chaffin v. GNI Group, Inc.,* 1999 WL 721569, at \*5 (Del. Ch.1999) (finding that a father "must be deemed 'interested' in a transaction from which his child stood to benefit substantially in career and economic terms" and that "the entire fairness standard would apply").

Likewise, as the majority stockholder of the Delaware Holding Company, Araneta owed fiduciary duties to the minority shareholders of the corporation when dealing with the corporation's property.[FN95] In this role, Araneta was prohibited from using his position of control to extract value from the corporation to the exclusion of, and detriment to, the minority stockholders.[FN96] Consequently, in this capacity as

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

well, the law imposed upon Araneta the obligation to prove that the transfer he structured using his total dominion over the Delaware Holding Company's affairs was fair to the minority rather than an extraction of value to their detriment.[FN97] Araneta did not do that.[FN98]

> FN95. *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109-10 (Del.1952).

> FN96. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971).

> FN97. *See id.* at 721 (explaining that where a parent corporation "would be receiving something from [its] subsidiary to the exclusion of and detrimental to [the subsidiary's] minority stockholders" the combination of that "self-dealing, coupled with the parent's fiduciary duty, would make intrinsic fairness the proper standard").

> FN98. This fraudulent transfer also involved a sale of substantially all of the Delaware Holding Company's assets and had to be performed consistently with 8 *Del. C.* § 271, which sets forth the procedures required to complete such a transaction. ATR has asserted, without contradiction from Araneta, that these procedures were not followed, and specifically that no shareholder vote took place. For his part, Araneta testified that he did not even inform ATR or his fellow directors about his removal of the LBC Operating Companies. Tr. at 254-55.

In this case, Araneta has not disputed these principles or even advanced an argument under the entire fairness rubric. Indeed, quite obviously, what Araneta did was not fair to the Delaware Holding Company or its minority stockholder, ATR. Araneta's only major defense is his factual claim that the assets were never transferred into the Delaware Holding Company. On this basis, Araneta asserts, without citation to any legal authority, that entire fairness review cannot attach to his transfer of the LBC Operating Companies. That is, Araneta rests his entire case on a factual claim which I reject.[FN99]

> FN99. Because I reject the factual underpinning of Araneta's argument, I need not decide the legal issue he presents. But, I doubt that Delaware law would permit a fiduciary who contracted to convey assets to a corporation when soliciting a minority shareholder's investment and who later confirmed the corporation's ownership of those assets while serving as a director of that corporation to escape liability for redirecting those assets away from the corporation merely because the fiduciary "cut out the middleman" and never honored his obligation to place the assets into the corporation's accounts in the first place. Fiduciary duties do not attach only when assets are transferred but rather arise "where one person reposes special confidence in another, or where a special duty exists on the part of one person to protect the interests of another, or where there is a reposing of faith, confidence, and trust, and the placing of reliance by one person on the judgment and advice of another." *Lank v. Steiner*, 213 A.2d 848, 852 (Del. Ch.1965), *aff'd*, 224 A.2d 242 (Del.1966). From the moment Araneta became a director of, and ATR became a stockholder of, the Delaware Holding Company, Araneta had an obligation to enforce the Delaware Holding Company's right to ownership of the LBC Operating Companies for the benefit of the corporation and its shareholders that paralleled but existed independently from his contractual duty to cause the same transfer to occur. *See Legatski v. Bethany Forest Assoc., Inc.*, 2006 WL 1229689, at *6 (Del.Super.Ct.2006) (recognizing that contractual and fiduciary duties are not mutually exclusive).

That factual claim is ridiculous. Araneta asserts that for tax reasons he never did what he and his allies said he had done in numerous documents-including the corporation's tax filings!-that is, transfer control of the LBC Operating Companies to the Delaware Holding Company. Araneta says he was pondering using a Hong Kong company instead. But a written

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 19

agreement with ATR indicates that if Araneta wished to transfer the LBC Operating Companies to a Hong Kong entity, it could only do so on specific contractual terms. No evidence of such a transfer exists. Most important of all, it is preposterous to believe that ATR was willing to allow Araneta to keep the LBC Operating Companies for himself, rather than transferring them into some other corporation, whether located in the Philippines, Hong Kong, or elsewhere, in which ATR would have a 10% interest.

Recognizing that this claim might well be found ludicrous, Araneta and his counsel propounded an equally unpersuasive defense. They try to claim that the LBC Operating Companies were transferred to Araneta's family to extinguish a $36 million debt owed to the Aranetas by the Delaware Holding Company. On cross-examination, Araneta opined that the Delaware Holding Company was better off following the transaction because he "offset" these assets against a "liability" that the corporation owed to his family.[FN100]

FN100. Tr. at 256-57.

*17 Nothing in the record supports this position. The liability that Araneta purported to offset arose as a result of his contribution of the LBC Operating Companies and was valued based on Araneta's 90% ownership stake. But, following his so-called offset, Araneta testified that he maintained his 90% ownership.[FN101] Thus, ATR was left with a 10% stake in what is now effectively a shell corporation devoid of its primary operating assets, while Araneta and his family gained a windfall by retaining a 90% interest in the Delaware Holding Company's remaining assets-primarily the minority interest in the Pre-Need Company-without giving any substantial value in exchange. Suffice it to say that Araneta could not point to any fairness-enforcing procedures that he used to come up with this blatantly unfair transaction. Rather plainly, any director, officer, or advisor acting in good faith would have protested that the transaction was fraudulent.

FN101. Tr. at 258.

The evidence in this case is clear, and Araneta's at-

tempts to distort that reality only make his conduct less tolerable. Araneta used his majority control and effective dominion over the Delaware Holding Company and its board of directors to engage in a course of unfair dealing that resulted in a de facto liquidation of corporate assets that enriched the Araneta family at the expense of the Delaware Holding Company and ATR.

### C. If The Delaware Holding Company Never Owned The LBC Operating Companies, Araneta Breached His Duty Of Loyalty By Knowingly Disclosing False Information

In order to dispute his self-interested transfer of the LBC Operating Companies, Araneta testified that the Deed of Adherence and Confirmation Letter he signed and sent to ATR while he was a director of the Delaware Holding Company were false. These documents confirmed, both in express representations of fact and through financial statements showing the corporation's assets, that the Delaware Holding Company owned the LBC Operating Companies. But, Araneta testified at trial that he and ATR knew the ownership representations to be false at the time he signed the documents containing them. As I have explained, I find this "believe-me-now-I-was-lying-then" defense to be without merit. Yet, even if I were to accept the factual predicate to Araneta's argument, it would not aid Araneta in escaping liability.

As a corporate fiduciary, Araneta was required to be candid in all of his communications concerning the Delaware Holding Company's financial condition. As our Supreme Court explained in *Malone v. Brincat*, the fiduciary duty of loyalty prohibits a director from lying to the stockholders.[FN102] Thus, "[i]t necessarily follows from *Malone* that when directors communicate with stockholders, they must recognize their duty of loyalty to do so with honesty and fairness." [FN103] As such, a stockholder may carry its burden by establishing that a director breached his or her "fiduciary duty of loyalty ... by knowingly disseminating to the stockholders false information about the financial condition of the company." [FN104]

FN102. 722 A.2d 5, 12 (Del.1998).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN103. *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 390 (Del. Ch.1999).

FN104. *Malone,* 722 A.2d at 10.

*18 ATR has met its burden here. If Araneta's testimony in court is to be believed, he himself admits that his statements in the Deed of Adherence and in the Confirmation Letter were lies. Araneta testified: "The truth is, I signed these documents. And when I signed these documents they were not true. I signed these documents, but the assets were not transferred to Delaware."<sup>FN105</sup> Moreover, Araneta confirmed that he understood that he was signing the Confirmation Letter "at the request of ATR for [the] Filipino Stock Exchange" and that he knew public shareholders would be seeing this information in some form.<sup>FN106</sup> Thus, in Araneta's own words, neither the representations in the Deed of Adherence, the Confirmation Letter, nor the financial statements attached thereto provided an accurate picture of the Delaware Holding Company, and he knew it.

FN105. Tr. at 206-07.

FN106. Tr. at 200.

Araneta's defense to these admissions-that ATR should have known the falsity of the statements-is without merit. According to Araneta's tale, told for the first time at trial, Arnaiz pressured him to sign these documents and he gave in to that pressure to support his friend and to curry favor with the Philippine government because the brother of the Philippine President was involved with ATR.<sup>FN107</sup> Although in Araneta's story ATR requested the letters, that fact does not establish that ATR knew the information therein to be untrue. Only Araneta's claim that he told Arnaiz that those statements were false purports to do that.<sup>FN108</sup> Based on the ever-shifting positions taken by Araneta throughout this litigation, the conflict between his testimony on the witness stand and the contemporaneous emails he sent in December 2000, and the lack of any records indicating ATR's knowledge that the assets were not owned by the Delaware Holding Company after Araneta stated that the tax issues had been resolved, I do not credit Araneta's testimony.

FN107. Tr. at 42-47.

FN108. Araneta also argues that various communications sent to ATR regarding the purported tax and other hurdles to making the Delaware Holding Company operational between November 1999 and April 2000 provided notice to ATR that the assets had not been transferred to the Delaware Holding Company. *See* DX 5-21. But, the timing of these communications undercuts their value. Following these communications, Araneta sent an e-mail in December 2000 expressly stating that "WE HAVE ALSO RESOLVED WITH OUR TAX CONSULTANTS THE MANNER OF THE TRANSFER OF SOME ASSETS TO THE HOLDING CO." PX 7 at 1 (capitals in original). The only communication on this topic that Araneta sent after this date, an e-mail dated January 3, 2001, does not list anyone at ATR as a recipient. DX 22.

Consequently, I find that even if Araneta did not transfer the LBC Operating Companies to the Delaware Holding Company, he still violated his fiduciary duties to ATR on an alternate basis. Specifically, I hold that if the LBC Operating Companies were never owned by the Delaware Holding Company, Araneta breached his duty of loyalty to ATR by knowingly disclosing false information concerning the Delaware Holding Company, including false financial statements indicating its ownership of the LBC Operating Companies.<sup>FN109</sup>

FN109. Moreover, as a director of the Delaware Holding Company, Araneta had a duty to seek recourse against himself-odd, but true-if he failed to deliver the stock of the LBC Operating Companies to the Delaware Holding Company. Of course, I find that his breach occurred later, when he stripped the Delaware Holding Company of those Companies' stock. But either way, Araneta breached his fiduciary duties.

ATR has also brought a fraud claim against Araneta. Given that this claim is identical to ATR's *Malone*

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

claim but would arguably involve more stringent standards,[FN110] and because I have already found that the transfer occurred and was substantially unfair, I need not reach it. Insofar as reasonable reliance is required, ATR has shown that after being informed that the Delaware Holding Company owned the LBC Operating Companies, it acted on that information.

> FN110. Delaware's standards of fiduciary disclosure are specialized applications of fraud standards. As a result, a plaintiff is rarely better off pressing garden-variety common law fraud claims when a more tailored fiduciary disclosure claim can be pursued. *See Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121, 156 (Del.Ch.2004) ("[T]he standards that a fiduciary faces are tougher than the common law and equitable fraud standards, which always require proof of reasonable reliance.").

In a transaction that closed in November 2001, ATR sold its 10% interest in the Delaware Holding Company to Philtread, reinvesting the entire proceeds of the sale as well as roughly $1.2 million in additional capital back into Philtread to create an Internet service and fulfillment business. ATR intended to use the LBC Operating Companies as part of the fulfillment side of its business model for Philtread. More importantly, because Philtread was publicly listed on the Philippine Stock Exchange, ATR made representations to the Philippine equivalent of the U.S. Securities and Exchange Commission and to outside investors that the Delaware Holding Company was "the ultimate holding company for all the LBC operations," including the LBC Operating Companies, among others, based on Araneta's express confirmation of those facts in the Deed of Adherence and Confirmation Letter he signed while a director of the Delaware Holding Company.[FN111] As such, to the extent that ATR cannot hold Araneta accountable by receiving a remedy for his actions in never giving up ownership of the LBC Operating Companies, ATR has exposed itself to liability by endorsing and disseminating Araneta's false statements.

> FN111. PX 32 at 33 (describing the

Delaware Holding Company in Philtread's public disclosures); *see also* PX 20 (Deed of Adherence); PX 27 (Confirmation Letter) (containing Araneta's express representations).

**\*19** Of course, I ultimately conclude that Araneta did originally hand over the LBC Operating Companies to the Delaware Holding Company and that the Delaware Holding Company did own those assets for over two years-from at least January 22, 2001, when Araneta attested to that fact in the Deed of Adherence, to May 31, 2003, the date of the last balance sheet showing ownership of those assets-before Araneta stripped them away for no value. But, either way, Araneta has caused harm to ATR.

### D. Bonilla And Berenguer Acted As Stooges For Araneta And Failed To Take Any Steps To Perform Their Duties As Fiduciaries

I now come to a slightly more difficult issue. Namely, to what extent should Araneta's fellow directors, Bonilla and Berenguer, share responsibility for harming the Delaware Holding Company and ATR?

Making this more challenging is that ATR does not allege that either Berenguer or Bonilla participated in, approved of, or directly profited from Araneta's removal of the LBC Operating Companies. Rather, ATR claims that Bonilla and Berenguer consciously breached the important duties articulated in this court's *Caremark*[FN112] decision and recently reaffirmed by our Supreme Court in *Stone v. Ritter*.[FN113] Specifically, ATR alleges that Bonilla and Berenguer failed to monitor Araneta's conduct thereby allowing his self-dealing to continue.

> FN112. *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del.Ch.1996).

> FN113. 911 A.2d 362, 2006 WL 3169168 (Del.2006).

Under Delaware law, it is fundamental that a director cannot act loyally towards the corporation unless she tries-i.e., makes a genuine, good faith effort-to do her job as a director.[FN114] One cannot accept the im-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

portant role of director in a Delaware corporation and thereafter consciously avoid any attempt to carry out one's duties.

FN114. See *Guttman v. Huang,* 823 A.2d 492, 506 & n. 34 (Del. Ch.2003).

One of the most important duties of a corporate director is to monitor the potential that others within the organization will violate their duties. Thus, "a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board considers to be adequate, exists."[FN115] Obviously, such a reporting system will not remove the possibility of illegal or improper acts, but it is the directors' charge to "exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary questions, so that it may satisfy its responsibility."[FN116] Thus, as the Supreme Court recently stated:

FN115. *Caremark,* 698 A.2d at 970.

FN116. *Id.*

*Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.[FN117]

FN117. *Stone,* 911 A.2d 362, 2006 WL 3169168, at *17.

**\*20** From the testimony of the directors of the Delaware Holding Company, it is apparent that no re-

porting system was in place and that no other information systems or controls were ever considered, let alone implemented, by the Delaware Holding Company's board of directors. They did not even have regular board meetings. As a result, the directors were often unaware of corporate activities-despite how easy that would have been given the Delaware Holding Company's modest size. Berenguer testified that although there had been meetings regarding the Delaware Holding Company before the LBC Operating Companies were transferred into the corporation in January 2001, she did not remember any meetings of the board of directors or of the shareholders after that time.[FN118] Bonilla confirmed this fact, explaining that when the Delaware Holding Company's name was changed from LBC Global, Corp. to PMHI Holdings, Corp., he was never informed about the change, never voted to approve it, and did not even know what the initials PMHI in the new corporate name stood for at the time he signed the certificate of amendment as the corporation's authorized agent.[FN119] Even when corporate activities involved them directly-as in the case of their supposed resignations from the board of directors-neither Berenguer nor Bonilla questioned the wisdom of Araneta's actions nor insisted that corporate procedures be followed.[FN120]

FN118. Berenguer at 201.

FN119. Bonilla I at 175-76; *see also* PX 54 at 6-7.

FN120. Notwithstanding the issues regarding the date of their resignation as directors, the process by which Berenguer and Bonilla were removed by Araneta is telling. Bonilla testified that he received a phone call from Araneta informing them that he was no longer a director of the Delaware Holding Company. Bonilla I at 47. Berenguer explained that she did not give formal written notice of her resignation; instead, Araneta just "took it [she] wanted to resign" from the Delaware Holding Company based on her general "verbal intention" to "resign in all LBC" and eventually "replaced" her. Berenguer at 83-84, 195.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Moreover, both Berenguer and Bonilla testified that they entirely deferred to Araneta in matters relating to the Delaware Holding Company. Berenguer is, as mentioned, Araneta's niece and served as the CFO for the LBC group of companies worldwide.[FN121] She testified that she would not insert herself into a disagreement between ATR and Araneta about how the Delaware Holding Company should proceed on an issue because such a disagreement would be between those parties and would not affect her as a director of the Delaware Holding Company.[FN122] Similarly, she stated that she would take Araneta's word as authoritative if he claimed that he had agreed with ATR to take certain actions.[FN123] Bonilla, the head of Araneta's U.S. operations, was more explicit-explaining that to him Araneta and the Delaware Holding Company were basically one and the same and that he took the word of Araneta as being the word of the company.[FN124] Moreover, when pressed regarding whether he would undertake an independent inquiry if told to act by Araneta, Bonilla responded, "Why should I ask him all these questions? He's telling me they have already agreed .... It's not like I'm going to go out there and check on him, doesn't make sense."[FN125]

> FN121. Berenguer at 47-48.
>
> FN122. Berenguer at 68.
>
> FN123. Berenguer at 197.
>
> FN124. Bonilla I at 63.
>
> FN125. Bonilla I at 180-81.

Based on these failures, neither Berenguer nor Bonilla can be said to have upheld their fiduciary obligations. Although it was Araneta who ran amok by emptying the Delaware Holding Company of its major assets, the other directors did nothing to make themselves aware of this blatant misconduct or to stop it.

*21 Put in plain terms, it is no safe harbor to claim that one was a paid stooge for a controlling stockholder. Berenguer and Bonilla voluntarily assumed the fiduciary roles of directors of the Delaware Holding Company. For them to say that they never

bothered to check whether the Delaware Holding Company retained its primary assets and never took any steps to recover the LBC Operating Companies once they realized that those assets were gone is not a defense. To the contrary, it is a confession that they consciously abandoned any attempt to perform their duties independently and impartially, as they were required to do by law. Their behavior was not the product of a lapse in attention or judgment; it was the product of a willingness to serve the needs of their employer, Araneta, even when that meant intentionally abandoning the important obligations they had taken on to the Delaware Holding Company and its minority stockholder, ATR.

When required by their office to be loyal to the Delaware Holding Company, Bonilla and Berenguer chose total fealty to Araneta's conflicting interests instead. Consequently, I find them jointly liable for Araneta's fiduciary violations.

### E. The Core Remedy

The major breach of fiduciary duty in this case is one that injured the Delaware Holding Company in the first instance and ATR secondarily as a minority stockholder. The obvious remedy for this wrongdoing would be to require Araneta to return control of the LBC Operating Companies to the Delaware Holding Company.

ATR is practical, however. It recognizes that it would likely take years and years to chase Araneta and his family around the nation (Araneta has a house in California) and across the globe to get that type of order implemented. Thus, ATR is willing to forsake a full remedy (in the sense that it appears the LBC Operating Companies have done very well) and to accept a direct award of damages.

A direct award to ATR is justified here. Araneta's behavior worked a de facto liquidation of the Delaware Holding Company. It would be unreal to require a monetary award to the Delaware Holding Company by Araneta and his blindly subservient subordinates, Bonilla and Berenguer. Even if such a payment were made, it would be foolhardy to believe that Araneta and his servants could be trusted to allow ATR to be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nefit from the grant of that relief to the Delaware Holding Company.

Rather, because Araneta's conduct had the effect of liquidating the Delaware Holding Company, it is appropriate to premise relief on the need to make ATR whole for the injury it suffered by entrusting its capital to the Delaware Holding Company, only to see that corporation impoverished by the defendants. The best way to shape that award is to require Araneta and the defendants to pay back to ATR the cost of acquiring its equity in the Delaware Holding Company-$3.922 million-plus pre-judgment interest at a rate that fairly compensates ATR for its loss of the upside inherent in the LBC Operating Companies' profit and growth. In determining that rate, I am aided by the parties' dealings and Araneta's admittedly high cost of debt and equity capital. Araneta's cost of debt was as high as 18%.[FN126] This high (equity-level) rate supports the fairness of a very high rate of interest, as it suggests an even higher cost of equity. That conclusion is confirmed by § 5 of the Undertaking Agreement. In that section, ATR secured a put option at a premium of 25% per annum over the issue price of ATR's shares in the Delaware Holding Company if exercised after the first two years of the investment. Using this contractual estimate of Araneta's cost of equity is the best way to do justice, even though it likely still leaves Araneta with a windfall.[FN127] I will compound this interest rate monthly in accordance with my understanding of prevailing commercial practices and in order to better ensure that ATR is made whole.[FN128]

> FN126. *See* Bonilla II at 44-45 (confirming that LBC's cost of private debt is 15%-18%).

> FN127. *See Gotham Partners. L.P. v. Hallwood Realty Partners. L.P.,* 817 A.2d 160, 175 (Del.2002) (permitting the Court of Chancery to fashion "broad, discretionary, and equitable remedies" in cases involving a breach of the duty of loyalty); *Int'l Telecharge, Inc. v. Bomarko, Inc.,* 766 A.2d 437, 440 (Del.2000) ("[T]he powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropri-

ate."); *Weinberger v. UOP, Inc.,* 457 A.2d 701, 715 (Del.1983) (holding that when the entire fairness standard is not met, the Court of Chancery's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate"). In fashioning a remedy, I err on the side of generosity to the plaintiffs because "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly" and because "strict imposition of penalties under Delaware law are designed to discourage disloyalty." *Bomarko,* 766 A.2d at 441 (quoting *Thorpe by Castleman v. CERBCO, Inc.,* 676 A.2d 436, 445 (Del.1996)); *see also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 855 A.2d 1059, n. 20 (Del. Ch.2003).

> FN128. *See Brandin v. Gottlieb,* 2000 WL 1005954, at *29 (Del. Ch.2000) (explaining that this court has "broad discretion, subject to principles of fairness, in fixing the rate [of interest] to be applied"); *Gotham Partners,* 817 A.2d at 173 (finding that the Court of Chancery's "uncontested 'discretion to select a rate of interest higher than the statutory rate ... include[s] the lesser authority to award compounding.' "); *see also Henke v. Trilithic, Inc.,* 2005 WL 2899677, at *13 (Del. Ch.2005) (explaining that awarding interest compounded on a monthly basis because doing so better "comports with the fundamental economic reality" that investors and "companies neither borrow nor lend at simple interest rates"); *Smith v. Nu-West Indus.,* 2001 WL 50206, at *1 (Del. Ch.2001) (awarding interest compounded monthly), *aff'd,* 781 A.2d 695 (Del.2001).

**\*22** It is worth noting that ATR requested monthly compounding in their opening brief. The defendants did not respond to this request except insofar as they argued that no damage award of any amount should be entered. Suffice it to say, the defendants are therefore in no position to quibble about the interest rate I now award, having forsaken their chance to respond.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 25
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

All of the defendants will be jointly and severally liable for the amount of the judgment. Nonetheless, I find that in any action as between Araneta, on the one hand, and Bonilla and Berenguer, on the other, Araneta should be deemed responsible to pay the entire judgment. In other words, to the extent it is later important, if Bonilla and Berenguer pay any or all of the judgment, Araneta should be required to make them whole, to the extent that is consistent with applicable law.[FN129]

> FN129. In qualifying this statement, I simply recognize that when persons act as mere tools for malefactors and contribute to harm to others, public policy might limit their ability to seek indemnification from their "boss," so to speak. That might be an occupational hazard.

### F. Attorneys' Fees

Finally, I consider ATR's request for an award of attorneys' fees. Delaware follows the American Rule under which parties to litigation normally bear their own costs regardless of the outcome of their case.[FN130] Yet, the American Rule, and correspondingly Delaware's application thereof, provide for fee awards in exceptional circumstances in order to deter abusive litigation, avoid harassment, and protect the integrity of the judicial process.[FN131] These circumstances include fraud, bad faith, or other outrageous conduct from which the claim arose and bad faith behavior in the course of subsequent litigation.[FN132] Here, ATR claims that the egregious nature of Araneta's fiduciary breaches coupled with the implausibility of his defenses and his bad faith in defending this litigation necessitate a fee-shifting award. I agree.

> FN130. *Johnston v. Arbitrium (Cayman Islands) Handels, 720 A.2d 542, 545-46 (Del.1998); see also* John F. Vargo, *The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice,* 42 AM. U.L. REV. 1567 (1993) (contrasting the American Rule with the English Rule whereby the losing party must pay the victor's litigation expenses).

> FN131. *Kaung v. Cole National Corp., 884 A.2d 500, 506 (Del.2005).*

> FN132. *See Gans v. MDR Liquidating Corp., 1998 WL 294006, at *3 (Del. Ch.1998)* ("Delaware courts have recognized the following as meriting an award of fees: (i) statutory authority; (ii) a class representative's litigation costs on behalf of the class; (iii) bad faith conduct in litigation; and (iv) fraud, bad faith, or other outrageous conduct from which the claim arose.").

The U.S. Supreme Court has explained that "bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."[FN133] Delaware courts have awarded attorneys' fees when defendants "had no valid defense and knew it," when "they unnecessarily required the institution of litigation, delayed the litigation, asserted frivolous motions, falsified evidence and changed their testimony to suit their needs," and when, in short, they "constructed their entire defense in bad faith."[FN134] Although any one of these findings alone would be sufficient to justify a shifting of fees; in this case, there is ample evidence to establish transgressions in each of these categories by Araneta.

> FN133. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766 (1980) (citations and quotations omitted).

> FN134. *Arbitrium (Cayman Islands) Handels,* 702 A.2d at 546; *see also Jacobson v. Dryson Acceptance Corp.,* 2002 WL 31521109, at *16 (Del. Ch.2002) (stating that fee awards "may be appropriate where a party misleads the court, alters his testimony or changes his position."), *aff'd,* 826 A.2d 298 (Del.2003).

Here, Araneta's bad faith was pervasive. Araneta's basic duties as a fiduciary of the Delaware Holding Company were well-established. But, by transferring the LBC Operating Companies from the Delaware Holding Company to his family for no value, Araneta flouted his obligations to the minority shareholders and profited at their expense. Moreover, when served

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with the § 220 suit, this lawsuit, and confronted with his conduct, Araneta engaged in a deliberate pattern of obfuscation ranging from the obstruction of legitimate discovery requests, to the presentation of baseless and shifting defenses, and ultimately to the telling of outright lies under oath and the submission of a phony defense in an attempt to escape this court's jurisdiction by exposing his own secretary to legal risk on the pretense that she was the sole director of the Delaware Holding Company during the period when Araneta denuded it of the LBC Operating Companies.[FN135]

> [FN135]. See H & H Brand Farms, Inc. v. Simpler, 1994 WL 374308, at *5-6 (Del. Ch. June 10, 1994) (imposing fee award for "acts of bad faith and wanton disregard for the rights of others").

*23 Certainly, not all breaches of the fiduciary duty of loyalty warrant the imposition of attorneys' fees.[FN136] But, where an "untenable conflict should have been perfectly obvious," a director's "effrontery in going forward nonetheless is reprehensible" and those "seeking to censor this outrageous conduct should have their attorneys' fees paid."[FN137] Thus, as an initial matter, I may award fees if I find that Araneta's conduct giving rise to this litigation constituted "an egregious breach" of his duty to ATR.[FN138] His conduct involved such an egregious breach. It was a fraudulent transfer that Araneta sought, by later fraud, to conceal.

> [FN136]. See, e.g., Weinberger v. UOP, Inc., 517 A.2d 653, 656 (Del. Ch.1986) (refusing to award fees for breach of fiduciary duty absent unjustifiable or bad faith conduct).

> [FN137]. Gans, 1998 WL 294006, at *4.

> [FN138]. Id.

Likewise, Araneta's misconduct during the litigation process was extensive. He obstructed legitimate requests for discovery. He proffered false testimony in order to avoid this court's jurisdiction and liability. In sum, he made the procession of the case unduly complicated and expensive.

Chancellor Allen well captured the traditional reluctance of this court to shift fees under the bad faith exception to the American Rule, by stating that the bad faith exception only applied when the party in question displayed "unusually deplorable behavior."[FN139] Even under that standard, which is more stringent than that articulated recently by our Supreme Court in Kaung v. Cole National Corp.,[FN140] Araneta easily qualifies for an order requiring him to pay ATR's attorneys' fees and expenses. Because of Araneta's bad faith, I also will enter an order requiring him to bear any additional attorneys' fees and expenses ATR is forced to bear in seeking to collect on this judgment. This will ensure that ATR obtains full relief if it is forced to expend even more resources to obtain redress from Araneta.

> [FN139]. Barrows v. Bowen, 1994 WL 514868, at *2 (Del. Ch.1994).

> [FN140]. 884 A.2d 500, 506 (Del.2005).

On this score, however, Bonilla and Berenguer are in a different position than Araneta. Their regrettable, if all too historically traditional, role as instruments of a controller's will rightly exposes them to damages liability, but they have not engaged in conduct that satisfies the exacting bad faith standard required for fee shifting.

### IV. Conclusion

Based on the foregoing, I find in favor of ATR on each of its claims and award ATR $3,922,000 in damages plus pre-judgment as well as post-judgment interest on this amount. Pre-judgment interest shall accrue at an annual rate of 25% with monthly compounding from the date of ATR's investment in the Delaware Holding Company through the date a final judgment is entered. Post-judgment interest at the statutory rate will accrue thereafter until payment is made. Araneta shall also pay ATR's attorneys' fees, costs, and expenses incurred in prosecuting this action and shall pay any future costs expended by ATR in enforcing this judgment. Counsel for the parties shall craft a final order implementing this decision within 20 days.

Del.Ch.,2006.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)


ATR-Kim Eng Financial Corp. v. Araneta
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1  MICHAEL J. BAKER (No. 56492)
   Email: mbaker@howardrice.com
2  WILLIAM J. LAFFERTY (No. 120814)
   Email: wlafferty@howardrice.com
3  MATTHEW L. BELTRAMO (No. 184796)
   Email: mbeltramo@howardrice.com
4  HOWARD RICE NEMEROVSKI CANADY
          FALK & RABKIN
5  A Professional Corporation
   Three Embarcadero Center, 7th Floor
6  San Francisco, California 94111-4024
   Telephone:  415/434-1600
7  Facsimile:  415/217-5910

8  Attorneys for Creditors
   ATR-KIM ENG FINANCIAL CORPORATION
9  AND ATR-KIM ENG CAPITAL PARTNERS,
   INC.

10

E-Filed: 7/23/07

11              UNITED STATES BANKRUPTCY COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

14

15  In re                              | Case No. 07-30309

16  HUGO N. BONILLA,                   | Chapter 7 Case

17              Debtor.

18  ATR-KIM ENG FINANCIAL              | Adv. Proc. No. _____
    CORPORATION and ATR-KIM ENG
19  CAPITAL PARTNERS, INC.,            | STATUS CONFERENCE
                                       | Date:   September 7, 2007
20              Plaintiffs,            | Time:   11:00 a.m.
                                       | Place:  235 Pine Street
21       v.                            |         Courtroom 23
                                       |         San Francisco, California
22  HUGO NERY BONILLA,                 | Judge:  Hon. Thomas E. Carlson

23              Defendant.

24

25   **COMPLAINT (1) TO DETERMINE THAT DEBTOR HUGO BONILLA IS NOT
     ENTITLED TO A DISCHARGE IN BANKRUPTCY PURSUANT TO 11 U.S.C.**
26   **§727(A) AND (2) SEEKING DETERMINATION OF NON-DISCHARGEABILITY**
     **OF DEBT PURSUANT TO 11 U.S.C. §523(A)(4)**
27

28

            COMPLAINT FOR DENIAL OF DISCHARGE, ETC.                    07-30309



EXHIBIT  B

1    Plaintiffs and Creditors ATR-Kim Eng Financial Corporation and ATR-Kim Eng
2  Capital Partners, Inc., for their claims against Hugo Nery Bonilla, the debtor in the above-
3  captioned Chapter 7 case, allege as follows:

4                              **JURISDICTION AND VENUE**

5    1.    This is an adversary proceeding (the "Adversary Proceeding") to: (a) deny the
6  Debtor's discharge under 11 U.S.C. §727(a) or, in the alternative, (b) determine  the
7  dischargeability of the Debtor's debt to Plaintiffs ATR-Kim Eng Financial Corporation and
8  ATR-Kim Eng Capital Partners, Inc., under 11 U.S.C. §523(a)(4).

9    2.    This Court has jurisdiction over this Adversary Proceeding by virtue of 28 U.S.C.
10  Sections 157 and 1334 and Bankruptcy Rules 4004, 4007, 7001(4) and 7001(6).

11    3.    This Adversary Proceeding is a core proceeding under 28 U.S.C. Sections
12  157(b)(2)(I) and (J), and this Court may enter a final judgment pursuant to 28 U.S.C. Section
13  157(b).

14    4.    Venue is proper in this Court under 28 U.S.C. Sections 1408 and 1409, as this
15  Adversary Proceeding arises under and in connection with a Chapter 7 bankruptcy case
16  styled *In re Hugo Nery Bonilla*, No. 07-30309 (Northern District of California, San
17  Francisco Division, filed March 16, 2007), which is pending before this Court.

18                                    **PARTIES**

19    5.    Plaintiffs and Creditors ATR-Kim Eng Financial Corporation and ATR-Kim Eng
20  Capital Partners, Inc. (hereinafter collectively, "ATR") are investment and financial services
21  corporations headquartered in the Philippines.

22    6.    Defendant and Debtor Hugo Nery Bonilla ("Bonilla") is an individual, residing in
23  the State of California.

24    7.    ATR is a judgment creditor of Bonilla, having obtained a money judgment for
25  over $24.5 million against Bonilla and others in a case entitled *ATR-Kim Eng Financial*
26  *Corporation and ATR-Kim Eng Capital Partners, Inc. v. Carlos R. Araneta, Hugo Bonilla,*
27  *et al.*, Delaware Court of Chancery No. CIV. A. 489-A (judgment entered January 10, 2007).

28    8.    Bonilla filed a voluntary petition in this Court (the "Petition") under Chapter 7 of

COMPLAINT FOR DENIAL OF DISCHARGE, ETC.                          07-30309
-1-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  the United States Bankruptcy Code on March 16, 2007 (the "Petition Date").

2  <center>FACTUAL BACKGROUND</center>

3  **A.    BONILLA'S BREACH OF FIDUCIARY DUTIES TO ATR AND THE**
   **RESULTING DELAWARE JUDGMENT.**
4

5  9.    Many of the factual findings pertinent to this Complaint are set forth in an

6  opinion issued by the Delaware Court of Chancery on December 21, 2006 (hereinafter, the

7  "Memorandum Opinion"). A copy of the Memorandum Opinion is attached as Exhibit A to

8  this Complaint and incorporated by reference herein. Unless otherwise stated, ATR alleges

9  paragraphs 10 through 23 below on information and belief based upon the Memorandum

10 Opinion and documents filed in connection with that case.

11 10.    Bonilla is the President of LBC Holdings USA Corporation and various related

12 United States companies. These companies are part of a larger family of "LBC" companies,

13 some based in the United States and others in the Philippines. The LBC companies—both

14 domestic and worldwide—are principally involved in courier and remittance services to the

15 Philippines.

16 11.    The founder of the LBC family of companies is a Philippine businessman by the

17 name of Carlos R. Araneta (hereinafter "Araneta"). As found by the Delaware Court of

18 Chancery, "Araneta exercises de facto and clear control over his family's worldwide

19 holdings." Memorandum Opinion (Ex. A) at *3 n.3.

20 12.    In 1999, Araneta entered into a series of business dealings with ATR. These

21 business dealings culminated in ATR advancing money to Araneta in exchange for receiving

22 a ten percent interest in PMHI Holdings Corp. (the "Delaware Holding Company"), a newly

23 formed holding company that was eventually incorporated in the State of Delaware.

24 13.    The Delaware Holding Company's chief assets consisted of certain LBC

25 companies that Araneta agreed to transfer into the Delaware Holding Company. At the time

26 of the transfer, these LBC entities had a stated value of $35 million, although their value has

27 increased substantially since then.

28 14.    Araneta retained personal control over the Delaware Holding Company and

<center>COMPLAINT FOR DENIAL OF DISCHARGE, ETC.                    07-30309</center>
<center>-2-</center>

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   appointed its board of directors.   The three-person board consisted of Araneta, Liza

2   Berenguer (who is Araneta's niece and a former chief financial officer within the LBC

3   family of companies), and Bonilla.

4       15.   At all times relevant to this action, Bonilla served as a director of the Delaware

5   Holding Company.   As a corporate director, Bonilla owed fiduciary duties to ATR under

6   Delaware law including, among other things, the duty to protect the value of the Delaware

7   Holding Company's assets, and, thereby, the value of ATR's interest in the Delaware

8   Holding Company.   Specifically, and as expressly found by the Chancery Court in the

9   Memorandum Opinion, Bonilla had duties:

10      • "to monitor the potential that others within the organization would violate their

11          [own] duties" (Memorandum Opinion (Ex. A) at *19);

12      • "to attempt in good faith to assure that a corporate information and reporting

13          system, which the board considers to be adequate, exists" (*id.* (internal quotations

14          marks and footnote omitted)); and

15      • to "exercise a good faith judgment that the corporation's information and reporting

16          system is in concept and design adequate to assure the board that appropriate

17          information will come to its attention in a timely manner as a matter of ordinary

18          questions, so that it may satisfy its responsibility" (*id.* (internal quotations marks

19          and footnote omitted)).

20      16.   Beginning in November 2002, ATR and Araneta had a falling out related to

21   ATR's decision to withdraw from certain business relationships with Araneta.   This

22   withdrawal, although permissible under the terms of the parties' agreements, angered

23   Araneta, who shortly thereafter began taking steps to injure ATR.

24      17.   Sometime between May and December 2003, Araneta conducted, as the

25   Delaware Chancery Court expressly found, a *de facto* liquidation of the corporate assets of

26   the Delaware Holding Company.   He transferred its only valuable assets—the LBC

27   entities—to members of his own family without consideration to the Delaware Holding

28   Companies , and without informing ATR of the transfers, or causing the Delaware Holding

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    Company to make a distribution to ATR on account of these transfers. As a result, ATR was
2    left with a 10 percent interest in a company that was effectively a shell corporation stripped
3    of its primary assets.

4        18.    Bonilla, who was at all relevant times a director of the Delaware Holding
5    Company, failed to monitor Araneta's conduct, protect ATR's interests, or stop Araneta
6    from liquidating the corporate assets of the Delaware Holding Company for no
7    consideration.

8        19.    Throughout the first half of 2003, ATR's attorneys sent demand letters to
9    Araneta, and his agents, seeking to examine the books and records of the Delaware Holding
10   Company. Upon information and belief, certain of these demand letters were copied to
11   Bonilla. Araneta ignored these letters and instructed Bonilla to ignore them as well.

12       20.    ATR was therefore forced to enlist the assistance of the Delaware courts to
13   compel Araneta and the Delaware Holding Company to turn over corporate documents.
14   ATR filed an action in the Delaware Court of Chancery pursuant to Section 220 of the
15   Delaware Corporations Code to require production of the books and records of the Delaware
16   Holding Company. Only after a court order was issued in this action did Araneta and the
17   Delaware Holding Company finally turn over at least some documents responsive to the
18   request. These records, though sparse, revealed that during the last nine months of 2003
19   Araneta had stripped the Delaware Holding Company of its interest in the LBC companies,
20   its principal assets.

21       21.    ATR filed a liability and damages suit in June 2004 against Araneta and his two
22   co-directors, Berenguer and Bonilla. *See ATR-Kim Eng Financial Corp., et al. v. Carlos R.*
23   *Araneta, Hugo Bonilla, et al., C.A. No. 489-N (Del. Ch. 2006).* With respect to Berenguer
24   and Bonilla, ATR alleged that they had breached their fiduciary duties to ATR, a minority
25   shareholder in the Delaware Holding Company, by failing to monitor Araneta or prevent his
26   fraudulent conduct.

27       22.    The case proceeded to trial in the Delaware Court of Chancery in August 2006.
28   The Vice Chancellor issued a 54-page Memorandum Opinion on December 21, 2006.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

23. In the Memorandum Opinion, the Court found all three defendants—Araneta, Berenguer and Bonilla—jointly and severally liable for the damages caused to ATR. With respect to Bonilla, the Court found that he (along with his co-director, Berenguer) had breached fiduciary duties to ATR by, among other things:

- "allow[ing] Araneta to do whatever he wanted, without any examination of whether his conduct benefited the Delaware Holding Company and all of its stockholders, rather than simply Araneta personally" (Memorandum Opinion (Ex. A) at *1);

- treating "Araneta and the Delaware Holding Company [as] basically one and the same and [taking] the word of Araneta as being the word of the company" (*id.* at *20);

- never "question[ing] the wisdom of Araneta's actions nor insist[ing] that corporate procedures be followed" (*id.* *20);

- "consciously abandon[ing] any attempt to perform [his] duties independently and impartially, as [he was] required to do by law" (*id.* at *21);

- evincing a "willingness to serve the needs of [his] employer, Araneta, even when that meant intentionally abandoning the important obligations they had taken on to the Delaware Holding Company and its minority stockholder, ATR" (*id.*); and

- "act[ing] as—no other word captures it so accurately—[a] stooge[] for Araneta, seeking to please him and only him, and having no regard for [his] obligations to act loyally towards the corporation and all of its stockholders" (*id.* at *1).

24. The Court issued its Final Order Of Judgment (the "Delaware Judgment") on January 10, 2007. A copy of the Delaware Judgment, as recorded on January 11, 2007, is attached hereto as Exhibit B to this Complaint and incorporated by reference herein. In that Judgment, the Court held that all three defendants were jointly and severally liable to ATR "in the amount of $24,490,422.50" (Ex. B at 1 (emphasis in original)), plus post-judgment interest accruing at a rate of 11.25 percent per year.

25. The Final Judgment was affirmed on appeal by the Delaware Supreme Court in a two-page summary decision entered on June 14, 2007, in which the Court concluded that:

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   "the final judgment of the Court of Chancery should be affirmed on the basis of and for the

2   reasons assigned by the Court of Chancery in its decision dated December 21, 2006 [the

3   Memorandum Opinion].  [¶] NOW, THEREFORE, IT IS HEREBY ORDERED that the

4   final judgment of the Court of Chancery, entered on January 10, 2007, is, AFFIRMED." A

5   copy of the Delaware Supreme Court's decision is attached to this Complaint as Exhibit C

6   and incorporated by reference herein.

7       26.   The amount of interest accruing from the date of the Delaware Judgment to the

8   date of Petition is $490,647.16.

9       27.   Thus, as of the date of the Petition, Bonilla was indebted to ATR for a judgment

10  debt in the amount of $24,981,069.66 ("the Judgment Debt").[1]

11      **B.   BONILLA ENGAGED IN THREE SEPARATE TRANSFERS OF HIS**
        **PROPERTY WITH ACTUAL INTENT TO HINDER DELAY OR**
12      **DEFRAUD HIS CREDITORS, INCLUDING ATR, WITHIN ONE YEAR**
        **OF THE PETITION DATE.**

13

14      28.   Upon information and belief, Bonilla engaged in three transfers of his property

15  with actual intent to hinder, delay or defraud ATR in its collection efforts within one year of

16  the Petition Date.

17      29.   The first such transfer involved a multi-million dollar home located at

18  1605 Wedgewood Drive, Hillsborough, California (the "Hillsborough Property").    As of

19  May 2005, Bonilla was the sole record owner of the Hillsborough Property.  On January 8,

20  2007, however, three weeks after the Memorandum Opinion was issued and two days before

21  the Final Judgment was entered, Bonilla signed a Grant Deed transferring the Hillsborough

22  Property to Monica Araneta—Carlos Araneta's daughter—for "consideration of less than

23  $100." A copy of that Grant Deed is attached hereto as Exhibit D.

24      30.   Upon information and belief, the transfer occurred at the office of Carlos

25  Araneta's attorney, with Carlos Araneta present.  Monica Araneta herself was not present.

26

27      [1]Since the filing of the Petition, ATR has recovered $11,566.60—a mere fraction of the
    Judgment Debt—from Araneta by way of bank levies and writs of execution.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

COMPLAINT FOR DENIAL OF DISCHARGE, ETC.                          07-30309

31.   Upon information and belief, in transferring the Hillsborough Property to Monica Araneta, Bonilla acted with the intent to hinder, delay or defraud ATR in its efforts to collect on the Delaware judgment.

32.   Upon information and belief, the transfer of the Hillsborough Property was not for adequate consideration and was made without any forewarning or notice to ATR, Bonilla's principal creditor.

33.   Upon information and belief, Bonilla transferred the Hillsborough Property to an "insider"—*i.e.*, the daughter of a co-defendant.

34.   Upon information and belief, at the time of the transfer of the Hillsborough Property, Bonilla had incurred or reasonably believed that he would incur a debt to ATR beyond his ability to pay.

35.   The second and third transfers of real property involved parcels of property located in Newark, California.  As of September 2006, Bonilla was the sole owner of real property located at 37022 Locust Street, Newark, California (the "Locust Street Property").  Also, at the time of the Delaware action, Bonilla and his wife co-owned real property located at 36611 Sequoia Court, Newark, California (the "Sequoia Court Property"), which was, and remains, their residence.

36.   According to documents recorded with the San Mateo County (California) Recorder's Office, on January 18, 2007, just a week after entry of the Delaware Judgment, Bonilla signed grant deeds transferring both the Locust Street and the Sequoia Court Properties to his aunt, Dora Maritza Aberouette ("Aberouette").  These grant deeds were recorded with the Alameda County Recorder's Office on January 25, 2007 and January 29, 2007, respectively.

37.   Upon information and belief, the transfers of the Locust Street and Sequoia Court Properties were private sales to Aberouette, not arm's-length transactions, and Bonilla never solicited or entertained bids from other potentially interested parties.

38.   Upon information and belief, although Aberouette paid consideration in exchange for the transfer of the Locust Street and Sequoia Court Properties, that consideration did not

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   reflect the amount of payment that could have been received following an arm's-length sale
2   on the open market.

3       39.   Upon information and belief, in transferring the Locust Street and Sequoia Court
4   Properties to Aberouette, Bonilla acted with the intent to hinder, delay or defraud ATR in its
5   efforts to collect on the Delaware judgment. Among other things, the transfers were made to
6   an insider—namely, Bonilla's aunt—for purposes of preventing ATR from foreclosing on
7   the properties to collect on its debt. Further, upon information and belief, Bonilla used a
8   portion of the proceeds from these transfers to pay off at least one other loan owed by his
9   wife. Finally, despite the fact that ATR was Bonilla's principal creditor, he neither informed
10  ATR of the transfers of the properties nor offered to forward the proceeds to ATR.

11      40.   Upon information and belief, at the time of the transfer of the Locust Street and
12  Sequoia Court Properties, Bonilla had incurred or reasonably believed that he would incur a
13  debt to ATR beyond his ability to pay.

14  **C.   WITHOUT JUSTIFICATION, BONILLA HAS FAILED TO KEEP
        RECORDS FROM WHICH HIS FINANCIAL CONDITION COULD BE
15      ASCERTAINED.**

16      **1.   The 2006 Sequoia Court Refinancing**

17      41.   Upon information and belief, Bonilla also failed to keep records from which his
18  financial condition could be ascertained within the meaning of 11 U.S.C. §727(a)(3).

19      42.   Upon information and belief, Bonilla and his wife refinanced the Sequoia Court
20  Property in January of 2006 by executing a new deed of trust and promissory note (the
21  "Sequoia Court Refinancing") in favor of Lehman Brothers Bank. The Sequoia Court
22  Refinancing constituted a "transfer" of the Debtor's property within the meaning of 11
23  U.S.C. §101(54).

24      43.   Upon information and belief, as a result of the refinancing, Bonilla received a
25  cash payment of $140,884.07.

26      44.   Upon information and belief, on or about February 1, 2006, the $140,884.07 cash
27  payment was deposited into Bonilla's individual checking account (#181868680) at Mission
28  National Bank in San Francisco, California ("Mission National Bank").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

45.    Upon information and belief, on or about February 10, 2006, funds in the amount of $150,000.00 were transferred from Bonilla's individual checking account (#181868680) by way of telephone transfer to an unknown recipient. To date, Bonilla has failed to produce records accounting for the transfer of these funds, the recipient of the funds or the purpose of the transfer.

46.    Bonilla failed to disclose the $140,884.07 cash payment that he received from the Sequoia Court Refinancing, or the February 10, 2006 transfer of $150,000.00, in response to Question No. 10 of the Statement of Financial Affairs that he filed in connection with his bankruptcy case, despite the fact that the Sequoia Court Refinancing took place within two years of the Petition Date.

47.    Upon information and belief, Bonilla has failed, without justification, to maintain books, records, documents or papers from which the proceeds of the Sequoia Court Refinancing may be traced.

### 2.    The 2005 Locust Street Refinancing

48.    Upon information and belief, Bonilla and his wife refinanced the Locust Street property in March of 2005 by executing a new deed of trust and promissory note (the "Locust Street Refinancing") in favor of World Savings Bank. That Locust Street Refinancing constituted a "transfer" of the Debtor's property within the meaning of 11 U.S.C. §101(54).

49.    Upon information and belief, as a result of the Locust Street Refinancing, Bonilla received a cash payment of $197,512.07.

50.    Upon information and belief, on March 22, 2005, that $197,512.07 cash payment was deposited into Bonilla's individual checking account (#181868680) maintained at Mission National Bank.

51.    Upon information and belief, Bonilla has failed adequately to account for the $197,512.07 cash distribution. Although records supplied by Bonilla reveal that on May 19, 2005, he transferred $190,000.00 from his checking account into a savings account that he maintained at Mission National Bank, to date Bonilla has failed to produce records

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1 | accounting for any subsequent distribution of the funds for his savings account.

2 |     52.   Bonilla failed to disclose the $197,512.07 cash distribution that he received from
3 | the Locust Street Refinancing, or the May 19, 2005 transfer of $190,000.00, in response to
4 | Question No. 10 of the Statement of Financial Affairs that he filed in connection with his
5 | bankruptcy case, despite the fact that the Locust Street Court Refinancing took place within
6 | two years of the Petition Date.

7 |     53.   Upon information and belief, Bonilla has failed, without justification, to maintain
8 | books, records, documents or papers from which the proceeds of the Locust Street
9 | Refinancing may be traced.

10 |     **3.   Other Cash Distributions.**

11 |     54.   Upon information and belief, within the past three years there have been a
12 | number of other large transfers of money into and out of Bonilla's bank accounts at Mission
13 | National Bank for which Bonilla has failed to maintain books, records, documents or papers.
14 | Upon information and belief, these transfers include, but are not limited to:

15 |     •  a March 17, 2004, deposit of $500,000.00 which was wire transferred into Bonilla's
16 |       savings account number (#182840180) at Mission National Bank and, that same
17 |       day, withdrawn by way of check number 161;

18 |     •  a September 16, 2005 deposit of $250,000.00 which was deposited by way of
19 |       telephone transfer into Bonilla's individual checking account (#181868680) at
20 |       Mission National Bank, apparently in order to cover a withdrawal of $250,000 that
21 |       had occurred two days earlier; and

22 |     •  a January 9, 2006 deposit of $15,000.00 which was deposited by way of telephone
23 |       transfer into Bonilla's individual checking account (#181868680) at Mission
24 |       National Bank and withdrawn thereafter in multiple transactions.

25 |     55.   Bonilla's bankruptcy schedules fail to disclose any of the foregoing transfers into
26 | or out of his accounts at Mission National Bank, despite the fact that the majority occurred
27 | within two years of the Petition Date.

28 |     56.   Upon information and belief, Bonilla has also stated in loan documents filed in

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  connection with the Hillsborough Property in May of 2005 that he had a net worth of over

2  $4 million.

3      57.  Upon information and belief, since filing for bankruptcy, Bonilla has failed to

4  adequately account for the transfers or assets alleged above.

5      58.  Upon information and belief, Bonilla has failed, without justification, to maintain

6  books, records, documents or papers from which the transfers and assets alleged above may

7  be traced.

8  **D.    BONILLA HAS FAILED TO EXPLAIN SATISFACTORILY THE
         ABSENCE OF ASSETS RELATED TO THE SEQUOIA COURT**

9  **REFINANCING, THE LOCUST STREET REFINANCING OR THE
      OTHER CASH DEPOSITS ALLEGED ABOVE.**

10

11     59.  Bonilla also failed to explain satisfactorily the loss or deficiency of assets that

12  could satisfy at least a portion of his debt to ATR under 11 U.S.C. §727(a)(3).

13     60.  Bonilla failed to list in his bankruptcy schedules the cash distributions that he

14  received from the Sequoia Court Refinancing or the Locust Street Refinancing, despite the

15  fact the refinancings constitute transfers that occurred within two years of the date of the

16  bankruptcy petition.

17     61.  Bonilla also failed to disclose any of the other transfers of money into or out of

18  his accounts at Mission National Bank, despite the fact that the majority of these transfers

19  occurred within two years of the Petition Date.

20     62.  To date, Bonilla has failed to provide satisfactory explanation for the ultimate

21  disposition of the substantial funds that he received from the Sequoia Court Refinancing or

22  the Locust Street Refinancing.  In addition, Bonilla has also failed to provide satisfactory

23  explanation for the ultimate disposition of the additional cash deposits alleged above.

24

25                        **FIRST CLAIM FOR RELIEF**

26                 (Denial of Discharge Under 11 U.S.C. §727(a)(2)(A))

27     63.  ATR incorporates by reference paragraphs 1-62 inclusive, as though fully set

28  forth herein.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

64. Bonilla's transfers of the Hillsborough, Sequoia Court and Locust Street Properties, having occurred within one year of the Petition Date and having been made with the intent to hinder, delay or defraud ATR, require that the Court deny him a discharge pursuant to Section 727(a)(2)(A).

65. Based on the foregoing, ATR respectfully requests that the Court enter a judgment that Bonilla is not entitled to a discharge in bankruptcy.

## SECOND CLAIM FOR RELIEF
### (Denial of Discharge Under 11 U.S.C. §727(a)(3))

66. ATR incorporates by reference paragraphs 1-62 inclusive, as though fully set forth herein.

67. Bonilla's failure to maintain books, documents, records and papers from which his financial condition or business transactions might be ascertained—specifically his failure to maintain books, documents, records and papers related to the cash distributions he received from the Sequoia Court Refinancing, the Locust Street Refinancing and the other transfers of money alleged above—require that the Court deny him a discharge under 11 U.S.C. §727(a)(3).

68. Based on the foregoing, ATR respectfully requests that the Court enter a judgment that Bonilla is not entitled to a discharge in bankruptcy.

## THIRD CLAIM FOR RELIEF
### (Denial of Discharge Under 11 U.S.C. §727(a)(5))

69. ATR incorporates by reference paragraphs 1-62 inclusive, as though fully set forth herein.

70. Bonilla's failure to explain satisfactorily the loss or deficiency of assets related to the Sequoia Court Refinancing, the Locust Street Refinancing and/or the other cash deposits alleged above—despite the fact that those assets would satisfy as least a portion of his debt to ATR—require that the Court deny him a discharge under 11 U.S.C. §727(a)(5).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    71.    Based on the foregoing, ATR respectfully requests that the Court enter a

2    judgment that Bonilla is not entitled to a discharge in bankruptcy.

3

4    ### FOURTH CLAIM FOR RELIEF

5    (Non-Dischargeability Of Debt Under 11 U.S.C. §523(a)(4))

6    72.    ATR incorporates by reference paragraphs 1-62 inclusive, as though fully set

7    forth herein.

8    73.    In his capacity as Director of a Delaware corporation, Bonilla owed fiduciary

9    duties to ATR, the Delaware Holding Company's minority shareholder, that predated the

10   debt in this case.    Those pre-existing fiduciary duties imposed upon Bonilla the

11   responsibility for safeguarding the value of the assets of the Delaware Holding Company

12   and, thereby, preserving the value of ATR's interest as a minority shareholder in the

13   Delaware Holding Company.

14   74.    Further, as a director of a Delaware corporation, Bonilla stood in the position of a

15   trustee for the shareholders of the Delaware Holding Company, including ATR.    That trust

16   relationship predated the debt owed by Bonilla to ATR and existed without reference to that

17   debt.

18   75.    Bonilla's failure—as found by the Delaware Chancery Court—to monitor

19   Araneta's actions, to prevent him from removing assets from the Delaware Holding

20   Company to his family members without consideration, or to take any steps to protect

21   ATR's interest as a minority shareholder, facilitated and enabled Araneta's wrongful transfer

22   of assets from the Delaware Holding Company, resulting in the misappropriation of funds

23   held in a fiduciary capacity.    Further, by failing to respond to ATR's discovery requests in

24   the Delaware action, Bonilla failed properly to account for the investment ATR made in the

25   Delaware Holding Company.

26   76.    As a result of these actions, Bonilla's Judgment Debt to ATR arises from "fraud

27   or defalcation while acting in a fiduciary capacity," within the meaning of 11 U.S.C. Section

28   523(a)(4) and therefore should be excepted from discharge.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    77.    Based on the foregoing, ATR respectfully requests that the Court enter judgment

2    that the $24,981,069.66 Judgment Debt that Bonilla owes to ATR (less any payments

3    already received) is non-dischargeable under Section 523(a)(4).

4

5                                **PRAYER FOR RELIEF**

6    78.    WHEREFORE, ATR prays that judgment be entered in ATR's favor and against

7    Bonilla as follows:

8            a.      For a determination that Bonilla is not entitled to a discharge under 11

9                    U.S.C. §727(a)(2)(A), (a)(3), and/or (a)(5);

10           b.      In the alternative, for a determination that the $24,981,069.66 Judgment

11                   Debt that Bonilla owes to ATR (less any payments received) is not

12                   dischargeable under 11 U.S.C. §523(a)(4);

13           c.      For relief from the automatic stay imposed by the filing of the petition in

14                   this case, so that ATR may pursue collection of their claim;

15           d.      For recovery of ATR's costs and expenses in connection with this adversary

16                   proceedings; and

17           e.      For such other relief against Bonilla and in favor of ATR as this Court

18                   deems just and equitable.

19   Dated: July 23, 2007                    Respectfully,

20                                           MICHAEL J. BAKER
                                             WILLIAM J. LAFFERTY
21                                           MATTHEW L. BELTRAMO
                                             HOWARD RICE NEMEROVSKI CANADY
22                                                   FALK & RABKIN
                                             A Professional Corporation
23

24                                           By: _____
                                                      WILLIAM J. LAFFERTY
25
                                             Attorneys for Creditors ATR-KIM ENG
26                                           FINANCIAL CORPORATION and ATR-KIM
                                             ENG CAPITAL PARTNERS, INC.
27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

## CORPORATE DISCLOSURE STATEMENT UNDER
## FEDERAL RULE OF BANKRUPTCY PROCEDURE 7007.1

Please be advised that the following corporations own 10 percent of more of any class of stock in Plaintiff and Creditor ATR-Kim Eng Financial Corporation:

- ATR Holdings, Inc.

- Kim Eng Holdings Limited

Please be advised that Plaintiff and Creditor ATR-Kim Eng Capital Partners, Inc. is a wholly owned subsidiary of Plaintiff and Creditor ATR-Kim Eng Financial Corporation.

Dated: July 23, 2007

Respectfully,

MICHAEL J. BAKER
WILLIAM J. LAFFERTY
MATTHEW L. BELTRAMO
HOWARD RICE NEMEROVSKI CANADY
    FALK & RABKIN
A Professional Corporation

By: _____
        WILLIAM J. LAFFERTY

Attorneys for Creditors ATR-KIM ENG FINANCIAL CORPORATION and ATR-KIM ENG CAPITAL PARTNERS, INC.



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

07-30309

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

**C**

ATR-Kim Eng Financial Corp. v. **Araneta**
Del.Ch.,2006.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
ATR-KIM ENG FINANCIAL CORPORATION, and
ATR-KIM ENG CAPITAL PARTNERS, INC.,
Plaintiffs,
v.
Carlos R. ARANETA, Hugo Bonilla, Liza Berenguer
and Marites Vicente, Defendants,
andPMHI HOLDINGS CORPORATION, (f/k/a LBC
Global Corporation), a Delaware corporation, Nom-
inal Defendant.
No. CIV.A. 489-N.

Submitted: Oct. 9, 2006.
Decided: Dec. 21, 2006.

Steven T. Margolin, Esquire, Richard D. Heins, Es-
quire, Ashby & Geddes, Wilmington, Delaware; Sid-
ney Todres, Esquire, Epstein Becker & Green P.C.,
New York, NY, for Plaintiff.
Richard D. Allen, Esquire, Thomas W. Briggs, Jr.,
Esquire, Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, for Defendants.

MEMORANDUM OPINION
STRINE, Vice Chancellor.

*I. Introduction*

**\*1** Plaintiffs ATR-Kim Eng Financial Corp. ("ATR
Financial") and ATR-Kim Eng Capital Partners, Inc.
("ATR Capital") (collectively, "ATR") own 10% of
the shares of a holding company-PMHI Holdings
Corp. (f/k/a LBC Global Corp.) (the "Delaware Hold-
ing Company"). ATR claims that defendant Carlos
Araneta, who controlled the remaining 90% of the
Delaware Holding Company's equity and served as
chairman of its board, caused the corporation to
transfer its key assets-its ownership of several busi-
nesses worth over $35 million (the "LBC Operating
Companies")-to members of his family in violation of

his fiduciary duties. The Delaware Holding Company
was formed precisely to enable ATR to share with
Araneta in the benefits of owning the LBC Operating
Companies. But, after Araneta denuded the Delaware
Holding Company of those assets, ATR was left with
only a minority stock ownership position in a
floundering joint venture that it had undertaken with
Araneta, a position that is worth very little. Mean-
while, Araneta and his family were left with sole con-
trol of the LBC Operating Companies, which, from
the record, appear to be thriving.

Furthermore, ATR claims that the other members of
the board of directors of the Delaware Holding Com-
pany, defendants Hugo Bonilla and Liza Berenguer,
are jointly and severally liable for this harm because
they failed to take any steps to monitor Araneta and
prevent his self-dealing. Bonilla was the head of
Araneta's operations in the United States, and Ber-
enguer served as the Chief Financial Officer of his
worldwide enterprise. They essentially admit that
they regarded themselves as mere employees of
Araneta and failed to take any steps to fulfill their fi-
duciary duties to the Delaware Holding Company. As
directors, they are charged with protecting the in-
terests of their corporation and its stockholders. Yet,
Bonilla and Berenguer allowed Araneta to do
whatever he wanted, without any examination of
whether his conduct benefited the Delaware Holding
Company and all of its stockholders, rather than
simply Araneta personally.

In this post-trial opinion, I find that Araneta breached
his duty of loyalty by impoverishing the Delaware
Holding Company for his own personal enrichment.
Bonilla and Berenguer also breached their duty of
loyalty. Having assumed the important fiduciary du-
ties that come with a directorship in a Delaware cor-
poration, Bonilla and Berenguer acted as-no other
word captures it so accurately-stooges for Araneta,
seeking to please him and only him, and having no
regard for their obligations to act loyally towards the
corporation and all of its stockholders. Such behavior
is not indicative of a good faith error in judgment; it
reflects a conscious decision to approach one's role in
a faithless manner by acting as a tool of a particular

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stockholder rather than an independent and impartial fiduciary honestly seeking to make decisions for the best interests of the corporation. Although it is clearly the case that Araneta is the most culpable of the defendants, Bonilla and Berenguer are accountable for their complicity in his wrongful endeavors.

*2 To the point of Araneta's misconduct, the sad reality is that his behavior as a director of the Delaware Holding Company and as a defendant in this litigation clearly manifests: (1) an intent on his part to defraud and injure ATR by consummating a de facto liquidation of the Delaware Holding Company in which its value was siphoned out entirely to the Araneta family, to the exclusion of ATR; (2) a willingness to put an innocent administrative employee of his at risk by falsely suggesting that she alone (rather than Araneta, Bonilla, and Berenguer as a group) comprised the board of directors of the Delaware Holding Company at the time Araneta impoverished it, all in a cynical attempt to avoid this court's jurisdiction and accountability for his own actions; (3) a contempt for the judicial process by providing a false and incomplete response to a legitimate demand for books and records under 8 *Del. C.* § 220; (4) a desire to obstruct the efficient procession of this litigation by making the discovery process unduly expensive and by failing to promptly produce required discovery; and (5) a shamelessness about telling lies so extreme as to make it impossible to address all of the numerous false statements and assertions he made both from his own lips and through theories he provided to his counsel.

Because of the difficulty of implementing a remedy that would undo the de facto liquidation of the Delaware Holding Company that Araneta effected, I enter an order requiring Araneta to pay to ATR a judgment based on the price ATR originally paid for its 10% equity stake in the Delaware Holding Company, plus pre-judgment and post-judgment interest pegged to a cost of capital determined by reference to an agreement between Araneta and ATR that provides the most reliable benchmark of the interest rate required to make ATR whole and to avoid unjustly enriching Araneta. This judgment may well understate the relief due ATR, as it appears that the LBC Operating Companies are booming. But ATR is

willing to accept this more limited remedy and it is the most efficient means of providing it fair recourse.

Given Araneta's egregious misconduct both before and during this litigation, fee shifting under the bad faith exception to the American Rule is in order. Only through such an award will ATR be made whole for the excessive costs it had to incur in order to address Araneta's faithless acts, and only through such an award will Araneta's misuse of a Delaware corporation be rectified. The fee shifting award will also extend to any collection efforts ATR must expend in attempting to collect on this judgment.

Bonilla and Berenguer will be held jointly and severally liable for the monetary judgment but not for the fee-shifting award.

II. *Factual Background*

These are the facts as I find them after trial.[FN1]

> FN1. Citations to plaintiffs' exhibits ("PX ___"), defendants' exhibits ("DX ___"), or the trial transcript ("Tr. at ___") are illustrative. Other portions of the record often support the same findings.

A. *Overview Of The Key Arrangements Between Araneta And ATR*

Before describing the origins of the current dispute between ATR and Araneta in more detail, it is useful to provide a basic overview of the parties and how they came to form the Delaware Holding Company.

*3 Araneta first met ATR's chairman Ramon Arnaiz when they were in kindergarten in the Philippines. During their school days, Araneta and Arnaiz became close friends. After many years of friendship, the two fell out of touch as each embarked on his own career.

Araneta left the Philippines to attend college in the United States. After completing his studies, Araneta returned home to work in his family's business-an empire of companies run from the Philippines that share the initials LBC in their names (collectively, "LBC").[FN2] Araneta gained prominence by developing LBC Express, Inc. (f/k/a LBC Air Cargo), a Phil-

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 3

ippine version of Federal Express, into an international money remittance business that facilitates and profits from wire transfers made by Filipino expatriates who have gone abroad to make a living but continue to support their families still living in the Philippines. As a result of his efforts, Araneta came to dominate and control LBC and is the ultimate manager for the thousands of employees working for LBC and the hundreds of locations owned by LBC around the globe.[FN3]

> FN2. LBC Development Corp., a corporation organized and existing under the laws of the Philippines, was the primary holding company for the Araneta family businesses before the events giving rise to this dispute. Through this entity, the Aranetas owned the non-U.S. LBC Operating Companies that provided courier and money remittance services in the Philippines and to Filipino expatriates working in other nations. These entities include the following companies and their subsidiaries: LBC Domestic Franchise Co., Inc., LBC Express, Inc., LBC Mabuhay Development Philippine Corp., LBC International, Inc., and LBC Development Bank. The Aranetas also own LBC Holdings USA Corp. (overseen by defendant Bonilla), which serves Filipinos working in the United States.

> FN3. Although Araneta has at various times used his children to directly hold stock in the LBC Operating Companies, his children are subject to his will as to these matters. Araneta exercises de facto and clear control over his family's worldwide holdings.

Meanwhile, Amaiz went into the financial services field. He gained prominence by spearheading the revitalization of a major financial firm's Hong Kong office. Following that success, Arnaiz ("A"), along with Manuel Tordesillas ("T") and Lorenzo Roxas ("R"), founded ATR, a Philippine corporation licensed to provide investment and financial services From its creation, ATR has been essentially a capital provider, helping businesses raise capital and investing its own funds (and those of its investors) in vari-

ous enterprises.

In the late 1990s, Araneta and Arnaiz reunited. At that time, Araneta turned to Arnaiz and ATR for investment banking assistance on behalf of his LBC enterprise. Initially, Araneta engaged ATR to search for capital and to prepare LBC for a public offering. After a while, however, the relationship changed.

In 1999, ATR began investigating an opportunity to purchase a controlling interest in The Professional Group Plans, Inc., a corporation that sold "pre-need" insurance policies designed to cover expenses (such as educational and health costs) that buyers expected to face in the future (the "Pre-Need Company").[FN4] Seeing potential synergies in this industry between ATR's financial acumen and LBC's logistical network, which was well-positioned to attract Filipino customers who had traditionally purchased these policies, Arnaiz offered to structure the investment in the Pre-Need Company as a joint enterprise with Araneta. After some negotiation, Araneta agreed to participate in the deal ATR proposed.

> FN4. According to Araneta, "A pre-need company is like ... an insurance plan except that an insurance plan is something that you sell but you don't know when the event will happen. In the case of the pre-need, it's the same thing but a date is set." Tr. at 20. "In other words, you keep on paying monthly maybe for 20 years; and if anything happens to you within that 20-year period you can make a claim for your health or for your education." Id.

Based on this understanding, ATR and Araneta executed two contracts-an "Undertaking Agreement" [FN5] and a "Joint Venture Agreement" [FN6] that set out the terms of their relationship and laid the groundwork for the Delaware Holding Company's incorporation. Through the Joint Venture Agreement, ATR and Araneta bought a controlling interest in the Pre-Need Company, and as part of this transaction, ATR advanced $3.922 million on Araneta's behalf (the "Advances").[FN7] In exchange for the Advances, Araneta pledged, in the Undertaking Agreement, to contribute the LBC Operating Companies along with

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

his newly acquired interest in the Pre-Need Company to a new holding company and to issue to ATR a 10% minority interest in that entity.[FN8]

> FN5. PX 1.

> FN6. PX 2.

> FN7. The joint investment in the Pre-Need Company was made through one of ATR's subsidiaries, Professional Mutual Holdings, Inc. ("Professional Holdings") in which both Araneta and ATR had acquired 50% interests at a price of 37.5 million pesos (about $937,500) each. Using its 75 million pesos in contributed capital as well as an additional 239 million pesos nominally contributed on equal terms by ATR and Araneta (119.5 million pesos each), Professional Holdings purchased 80% of the Pre-Need Company. In this transaction, ATR advanced Araneta's portion as well as its own. As a result, Araneta owed ATR 157 million pesos (approximately $3.922 million).

> FN8. The Undertaking Agreement specifically provided that Araneta would transfer the following assets to the Delaware Holding Company:
> (i) LBC Domestic Franchise Co., Inc. and its subsidiaries; (ii) LBC Express, Inc. and its subsidiaries; (iii) LBC Mabuhay Development Philippine Corp. and its subsidiaries; (iv) LBC Holdings USA Corp. and its subsidiaries; (v) LBC International, Inc. and its subsidiaries (including all remittance businesses outside of LBC Holdings USA Corp.); (vi) LBC Development Bank; (vii) the foreign exchange business arising from the remittance transactions involving any and all of the above companies.
> PX 1 at 2. For simplicity's sake, I refer to these as the LBC Operating Companies.

*4 To protect ATR's investment in the LBC Operating Companies, the Undertaking Agreement granted ATR contractual protections, including the right to a seat on the board of directors of any holding com-

pany that Araneta ultimately formed as well as a five-year put option, which, when exercised, required Araneta to buy out ATR's interest at the higher of (i) the issue price of ATR's shares plus a premium of between 22% and 25% per year, or (ii) the adjusted book value of ATR's shares.[FN9] Likewise, to safeguard their joint investment in the Pre-Need Company, ATR and Araneta executed a Stockholders Agreement which they attached to their Joint Venture Agreement (the "Stockholders Agreement")[FN10]. The Stockholders Agreement evenly divided the eight (out of ten) board seats secured by ATR's and Araneta's joint 80% interest in the Pre-Need Company, and unanimously appointed Topax Colayco, the residual 20% shareholder in the Pre-Need Company, to be its President and CEO.

> FN9. ATR also had an option to require Araneta to cede the shares the Advances had purchased as well as all rights and interests secured by the Advances if within a period of three months from the closing of the Joint Venture Agreement the LBC Operating Companies were not transferred into the holding company. Although it is undisputed that the holding company was not formed or funded within three months, ATR chose not to exercise this option.

> FN10. DX 1 at Annex "A".

Although the Undertaking Agreement did not require that the holding company it contemplated be a Delaware, or even an American, entity, Araneta perceived the United States as a favorable jurisdiction in which to raise capital and viewed Delaware as a tax haven. In particular, Araneta viewed a Delaware entity as a vehicle that could be used to access the American capital markets through an initial public offering of stock. As a result, in January 2000, Araneta incorporated the Delaware Holding Company and presented ATR with 3,000 of its shares (10%) while personally retaining control over the residual 27,000 shares (90%). Likewise, Araneta appointed and dominated the Delaware Holding Company's board of directors, which consisted of himself, defendant Berenguer (Araneta's niece and the CFO of the LBC group of companies), and defendant Bonilla (the head

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

of LBC's U.S. operations).[FN11]

> [FN11]. Tr. at 109-15. I also note that ATR was not permitted to exercise its contractual right to appoint a director. By letter dated June 24, 2003, Arnaiz explained, "We were never provided regular, updated financials and a board seat ... in spite of our repeated request[s]." PX 51.

Thus, after 1999, ATR and Araneta were entwined in several ways: (1) they were contractually linked through the Undertaking Agreement, the Joint Venture Agreement, and the Shareholders Agreement; (2) they shared equal shareholder and directorial interests in the Pre-Need Company; (3) they possessed inverse majority and minority shareholder interests in the Delaware Holding Company; and perhaps most importantly, (4) Araneta and ATR were tied together through Araneta's friendship with Arnaiz.

### B. The Personal Nature Of This Dispute

ATR's claims against Araneta boil down to an allegation that he abused his position of control over the Delaware Holding Company. Specifically, ATR claims that Araneta transferred the LBC Operating Companies from the Delaware Holding Company to his children for no consideration without notice to ATR and without following the process required by Delaware law.

Araneta does not dispute that the LBC Operating Companies are now owned by his family or that ATR has no interest in those assets through its minority ownership of the Delaware Holding Company. He merely claims never to have transferred ownership of the LBC Operating Companies to the Delaware Holding Company in the first place. He says that ATR knew that. What he never says is why ATR would have made a nearly $4 million payment to acquire 10% of an entity with no valuable assets. Further, in the event that I conclude that he is lying when he says that the Delaware Holding Company never owned the LBC Operating Companies, Araneta offers only the half-hearted and wholly-illogical defense that he was permitted to reclaim the LBC Operating Companies without payment through an accounting "offset" be-

cause he was the one who initially contributed the LBC Operating Companies to the Delaware Holding Company.

*5 To understand how a case as stark as this actually resulted in a trial, rather than a voluntary settlement by Araneta, it is useful to return to Araneta's relationship with his old friend, Ramon Arnaiz. That's right, this case is personal.

Araneta has known Arnaiz since they were five years old. As Araneta testified, he and Arnaiz were "very, very close friends, buddy buddies" who sat next to each other in classes and had parents who played mahjong together several times a week while they were growing up.[FN12] Although Araneta and Arnaiz went to different colleges, and ultimately into different careers, "whenever [they] saw each other [before this dispute], it was really a warm[ ] meeting."[FN13]

> [FN12]. Tr. at 16.

> [FN13]. Tr. at 17.

But, as a result of their business dealings, Araneta's friendship with Arnaiz has ended. Araneta testified that he considers this case a "personal fight" between himself and Ramon Arnaiz.[FN14] He stated in his deposition and confirmed at trial that he did not think his co-directors had "anything to do with this tie-up with ATR."[FN15] And, perhaps most tellingly, he admitted on cross examination that at least "to some extent" this litigation was "over the disintegration of [his] friendship" with Arnaiz.[FN16]

> [FN14]. Tr. at 104.

> [FN15]. Id.

> [FN16]. Id.

That disintegration began in November 2002 when ATR sold its 50% interest in Professional Holdings, the corporation that owned 80% of the Pre-Need Company. Having closely aligned himself with Arnaiz and ATR, Araneta felt betrayed by that action. In compliance with the Shareholders Agreement, which secured ATR's right to sell its Professional Holdings shares as long as Araneta was given a right of first re-

fusal, ATR offered its shares to Araneta, but he refused to purchase them.[FN17] After Araneta declined, ATR sold its interest to Topax Colayco (the "Colayco Sale") giving Colayco co-equal control with Araneta over Professional Holdings and thus over Professional Holdings's 80% control bloc in the Pre-Need Company. But, because Colayco already directly owned the residual 20% of the Pre-Need Company that Professional Holdings did not, Araneta understandably viewed himself as having less leverage than Colayco in this dynamic.

> FN17. See PX 44 (offering shares); Tr. at 59 (rejecting offer); see also DX 1 at Annex "A" § 5 (describing rights and restrictions regarding transfers of Professional Holdings shares).

Notwithstanding ATR's contractual right to sell its interest in Professional Holdings and Araneta's own failure to exercise his right of first refusal, Araneta felt victimized by Arnaiz and ATR and blamed them for subjugating him to the role of a minority investor under Colayco's de facto control. Even though Colayco had been a longstanding 20% shareholder in the Pre-Need Company, had managed its day-to-day operations as its President and CEO with Araneta's consent, and had served on the board of the Pre-Need Company with Araneta from the time Araneta first invested in the Pre-Need Company, Araneta testified that he felt as though he was "stuck running this company with a stranger."[FN18] Most important, he felt that ATR had done the sticking.[FN19]

> FN18. Tr. at 86-90; DX 1 at Annex "A" § 3.03.

> FN19. Araneta testified, "When [ATR] decided to get out of the business, I said 'My God, that's the very essence why I got involved in this business.... I don't understand the pre-need business.... The very person you're selling it to, I don't even know. I came to know him because of you.... How can you do this to me?" Tr. at 60-61.

Araneta allowed this hostility to affect his management of the Delaware Holding Company. After the Colayco Sale, Araneta withheld information, effectively closed the lines of communication with ATR, and eventually transferred all of the LBC Operating Companies out of the Delaware Holding Company.

### C. The Discovery Of Araneta's Misconduct

\*6 Araneta began to exact his revenge soon after the Colayco Sale was completed. In the months that followed, ATR repeatedly requested information on the condition of the Delaware Holding Company in which it still had nearly $4 million invested. But Araneta summarily rebuffed those requests. Araneta testified that any request ATR made for information during the entire 2003 calendar year went ignored because he was "no longer talking to them because [he was] upset with Mr. Arnaiz."[FN20] Throughout the first half of that year, lawyers in the Philippines exchanged letters regarding the "ongoing fight" between Araneta and Arnaiz, but were unable to resolve the matter.[FN21]

> FN20. Tr. at 235.

> FN21. Tr. at 233.

Fed up, ATR, through its attorneys, sent a formal books and records demand letter to Araneta on July 18, 2003.[FN22] In that letter, ATR exercised its right as a stockholder of a Delaware corporation to request financial statements of the Delaware Holding Company as well as documents showing the Delaware Holding Company's ownership of the LBC Operating Companies and Araneta's interest in the Pre-Need Company.[FN23] In hopes of a response, ATR sent additional demand letters to the Delaware Holding Company's corporate secretary at its registered address and to Araneta's attorney in the Philippines on the same day as it sent its letter to Araneta.[FN24] These additional demand letters sought to review the Delaware Holding Company's stock ledger, the records of all business transactions of the corporation, and the minutes of every meeting of the stockholders and directors of the Delaware Holding Corporation since its incorporation.[FN25]

> FN22. PX 53 at 1-3. ATR copied Araneta's son, his lawyer, and the head of LBC's U.S. operations, defendant Bonilla, on this de-

mand. *Id.* at 3.

FN23. *Id.* at 4-9.

FN24. *Id.* (copying Araneta, his son, and Bonilla on each).

FN25. *Id.*

Each of ATR's demand letters warned that ATR would file suit to protect its interests if its demands were denied.[FN26] Yet, even knowing legal action was imminent, Araneta testified that he was "so angry with Mr. Arnaiz" that he "ignored these letters" and prevented ATR from gaining the information it sought.[FN27] Starved for information, ATR filed an action under 8 *Del. C.* § 220 in this court on October 27, 2003. But still irked by ATR's decision to sell its interest in Professional Holdings, Araneta "deliberately ignored" that lawsuit and instructed Bonilla not to provide the requested information.[FN28]

FN26. *See* PX 53 at 2 ("If we do not receive any response from you within ten (10) days ... we shall be constrained to initiate the appropriate legal actions ... to protect our client's interests."); *id.* at 5, 8 (providing similar warnings).

FN27. *Id.* at 238.

FN28. *Id.* at 239. Specifically, when discussing the § 220 litigation with Bonilla, Araneta told him, "Don't mind it." *Id.*

Only after being ordered by this court to turn over the records requested by ATR did Araneta do so. On January 14, 2004, Araneta produced a "Compliance"[FN29] that purported to include all available documents but totaled only nine pages and failed to include many essential corporate papers.[FN30] The nine pages that Araneta did produce, however, included three documents that caused ATR great concern. Those documents-two balance sheets and a purported resolution of the board of directors-led ATR to believe that Araneta had conducted a de facto and (non-pro rata) liquidation of the Delaware Holding Company's assets and that Araneta was attempting to es-

cape responsibility for that act.

FN29. PX 54.

FN30. In response to the pithy Compliance, ATR was permitted to depose Mr. Bonilla under 10 *Del. C.* § 368. That deposition uncovered several documents that had not been previously disclosed including the bylaws of the corporation, the corporate kit, and various financial and tax-related working papers. Finding that the corporation had not complied with its December 22 order, the court awarded ATR its attorneys' fees in prosecuting the § 220 action. Araneta's inappropriate behavior continued throughout the present litigation wherein he was repeatedly non-responsive, delayed the proceeding, and had to be admonished for exhibiting "close to contemptuous behavior" and having committed a "clear violation" of applicable rules by engaging in a "persistent pattern [of] flouting obligations that he owes under the rules of this Court and, frankly, under the Delaware General Corporation Law." *See* 4/20/04 Hearing Tr. at 10, 57, 59, 61, 67 (noting that "the horsing around, the inappropriate behavior, began long ago").

The two balance sheets that manifest the de facto liquidation are dated March 2003 and December 2003, respectively. Under Philippine accounting conventions, as adopted by the parties, both balance sheets reflect "investments" and "liabilities" in an unusual way. On the Delaware Holding Company's books, "investments" referred to the LBC Operating Companies and the Professional Holdings shares purchased for Araneta by ATR's Advances, which were to be owned by the Delaware Holding Company under the terms of the Undertaking Agreement. "Liabilities" represented the pro rata amounts due to Araneta and ATR as a result of the equity positions that each gained for their capital contributions. As of March, the Delaware Holding Company's balance sheet reflected approximately $36 million in "investments" and approximately $39 million in "liabilities." But, by December, the balance sheet showed only $937,500 in "investments" and $3.922

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

million in "liabilities." These financial statements indicated that during the last nine months of 2003 Araneta stripped the Delaware Holding Company of the LBC Operating Companies. The only operating asset he left in the Delaware Holding Company was ownership of the de facto minority position in the Pre-Need Company.

\*7 A board of directors resolution Araneta produced in the Compliance is relevant in considering Araneta's intentions. In that document, dated May 22, 2003, Araneta putatively resigns his directorship along with Berenguer and Bonilla effective that day. In their stead, Araneta's secretary, Vicente, was supposedly appointed that day as the President and sole director of the Delaware Holding Company. As I discuss later, Vicente never assumed those positions and Araneta, Bonilla and Berenguer never left the Delaware Holding Company board. Araneta seems to have created this fiction in order to set up a phony defense to this court's jurisdiction and to claim that Vicente was responsible for any misfeasance at the Delaware Holding Company after May 22, 2003–a futile exercise in "plausible deniability."

*D. The Parties' Claims*

Based on the balance sheets unearthed in the § 220 action, ATR filed this lawsuit on June 3, 2004. ATR's complaint alleges direct and derivative injuries caused by the removal of the LBC Operating Companies, which were valued at nearly $36 million, from the Delaware Holding Company between March and December 2003. ATR claims that it was harmed as a stockholder of the Delaware Holding Company when Araneta effectively made a $36 million liquidation payment to his family without following the required process and without distributing to ATR its pro rata portion thereof. ATR also alleges that the corporation itself was injured by this transaction because it received no substantial consideration for the transfer of substantially all of its assets to the Araneta family.

In response, Araneta mounted three shifting defenses. First, he raised a "scapegoat" jurisdictional defense based on his purported resignation from the board of directors.[FN31] Further, in the event his jurisdictional

argument proved unpersuasive, Araneta attempted to explain that contrary to his own contemporaneous admissions in e-mails, letters, and financial statements-and, yes, even tax filings-the LBC Operating Companies were never transferred into the Delaware Holding Company in the first instance because of tax issues.[FN32] Ultimately, in his deposition and at trial, perhaps recognizing the difficulties inherent in this "believe-me-now-I-was-lying-then" tax defense, Araneta proffered a half-hearted justification for the transfer of assets as an "offset" against the "liability" his family was owed for having contributed those assets.[FN33] If his implausible excuses were not expending ATR's and this court's limited resources and impeding ATR's just claim for recompense, Araneta's brazen and abundant falsehoods might be amusing. Because they have these costs, they are appalling.

> FN31. Araneta raised this defense in his very first pleading, a Motion to Dismiss or Stay filed in July 6, 2004. Araneta also made this argument as his first affirmative defense in his Answer dated August 2, 2004.

> FN32. This "tax defense" first appeared with along with the jurisdictional defense in Araneta's Motion to Dismiss or Stay. Over the two years since then, this argument gained prominence, becoming the focus of Araneta's pre-trial briefing.

> FN33. *See* Tr. at 253-58 (referencing deposition testimony).

*1. Araneta's Scapegoat Defense*

In May 2003, Araneta claims that the composition of the board of directors of the Delaware Holding Company changed. Araneta asserts, based on a purported board resolution dated May 22, 2003 (the "May 2003 Resolution"), that he, Bonilla and Berenguer resigned as directors, and were replaced by one of his employees at LBC in the Philippines, Marites Vicente.

\*8 Vicente is the assistant to the executive secretary to the chairman at LBC, which means that she reports directly to Araneta's secretary and ultimately to Araneta himself.[FN34] In this position, Vicente did the typing and filing for Araneta and his in-house at-

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 9

torneys, who included Ronaldo Tugonon, and sat at a desk just outside Araneta's office.[FN35] As part of her responsibilities, Vicente testified that she was regularly called upon to sign documents, many of which she did not understand, at the request of her bosses-Araneta and his attorneys.[FN36] For her work, Vicente earned a salary of 11,500 pesos (less than $300) per month. Valuing her job, Vicente never refused to perform the tasks her superiors asked her to perform, and in the three years she had worked for LBC, she never mustered the courage to ask Araneta for a raise even though she believed she deserved one.[FN37] In this light, Vicente admits that her signature appears on the Compliance, the May 2003 Resolution, and other corporate documents, but she denies that she understood those documents or ever knowingly became a director and officer of the Delaware Holding Company as Araneta has suggested.[FN38]

> FN34. Vicente at 5-6.

> FN35. Vicente at 4-5.

> FN36. See, e.g., Vicente at 43-45, 47, 50, 58.

> FN37. Vicente at 3-4, 23-24.

> FN38. See, e.g., Vicente at 42-50, 57-58

Araneta's contention that Vicente was appointed as a director and officer of the Delaware Holding Company is likewise without support in the record. Neither the actions nor testimony of Araneta, Bonilla, Berenguer or Vicente are consistent with a complete overhaul of the board of directors of the Delaware Holding Company in May 2003. Vicente testified that she was never a director or officer of the Delaware Holding Company and that she was "surprised" to learn that she was listed as having those positions.[FN39] In fact, Vicente did not even know the name of the Delaware Holding Company and did not have any idea what the May 2003 Resolution was when it was shown to her.[FN40] Perhaps this should have been unsurprising because at his deposition, Araneta testified that he had appointed Vicente to those roles because "[s]he was there" and "[s]he looked timid."[FN41] Bonilla and Berenguer were likewise unaware of Vicente's appointment to

the board. Berenguer testified that she did not learn of Vicente's apparent appointment until October or November of 2004.[FN42] Bonilla agreed that it was "news to [him] upon receiving [the Compliance containing the May 2003 Resolution while testifying] that [Vicente] was the president and director of the company."[FN43] Even Araneta did not acknowledge the role he purportedly assigned to Vicente-failing to name her as one of his co-directors at his deposition.[FN44]

> FN39. Vicente at 56.

> FN40. Vicente at 37-38, 46-47.

> FN41. Araneta Dep. at 264.

> FN42. Berenguer at 193.

> FN43. Bonilla I at 85.

> FN44. Tr. at 259-60.

The actions of Araneta, Bonilla, and Berenguer further manifested their ongoing service as directors after May 22, 2003. On May 23, 2003, the very day after he claims to have resigned, Araneta himself approved a board resolution-which he signed as a director!-to change the name of the Delaware Holding Company (the "Name Change").[FN45] Soon thereafter, Bonilla received a copy of the Name Change, and proceeded to prepare, sign, and file a certificate amending the Delaware Holding Company's charter on June 17, 2003, in accordance with the Name Change.[FN46] Moreover, in his mind, Bonilla continued to serve as a director of the Delaware Holding Company until December 2003.[FN47] Consistent with the notion that the leadership of the Delaware Holding Company remained unchanged until late 2003 or early 2004, Berenguer testified that she was still acting in her fiduciary capacity in January 2004.[FN48] Finally, even Araneta supported this notion when he stated that his co-directors at the time he prepared a balance sheet dated December 31, 2003 were Berenguer and Bonilla, but not Vicente.[FN49]

> FN45. PX 54 at 7.

> FN46. PX 54 at 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 10

FN47. Bonilla I at 44-45.

FN48. *See* Berenguer at 139-45; Berenguer Ex. 2, at 21 (establishing that Berenguer signed a stock certificate as an officer of the Delaware Holding Company on January 9, 2004). I do note that Berenguer's testimony regarding her board service was a bit uncertain. She testified that she resigned from the boards of all companies except LBC Development and LBC Development Bank sometime during the period from April or May 2003 through December 2003. But, she was unable to be more specific about her resignation from the Delaware Holding Company's board than to agree that she believed she resigned "at some point after May 2003," and that she thought it might have been "[a]ny time from May ... to August." Berenguer at 82-83.

FN49. Tr. at 259-60.

*9 Thus, only the date on the May 2003 Resolution itself seems to indicate that a transition of the board of directors occurred at the Delaware Holding Company on May 22, 2003. Yet, even this resolution is suspect. At trial, ATR presented evidence that the substance, format, and notary stamps used in preparing this resolution were consistent with it being created in January 2004-at the same time as the Compliance-rather than in May 2003-a day before the Name Change.FN50 Specifically, the Name Change refers to the Delaware Holding Company as "LBC Global Corporation," uses a type-written fill-in-the-blank format, and bears a notary stamp from Ronaldo Tugonon in a bolded, sans-serif font.FN51 Meanwhile, both the certification of share ownership submitted in the Compliance and dated January 9, 2004 (the "Certification") and the May 2003 Resolution employ a fully-completed word-processed format, refer to the Delaware Holding Company as "PMHI Holdings Corporation (formerly LBC Global Corporation)," and carry a faded notary stamp from Tugonon in a serif typeface.FN52 Perhaps most striking is that when confronted with these documents Araneta did not vehemently deny a charge of fabrication; instead, he claimed a convenient lack of

memory.FN53

FN50. In his post-trial briefing, Araneta submitted the affidavit of Ronaldo Tugonon, the LBC in-house attorney who notarized each of the documents in question, which asserts that Tugonon maintained two offices and two notary stamps, and that his notary logs support the contemporaneous notarization of the May 2003 Resolution, rather than it being back-dated. Def. Post-Trial Br. Ex. 3. I do not consider this post-trial affidavit or its exhibits because it was submitted after the close of evidence at a time when ATR was unable to cross-examine Tugonon or test the merits of his affidavit. *See Stigliano v. Anchor Packing Co., 2006 WL 3026168, *1 (Del.Super.Ct.2006)* (concluding that a post-deposition affidavit was hearsay and "not sufficiently trustworthy to allow its admission" when it had not been "tested by cross-examination"). I further note that the two-cities-two-stamps position Tugonon advances is hardly unassailable given that the "PTR" lines at the end of each notary stamp list the city of Pasay. *See* PX 59. Moreover, Tugonon's credibility is also suspect because he was likely involved, at the very least, in having Vicente sign documents in a capacity to which she was never properly appointed, which she did not understand, and which she never knowingly assumed.

FN51. PX 59.

FN52. *Id.*

FN53. Tr. at 142.

The timing of the May 2003 Resolution and the date of its appearance in this case also support ATR's claim of fabrication because this chronology establishes a motive for the creation of such a document. The May 2003 Resolution first appeared in the January 2004 Compliance-nearly six months after ATR's July 2003 demand letters put Araneta on notice of impending litigation and nearly three months after the § 220 action was filed-at a time when Araneta must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 11

have realized that this court would not permit him to ignore ATR's demands. Moreover, when the May 2003 Resolution was produced in the Compliance, it was accompanied by balance sheets indicating that the removal of the LBC Operating Companies occurred between May 31, 2003 and December 31, 2003-after Araneta's purported resignation.[FN54] On that basis, Araneta asserted jurisdictional defenses and attempted to shift responsibility to Vicente.

FN54. See PX 54.

In light of all the evidence presented, it is possible that the May 2003 Resolution is a back-dated fabrication. Regardless, it is clear that none of the actual Delaware Holding Company directors stood behind it. Each continued to act as a Delaware Holding Company officer and director after that date. As important, it is undisputed that Vicente never accepted appointment to the Delaware Holding Company board and was not properly appointed at any board meeting, by any stockholder vote, or by any other recognized corporate procedure.[FN55] As such, I find the board of the Delaware Holding Company at all relevant times consisted of Araneta, Bonilla, and Berenguer. Consequently, I hold that as a factual matter Vicente was never a director of the Delaware Holding Company.

FN55. See Berenguer at 200-01 (confirming that the Delaware Holding Company did not have board meetings after January 2001, when its incorporation and funding were completed, and that there was never a formal meeting of the stockholders of the Delaware Holding Company at any time).

### 2. Araneta's Tax Defense

*10. Araneta's assertion that the Delaware Holding Company was never fully funded or operational is also one I reject as false. Araneta states that he never transferred the LBC Operating Companies to the Delaware Holding Company and that certain post-registration requirements necessary to commence business operations were never completed. As such, he contends that the plan to create and utilize the Delaware Holding Company to implement the Un-

dertaking Agreement was abandoned in May 2000 as a result of certain adverse tax consequences of that proposal. But, these tax issues were resolved by December 2000-before the Delaware Holding Company was incorporated, before Araneta confirmed the Delaware Holding Company's ownership of the LBC Operating Companies, and before Araneta caused the Delaware Holding Company to file tax returns containing that same information.

Araneta bases his tax argument on the receipt of an opinion letter from a tax specialist that identified material tax obligations that would arise if the LBC Operating Companies were transferred into the Delaware Holding Company. That letter dated May 10, 2000 expressed the opinion that:

The proposal to make [LBC], a Philippine corporation, into a subsidiary of [the Delaware Holding Company] (a U.S. corporation) by an exchange of shares raises a number of concerns ... [because] corporations formed in the U.S. are taxed by the U.S. on their worldwide income, generally at a 34% or 35% rate on income above $100,000, though with limited crediting of the foreign tax they pay on foreign income.... On the other hand, the U.S. generally has no tax claim on the profits of non-US subsidiaries of non-US corporations.[FN56]

FN56. DX 21 at 4. Araneta also testified that he was informed that the initial transfer of assets into Delaware would create a tax liability in excess of $7.4 million. Tr. at 35 ("[T]here was a big mistake in incorporating-in putting assets in Delaware because of a very exorbitant or huge tax problem that my family or LBC was going to absorb. At some point, the amount ... was, in the tune of 7.4 to $8 million, rough estimates.").

As a result of these adverse tax consequences, Araneta testified that the Delaware Holding Company was abandoned as the implementation device and his focus shifted towards creating a holding company in Hong Kong.[FN57]

FN57. Tr. at 222.

ATR contends that any tax issue Araneta had with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 12

use of the Delaware Holding Company in the months surrounding May 2000 was resolved before the end of that year. Manuel Tordesillas, ATR's chief executive officer and one of the parties who signed the Undertaking Agreement, testified that he was not made aware of any tax issues that prevented the transfer of assets to the Delaware Holding Company until the start of this litigation.[FN58] Further, because the Undertaking Agreement placed the responsibility on Araneta and LBC to organize and fund the Delaware Holding Company, Tordesillas explained that ATR was not involved in these implementation issues.[FN59]

> FN58. Tr. at 289.

> FN59. Tr. at 299-300, 383. This is unsurprising because the primary funding for the Delaware Holding Company was the transfer of assets controlled by Araneta, not ATR.

Moreover, by December 2000, ATR solicited and obtained Araneta's confirmation that he had incorporated and funded the Delaware Holding Company as part of ATR's negotiation of the sale of its 10% interest in the Delaware Holding Company to Philtread Tire & Rubber Company ("Philtread"). In connection with this sale, ATR informed Araneta of the need to complete the transactions required by the Undertaking Agreement. On December 8, 2000, Arnaiz emailed Araneta saying, "[T]o date, LBC is not in compliance with our agreement that requires LBC to set up a holding company incorporating under it all its subsidiaries."[FN60] That same day, Araneta responded:

> FN60. PX 7 at 2.

**11** PLEASE BE INFORMED THAT WE HAVE ALREADY INCORPORATED THE HOLDING COMPANY FOR YOUR ENTRY AS PER OUR PREVIOUS AGREEMENTS ........ WE HAVE ALSO RESOLVED WITH OUR TAX CONSULTANTS THE MANNER OF THE TRANSFER OF SOME ASSETS TO THE HOLDING CO[.]. WE SHOULD WITHIN A WEEK OR TWO BE ABLE TO ISSUE IN THE NAME OF ATR [ITS] TEN

PERCENT OWNERSHIP AND TOGETHER WITH IT THE STOCK CERTIFICATE CORRESPONDING TO THE TEN PERCENT.[FN61]

> FN61. PX 7 at 1 (capitals and ellipses in original).

Three days later, on December 11, 2000, Araneta reiterated:
THE HOLDING COMPANY THAT WILL OWN THE "ARANETA" INTERESTS IN 100% LBC HOLDINGS USA, 100% LBC DEVELOPMENT AND 50% OF PROFESSIONAL MUTUAL HOLDINGS INC. IS LBC GLOBAL.... WE [ARE] REQUIRING LBC HOLDINGS USA AND LBC DEVELOPMENT TO ISSUE THE NECESSARY CERTIFICATES IN FAVOR OF LBC GLOBAL CORPORATION.[FN62]

> FN62. PX 8 at 1.

These emails are devastating to Araneta's claims that tax problems forced the abandonment of the Delaware Holding Company in early-to-mid 2000 and that as a result of those alleged tax problems, no assets were ever transferred to the Delaware Holding Company. Rather than demonstrate a continuing reluctance or refusal to transfer assets, the emails indicate that by December 11, 2000, any tax problems relating to the transfer of the LBC Operating Companies to the Delaware Holding Company had been resolved such that Araneta was issuing the necessary certificates to effect this transfer.[FN63]

> FN63. See PX 7, 8.

In addition to his December 2000 emails, Araneta personally confirmed that the Delaware Holding Company owned the LBC Operating Companies on two separate occasions in 2001. On January 22, 2001, Araneta signed a deed of adherence letter (the "Deed of Adherence") in both his personal capacity and as chairman of LBC Development attesting to the transfer of the LBC Operating Companies to the Delaware Holding Company.[FN64] Six months later, on July 26, 2001, Araneta executed, in his personal capacity and on behalf of the Delaware Holding Company, a confirmation letter (the "Confirmation Letter") clari-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 13
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

fying the Deed of Adherence and providing a balance sheet indicating that assets were owned by the Delaware Holding Company as of March 31, 2001.FN65

FN64. PX 20.

FN65. PX 27.

The Deed of Adherence explicitly confirmed the formation and funding of the Delaware Holding Company. It verified that:
[T]he holding company referred to as LBC HoldCo [the Delaware Holding Company] in the Undertaking Agreement has now been duly incorporated under the laws of the State of Delaware, U.S.A. and is named "LBC Global Corporation" which now owns, directly or indirectly, the Professional Holdings Shares, the Professional Holdings Advances, all the shares and interest in LBC and all the shares and interests in the companies and businesses which are owned and controlled by [Araneta], as follows:
(i) LBC Domestic Franchise Co., Inc. and its subsidiaries;
(ii) LBC Express, Inc. and its subsidiaries;
(iii) LBC Mabuhay Development Philippine Corporation and its subsidiaries;
(iv) LBC Holdings USA Corp. and its subsidiaries;
*12 (v) LBC International, Inc. and its subsidiaries (including all remittance businesses outside of LBC Holdings USA Corporation);
(vi) LBC Development Bank;
(vii) the foreign exchange business arising from the remittance transactions involving any and all of the above companies.FN66

FN66. PX 20 at 1-2.

Likewise, the Deed of Adherence included Araneta's consent to ATR's transfer of its interest in the Delaware Holding Company to Philtread and ATR's affiliation with Philtread going forward.

The drafting history of the Deed of Adherence reinforces Araneta's contemporaneous representations. Araneta originally agreed to provide the Deed of Adherence in the Undertaking Agreement, and confirmed that intention on January 9, 2001 in an email

to ATR.FN67 He received an initial draft of the Deed of Adherence on January 10, 2001, and an electronic version the following day.FN68 Araneta and his attorneys revised the Deed of Adherence and sent it back to ATR for comments.FN69 ATR further revised the document to provide for ownership "directly or indirectly" of the assets by the Delaware Holding Company and to clarify language allowing the transfer of the assets to a Hong Kong entity only "provided, that all the assets ... shall *remain* owned and held by a single holding company, and that ATR shall in any event own and hold 10% of the capital stock of the same holding company." FN70 Neither Araneta nor his attorneys amended or renounced the claim that the LBC Operating Companies had, in fact, been transferred to the Delaware Holding Company, and Araneta executed the final version of the Deed of Adherence guaranteeing ATR's right to 10% of those assets.

FN67. Tr. at 170-71.

FN68. PX 15.

FN69. PX 18.

FN70. PX 19 at 1-2 (emphasis added).

The Confirmation Letter signed six months later reaffirmed the formation of the Delaware Holding Company and its ownership of the assets in both its text and in the balance sheet it incorporated as an attachment. The Confirmation Letter clearly stated:
As contemplated in the Undertaking Agreement and the [Deed of Adherence], LBC Global Corporation [i.e., the Delaware Holding Company] ... now owns directly or indirectly, the Professional Holdings Shares, the Professional Holdings Advances, all the shares and interest in LBC Development Corporation and the companies and businesses listed in the Undertaking Agreement which are owned and controlled by Mr. Carlos R. Araneta.FN71

FN71. PX 27 at 1.

Likewise, the balance sheet dated March 31, 2001 that was attached to the Confirmation Letter illustrated the Delaware Holding Company's recognition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 14

of both its ownership of the LBC Operating Companies as assets and its pro rata liabilities to the Araneta family and ATR as described in the text of the letter.FN72 On the balance sheet, LBC Holdings USA, LBC Development, and Araneta's Professional Holdings shares are all listed under assets as "Investments" having a value of $36,235,500 at cost.FN73 Likewise, the balance sheet shows "Liabilities" of $39,220,000, represented as $3,922,000 "due to" ATR as well as a $35,298,000 "accounts payable" entry for the Araneta family.FN74 These "Liabilities" correspond exactly to the relative ownership of the Delaware Holding Company-10% to ATR and the remaining 90% to Araneta.

> FN72. The Confirmation Letter explained the unique accounting methods used for the contribution of the assets. ATR and Araneta's contributions, although infusions of cash generating equity ownership interests, were recognized as liabilities due to the shareholders under a Philippine accounting practice. The Confirmation Letter clarified that the liabilities reflected on the balance sheet as a result of this transaction were payable pro rata based on percentage share ownership, much like dividends would be paid on equity. Specifically, the Confirmation Letter explained that "[a]ny conversion of all or any portion of the liabilities into equity shall be effected by LBC Global pro rata in proportion to the outstanding amount owed to each of the holders thereof," and "[a]ny full or partial payment or prepayment by LBC Global of the liabilities shall be made to all holders thereof pro rata in proportion to the amount owed to them respectively." PX 27 at 1-2.

> FN73. Id. at Annex "A."

> FN74. Id.

*13 In addition to Araneta's representations of the Delaware Holding Company's ownership of the assets, disclosures and financial statements by others affiliated with the Delaware Holding Company confirm that the corporation held controlling interests in the LBC Operating Companies from 2001 through 2003. Berenguer created a balance sheet identical to the one discussed above on July 19, 2001 in preparation for its inclusion in the Confirmation Letter.FN75 Victor Marquez, the Delaware Holding Company's accountant, distributed another copy of that very same balance sheet in the corporation's financial statements dated March 2001 and March 2002 FN76 and proffered it under the pains and penalties of perjury to the State of Delaware and the federal government as part of the corporation's tax returns filed for 2001 and 2002.FN77 In fact, no financial statement prepared between the balance sheet incorporated in the July 2001 Confirmation Letter-which Berenguer testified to have double checked before submitting FN78-and the balance sheet dated May 31, 2003 prepared by Araneta and submitted in connection with his Compliance in the § 220 action that preceded this dispute ever showed any combination of assets, liabilities, and equity inconsistent with the Delaware Holding Company's ownership of the LBC Operating Companies.

> FN75. PX 23. Berenguer also testified to the Delaware Holding Company's ownership of the LBC Operating Companies on at least seven different occasions during her testimony. See Berenguer at 88-89, 155, 174, 177, 186, 201, 281.

> FN76. See PX 25; PX 47.

> FN77. See PX 41; PX 50.

> FN78. Berenger testified that she was "double careful" in reviewing the figures on the balance sheet, and that she "cross-checked them against the letter" before she or Araneta signed off on them. Berenguer at 153-55.

On the basis of this contemporaneous record and as a predicate to my ultimate decision in this case, I conclude that the Delaware Holding Company owned the LBC Operating Companies. Correspondingly, I find that Araneta's testimony to the contrary was self-serving and untruthful.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 15

### 3. *Araneta's Offset Defense*

Araneta's final defense is a semantic attempt to disguise the unfairness of his removal of the LBC Operating Companies. To explain the differences in the March 2003 and December 2003 balance sheets, Araneta testified that he had "offset" the roughly $36 million in assets he had removed from the Delaware Holding Company, i.e., the LBC Operating Companies, against the liability the Delaware Holding Company showed as "payable" to his family in the same amount.[FN79] He maintains that the Delaware Holding Company is better off as a result of this transaction because of this decrease in its liabilities.[FN80] But, Araneta still claims control over 90% of the equity in the Delaware Holding Company and never indicated that the assets had been transferred to any other holding company in which ATR would have a minority interest.[FN81]

> FN79. When asked whether he had "offset the LBC assets-LBC Holdings and LBC Development-which added up to roughly 36 million ... against the Araneta advance liability that equaled the same 36 million," Araneta answered, "Yes. I think so, yes." Tr. at 253-54. Moreover, Araneta agreed that he "didn't consult with anyone when [he] did that." *Id.* at 254.

> FN80. *Id.*

> FN81. *Id.*

This "offset" defense does not withstand even minimal scrutiny. Despite the nomenclature on the financial statements, which characterize the contributions of the Advances and the LBC Operating Companies as "liabilities" rather than "equity," there is no dispute that the LBC Operating Companies were contributed in exchange for Araneta's 90% equity interest. Moreover, the Deed of Adherence and Confirmation Letter explain that any distributions out of the Delaware Holding Company would be paid pro rata on the majority and minority equity investments. No pro rata payment was made to ATR, and Araneta did not forfeit his equity position in the Delaware Holding Company when he cashed out the assets that he

initially contributed. Thus, this scenario is even further removed than a non-pro rata exchange accompanying the retirement of the majority equity stake, which would liquidate one investor's stake and leave the remaining investor in complete control of the remaining assets. Here, the majority investor claims not to have given up his equity position even though it withdrew the entirety of its investment.

*14 It is illogical that ATR would be in a better position owning 10% of what had essentially become a shell corporation than it had been in while indirectly owning a share of the LBC Operating Companies. After the removal of the LBC Operating Companies, ATR's interest in the Delaware Holding Company was essentially a 10% stake in Araneta's minority position in the Pre-Need Company.[FN82] If such a result were permitted to stand, it would unjustly enrich Araneta because after removing the same assets that he initially contributed he would have gained an indirect interest in the Pre-Need Company for nothing. That result is untenable, especially because ATR paid the costs of acquiring the Pre-Need Company out of its coffers in 1999. Thus, no legitimate offset could have taken place.

> FN82. Tr. at 256-58.

Factually, then, Araneta's "offset" argument is without basis. Unlike some scenarios in which there may be a dispute as to the values given or received, this is a straightforward self-dealing case in which Araneta took something for nothing. His secretive conduct reinforces this point.[FN83] Thus, I find the factual predicate for Araneta's "offset" argument has not been satisfied.

> FN83. Araneta admitted that he alone decided to carry out this transaction without consulting with anyone, without notifying the other directors, and without informing ATR. Tr. at 254, 260.

### E. *The Philippine Litigation Front*

After ATR filed its § 220 action in Delaware and was met with Araneta's first instance of litigation abuse, it was sued by Araneta in the Philippines. In that action, Araneta sought, among other relief, the annulment of

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 16

the Undertaking Agreement and Joint Venture Agreements on the grounds that ATR fraudulently concealed the implications, risks and consequences involved in the acquisition of the Pre-Need Company.FN84 In response, ATR sought a declaration of validity and judicial approval of the Colayco Sale.

> FN84. Def. Post-Trial Br. Ex. 1 at 1. Jurisdiction for this contractual dispute was established in the Philippines based on forum selection clauses in both the Joint Venture Agreement and Undertaking Agreement providing: "Each of the parties irrevocably consents to the exclusive jurisdiction of the courts of the National Capital Judicial Region with respect to any action or proceeding relating to this Agreement." PX 1 at 5; DX 1 at 8.

In the end, Araneta lost his case in the Philippines decisively. The Regional Trial Court refused to annul any of the contracts between the parties.FN85 In upholding the validity of the Joint Venture Agreement and the Undertaking Agreement, the Regional Trial Court found that "there was no incident present in the case that would destroy the freedom of Araneta to enter in the agreements" and described Araneta's grounds for annulment to be "sham and contrived." FN86 It dismissed Araneta's complaint and entered judgment for ATR on January 24, 2006.

> FN85. Def. Post-Trial Br. Ex. 1 at 4.

> FN86. Id. at 3-4.

Following that decision, Araneta moved for reconsideration and ATR moved to enforce its rights under § 5 of the Undertaking Agreement, which granted ATR a put option whereby ATR could require Araneta to purchase its interest in the Delaware Holding Company. After reviewing the claims, on May 8, 2006, the Regional Trial Court reaffirmed the validity of the Undertaking Agreement and amended its previous decision to include the implementation of the provisions of § 5 of the Undertaking Agreement.FN87 As such, the court found Araneta "liable for the aggregate subscription or issue price of

the [Delaware Holding Company] shares and the premium of 25% per annum." FN88 Araneta, of course, appealed that judgment. The parties indicate that the appellate process in the Philippines could take many years to complete.

> FN87. Def. Post-Trial Br. Ex. 2 at 2.

> FN88. Id. at 3.

### III. Legal Analysis

*15 With this backdrop in mind, I begin my analysis with Araneta's suggestion that this court is not the proper forum for ATR's claims. I next turn to Araneta's disloyal conduct and false disclosures while serving as the dominant director and controlling stockholder of the Delaware Holding Company. Then, I focus on the other directors-Bonilla and Berenguer-and take up the questions regarding their responsibility to monitor Araneta's conduct. Finally, I address the appropriate relief to be awarded, including whether to grant ATR's request for an award of imposition of attorneys' fees and costs.

### A. Delaware Is The Proper Forum For ATR's Claims

Araneta contends that the entirety of his dispute with ATR should have been resolved in the Philippines under the terms of the forum selection clauses of the Joint Venture Agreement and the Undertaking Agreement. But, in this court, ATR has premised its claims entirely on the fiduciary duties Araneta, Berenguer, and Bonilla owed to it as directors of a Delaware corporation, not on any other contractual duties that may exist between the parties. As such, this court may properly decide ATR's Delaware law claims.

Under the teaching of *Parfi Holding AB v. Mirror Image Internet, Inc.,* FN89 ATR was not required to press its Delaware law claims in the Philippines, as they do not "depend on the existence" of the Undertaking Agreement or Joint Venture Agreement for their viability.FN90 When sued by Araneta in the Philippines, ATR had no practical choice but to invoke its contractual remedies as defenses. By doing so, ATR did not waive claims it had against Araneta that are grounded in other legal and equitable duties Araneta owed to it that were not contractual in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nature.

> FN89. 817 A.2d 149 (Del.2002).

> FN90. *See id.* at 155-57 (explaining that "fiduciary duties ... consist of a set of rights and obligations that are independent of any contract" and can only be limited in their assertion by contractual provisions when "the claims based on fiduciary duties touch on the obligations created in the [contract]").

Here, ATR simply seeks to finish the process it began in July 2003, before Araneta filed his action in the Philippines, when it first began to pursue Araneta for breaching his duties as the director of a Delaware corporation. The existence of the Philippine litigation provides Araneta no defense. If he wished to escape this court's jurisdiction in responding to claims against him as a Delaware director, he needed to secure an explicit right to that effect. He did not do so and this court is available to ATR for it to seek redress as a stockholder of a Delaware corporation. Because ATR's claims alleging breaches of fiduciary duty by Araneta-as well as his co-directors Bonilla and Berenguer-arise independently of the parties' contracts, ATR does not seek an impermissible double recovery.

*B. Araneta Breached His Duty Of Loyalty By Stripping The Delaware Holding Company Of Its Major Assets For No Consideration*

ATR's allegations against Araneta are clear-cut claims of self-dealing by a controlling shareholder and director of a Delaware corporation. Araneta does not contest that he was the controlling shareholder of the Delaware Holding Company, and I have already found that his factual argument that he was not a director at all relevant times is without merit. Similarly, I have found as a fact that Araneta removed from the Delaware Holding Company its primary assets-its ownership of the LBC Operating Companies. In its financial statements and tax filings, the Delaware Holding Company had valued this ownership interest at over $36 million.[FN91] Yet, by the end of 2003, this value had disappeared from the Delaware Holding Company's books. To where did Araneta remove

the assets? To his family. What did the Delaware Holding Company receive in exchange? Effectively nothing. Araneta did not even reduce his 90% interest in the Delaware Holding Company when he repossessed the very assets that had secured that interest in the first place. Araneta simply took the LBC Operating Companies back in a fit of pique.

> FN91. *See* Tr. at 254.

*16 The standard of review to evaluate this self-dealing is, of course, the entire fairness standard.[FN92] As a director, Araneta had a duty of loyalty to the Delaware Holding Company to act in the best interests of the corporation and its shareholders and in a manner such that there would be "no conflict between [his] duty and [his] self-interest."[FN93] Thus, as the director who conceived of and carried out the transfer of the LBC Operating Companies from the Delaware Holding Company to members of his family for no value, Araneta bore the burden of establishing the fairness of this transaction.[FN94]

> FN92. *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.").

> FN93. *Guth v. Loft, Inc.* 5 A.2d 503, 510 (Del.1939).

> FN94. *See Chaffin v. GNI Group, Inc.,* 1999 WL 721569, at *5 (Del. Ch.1999) (finding that a father "must be deemed 'interested' in a transaction from which his child stood to benefit substantially in career and economic terms" and that "the entire fairness standard would apply").

Likewise, as the majority stockholder of the Delaware Holding Company, Araneta owed fiduciary duties to the minority shareholders of the corporation when dealing with the corporation's property.[FN95] In this role, Araneta was prohibited from using his position of control to extract value from the corporation to the exclusion of, and detriment to, the minority stockholders.[FN96] Consequently, in this capacity as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 18

well, the law imposed upon Araneta the obligation to prove that the transfer he structured using his total dominion over the Delaware Holding Company's affairs was fair to the minority rather than an extraction of value to their detriment.[FN97] Araneta did not do that.[FN98]

> FN95. *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109-10 (Del.1952).

> FN96. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971).

> FN97. *See id.* at 721 (explaining that where a parent corporation "would be receiving something from [its] subsidiary to the exclusion of and detrimental to [the subsidiary's] minority stockholders" the combination of that "self-dealing, coupled with the parent's fiduciary duty, would make intrinsic fairness the proper standard").

> FN98. This fraudulent transfer also involved a sale of substantially all of the Delaware Holding Company's assets and had to be performed consistently with 8 Del. C. § 271, which sets forth the procedures required to complete such a transaction. ATR has asserted, without contradiction from Araneta, that these procedures were not followed, and specifically that no shareholder vote took place. For his part, Araneta testified that he did not even inform ATR or his fellow directors about his removal of the LBC Operating Companies. Tr. at 254-55.

In this case, Araneta has not disputed these principles or even advanced an argument under the entire fairness rubric. Indeed, quite obviously, what Araneta did was not fair to the Delaware Holding Company or its minority stockholder, ATR. Araneta's only major defense is his factual claim that the assets were never transferred into the Delaware Holding Company. On this basis, Araneta asserts, without citation to any legal authority, that entire fairness review cannot attach to his transfer of the LBC Operating Companies. That is, Araneta rests his entire case on a factual claim which I reject.[FN99]

> FN99. Because I reject the factual underpinning of Araneta's argument, I need not decide the legal issue he presents. But, I doubt that Delaware law would permit a fiduciary who contracted to convey assets to a corporation when soliciting a minority shareholder's investment and who later confirmed the corporation's ownership of those assets while serving as a director of that corporation to escape liability for redirecting those assets away from the corporation merely because the fiduciary "cut out the middleman" and never honored his obligation to place the assets into the corporation's accounts in the first place. Fiduciary duties do not attach only when assets are transferred but rather arise "where one person reposes special confidence in another, or where a special duty exists on the part of one person to protect the interests of another, or where there is a reposing of faith, confidence, and trust, and the placing of reliance by one person on the judgment and advice of another." *Lank v. Steiner*, 213 A.2d 848, 852 (Del. Ch.1965), *aff'd*, 224 A.2d 242 (Del.1966). From the moment Araneta became a director of, and ATR became a stockholder of, the Delaware Holding Company, Araneta had an obligation to enforce the Delaware Holding Company's right to ownership of the LBC Operating Companies for the benefit of the corporation and its shareholders that paralleled but existed independently from his contractual duty to cause the same transfer to occur. *See Legatski v. Bethany Forest Assoc., Inc.*, 2006 WL 1229689, at *6 (Del.Super.Ct.2006) (recognizing that contractual and fiduciary duties are not mutually exclusive).

That factual claim is ridiculous. Araneta asserts that for tax reasons he never did what he and his allies said he had done in numerous documents-including the corporation's tax filings!-that is, transfer control of the LBC Operating Companies to the Delaware Holding Company. Araneta says he was pondering using a Hong Kong company instead. But a written

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

agreement with ATR indicates that if Araneta wished to transfer the LBC Operating Companies to a Hong Kong entity, it could only do so on specific contractual terms. No evidence of such a transfer exists. Most important of all, it is preposterous to believe that ATR was willing to allow Araneta to keep the LBC Operating Companies for himself, rather than transferring them into some other corporation, whether located in the Philippines, Hong Kong, or elsewhere, in which ATR would have a 10% interest.

Recognizing that this claim might well be found ludicrous, Araneta and his counsel propounded an equally unpersuasive defense. They try to claim that the LBC Operating Companies were transferred to Araneta's family to extinguish a $36 million debt owed to the Aranetas by the Delaware Holding Company. On cross-examination, Araneta opined that the Delaware Holding Company was better off following the transaction because he "offset" these assets against a "liability" that the corporation owed to his family.[FN100]

> FN100. Tr. at 256-57.

*17 Nothing in the record supports this position. The liability that Araneta purported to offset arose as a result of his contribution of the LBC Operating Companies and was valued based on Araneta's 90% ownership stake. But, following his so-called offset, Araneta testified that he maintained his 90% ownership.[FN101] Thus, ATR was left with a 10% stake in what is now effectively a shell corporation devoid of its primary operating assets, while Araneta and his family gained a windfall by retaining a 90% interest in the Delaware Holding Company's remaining assets-primarily the minority interest in the Pre-Need Company-without giving any substantial value in exchange. Suffice it to say that Araneta could not point to any fairness-enforcing procedures that he used to come up with this blatantly unfair transaction. Rather plainly, any director, officer, or advisor acting in good faith would have protested that the transaction was fraudulent.

> FN101. Tr. at 258.

The evidence in this case is clear, and Araneta's at-

tempts to distort that reality only make his conduct less tolerable. Araneta used his majority control and effective dominion over the Delaware Holding Company and its board of directors to engage in a course of unfair dealing that resulted in a de facto liquidation of corporate assets that enriched the Araneta family at the expense of the Delaware Holding Company and ATR.

### C. If The Delaware Holding Company Never Owned The LBC Operating Companies, Araneta Breached His Duty Of Loyalty By Knowingly Disclosing False Information

In order to dispute his self-interested transfer of the LBC Operating Companies, Araneta testified that the Deed of Adherence and Confirmation Letter he signed and sent to ATR while he was a director of the Delaware Holding Company were false. These documents confirmed, both in express representations of fact and through financial statements showing the corporation's assets, that the Delaware Holding Company owned the LBC Operating Companies. But, Araneta testified at trial that he and ATR knew the ownership representations to be false at the time he signed the documents containing them. As I have explained, I find this "believe-me-now-I-was-lying-then" defense to be without merit. Yet, even if I were to accept the factual predicate to Araneta's argument, it would not aid Araneta in escaping liability.

As a corporate fiduciary, Araneta was required to be candid in all of his communications concerning the Delaware Holding Company's financial condition. As our Supreme Court explained in *Malone v. Brincat,* the fiduciary duty of loyalty prohibits a director from lying to the stockholders.[FN102] Thus, "[i]t necessarily follows from *Malone* that when directors communicate with stockholders, they must recognize their duty of loyalty to do so with honesty and fairness."[FN103] As such, a stockholder may carry its burden by establishing that a director breached his or her "fiduciary duty of loyalty ... by knowingly disseminating to the stockholders false information about the financial condition of the company."[FN104]

> FN102. 722 A.2d 5, 12 (Del.1998).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN103. *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 390 (Del. Ch.1999).

FN104. *Malone,* 722 A.2d at 10.

*18 ATR has met its burden here. If Araneta's testimony in court is to be believed, he himself admits that his statements in the Deed of Adherence and in the Confirmation Letter were lies. Araneta testified: "The truth is, I signed these documents. And when I signed these documents they were not true. I signed these documents, but the assets were not transferred to Delaware." FN105 Moreover, Araneta confirmed that he understood that he was signing the Confirmation Letter "at the request of ATR for [the] Filipino Stock Exchange" and that he knew public shareholders would be seeing this information in some form.FN106 Thus, in Araneta's own words, neither the representations in the Deed of Adherence, the Confirmation Letter, nor the financial statements attached thereto provided an accurate picture of the Delaware Holding Company, and he knew it.

FN105. Tr. at 206-07.

FN106. Tr. at 200.

Araneta's defense to these admissions-that ATR should have known the falsity of the statements-is without merit. According to Araneta's tale, told for the first time at trial, Arnaiz pressured him to sign these documents and he gave in to that pressure to support his friend and to curry favor with the Philippine government because the brother of the Philippine President was involved with ATR.FN107 Although in Araneta's story ATR requested the letters, that fact does not establish that ATR knew the information therein to be untrue. Only Araneta's claim that he told Arnaiz that those statements were false purports to do that.FN108 Based on the ever-shifting positions taken by Araneta throughout this litigation, the conflict between his testimony on the witness stand and the contemporaneous emails he sent in December 2000, and the lack of any records indicating ATR's knowledge that the assets were not owned by the Delaware Holding Company after Araneta stated that the tax issues had been resolved, I do not credit Araneta's testimony.

FN107. Tr. at 42-47.

FN108. Araneta also argues that various communications sent to ATR regarding the purported tax and other hurdles to making the Delaware Holding Company operational between November 1999 and April 2000 provided notice to ATR that the assets had not been transferred to the Delaware Holding Company. *See* DX 5-21. But, the timing of these communications undercuts their value. Following these communications, Araneta sent an e-mail in December 2000 expressly stating that "WE HAVE ALSO RESOLVED WITH OUR TAX CONSULTANTS THE MANNER OF THE TRANSFER OF SOME ASSETS TO THE HOLDING CO." PX 7 at 1 (capitals in original). The only communication on this topic that Araneta sent after this date, an e-mail dated January 3, 2001, does not list anyone at ATR as a recipient. DX 22.

Consequently, I find that even if Araneta did not transfer the LBC Operating Companies to the Delaware Holding Company, he still violated his fiduciary duties to ATR on an alternate basis. Specifically, I hold that if the LBC Operating Companies were never owned by the Delaware Holding Company, Araneta breached his duty of loyalty to ATR by knowingly disclosing false information concerning the Delaware Holding Company, including false financial statements indicating its ownership of the LBC Operating Companies.FN109

FN109. Moreover, as a director of the Delaware Holding Company, Araneta had a duty to seek recourse against himself-odd, but true-if he failed to deliver the stock of the LBC Operating Companies to the Delaware Holding Company. Of course, I find that his breach occurred later, when he stripped the Delaware Holding Company of those Companies' stock. But either way, Araneta breached his fiduciary duties.

ATR has also brought a fraud claim against Araneta. Given that this claim is identical to ATR's *Malone*

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 21

claim but would arguably involve more stringent
standards,[FN110] and because I have already found
that the transfer occurred and was substantially un-
fair, I need not reach it. Insofar as reasonable reliance
is required, ATR has shown that after being informed
that the Delaware Holding Company owned the LBC
Operating Companies, it acted on that information.

> FN110. Delaware's standards of fiduciary
> disclosure are specialized applications of
> fraud standards. As a result, a plaintiff is
> rarely better off pressing garden-variety
> common law fraud claims when a more
> tailored fiduciary disclosure claim can be
> pursued. *See Metro Communication Corp.*
> *BVI v. Advanced Mobilecomm Technologies*
> *Inc.,* 854 A.2d 121, 156 (Del.Ch.2004)
> ("[T]he standards that a fiduciary faces are
> tougher than the common law and equitable
> fraud standards, which always require proof
> of reasonable reliance.").

In a transaction that closed in November 2001, ATR
sold its 10% interest in the Delaware Holding Com-
pany to Philtread, reinvesting the entire proceeds of
the sale as well as roughly $1.2 million in additional
capital back into Philtread to create an Internet ser-
vice and fulfillment business. ATR intended to use
the LBC Operating Companies as part of the fulfill-
ment side of its business model for Philtread. More
importantly, because Philtread was publicly listed on
the Philippine Stock Exchange, ATR made represent-
ations to the Philippine equivalent of the U.S. Secur-
ities and Exchange Commission and to outside in-
vestors that the Delaware Holding Company was "the
ultimate holding company for all the LBC opera-
tions," including the LBC Operating Companies,
among others, based on Araneta's express confirma-
tion of those facts in the Deed of Adherence and
Confirmation Letter he signed while a director of the
Delaware Holding Company.[FN111] As such, to the
extent that ATR cannot hold Araneta accountable by
receiving a remedy for his actions in never giving up
ownership of the LBC Operating Companies, ATR
has exposed itself to liability by endorsing and dis-
seminating Araneta's false statements.

> FN111. PX 32 at 33 (describing the

Delaware Holding Company in Philtread's
public disclosures); *see also* PX 20 (Deed of
Adherence); PX 27 (Confirmation Letter)
(containing Araneta's express representa-
tions).

*19 Of course, I ultimately conclude that Araneta did
originally hand over the LBC Operating Companies
to the Delaware Holding Company and that the
Delaware Holding Company did own those assets for
over two years-from at least January 22, 2001, when
Araneta attested to that fact in the Deed of Adher-
ence, to May 31, 2003, the date of the last balance
sheet showing ownership of those assets-before
Araneta stripped them away for no value. But, either
way, Araneta has caused harm to ATR.

### D. *Bonilla And Berenguer Acted As Stooges For Araneta And Failed To Take Any Steps To Perform Their Duties As Fiduciaries*

I now come to a slightly more difficult issue.
Namely, to what extent should Araneta's fellow dir-
ectors, Bonilla and Berenguer, share responsibility
for harming the Delaware Holding Company and
ATR?

Making this more challenging is that ATR does not
allege that either Berenguer or Bonilla participated
in, approved of, or directly profited from Araneta's
removal of the LBC Operating Companies. Rather,
ATR claims that Bonilla and Berenguer consciously
breached the important duties articulated in this
court's *Caremark* [FN112] decision and recently reaf-
firmed by our Supreme Court in *Stone v.
Ritter.*[FN113] Specifically, ATR alleges that Bonilla
and Berenguer failed to monitor Araneta's conduct
thereby allowing his self-dealing to continue.

> FN112. *In re Caremark Int'l. Inc. Deriv. Lit-
> ig.,* 698 A.2d 959 (Del. Ch.1996).

> FN113. 911 A.2d 362, 2006 WL 3169168
> (Del.2006).

Under Delaware law, it is fundamental that a director
cannot act loyally towards the corporation unless she
tries-i.e., makes a genuine, good faith effort-to do her
job as a director.[FN114] One cannot accept the im-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 22

portant role of director in a Delaware corporation and thereafter consciously avoid any attempt to carry out one's duties.

> FN114. *See Guttman v. Huang,* 823 A.2d 492, 506 & n. 34 (Del. Ch.2003).

One of the most important duties of a corporate director is to monitor the potential that others within the organization will violate their duties. Thus, "a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board considers to be adequate, exists." [FN115] Obviously, such a reporting system will not remove the possibility of illegal or improper acts, but it is the directors' charge to "exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary questions, so that it may satisfy its responsibility." [FN116] Thus, as the Supreme Court recently stated:

> FN115. *Caremark,* 698 A.2d at 970.

> FN116. *Id.*

*Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith. [FN117]

> FN117. *Stone,* 911 A.2d 362, 2006 WL 3169168, at *17.

**\*20** From the testimony of the directors of the Delaware Holding Company, it is apparent that no re-

porting system was in place and that no other information systems or controls were ever considered, let alone implemented, by the Delaware Holding Company's board of directors. They did not even have regular board meetings. As a result, the directors were often unaware of corporate activities-despite how easy that would have been given the Delaware Holding Company's modest size. Berenguer testified that although there had been meetings regarding the Delaware Holding Company before the LBC Operating Companies were transferred into the corporation in January 2001, she did not remember any meetings of the board of directors or of the shareholders after that time. [FN118] Bonilla confirmed this fact, explaining that when the Delaware Holding Company's name was changed from LBC Global, Corp. to PMHI Holdings, Corp., he was never informed about the change, never voted to approve it, and did not even know what the initials PMHI in the new corporate name stood for at the time he signed the certificate of amendment as the corporation's authorized agent.[FN119] Even when corporate activities involved them directly-as in the case of their supposed resignations from the board of directors-neither Berenguer nor Bonilla questioned the wisdom of Araneta's actions nor insisted that corporate procedures be followed. [FN120]

> FN118. Berenguer at 201.

> FN119. Bonilla I at 175-76; *see also* PX 54 at 6-7.

> FN120. Notwithstanding the issues regarding the date of their resignation as directors, the process by which Berenguer and Bonilla were removed by Araneta is telling. Bonilla testified that he received a phone call from Araneta informing them that he was no longer a director of the Delaware Holding Company. Bonilla I at 47. Berenguer explained that she did not give formal written notice of her resignation; instead, Araneta just "took it [she] wanted to resign" from the Delaware Holding Company based on her general "verbal intention" to "resign in all LBC" and eventually "replaced" her. Berenguer at 83-84, 195.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Moreover, both Berenguer and Bonilla testified that they entirely deferred to Araneta in matters relating to the Delaware Holding Company. Berenguer is, as mentioned, Araneta's niece and served as the CFO for the LBC group of companies worldwide.[FN121] She testified that she would not insert herself into a disagreement between ATR and Araneta about how the Delaware Holding Company should proceed on an issue because such a disagreement would be between those parties and would not affect her as a director of the Delaware Holding Company.[FN122] Similarly, she stated that she would take Araneta's word as authoritative if she claimed that he had agreed with ATR to take certain actions.[FN123] Bonilla, the head of Araneta's U.S. operations, was more explicit-explaining that to him Araneta and the Delaware Holding Company were basically one and the same and that he took the word of Araneta as being the word of the company.[FN124] Moreover, when pressed regarding whether he would undertake an independent inquiry if told to act by Araneta, Bonilla responded, "Why should I ask him all these questions? He's telling me they have already agreed .... It's not like I'm going to go out there and check on him, doesn't make sense."[FN125]

> FN121. Berenguer at 47-48.
>
> FN122. Berenguer at 68.
>
> FN123. Berenguer at 197.
>
> FN124. Bonilla I at 63.
>
> FN125. Bonilla I at 180-81.

Based on these failures, neither Berenguer nor Bonilla can be said to have upheld their fiduciary obligations. Although it was Araneta who ran amok by emptying the Delaware Holding Company of its major assets, the other directors did nothing to make themselves aware of this blatant misconduct or to stop it.

*21 Put in plain terms, it is no safe harbor to claim that one was a paid stooge for a controlling stockholder. Berenguer and Bonilla voluntarily assumed the fiduciary roles of directors of the Delaware Holding Company. For them to say that they never bothered to check whether the Delaware Holding Company retained its primary assets and never took any steps to recover the LBC Operating Companies once they realized that those assets were gone is not a defense. To the contrary, it is a confession that they consciously abandoned any attempt to perform their duties independently and impartially, as they were required to do by law. Their behavior was not the product of a lapse in attention or judgment; it was the product of a willingness to serve the needs of their employer, Araneta, even when that meant intentionally abandoning the important obligations they had taken on to the Delaware Holding Company and its minority stockholder, ATR.

When required by their office to be loyal to the Delaware Holding Company, Bonilla and Berenguer chose total fealty to Araneta's conflicting interests instead. Consequently, I find them jointly liable for Araneta's fiduciary violations.

### E. The Core Remedy

The major breach of fiduciary duty in this case is one that injured the Delaware Holding Company in the first instance and ATR secondarily as a minority stockholder. The obvious remedy for this wrongdoing would be to require Araneta to return control of the LBC Operating Companies to the Delaware Holding Company.

ATR is practical, however. It recognizes that it would likely take years and years to chase Araneta and his family around the nation (Araneta has a house in California) and across the globe to get that type of order implemented. Thus, ATR is willing to forsake a full remedy (in the sense that it appears the LBC Operating Companies have done very well) and to accept a direct award of damages.

A direct award to ATR is justified here. Araneta's behavior worked a de facto liquidation of the Delaware Holding Company. It would be unreal to require a monetary award to the Delaware Holding Company by Araneta and his blindly subservient subordinates, Bonilla and Berenguer. Even if such a payment were made, it would be foolhardy to believe that Araneta and his servants could be trusted to allow ATR to be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

nefit from the grant of that relief to the Delaware Holding Company.

Rather, because Araneta's conduct had the effect of liquidating the Delaware Holding Company, it is appropriate to premise relief on the need to make ATR whole for the injury it suffered by entrusting its capital to the Delaware Holding Company, only to see that corporation impoverished by the defendants. The best way to shape that award is to require Araneta and the defendants to pay back to ATR the cost of acquiring its equity in the Delaware Holding Company-$3.922 million-plus pre-judgment interest at a rate that fairly compensates ATR for its loss of the upside inherent in the LBC Operating Companies' profit and growth. In determining that rate, I am aided by the parties' dealings and Araneta's admittedly high cost of debt and equity capital. Araneta's cost of debt was as high as 18%.[FN126] This high (equity-level) rate supports the fairness of a very high rate of interest, as it suggests an even higher cost of equity. That conclusion is confirmed by § 5 of the Undertaking Agreement. In that section, ATR secured a put option at a premium of 25% per annum over the issue price of ATR's shares in the Delaware Holding Company if exercised after the first two years of the investment. Using this contractual estimate of Araneta's cost of equity is the best way to do justice, even though it likely still leaves Araneta with a windfall.[FN127] I will compound this interest rate monthly in accordance with my understanding of prevailing commercial practices and in order to better ensure that ATR is made whole.[FN128]

FN126. See Bonilla II at 44-45 (confirming that LBC's cost of private debt is 15%-18%).

FN127. See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 175 (Del.2002) (permitting the Court of Chancery to fashion "broad, discretionary, and equitable remedies" in cases involving a breach of the duty of loyalty); Int'l Telecharge, Inc. v. Bomarko, Inc., 766 A.2d 437, 440 (Del.2000) ("[T]he powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropri-

ate."); Weinberger v. UOP, Inc., 457 A.2d 701, 715 (Del.1983) (holding that when the entire fairness standard is not met, the Court of Chancery's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate"). In fashioning a remedy, I err on the side of generosity to the plaintiffs because "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly" and because "strict imposition of penalties under Delaware law are designed to discourage disloyalty." Bomarko, 766 A.2d at 441 (quoting Thorpe by Castleman v. CERBCO, Inc., 676 A.2d 436, 445 (Del.1996)); see also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 855 A.2d 1059, n. 20 (Del. Ch.2003).

FN128. See Brandin v. Gottlieb, 2000 WL 1005954, at *29 (Del. Ch.2000) (explaining that this court has "broad discretion, subject to principles of fairness, in fixing the rate [of interest] to be applied"); Gotham Partners, 817 A.2d at 173 (finding that the Court of Chancery's "uncontested 'discretion to select a rate of interest higher than the statutory rate ... include[s] the lesser authority to award compounding.' "); see also Henke v. Trilithic, Inc., 2005 WL 2899677, at *13 (Del. Ch.2005) (explaining that awarding interest compounded on a monthly basis because doing so better "comports with the fundamental economic reality" that investors and "companies neither borrow nor lend at simple interest rates"); Smith v. Nu-West Indus., 2001 WL 50206, at *1 (Del. Ch.2001) (awarding interest compounded monthly), aff'd, 781 A.2d 695 (Del.2001).

*22 It is worth noting that ATR requested monthly compounding in its opening brief. The defendants did not respond to this request except insofar as they argued that no damage award of any amount should be entered. Suffice it to say, the defendants are therefore in no position to quibble about the interest rate I now award, having forsaken their chance to respond.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 25



All of the defendants will be jointly and severally liable for the amount of the judgment. Nonetheless, I find that in any action as between Araneta, on the one hand, and Bonilla and Berenguer, on the other, Araneta should be deemed responsible to pay the entire judgment. In other words, to the extent it is later important, if Bonilla and Berenguer pay any or all of the judgment, Araneta should be required to make them whole, to the extent that is consistent with applicable law.[FN129]

> FN129. In qualifying this statement, I simply recognize that when persons act as mere tools for malefactors and contribute to harm to others, public policy might limit their ability to seek indemnification from their "boss," so to speak. That might be an occupational hazard.

### F. Attorneys' Fees

Finally, I consider ATR's request for an award of attorneys' fees. Delaware follows the American Rule under which parties to litigation normally bear their own costs regardless of the outcome of their case.[FN130] Yet, the American Rule, and correspondingly Delaware's application thereof, provide for fee awards in exceptional circumstances in order to deter abusive litigation, avoid harassment, and protect the integrity of the judicial process.[FN131] These circumstances include fraud, bad faith, or other outrageous conduct from which the claim arose and bad faith behavior in the course of subsequent litigation.[FN132] Here, ATR claims that the egregious nature of Araneta's fiduciary breaches coupled with the implausibility of his defenses and his bad faith in defending this litigation necessitate a fee-shifting award. I agree.

> FN130. Johnston v. Arbitrium (Cayman Islands) Handels, 720 A.2d 542, 545-46 (Del.1998); see also John F. Vargo, The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice, 42 AM. U.L. REV. 1567 (1993) (contrasting the American Rule with the English Rule whereby the losing party must pay the victor's litigation expenses).

> FN131. Kaung v. Cole National Corp., 884 A.2d 500, 506 (Del.2005).

> FN132. See Gans v. MDR Liquidating Corp., 1998 WL 294006, at *3 (Del. Ch.1998) ("Delaware courts have recognized the following as meriting an award of fees: (i) statutory authority; (ii) a class representative's litigation costs on behalf of the class; (iii) bad faith conduct in litigation; and (iv) fraud, bad faith, or other outrageous conduct from which the claim arose.").

The U.S. Supreme Court has explained that "bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."[FN133] Delaware courts have awarded attorneys' fees when defendants "had no valid defense and knew it," when "they unnecessarily required the institution of litigation, delayed the litigation, asserted frivolous motions, falsified evidence and changed their testimony to suit their needs," and when, in short, they "constructed their entire defense in bad faith."[FN134] Although any one of these findings alone would be sufficient to justify a shifting of fees; in this case, there is ample evidence to establish transgressions in each of these categories by Araneta.

> FN133. Roadway Express, Inc. v. Piper, 447 U.S. 752, 766 (1980) (citations and quotations omitted).

> FN134. Arbitrium (Cayman Islands) Handels, 702 A.2d at 546; see also Jacobson v. Dryson Acceptance Corp., 2002 WL 31521109, at *16 (Del. Ch.2002) (stating that fee awards "may be appropriate where a party misleads the court, alters his testimony or changes his position."), aff'd, 826 A.2d 298 (Del.2003).

Here, Araneta's bad faith was pervasive. Araneta's basic duties as a fiduciary of the Delaware Holding Company were well-established. But, by transferring the LBC Operating Companies from the Delaware Holding Company to his family for no value, Araneta flouted his obligations to the minority shareholders and profited at their expense. Moreover, when served

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)

with the § 220 suit, this lawsuit, and confronted with his conduct, Araneta engaged in a deliberate pattern of obfuscation ranging from the obstruction of legitimate discovery requests, to the presentation of baseless and shifting defenses, and ultimately to the telling of outright lies under oath and the submission of a phony defense in an attempt to escape this court's jurisdiction by exposing his own secretary to legal risk on the pretense that she was the sole director of the Delaware Holding Company during the period when Araneta denuded it of the LBC Operating Companies.[FN135]

> FN135. See H & H Brand Farms, Inc. v. Simpler, 1994 WL 374308, at *5-6 (Del. Ch. June 10, 1994) (imposing fee award for "acts of bad faith and wanton disregard for the rights of others").

*23 Certainly, not all breaches of the fiduciary duty of loyalty warrant the imposition of attorneys' fees.[FN136] But, where an "untenable conflict should have been perfectly obvious," a director's "effrontery in going forward nonetheless is reprehensible" and those "seeking to censor this outrageous conduct should have their attorneys' fees paid." [FN137] Thus, as an initial matter, I may award fees if I find that Araneta's conduct giving rise to this litigation constituted "an egregious breach" of his duty to ATR. [FN138] His conduct involved such an egregious breach. It was a fraudulent transfer that Araneta sought, by later fraud, to conceal.

> FN136. See, e.g., Weinberger v. UOP, Inc., 517 A.2d 653, 656 (Del. Ch.1986) (refusing to award fees for breach of fiduciary duty absent unjustifiable or bad faith conduct).

> FN137. Gans, 1998 WL 294006, at *4.

> FN138. Id.

Likewise, Araneta's misconduct during the litigation process was extensive. He obstructed legitimate requests for discovery. He proffered false testimony in order to avoid this court's jurisdiction and liability. In sum, he made the procession of the case unduly complicated and expensive.

Chancellor Allen well captured the traditional reluctance of this court to shift fees under the bad faith exception to the American Rule, by stating that the bad faith exception only applied when the party in question displayed "unusually deplorable behavior." [FN139] Even under that standard, which is more stringent than that articulated recently by our Supreme Court in Kaung v. Cole National Corp.,[FN140] Araneta easily qualifies for an order requiring him to pay ATR's attorneys' fees and expenses. Because of Araneta's bad faith, I also will enter an order requiring him to bear any additional attorneys' fees and expenses ATR is forced to bear in seeking to collect on this judgment. This will ensure that ATR obtains full relief if it is forced to expend even more resources to obtain redress from Araneta.

> FN139. Barrows v. Bowen, 1994 WL 514868, at *2 (Del. Ch.1994).

> FN140. 884 A.2d 500, 506 (Del.2005).

On this score, however, Bonilla and Berenguer are in a different position than Araneta. Their regrettable, if all too historically traditional, role as instruments of a controller's will rightly exposes them to damages liability, but they have not engaged in conduct that satisfies the exacting bad faith standard required for fee shifting.

### IV. Conclusion

Based on the foregoing, I find in favor of ATR on each of its claims and award ATR $3,922,000 in damages plus post-judgment interest on this amount. Pre-judgment interest shall accrue at an annual rate of 25% with monthly compounding from the date of ATR's investment in the Delaware Holding Company through the date a final judgment is entered. Post-judgment interest at the statutory rate will accrue thereafter until payment is made. Araneta shall also pay ATR's attorneys' fees, costs, and expenses incurred in prosecuting this action and shall pay any future costs expended by ATR in enforcing this judgment. Counsel for the parties shall craft a final order implementing this decision within 20 days.

Del.Ch.,2006.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 27
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)
(Cite as: Not Reported in A.2d)


ATR-Kim Eng Financial Corp. v. Araneta
Not Reported in A.2d, 2006 WL 3783520 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



COPY



## GRANTED

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

ATR-KIM ENG FINANCIAL CORPORATION, )
and ATR-KIM ENG CAPITAL PARTNERS, INC., )
)
Plaintiffs, )
)
v. )     Civil Action No. 489-N
)
CARLOS R. ARANETA, HUGO BONILLA, )
LIZA BERENGUER AND MARITES VICENTE, )
)
Defendants, )
)
and )
)
PMHI HOLDINGS CORPORATION, )
(f/k/a LBC GLOBAL CORPORATION), )
a Delaware corporation, )
)
Nominal Defendant. )

*FILED PROTHONOTARY 2007 JAN 11 AM 10: 55*

### FINAL ORDER OF JUDGMENT

For the reasons set forth in the December 21, 2006 post-trial Memorandum

Opinion in the captioned matter, which found in favor of plaintiffs (collectively "ATR")

on each fiduciary claim asserted, IT IS HEREBY ORDERED as follows:

1.     Having been found jointly and severally liable for their breaches of

fiduciary duty, judgment is entered against defendants Carlos R. Araneta, Hugo Bonilla

and Liza Berenguer in the amount of **$24,490,422.50** (representing a damages award of

$3.922 million plus pre-judgment interest from August 17, 1999 through January 10,

2007 at an annual rate of 25% compounded monthly).

2.    In light of his egregious misconduct both before and during the litigation of this matter, judgment is also entered against defendant Carlos R. Araneta in the additional amount of <u>$863,059.89</u> (representing an award of the attorneys' fees, costs and expenses ATR incurred in prosecuting this action).

3.    Post-judgment interest on these awards shall accrue at an annual rate of <u>11.25%</u>, and judgment is entered against the defendants for all such interest that accrues between the date of this Order and the date on which they make full payment of the amounts due hereunder.  Carlos R. Araneta is also ordered to pay all future fees, costs and expenses incurred by ATR in enforcing this Order.

/s/ Leo E. Strine Jr.
Leo E. Strine, Jr.,
Vice Chancellor

Dated:  January 10, 2007

CERTIFIED
AS A TRUE COPY:
ATTEST:
REGISTER IN CHANCERY

By

FILED
PROTHONOTARY
2007 JAN 11  AM 10:

Court: DE Court of Chancery

Judge: Strine, Leo E

File & Serve reviewed Transaction ID: 13408130

Current date: 1/10/2007

Case number: 489-N

Case name: A T R Kim Eng Financial Corp et al vs Carlos R Araneta et al

/s/ Judge Leo E Strine Jr

FILED
PROTHONOTARY
2007 JAN 11 AM 10:55

EFiled: Jun 14 2007 10:35AM EDT
Filing ID 15225238
Case Number 60,2007

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CARLOS R. ARANETA, HUGO BONILLA and LIZA BERENGUER, | § § § | No. 60, 2007 |
| Defendants Below, Appellants, | § § § § | Court Below—Court of Chancery of the State of Delaware, in and for New Castle County |
| v. | § § | C.A. No. 489 |
| ATR-KIM ENG FINANCIAL CORPORATION and ATR-KIM ENG CAPITAL PARTNERS, INC., | § § § § § | |
| Plaintiffs Below, Appellees. | § § § | |

Submitted: June 13, 2007
Decided: June 14, 2007

Before **HOLLAND, BERGER** and **JACOBS**, Justices.

This 14th of June 2007, the Court having considered this matter after briefing and oral argument, has determined the appeal is without merit because:  to the extent the issues raised on appeal are factual, the record evidence supports the trial judge's factual findings; to the extent the errors alleged on appeal are attributed to an abuse of discretion, the record does not support those assertions; and to the extent that the issues raised on appeal are legal, they are controlled by settled Delaware law, which was properly applied.  Therefore, this Court has concluded that the final judgment of the

Court of Chancery should be affirmed on the basis of and for the reasons assigned by the Court of Chancery in its decision dated December 21, 2006.

NOW, THEREFORE, IT IS HEREBY ORDERED that the final judgment of the Court of Chancery, entered on January 10, 2007, is, AFFIRMED.

BY THE COURT:

_Justice_

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

    MONICA ARANETA
    1605 WEDGEWOOD DRIVE
    HILLSBOROUGH, CA 94010

MAIL TAX STATEMENTS TO:

    MONICA ARANETA
    1605 WEDGEWOOD DRIVE
    HILLSBOROUGH, CA 94010

    APN: 038-074-010

**2007-003707**
02:14pm 01/09/07 DE  Fee: 30.00
Count of pages 2
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder



*2 0 0 7 0 0 0 3 7 0 7 A R*

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

# GRANT DEED

| THE UNDERSIGNED GRANTOR(S) DECLARE(S) | Consideration less than $100 |
|---|---|
| DOCUMENTARY TRANSFER TAX IS $ ___-0-___ | |

      FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, HUGO BONILLA, a married man, as his sole and separate property, hereby GRANT(S) to MONICA ARANETA, the real property commonly known as 1605 Wedgewood Drive♦, Hillsborough, County of San Mateo, State of California, and more particularly described as follows:

      See Exhibit "A" attached hereto and incorporated herein by this reference.

Dated: 1-8-2007

Hugo Bonilla

STATE OF CALIFORNIA      )
                  ) ss.
COUNTY OF SAN MATEO    )

On this _8_ day of _January_ in the year _2007_, before me, Victoria Rodrigues , a Notary Public in and for said State, personally appeared _Hugo Bonilla_, personally known to me (or proved on the basis of satisfactory evidence) to be the person(s) whose name is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

VICTORIA RODRIGUES
Commission # 1417957
Notary Public - California
San Mateo County
My Comm. Expires Jun 12, 2007

Victoria Rodrigues
NOTARY PUBLIC IN AND FOR SAID STATE

FOR NOTARY SEAL OR STAMP

MAIL TAX STATEMENTS AS DIRECTED ABOVE

EXHIBIT
2
Bonilla 3/7/07

# EXHIBIT "A"

**Description:**

The land referred to herein is situated in the State of California, County of San Mateo, Town of Hillsborough, and is described as follows:

LOT 9, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "CRYSTAL SPRINGS MAP. NO. 1-A, HILLSBOROUGH, SAN MATEO COUNTY, CALIFORNIA". FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, ON AUGUST 15, 1947, IN BOOK 27 OF MAPS AT PAGE(S) 45, 46, 47 AND 48.

AP No.:        038-074-010  JPN: 038-007-074-01

```
MIME-Version:1.0
From:BKECF_CANB@canb.uscourts.gov
To:CourtMail@canblei.canb.circ9.dcn
Bcc:Ca80@ecfcbis.com,jcrom@bachcrom.com,jmelder7@aol.com,ksakamoto@howardrice.com,ca
Message-Id:<6461053@canb.uscourts.gov>
Subject:07-03079 Complaint
```

Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without
charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. Bankruptcy Court

### Northern District of California

Notice of Electronic Filing

The following transaction was received from Lafferty, William entered on 7/23/2007 at 5:14 PM PDT
and filed on 7/23/2007

**Case Name:**       ATR-Kim Eng Capital Partners, Inc. et al v. Bonilla
**Case Number:**     07-03079
**Document Number:** 1
**Case Name:**       Hugo Nery Bonilla
**Case Number:**     07-30309
**Document Number:** 76

**Docket Text:**
Adversary case 07-03079. 41 (Objection / revocation of discharge - 727(c),(d),(e)), 67 (Dischargeability
- 523(a)(4), fraud as fiduciary, embezzlement, larceny) Complaint by ATR-Kim Eng Capital Partners,
Inc., ATR-Kim Eng Financial Corporation against Hugo Nery Bonilla. Fee Amount $250. (Attachments:
# (1) Exhibit A# (2) Exhibit B# (3) Exhibit C# (4) Exhibit D) (Lafferty, William)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**M:\EFiling\07-30309\072307\ATR Complaint.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461041-0
] [75826a18a2347084a916239bdfc33252fe2e6631e34879110269ae6769f5f2c46b5
a33e962b82b6a912833bdd0743072e4cb8ebf51ca8c0175f057e92aed8712]]
**Document description:**Exhibit A
**Original filename:**M:\EFiling\07-30309\072307\Ex A to Complaint.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461041-1
] [328ebf080a7f3daeb5d9a535ade20f7e03c3388477206c7849e6897005d4357932a
2fe463faebd0fe407f36453042eb6dbe625787b9b566a68a35349f1aed341]]
**Document description:**Exhibit B
**Original filename:**M:\EFiling\07-30309\072307\Ex B to Complaint.pdf
**Electronic document Stamp:**

[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461041-2
] [b91ee1d674d50980a9141c8a3f0209ed0e18f556cc69fe43ec5ab462de49d03d61e
de4ce3ba58e9df40c50ec43efbb89b3a7d2eb43dcd737aad51377b9dc13d8]]
Document description:Exhibit C
Original filename:M:\EFiling\07-30309\072307\Ex C to Complaint.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461041-3
] [ba22944032c9c1c70c32fc359a92f70a791a6b47c42bb22055bd348a472b21a3072
b80ec6802dfc79c6b193e138da9871131257f6f0a97e3cd45db1e61dac1c3]]
Document description:Exhibit D
Original filename:M:\EFiling\07-30309\072307\Ex D to Complaint.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461041-4
] [7b0d8a764ef8844eb41dcb6353706d50753add9ae15adeb9d159a6d4d978220e7bc
0274b42f9d7483e7c60ace8fb0b0abbe81f44f7d15e4d27db3778806db373]]
Document description:Main Document
Original filename:M:\EFiling\07-30309\072307\ATR Complaint.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461043-0
] [38c93e93d3c0032a6a0753bea0f6eed2b212726cd7b1e3aa81de2cdd2ed2dcf6004
0b2d161d87e9527ffa024ec912d30a7fdcea155d01a8ff303f5aa06316890]]
Document description:Exhibit A
Original filename:M:\EFiling\07-30309\072307\Ex A to Complaint.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461043-1
] [080400b1763e4da5809e6db08b45ac1a1f56f29258f64cbb197e29b1d2d92feee81
7f2c3b13c17742a783a8a1707f0236ccd8fde838ae90c9cef6509b82267f3]]
Document description:Exhibit B
Original filename:M:\EFiling\07-30309\072307\Ex B to Complaint.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461043-2
] [3d18ff3eb5f23591a5497cc0526b417be2f7d39dec2a26e6db02d98886f0249d629
dd1bd3e291af62b7387e5d42ef43d9113f5a4df35f4a7cc28ef1b133f11c1]]
Document description:Exhibit C
Original filename:M:\EFiling\07-30309\072307\Ex C to Complaint.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461043-3
] [3de4acd6c3a8c205283b1469eefef15aa06a1c47647c1d4080698971c8cad197f7c
a7be4addf8ec24a23c90daa80296a156fed5e8d9bac3c952acf89a9e86fee]]
Document description:Exhibit D
Original filename:M:\EFiling\07-30309\072307\Ex D to Complaint.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=1017961465 [Date=7/23/2007] [FileNumber=6461043-4
] [0ff9fc77045f81d3f651963b7379b95cc90fce10af95f2f17c98420ab66a33568b8
4d495adee50b0c42701322e6c77ba9e9435e6a357f728f6633809525d0660]]

**07-03079 Notice will be electronically mailed to:**

William J. Lafferty    wlafferty@howardrice.com,
ksakamoto@howardrice.com;calendar@howardrice.com

Iain A. Macdonald    mac@macdonaldlawsf.com

**07-03079 Notice will not be electronically mailed to:**


**07-30309 Notice will be electronically mailed to:**

Jay D. Crom    jcrom@bachcrom.com

Janina M. Elder    jmelder7@aol.com, Ca80@ecfcbis.com

Michael C. Fallon    mcfallon@fallonlaw.net

William J. Lafferty    wlafferty@howardrice.com,
ksakamoto@howardrice.com;calendar@howardrice.com

Iain A. Macdonald    mac@macdonaldlawsf.com

Office of the U.S. Trustee / SF    USTPRegion17.SF.ECF@usdoj.gov

**07-30309 Notice will not be electronically mailed to:**

ORIGINAL

1  MACDONALD & ASSOCIATES
   IAIN A. MACDONALD (State Bar No. 051073)
2  HEATHER A. CUTLER (State Bar No. 217837)
   Two Embarcadero Center, Suite 1670
3  San Francisco, CA  94111-3930
   Telephone: (415) 362-0449
4  Facsimile: (415) 394-5544

5  Attorneys for Defendant,
   HUGO NERY BONILLA
6

7

8                UNITED STATES BANKRUPTCY COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  In Re:                              Case No. 07-30309

12  HUGO NERY BONILLA,                  Chapter 7

13              Debtor.                 Adv. Proc. No. 07-03079

14
                                        Date:  September 28, 2007
15  ATR-KIM ENG FINANCIAL               Time:  9:30 a.m.
    CORPORATION AND ATR-KIM ENG         Place: 235 Pine Street
16  CAPITAL PARTNERS, INC.,                    Courtroom No. 23
                                               San Francisco, CA
17              Plaintiffs,
                                        (Judge Carlson)
18        vs.

19  HUGO NERY BONILLA,

20              Defendant.

21

22

23        MEMORANDUM OF POINTS AND AUTHORITIES

24        SUPPORTING MOTION TO DISMISS COMPLAINT

25

26

27

28

                                                                    1
   MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MOTION TO DISMISS COMPLAINT



EXHIBIT ___C___

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................... 1

II. THE DELAWARE JUDGMENT ............................................ 1

    A.  Findings Regarding The Incorporation Of The Delaware
        Holding Company ............................................. 3

    B.  Findings Regarding The Transfer Of Assets ............................ 3

    C.  Findings Regarding Failure To Provide Records to ATR ................... 3

    D.  Findings Regarding Resignation Of The Delaware Holding
        Company's Board Of Directors ...................................... 4

    E.  The Court's Rulings Pertaining To Bonilla's Liability ....................... 4

    F.  Damages ...................................................... 5

III. ATR'S FOURTH CAUSE OF ACTION FAILS TO STATE FACTS
    CONSTITUTING A CLAIM FOR RELIEF UNDER § 523(a)(4) .................. 6

    A.  Rule 12(b)(6) Standards ............................................ 6

    B.  Under Delaware State Law, The Doctrine Of Collateral Estoppel
        Does Not Apply Unless The Issue Previously Decided Is Identical
        To The One Presented In The Current Action............................ 7

    C   Bankruptcy Code Section 523(a)(4) ................................... 8

                1.  A Debt Is Non-Dischargeable Under Section 523(a)(4)
                      Where The Debtor's Fiduciary Duties To The Creditor
                      Were Imposed Pursuant To An Express Or Statutory
                      Trust................................................ 8

                 2.  Delaware State Law Does Not Impose Express Or
                      Statutory Trusts On Corporate Directors, But Imposes
                      A Constructive Trust On Corporate Funds, Pursuant
                      To The Delaware Trust Fund Doctrine, When
                      Corporate Directors Profit From Their Wrongdoing ........... 9

                        a.  Miramar Resources, Inc. v. Arthur C. Shultz ............ 10

                        b.  The Delaware Trust Fund Doctrine Imposes
                            A Constructive Trust Rather Than An Express
                            Trust Where Inequity Results From Personal
                            Profit By The Insiders, Which Have Engaged
                            In Wrongdoing Resulting In The Corporation's

i

      *Insolvency* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     c. *Miramar Resources, Inc. v. Zachary L. Shultz* . . . . . . . . . . 13

   3. *ATR Fails To State A Claim For Relief Under Section 523(A)(4) Because Neither ATR's Complaint Nor The Findings And Holding Set Forth In The Memorandum Opinion Establish That Bonilla's Duties To ATR Were Imposed Pursuant To An Express Or Statutory Trust* . . . . . . . . . . . 14

     a. *ATR Fails To Allege That An Express Trust Imposed Trust Duties On Bonilla* . . . . . . . . . . . . . . . . . . . . . 14

     b. *ATR Fails To Allege That A Statutory Trust Imposed Trust Duties On Bonilla.* . . . . . . . . . . . . . . . . . . . . 14

     c. *ATR Does Not State Facts Sufficient To Establish That Trust Duties May Be Imposed On Bonilla Pursuant To The Delaware Trust Fund Doctrine.* . . . . . . . . . . . . . . . . . . . . . 15

     d. *Pursuant To This Court's Decision In The Matter Of JTS Corp., The Delaware Trust Fund Doctrine Does Not Impose Trust Duties Sufficient To Meet The "Express Or Statutory Trust" Requirement Under Section 523(a)(4)* . . . . . . . . . . . 16

  D. ATR Fails To State Facts Sufficient To Support Its Claim That Bonilla Committed "Fraud While Acting In A Fiduciary Capacity" Because ATR Does Not Allege That Bonilla Intentionally Deceived ATR . . . . . . . . . . . . . . 16

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ii

1

## TABLE OF AUTHORITIES

2

Cases                                                                    Page(s)

3   *Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

4   *American Surety & Casualty Co. v. Hutchinson (In re Hutchinson)*,
5   193 B.R. 61 (Bankr. M.D.Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

6   *Arkansas v. Fatjo*, 1993 U.S. Dist. LEXIS 7911, 1993 WL 208440 (S.D.Tex.) . . . . . . . . . . . . . . . .11

7   *ATR-Kim Eng Financial Corporation and ATR-Kim Eng Capital Partners, Inc. v.*
    *Carlos R. Araneta, et al.*, Delaware Court of Chancery No. ICV.A. 489-A . . . . . . . . . . . . . . . . . . . .1
8
9   *Betts v. Townsends, Inc.*, 765 A.2d 531 (Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10  *Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186 (9th Cir. 2001) . . . . . . . . . . . . . . . . . 8, 9, 16

11  *Bovay v. H.M. Byllesby & Co.*, 27 Del. Ch. 381, 38 A.2d 808 (Del. 1944) . . . . . . . . . . . . . . . . . . . 12

12  *Busseto Foods v. Laisure (In re Laizure)*, 349 B.R. 604 (B.A.P. 9th Cir. 2006) . . . . . . . . . . . . . . .6

13  *In re Cantrell*, 329 F.3d 1119 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

14  *Caremark, Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
15
16  *Chapman v. Forsyth*, 43 U.S. 202, 2 HOW 202, 208, 11 L. Ed. 236 (1844) . . . . . . . . . . . . . . . . . .8

17  *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications, Co.* 1991 Del.
    Ch. LEXIS 215, No. 12150, 1991 WL 277613 (Del Ch. Dec. 30, 1991) . . . . . . . . . . . . . . . . . . . . . 11
18
19  *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 79 L. Ed. 393, 55 S. Ct. 151 (1934) . . . . . . . . 8, 11

20  *Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529 (Bankr. N.D. Cal. 2003) . . . . . . . . . . . 10, 12, 16

21  *Gayden v. Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 7

22  *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del. Ch. 1992) . . . . . . . . . . . . . . . . . . . . . . . . .11

23  *Grogan v. Garner*, 498 U.S. 279, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991) . . . . . . . . . . . . . . . . . 7

24  *G.W. White & Son v. Tripp (In re Tripp)*, 189 B.R. 29 (Bankr. N.D.N.Y. 1995) . . . . . . . . . . . . . . .16

25  *Harff v. Kerkorian*, 324 A.2d 215 (Del. Ch. 1974) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
26
27  *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 17

28  *Jacobson v. Schwarzenegger*, 357 F. Supp. 2d 1198 (C. D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . 6

    *Klingman v. Levinson*, 831 F.2d 1292 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iii

1   *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

2   *In re McDaniel*, 181 B.R. 883 (Bankr. S.D. Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

3   *Miramar Resources, Inc. v. Arthur C. Shultz (In re Arthur Shultz)*, 208 B.R.
4   723 (Bankr. M.D. Fl. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 12, 14

5   *Miramar Resources, Inc. v. Zachary L. Shultz (In re Zachary Shultz)*, 205 B.R.
6   952 (Bankr. NM 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 13

7   *Morgan v. Musgrove (In re Musgrove)*, 187 B.R. 808 (Bankr. N.D. Ga. 1995) . . . . . . . . . . . . . . 9

8   *Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

9   *Newsom v. Moore (In re Moore)*, 186 B.R. 962 (Bankr. N.D. Cal. 1995) . . . . . . . . . . . . . . . . . . 7

10  *In re Niles*, 106 F.3d 1456 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9

11  *Norm Gershman's Things to Wear, Inc. v. Peterson (In re Peterson)*,
12  332 B.R. 678 (Bankr. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

13  *Petty v. Penntech Papers, Inc.*, 347 A.2d 140 (Del. Ch. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14  *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15  *Runnion v. Pedrazzini (In re Padrazzini)*, 644 F.2d 756 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . .8
16
    *Schlecht v. Thornton (In re Thornton)*, 544 F.2d 1005 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . 8
17
18  *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . .7

19  *In re Snyder*, 101 B.R. 822 (Bankr. Mass. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

20  *Stone v. Ritter*, 911 A.2d 362 (Del. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

21  *Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

22  Federal Statutes:
23  11 U.S.C. § 523(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17

24  Federal Rules:
25  Federal Rules of Civil Procedure 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 7, 16

26  State Law Statutes:
    Del. Code Ann. tit 8 §§ 102(b)(7), 141(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
27
28  Treatises:
    4 COLLIER ON BANKRUPTCY (15th ed. 2006) at ¶ 523.10[1][a] . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MOTION TO DISMISS COMPLAINT

I. <u>INTRODUCTION</u>

Defendant Hugo Nery Bonilla, debtor in the within bankruptcy case, hereby moves to dismiss the fourth claim for relief set forth in the Complaint filed by ATR-Kim Eng Financial Corporation and ATR-Kim Eng Capital Partners, Inc. (collectively, "ATR"). ATR's fourth claim alleges that its judgment against Bonilla in the matter titled *ATR-Kim Eng Financial Corporation and ATR-Kim Eng Capital Partners, Inc. v. Carlos R. Araneta, et al.*, Delaware Court of Chancery No. ICV.A. 489-A ("the Delaware Judgment"), and which holds Bonilla jointly and severally for damages in the amount of $24,981,069.66, is non-dischargeable under Bankruptcy Code Section 523(a)(4).

Dismissal of the fourth claim is proper because ATR fails to state a claim upon which relief may be granted under Section 523(a)(4). ATR alleges that many of the factual findings relevant to its claims are set forth in the Delaware Chancery Court's Memorandum Opinion, which is attached as Exhibit A to ATR's complaint. But the Memorandum Opinion does not set forth findings, and ATR's complaint does not set forth allegations, which support the elements required in order to establish that Bonilla's debt to ATR is non-dischargeable under Section 523(a)(4). First, the Delaware Chancery Court did not find that Bonilla was a fiduciary to ATR pursuant to an express or statutory trust under Delaware state law. Rather, the Delaware Chancery Court found that as a corporate director, Bonilla breached his fiduciary duties to shareholder ATR. But Bonilla's duties to ATR as a corporate director fall within the realm of the broad and general definition of a fiduciary, which is inapplicable to the dischargeability context and are not sufficient to support a Section 523(a)(4) claim.

Second, the Delaware Chancery Court did not find and ATR does not allege in its complaint that Bonilla intentionally deceived ATR. Thus, ATR does not state facts sufficient to support its allegation that Bonilla committed "fraud while acting in a fiduciary duty." Consequently, dismissal is proper because ATR alleges no facts to support a Section 523(a)(4) claim.

II. <u>THE DELAWARE JUDGMENT</u>

On December 21, 2006, the Delaware Chancery Court issued its Memorandum Opinion, in ATR's suit against Bonilla and other defendants. Compl. at Ex. A. The Delaware Chancery Court

1   dedicated most of its decision to ATR's claims against Bonilla's co-defendant Carlos Araneta.  The

2   findings and rulings pertaining to ATR's claims against Bonilla are as follows:

3               A.      Findings Regarding The Incorporation Of The Delaware Holding Company

4               Defendant Araneta is a Philippine business man who owns and operates his family's

5   business, which consist of numerous courier and money remittance companies run from the

6   Philippines.  Compl. at Ex. A, p. 3.  Araneta's companies all share the initials "LBC" in their names

7   (collectively, "LBC Operating Companies").  Compl. at Ex. A, p. 3.

8               In 1999, ATR and Araneta entered into two contracts with each other.  Compl. at Ex. A, p. 3.

9   In the first, titled the "Joint Venture Agreement", ATR and Araneta agreed to purchase a controlling

10  interest in The Professional Group Plans, Inc. ("the Pre-Need Company"), and ATR agreed to

11  advance $3.922 million on Araneta's behalf.  Compl. at Ex. A, p. 3.  In the second, titled the

12  "Undertaking Agreement", Araneta pledged "to contribute the LBC Operating Companies along

13  with his newly acquired interest in the Pre-Need Company to a new holding company and to issue to

14  ATR a 10% minority interest in that entity."  Compl. at Ex. A, p. 3.  The Undertaking Agreement

15  protected ATR's investment in the LBC Operating Companies by granting ATR a right to a seat on

16  the board of directors of Araneta's new holding company "as well as a five-year put option, which,

17  when exercised, required Araneta to buy out ATR's interest at the higher of (i) the issue price of

18  ATR's shares plus a premium of between 22% and 25% per year, or (ii) the adjusted book value of

19  ATR's shares."  Compl. at Ex. A, p. 4.

20              In accordance with his promise in the Undertaking Agreement, Araneta incorporated the

21  Delaware Holding Company in January 2000.  Compl. at Ex. A, p. 4.  Thereafter, he "presented

22  ATR with 3,000 of its shares (10%) while personally retaining control over the residual 27,000

23  shares (90%).  Likewise, Araneta appointed and dominated the Delaware Holding Company's board

24  of directors, which consisted of himself, defendants [Liza] Berenguer ..., and defendant Bonilla (the

25  head of LBC's U.S. operations)."  Compl. at Ex. A, p. 4.  The court found that in late 2000 or early

26  2001, Araneta also fulfilled his promise in the Undertaking to contribute the LBC Operating

27  Companies to the Delaware Holding Company.  Compl. at Ex. A, p. 10-13.

28  / / /

2

1    B.    Findings Regarding The Transfer Of Assets

2    Nearly three years after the Delaware Holding Company was incorporated, a rift developed

3    between Araneta and ATR's chairman, Ramon Arnaiz. Compl. at Ex. A, p.5. Apparently in

4    response, Araneta "transferred all of the LBC Operating Companies out of the Delaware Holding

5    Company." Compl. at Ex. A, p. 5. As evidenced by documents showing the financial status of the

6    Delaware Holding Company during the last nine months of 2003, Araneta responded with hostility

7    by stripping the Delaware Holding Company of the LBC Operating Companies, resulting in a *de*

8    *facto* liquidation of the business. Compl. at Ex. A, p.6. The financial statements show that in March

9    2003, the Delaware Holding Company "reflected approximately $36 million in 'investments' and

10   approximately $39 million in 'liabilities.'" Compl. at Ex. A, p.6. "The 'investments' referred to the

11   LBC Operating Companies and the Professional Holdings shares purchased for Araneta by ATR's

12   Advances … [and the] 'liabilities' represented the pro rata amounts due to Araneta and ATR as a

13   result of the equity positions that each gained for their capital contributions." Compl. at Ex. A, p.6.

14   The financial sheets for December 2003 show that the Delaware Holding Company retained

15   $937,500 in 'investments' and $3.922 million in 'liabilities.'" Compl. at Ex. A, p.6.

16   C.    Findings Regarding Failure To Provide Records To ATR

17   After the rift developed between Araneta and Arnaiz, Araneta rebuffed ATR's repeated

18   requests for "information on the condition of the Delaware Holding Company in which it still had

19   nearly $4 million invested." Compl. at Ex. A, p.6. In response, ATR's attorneys formally demanded

20   ATR's right to review the Delaware Holding Company's books and records by letter dated July 18,

21   2003. Compl. at Ex. A, p.6. The letter asserts that ATR is exercising its right as a Delaware

22   corporation stockholder to request the Delaware Holding Company's financial statements,

23   documents showing that the Delaware Holding Company owns of the LBC Operating Companies,

24   and documents evidencing Araneta's interest in the Pre-Need Company. Compl. at Ex. A, p.6.

25   Araneta's son, his lawyer and Bonilla were sent copies of the demand letter. Compl. at Ex. A, p.6

26   n.22. ATR warned that if its demands were denied, it would sue to protect its interests. Compl. at

27   Ex. A, p.6. "Araneta … instructed Bonilla not to provide the requested information." Compl. at Ex.

28   A, p.6.

3

D.    Findings Regarding Resignation Of The Delaware Holding Company's Board Of Directors

A Delaware Holding Company board of directors resolution produced by Araneta and dated May 22, 2003 states that Araneta putatively resigned his directorship, along with the other directors, including Bonilla, effective that day. Compl. at Ex. A, p.7. Araneta's secretary, Marites Vicente, was appointed as the President and sole director of the Delaware Holding Company. Compl. at Ex. A, p.7. The following day, Araneta himself approved a board resolution to change the name of the Delaware Holding Company. Compl. at Ex. A, p.8.

However, the court found, based on the directors' actions and the testimony, that none of them left the Delaware Holding Company's board of directors. Compl. at Ex. A, p.7-9. Bonilla testified that he did not know that Vicente was appointed to the board. Compl. at Ex. A, p.8. Upon receipt of the resolution purporting to change the name of the Delaware Holding Company, Bonilla acted as a director by performing the tasks necessary to amend the Delaware Holding Company's charter. Compl. at Ex. A, p.8. "Moreover, in his mind, Bonilla continued to serve as a director of the Delaware Holding Company until December 2003." Compl. at Ex. A, p.8.

E.    The Court's Rulings Pertaining To Bonilla's Liability

The Memorandum Opinion notes that the issue of Bonilla's liability to ATR is challenging in part because "ATR does not allege that ... Bonilla participated in, approved of, or directly profited from Araneta's removal of the LBC Operating Companies. Rather, ATR claims that Bonilla ... consciously breached the important duties articulated in this court's *Caremark* decision and recently reaffirmed by our Supreme Court in *Stone v. Ritter*." Compl. at Ex. A, p.19, citing *Caremark, Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) and *Stone v. Ritter*, 911 A.2d 362 (Del. 2006). The court cited the *Caremark* and *Stone* decisions to establish that corporate directors have duties to "monitor the potential that others within the organization will violate their duties," which, in turn, imposes upon directors a duty to try "'in good faith to assure that a corporate information and reporting system, which the board considers to be adequate, exists.'" Compl. at Ex. A, p.19, citing *Caremark*, 698 A.2d 959, 970. In order to impose liability on corporate directors for failure to carry out such oversight duties, the court must find that the directors "utterly failed to implement any reporting or information system or controls" or, in the event that an information system or control

4

1  was in place, that the directors "consciously failed to monitor or oversee its operations thus disabling

2  themselves from being informed of risks or problems requiring their attention." Compl. at Ex. A,

3  p.19, citing *Caremark*, at 970. The court must show that "the directors knew that they were not

4  discharging their fiduciary obligations." Compl. at Ex. A, p.19.

5        The court found that "no reporting system was in place and that no other information systems

6  or controls were ever considered, let alone implemented, by the Delaware Holding Company board

7  of directors. As a result, the directors were often unaware of corporate activities – despite how easy

8  that would have been given the Delaware Holding Company's modest size." Compl. at Ex. A, p.20.

9  Bonilla testified that there had been no board meetings since January 2001, and that "when the

10  Delaware Holding Company's name was changed from LBC Global, Corp. to PHMI Holdings,

11  Corp., he was never informed about the change, never voted to approve it, and did not even know

12  what the initials PHMI in the new corporate name stood for at the time he signed the certificate of

13  amendment as the corporation's authorized agent." Compl. at Ex. A, p.20. Bonilla deferred to

14  Araneta in Delaware Holding Company matters, and testified that he would not "undertake an

15  independent inquiry if told to act by Araneta" because "Araneta and the Delaware Holding Company

16  were basically one and the same." Compl. at Ex. A, p.20.

17        Based on these findings, the court found that Bonilla failed to uphold his fiduciary duty of

18  loyalty to the Delaware Holding Company. Compl. at Ex. A, p.20-21. Accordingly, the court ruled

19  that "[a]lthough it is clearly the case that Araneta is the most culpable of the defendants, Bonilla ...

20  [is] accountable for [his] complicity in [Araneta's] endeavors." Compl. at Ex. A, p.1.

21        F.    Damages

22        The court found that it was impractical "to require Araneta to return control of the LBC

23  Operating Companies to the Delaware Holding Company" because "it would likely take years and

24  years to chase Araneta and his family across the nation ... and across the globe to get that type of

25  order implemented." Compl. at Ex. A, p.21. Instead, because Araneta effectively liquidated the

26  Delaware Holding Company, the court determined that ATR should be made "whole for the injury it

27  suffered by entrusting its capital to the Delaware Holding Company, only to see that corporation

28  impoverished by the defendants." Compl. at Ex. A, p.21. Thus, the court awarded ATR "the cost of

1   acquiring its equity in the Delaware Holding Company – $3.922 million – plus pre-judgment interest

2   at a rate that fairly compensates ATR for its loss of the upside inherent in the LBC Operating

3   Companies' profit and growth." Compl. at Ex. A, p.21. The court also stated that:

> 4   All of the defendants will be jointly and severally liable for the amount of the judgment.
> 5   Nonetheless, I find that in any action as between Araneta, on the one hand, and Bonilla and
>   Berenguer, on the other, Araneta should be deemed responsible to pay the entire judgment.
> 6   In other words, to the extent it is later important, if Bonilla and Berenguer pay any or all of
>   the judgment, Araneta should be required to make them whole, to the extent that it is
> 7   consistent with applicable law.

8   Compl. at Ex. A, p.22.

9       In considering ATR's request for attorneys' fees, the court stated that fees are only awarded

10   in exceptional circumstances, including "fraud, bad faith, or other outrageous conduct from which

11   the claim arose and bad faith behavior in the course of subsequent litigation." Compl. at Ex. A, p.22.

12   Finding that Araneta's bad faith was pervasive prior to and during the litigation, the court ruled that

13   Araneta must pay ATR's attorneys' fees and expenses. Compl. at Ex. A, p.23. Further, the court

14   entered an order required Araneta "to bear any additional attorneys' fees and expenses ATR is

15   forced to bear in seeking to collect on this judgment." Compl. at Ex. A, p.23. But, finding that

16   Bonilla did "not engage[] in conduct that satisfies the exacting bad faith standard required for fee

17   shifting", the court ruled that Bonilla is not jointly and severally liable for the fee-shifting award.

18   Compl. at Ex. A, p.23.

19
20
### III. ATR'S FOURTH CAUSE OF ACTION FAILS TO STATE FACTS CONSTITUTING A CLAIM FOR RELIEF UNDER § 523(a)(4)

21   A.   Rule 12(b)(6) Standards

22       A motion to dismiss a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6) is

23   applicable to adversary proceedings. Fed. R. Bankr. Proc. 7012(b). "In considering a motion to

24   dismiss a complaint for failure to state a claim, FRCP 12(b)(6), the bankruptcy court must take as

25   true all allegations of material fact and construe them in the light most favorable to the nonmoving

26   party." *Busseto Foods v. Laisure (In re Laizure)*, 349 B.R. 604, 606 (B.A.P. 9th Cir. 2006). "In

27   ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the

28   pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."

  *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); citing *Jacobson v. Schwarzenegger*, 357 F.

6

1  Supp. 2d 1198, 1204 (C. D. Cal. 2004). "Dismissal is proper under Rule 12(b)(6) if it appears

2  beyond doubt that the non-movant can prove no set of facts to support its claims." *Simpson v. AOL*

3  *Time Warner Inc.*, 452 F.3d 1040, 1046 (9th Cir. 2006), citing *Navarro v. Block*, 250 F.3d 729, 732

4  (9th Cir. 2001) citing *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

    B.    Under Delaware State Law, The Doctrine Of Collateral Estoppel Does Not Apply Unless The Issue Previously Decided Is Identical To The One Presented In The Current Action

7  "The Supreme Court has held that 'collateral estoppel principles do indeed apply in discharge

8  proceedings pursuant to § 523(a).'" *In re Cantrell*, 329 F.3d 1119, 1123 (9th Cir. 2003), citing

9  *Grogan v. Garner*, 498 U.S. 279, 284 n.11, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991). "In addition,

10  28 U.S.C. § 1738 requires us, as a matter of full faith and credit, to apply the pertinent state's

11  collateral estoppel principles." *In re Cantrell*, 329 F.3d 1119, 1123, citing *Gayden v. Nourbakhsh*

12  *(In re Nourbakhsh)*, 67 F.3d 798, 800 (9th Cir. 1995); *Newsom v. Moore (In re Moore)*, 186 B.R.

13  962, 968-70 (Bankr. N.D. Cal. 1995).

14  As explained in ATR's complaint, its underlying judgment against Bonilla was entered in the

15  Delaware Court of Chancery (Compl. at ¶ 7), and thus, Delaware state law governs the application of

16  collateral estoppel to the underlying judgment. Under Delaware law, the following four elements

17  must be shown to support a claim of collateral estoppel:

    (1) The issue previously decided is identical with the one presented in the action in question,
    (2) the prior action has been finally adjudicated on the merits,
    (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and
    (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

22  *Norm Gershman's Things to Wear, Inc. v. Peterson (In re Peterson)*, 332 B.R. 678, 683 (Bankr. Del.

23  2005), citing *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000). The reason that ATR's

24  underlying Delaware judgment does not support a collateral estoppel claim is that the first element is

25  not met. The issues which were decided in the underlying judgment are not identical to and do not

26  resolve the issues before this court on ATR's Section 523(a)(4) claim. Particularly, and as explained

27  in the following, the Delaware judgment does not address, much less find that Bonilla had fiduciary

28  duties to ATR which were imposed by an express or statutory trust.

7

1

  C.  <u>Bankruptcy Code Section 523(a)(4)</u>

2   Bankruptcy Code Section 523(a)(4) precludes a debtor's discharge on a debt only "for fraud

3 or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §

4 523(a)(4). "A debt is nondischargeable under 11 U.S.C. § 523(a)(4) where '1) an express trust

5 existed, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the

6 creditor at the time the debt was created.'" *In re Niles*, 106 F.3d 1456, 1459 (9th Cir. 1997), citing

7 *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987). ATR does not and cannot set forth facts

8 that an express trust or technical trust existed or that the underlying debt was caused by fraud, as

9 explained in the following:

10

11

    *1. A Debt Is Non-Dischargeable Under Section 523(a)(4) Where The Debtor's Fiduciary Duties To The Creditor Were Imposed Pursuant To An Express Or Statutory Trust*

12   "[I]t is well established in the Ninth Circuit that an express or statutory trust relationship

13 must exist between the parties in order for a debt to be found nondischargeable under 11 U.S.C. §

14 523(a)(4)." *In re Moore*, 186 B.R. 962, 974. Federal law defines the term "fiduciary capacity" and

15 limits the term to express or technical trust relationships Section 523(a)(4). *Id.*; *Blyler v. Hemmeter*

16 *(In re Hemmeter)*, 242 F.3d 1186, 1189 (9th Cir. 2001), citing *Lewis v. Scott (In re Lewis)*, 97 F.3d

17 1182, 1185 (9th Cir. 1996). The term "fiduciary" excludes "trusts *ex maleficio, i.e.*, trusts that arose

18 by operation of law upon a wrongful act." *In re Hemmeter*, 242 F.3d 1186, 1189, citing *Davis. v.*

19 *Aetna Corp.*, 293 U.S. 328, 333, 79 L.Ed. 393, 55 S. Ct. 151 (1934); *Chapman v. Forsyth*, 43 U.S.

20 202, 2 HOW 202, 208, 11 L. Ed. 236 (1844). "We have adhered to this construction in interpreting

21 the scope of 11 U.S.C. § 523(a)(4), refusing to deny discharge to those whose fiduciary duties were

22 established by constructive, resulting and implied trusts." *In re Hemmeter*, 242 F.3d at 1189-90,

23 citing *Runnion v. Pedrazzini (In re Padrazzini)*, 644 F.2d 756, 758 (9th Cir. 1981) and *Schlecht v.*

24 *Thornton (In re Thornton)*, 544 F.2d 1005, 1007 (9th Cir. 1976). "The broad, general definition of

25 fiduciary – a relationship involving confidence, trust and good faith – is inapplicable to the

26 dischargeability context." *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986).

27   In the Ninth Circuit, "[a] debtor is only a 'fiduciary' for purposes of § 523(a)(4), where state

28 law imposes an *express or statutory trust* on the funds at issue." *In re Niles*, 106 F.3d 1456, 1463

1  (9th Cir. 1997), italics added. For example, in the matter of *In re Niles*, 106 F.3d 1456, 1463, the

2  court found that that debtor, a licensed real estate broker, acted as fiduciary with respect to a

3  property management account because she was required either to collect rents for the plaintiffs as

4  their broker, and then pay funds from the account directly to the plaintiffs or to hold them in a trust

5  account. *In re Niles*, 106 F.3d 1456, 1459. Thus, the debtor was the trustee of an express trust, and

6  her fiduciary relationship to the plaintiffs arose prior to her wrongdoings which caused her to

7  become indebted to the plaintiffs. *Id.*

8        An example of a *statutory trust* which complies with Section 523(a)(4)'s requirements is set

9  forth in the matter of *In re Hemmeter*, which held that Employee Retirement Income Security Act

10  plan fiduciaries are also fiduciaries within the meaning of Section 523(a)(4). *In re Hemmeter* at

11  1189-90. The *Hemmeter* court stated that:

12      A statutory fiduciary is considered a fiduciary for the purposes of § 523(a)(4) if the statute:
13      (1) defines the trust res; (2) identifies the ficuciary's fund management duties; and (3)
    imposes obligations on the fiduciary prior to the wrongdoing.

14  Id. at 1190. The court reviewed ERISA and found that (1) it defines the trust res as the creation of

15  the plan itself; (2) identifies the fiduciary's fund management duties; and (3) states that the

16  ficuciary's duties arise upon creation of an ERISA plan. *In re Hemmeter* at 1190. Thus, "ERISA

17  satisfies the traditional requirements for a statutory fiduciary to qualify as a fiduciary under §

18  523(a)(4)." *Id.*, citing *Morgan v. Musgrove (In re Musgrove)*, 187 B.R. 808, 814 (Bankr. N.D. Ga.

19  1995).

20          2.    *Delaware State Law Does Not Impose Express Or Statutory Trusts On*
21              *Corporate Directors, But Imposes A Constructive Trust On Corporate Funds,*
            *Pursuant To The Delaware Trust Fund Doctrine, When Corporate Directors*
22              *Profit From Their Wrongdoing*

23        Because Delaware was the state of incorporation of the Delaware Holding Co. (Compl. at ¶

24  12), Delaware state law determines whether there was an express or statutory trust which imposed

25  trust duties on Bonilla, as meant by Section 523(a)(4). It is clear that Delaware law does not impose

26  an express or statutory trust on corporate directors, as explained in *Miramar Resources, Inc. v.*

27  *Arthur Shultz (In re Arthur Shultz)*, 208 B.R. 723 (Bankr. M.D. Fl. 1997). There, the court held that

28  Delaware law does not impose express or statutory trust duties on corporate directors. But, when a

9

1  corporation becomes insolvent as a result of the director's wrongdoing, and where the defendant

2  profits from his wrongdoing, the Delaware Trust Fund Doctrine is implicated and imposes trust

3  duties on a corporate director sufficient to satisfy section 523(a)(4). In contrast, Judge Marilyn

4  Morgan, who extensively analyzed the history and scope of the Delaware Trust Fund Doctrine in

5  *Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529, 535 (Bankr. N.D. Cal. 2003), found that the

6  Delaware Trust Fund Doctrine imposes a *constructive trust*, rather than a true trust, as an equitable

7  remedy where corporate directors profit from their wrongdoing. Thus, even if the Delaware Trust

8  Fund Doctrine is implicated, it does not meet the Section 523(a)(4) strict requirement for an express

9  or statutory trust. The only contrary authority is *Miramar Resources, Inc. v. Zachary L. Shultz (In re*

10  *Zachary Shultz)*, 205 B.R. 952 (Bankr. NM 1997) which dispensed with the "express or statutory

11  trust" element, but without offering a cogent explanation.

12              *a.    Miramar Resources, Inc. v. Arthur C. Shultz*

13         In the matter of *Miramar Resources, Inc. v. Arthur C. Shultz (In re Arthur Shultz)*, 208 B.R.

14  723 (Bankr. M.D. Fl. 1997), Miramar Resources, Inc. filed a complaint against the debtor to

15  determine the dischargeability under Section 523(a)(4) of Miramar's prior judgment against the

16  debtor for breach of fiduciary duty. *Arthur Shultz*, at 725. Prior to the debtor's bankruptcy case, the

17  debtor had been a member of Miramar's board of directors. *Id.* at 727. Most of the members were

18  part of debtor's family ("Family Directors") and the minority of the members were "outsider"

19  members. *Id.* at 727. Miramar's underlying judgment against the Family Directors, including the

20  debtor, was the result of the actions of one of the Family Directors, who brokered various

21  transactions with another company, whereby Miramar would sell most of its assets to the other

22  company for no consideration to the company, and assign Miramar's oil and gas leases to one of the

23  other Family Directors. *Id.* at 727. Soon after, the board passed resolutions authorizing the

24  transactions over the objections of the "outsider" members, who requested that the board obtain a

25  fairness opinion prior to approving the transaction. *Id.*

26         The court rejected Miramar's contention that the "express trust" element of Section 523(a)(4)

27  was established "under Delaware law, [which holds that] directors of a corporation stand in the

28  position of trustees with the shareholders" *Id*, citing *Petty v. Penntech Papers, Inc.*, 347 A.2d 140

                                                                                                      10

1  (Del. Ch. 1975). The court stated that:

2
> although state law is relevant in the determination of fiduciary duties
3
> under § 523(a)(4), the bankruptcy courts must find 'an express or
> technical trust' giving rise to the fiduciary duty. [citation]. The express
4
> or technical trust aspect of Section 523(a)(4) requires that there be 'a
> segregated trust *res*, an identifiable beneficiary, and affirmative trust
5
> duties established by contract or by statute.

6  *Id.* at 729, citing *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 79 L. Ed. 393, 55 S. Ct.

7  151 (1934) and *American Surety & Casualty Co. v. Hutchinson (In re Hutchinson)*, 193 B.R. 61, 65

8  (Bankr. M.D.Fla. 1996). Thus, although Delaware law imposes trust duties on corporate officers,

9  "this fact alone does not establish an express or technical trust as required for an exception from

10  discharge under Section 523(a)(4)." *Id.* at 728-29. Accordingly, "[t]he defendant's position as a

11  director does not per se make him a trustee to the corporation. ... [A]dditional proof was needed to

12  fulfill the 'express or technical trust' requirement." *Id.* at 729.

13        The court next considered Miramar's second argument, that a trust relationship existed

14  pursuant to the Delaware Trust Fund Doctrine, which arises upon a corporation's insolvency or

15  where the corporation is on the brink of insolvency, and which imposes on the board of directors a

16  duty to the corporate enterprise and its creditors. *Id.*, citing *Credit Lyonnais Bank Nederland, N.V. v.*

17  *Pathe Communications, Co.* 1991 Del. Ch. LEXIS 215, No. 12150, 1991 WL 277613 at *34 (Del

18  Ch. Dec. 30, 1991) and *Arkansas v. Fatjo*, 1993 U.S. Dist. LEXIS 7911 at *14, 1993 WL 208440 at

19  *5 (S.D.Tex.). The *Arthur Schultz* court found that the Delaware Trust Fund Doctrine was

20  implicated because the defendant's wrongdoing resulted in Miramar's insolvency, and permitted him

21  to profit from his wrongdoing. Specifically, the defendant knew that the proposed board resolutions

22  would result in Miramar's insolvency, and despite the fact that the defendant knew that the outside

23  directors objected to the transaction and had requested a fairness opinion, the defendant failed to act

24  in the best interest of the other directors and shareholders. *Arthur Shultz*, at 729, italics added.

25  Consequently, the court ruled that Miramar established the "express or statutory trust" element

26  required under Section 523(a)(4).

27  / / /

28  / / /

/ / /

11

1

                             *b.*     *The Delaware Trust Fund Doctrine Imposes A <u>Constructive</u> Trust*

2
                                        *Rather Than An* Express *Trust Where Inequity Results From Personal*

                                        *Profit By The Insiders, Which Have Engaged In Wrongdoing Resulting*

3
                                        *In The Corporation's Insolvency*

4
       In contrast to the *Arthur Shultz* court, Judge Morgan extensively reviewed the history and

5
scope of the Delaware Trust Fund Doctrine in the matter of *Decker v. Mitchell (In re JTS Corp.)*,

6
305 B.R. 529, 535 (Bankr. N.D. Cal. 2003)(finding that the Delaware Trust Fund Doctrine, which is

7
not relied upon in the strict sense and which does not truly create a trust, is different from the

8
insolvency exception, which imposes fiduciary duties on the corporate directors, but which does not

9
impose a trust on the corporate assets) and concluded, based upon case law interpreting the Delaware

10
Trust Fund Doctrine, including the seminal case, *Bovay v. H.M. Byllesby & Co.*, 27 Del. Ch. 381, 38

11
A.2d 808 (Del. 1944), that "directors are not trustees in a strict and technical sense but may be

12
treated as such when they have 'unlawfully profited through breach of duty, and at the expense of

13
the corporation.'" *In re JTS Corp.*, 305 B.R. at 538, citing *Bovay*, 38 A.2d at 813.  The Delaware

14
Trust Fund Doctrine applies where inequity results "from a combination of two factors []: personal

15
profit by the insiders and harm to the corporation leading to its insolvency." *In re JTS Corp.*, 305

16
B.R. 529, 538, citing *Bovay*, 38 A.2d 808, 813.  This court also noted that:

17
     In the years following *Bovay*, Delaware law has not followed an uncompromising trust fund
     doctrine. Although the supreme court has not had an opportunity to discuss the issue further,

18
     the lower courts, while still citing Bovay, have generally turned away from describing
     directors of an insolvent corporation as guardians of a trust fund for the benefit of creditors.

19
     … [A] litany of cases demonstrates that Delaware law has never relied on the trust fund
     doctrine in the strict sense. … Delaware's recognition that the trust fund doctrine is limited to

20
     the application of remedies designed to assure fairness is consistent with the construct trust
     concepts from which it arises. As one authority has noted, a constructive trust is a fiction of

21
     equity. It is 'a formula through which the conscience of equity finds expression.' Bogert,

22
     *The Law of Trust and Trustees*, § 471 at p. 8 (rev. 2d ed.). There is no true intent to create a
     trust, rather it is a devise used to work out an equitable result when a party has gained

23
     possession of property through unjust or unlawful means.

24
     *In re JTS Corp.* at 538, 540.

25
       In contrast, the insolvency exception, which first appeared in *Harff v. Kerkorian*, 324 A.2d

26
215 (Del. Ch. 1974), imposes fiduciary duties on directors towards creditors when a corporation is

27
insolvent. *In re JTS Corp.* at 539.  "This new fiduciary relationship is certainly one of loyalty, trust

28
and confidence, but it does not involve holding the insolvent corporation's assets in trust for

<div align="right">12</div>

---

1   distribution to creditors or holding directors strictly liable for actions that deplete the corporate

2   assets." *Id.*

3                   c.    *Miramar Resources, Inc. v. Zachary L. Shultz*

4           In the matter of *Miramar Resources, Inc. v. Zachary L. Shultz (In re Zachary Shultz)*, 205

5   B.R. 952 (Bankr. N.M. 1997), the court dispensed with Section 523(a)(4)'s "express or statutory

6   trust" requirement. The *Zachary Shultz* debtor, like the debtor in the *Arthur Shultz* case, was one of

7   the "Family Directors" of Miramar, and after filing a chapter 7 bankruptcy petition, was sued by

8   Miramar pursuant to a Section 523(a)(4) adversary proceeding. *Zachary Shultz* at 954. But unlike

9   the *Arthur Shultz* court, the *Zachary Shultz* court determined, based on the reasoning set forth in the

10  decision of *In re Snyder*, 101 B.R. 822 (Bankr. Mass. 1989), that the "technical trust" requirement

11  does not need to be applied in Section 523(a)(4) suits against corporate directors. *Zachary Shultz* at

12  958, citing *In re Snyder*, 101 B.R. 822, 835. Instead, 523(a)(4) denies discharge of a debt owed by a

13  corporate director so long as the debt was "created by the person who was already a fiduciary at the

14  time the debt was created.'" *Zachary Shultz* at 958, citing *In re Snyder*, 101 B.R. at 835. Following

15  the rationale of *Snyder*, the *Zachary Shultz* court concluded that the elements of Section 523(a)(4)

16  were met because Delaware state laws impose fiduciary and trust duties on corporate directors.

17  *Zachary Shultz* at 958-59, citing Del. Code Ann. tit 8 §§ 102(b)(7), 141(a).

18          The *Zachary Shultz* decision does not comport with the Ninth Circuit's strict requirement that

19  either an express or statutory trust exist in order to implicate non-dischargeability under Section

20  523(a)(4) and is thus not binding on this court. The *Zachary Shultz* decision fails to cite Delaware

21  law stating that corporate directors and officers are trustees under an *express trust*, which identifies a

22  segregated trust *res* and a beneficiary, as well as affirmative trust duties. And the *Zachary Shultz*

23  decision does not cite a Delaware statute which imposes *statutory fiduciary* duties on corporate

24  directors and officers whereby (1) the trust res is defined; (2) the fiduciary's funds management

25  duties are identified; and (3) obligations are imposed on the fiduciary prior to the alleged

26  wrongdoing.

27  / / /

28  / / /

                                                                                                    13

1
2
3

      3.     *ATR Fails To State A Claim For Relief Under Section 523(a)(4) Because Neither ATR's Complaint Nor The Findings And Holding Set Forth In The Memorandum Opinion Establish That Bonilla's Duties To ATR Were Imposed Pursuant To An Express Or Statutory Trust*

4
5

ATR fails to set forth facts satisfying the "express or statutory trust" element under Section 523(a)(4). In its complaint, ATR alleges that:

6
7

> as a director of a Delaware corporation, Bonilla stood in the position of a trustee for the shareholders of the Delaware Holding Company, including ATR. That trust relationship predated the debt owed by Bonilla to ATR and existed without reference to that debt.

8
9

Compl. at ¶ 74. Neither this allegation nor the Delaware Chancery Court's findings establish that an express or statutory trust existed which imposed trust duties on Bonilla, as follows:

10
11

      a.     *ATR Fails To Allege That An Express Trust Imposed Trust Duties On Bonilla*

12
13
14

ATR does not allege that an express trust existed under Delaware law which imposed fiduciary duties on Bonilla. Further, ATR does not allege that the express trust identified a segregated trust *res* and a beneficiary, or affirmative trust duties imposed on Bonilla.

15
16
17
18
19
20
21
22
23
24

ATR also cannot rely on the Memorandum Opinion to establish that an express trust existed which imposed fiduciary duties on Bonilla. The Delaware Chancery Court found that Delaware state law imposed upon Bonilla, as a director of the Delaware Holding Company, a duty of loyalty to ATR and to the Delaware Holding Company. Compl. at Ex. A, p.19. Bonilla breached this duty by failing "to monitor the potential that others within the organization will violate their duties." Compl. at Ex. A, p.19. But, as explained by the *Arthur Shultz* court, the fact that Bonilla had duties to the Delaware Holding Company as a director does not mean that Bonilla was a trustee to the Delaware Holding Company per se. Further, the Memorandum Opinion does not including findings that Bonilla's fiduciary duties were imposed pursuant to an express trust, much less identify a segregated trust *res* and a beneficiary, or Bonilla's affirmative trust duties imposed by the express trust.

25
26

      b.     *ATR Fails To Allege That A Statutory Trust Imposed Trust Duties On Bonilla*

27
28

Likewise, ATR does not allege that Delaware imposed trust duties on Bonilla pursuant to a Delaware statute. ATR does not allege that a Delaware statute exists which (1) defines a trust res; (2) identifies Bonilla's funds management duties as a director of the Delaware Holding Company, or

14

1    otherwise; or (3) imposed said duties on Bonilla prior to the time that Araneta transferred the LBC

2    Operational Companies from the Delaware Holding Company.  The Memorandum Opinion does not

3    including findings that a Delaware statute imposed statutory fiduciary duties on Bonilla, or that the

4    statute (1) defines the trust res; (2) identifies the fiduciary's funds management duties; and (3)

5    imposes such duties on the fiduciary prior to the alleged wrongdoing.

      c.  *ATR Does Not State Facts Sufficient To Establish That Trust Duties*
6
        *May Be Imposed On Bonilla Pursuant To The Delaware Trust Fund*
7       *Doctrine*

8      ATR does not allege that the "express or statutory trust" element is met by the Delaware

9    Trust Fund Doctrine, much less facts sufficient to support such a finding.  ATR does not allege, and

10   there are no findings in the Memorandum Opinion to support an allegation that imposition of the

11   Delaware Trust Fund Doctrine is appropriate on the grounds that Bonilla unlawfully profited from a

12   breach of duty which harmed the Delaware Holding Company, leading to its insolvency.  ATR does

13   not allege, and the Delaware Chancery Court did not find Bonilla *knew* that Araneta transferred

14   properties from the Delaware Holding Company, that Bonilla *knew* that the transfers would cause

15   the Delaware Holding Company to become insolvent, or that Bonilla *profited* from the transactions.

16   Compl. at Ex. A, at 19.

17     Other findings in the Memorandum Opinion establish that the Delaware Trust Fund Doctrine

18   does not apply.  While the Delaware Chancery Court's finding that Bonilla complied with Araneta's

19   instruction to not respond to ATR's document may establish that Bonilla was aware of a dispute

20   between ATR and Araneta, the finding certainly does not establish that Bonilla knew about the

21   transfers.  The Memorandum Opinion states that "ATR does not allege that ... Bonilla participated

22   in, approved of, or directly profited from Araneta's removal of the LBC Operating Companies."

23   Compl. at Ex. A, at 19.  Finally, the Delaware Chancery Court's decision to exclude Bonilla from

24   the fee shifting award, on the basis that Bonilla did not engage in conduct satisfying the bad faith

25   standard, including engaging in "fraud, bad faith or other outrageous conduct from which the claim

26   arose," further erodes support for an allegation that Bonilla was aware of Araneta's transfers.

27   / / /

28   / / /

1

                d.    *Pursuant To This Court's Decision In The Matter Of JTS Corp., The*
2                     *Delaware Trust Fund Doctrine Does Not Impose Trust Duties*
                    *Sufficient To Meet The "Express Or Statutory Trust" Requirement*
3                     *Under Section 523(a)(4)*

4       Lastly, it is clear from this court's interpretation of the Delaware Trust Fund Doctrine, in the

5 matter of *Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529, 535 (Bankr. N.D. Cal. 2003), that the

6 Delaware Trust Fund Doctrine does not impose trust duties sufficient to meet the "express or

7 statutory trust" requirement under Section 523(a)(4). This court specifically found that:

8       Delaware's recognition that the trust fund doctrine is limited to the application of remedies
      designed to assure fairness is consistent with the construct trust concepts from which it
9       arises. ... There is no true intent to create a trust, rather it is a device used to work out an
      equitable result when a party has gained possession of property through unjust or unlawful
10       means.

11 *In re JTS Corp.*, 305 B.R. 529, 540. Accordingly, even if the Delaware Trust Fund Doctrine

12 imposed trust duties on Bonilla, such duties arose from a *constructive trust*, rather than from an

13 "express or statutory trust." And the Ninth Circuit will not deny discharge to those whose fiduciary

14 duties were established by constructive trusts. *In re Hemmeter*, 242 F.3d 1186, 1189-90 (9th Cir.

15 2001). Accordingly, imposing trust duties on Bonilla pursuant to the Delaware Trust Fund Doctrine

16 does not result in a denial of Bonilla's right to discharge his debt to ATR under Section 523(a)(4).

17       In conclusion, ATRs fourth claim for relief fails to pass muster under the Rule 12(b)(6)

18 analysis: taking as true all of ATR's material allegations and construing them in a light most

19 favorable to ATR, ATR has not set forth facts establishing that the "express or statutory trust"

20 element required before this court may determine that Bonilla's debt to ATR is nondischargeable

21 under Section 523(a)(4). Further, the Delaware judgment does not apply to preclude Bonilla from

22 moving to dismiss ATR's complaint because the Delaware Chancery Court did not address or

23 resolve the issue of whether an express or statutory existed which imposed fiduciary duties on

24 Bonilla.

25       D.    ATR Fails To State Facts Sufficient To Support Its Claim That Bonilla Committed
26             "Fraud While Acting In A Fiduciary Capacity" Because ATR Does Not Allege That
            Bonilla Intentionally Deceived ATR
27
      "Establishing fraud [for the purposes of section 523(a)(4)] requires a showing of a positive
28
intentional act involving moral turpitude." *G.W. White & Son v. Tripp (In re Tripp)*, 189 B.R. 29, 35

16

1   (Bankr. N.D.N.Y. 1995). "The fraud definition is the same as that stated for 523(a)(2)(A)." *In re*

2   *McDaniel*, 181 B.R. 883, 887 (Bankr. .S.D. Tex. 1994). And under section 523(a)(2), "the debtor

3   must have intended to deceive the creditor." *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240,

4   1249 n.10 (9th Cir. 2001); 4 COLLIER ON BANKRUPTCY (15th ed. 2006) at ¶ 523.10[1][a]("'Fraud'

5   for purposes of this exception has generally been interpreted as involving intentional deceit, rather

6   than implied or constructive fraud").

7        ATR does not allege that Bonilla intentionally deceived ATR, and the Delaware judgment

8   did not find that Bonilla intentionally deceived ATR. Rather, the Delaware Chancery Court

9   specifically found that Bonilla did "not engage[] in conduct that satisfies the exacting bad faith

10   standard required for fee shifting", namely, "fraud, bad faith, or other outrageous conduct from

11   which the claim arose and bad faith behavior in the course of subsequent litigation" and thus ruled

12   that Bonilla is not jointly and severally liable for the fee-shifting award. Compl. at Ex. A, p.23.

13   Accordingly, ATR has failed to state a claim for relief on the basis that Bonilla's debt to ATR was

14   due to fraud, pursuant Section 523(a)(4), and ATR cannot rely upon the Delaware judgment to

15   satisfy this element under Section 523(a)(4).

16                          IV. <u>CONCLUSION</u>

17        Based on the foregoing, the debtor prays that the fourth claim for relief set forth in ATR's

18   complaint against Bonilla be dismissed. Because ATR cannot amend to cure the defects, the debtor

19   also prays that ATR be denied leave to amend its complaint.

20   Dated: August 31, 2007                    MACDONALD & ASSOCIATES

21

22                          By: _Heather A. Cutler_____

23                              Heather A. Cutler, Attorneys for Debtor,
                               Hugo Nery Bonilla

24

25

26

27

28

                                                                17

1  MICHAEL J. BAKER (No. 56492)
   Email: mbaker@howardrice.com
2  WILLIAM J. LAFFERTY (No. 120814)
   Email: wlafferty@howardrice.com
3  MATTHEW L. BELTRAMO (No. 184796)
   Email: mbeltramo@howardrice.com
4  HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
5  A Professional Corporation
   Three Embarcadero Center, 7th Floor
6  San Francisco, California 94111-4024
   Telephone: 415/434-1600
7  Facsimile:  415/217-5910

8  Attorneys for Plaintiffs
   ATR-KIM ENG FINANCIAL CORPORATION
9  and ATR-KIM ENG CAPITAL PARTNERS,
   INC.

10

11              UNITED STATES BANKRUPTCY COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

15  In re                          │  Case No. 07-30309

16  HUGO N. BONILLA,               │  Chapter 7 Case

17          Debtor.

18  ─────────────────────────────
    ATR-KIM ENG FINANCIAL          │   Adv. Proc. No. 07-03079
19  CORPORATION and ATR-KIM ENG
    CAPITAL PARTNERS, INC.,        │  Date:    September 28, 2007
20                                 │  Time:    9:30 a.m.
            Plaintiffs,            │  Place:   235 Pine Street
21                                 │           Courtroom 23
        v.                         │           San Francisco, California
22                                 │  Judge:   Hon. Thomas E. Carlson
    HUGO NERY BONILLA,
23
            Defendant.
24

25  **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
    **DEFENDANT'S MOTION TO DISMISS FOURTH CAUSE OF ACTION**
26  **PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

27

28

MPA OPP'N MOT. TO DISMISS 4TH CAUSE OF ACTION



EXHIBIT    D

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................ 1

FACTUAL ALLEGATIONS IN COMPLAINT AND ITS ATTACHMENTS ....... 3

   I.   THE INJURY TO ATR AND THE ENSUING DELAWARE
      LITIGATION ........................................................................... 4

   II.  THE FINDINGS AGAINST BONILLA ..................................... 6

   III. ALLEGATIONS OF THE PRESENT COMPLAINT ............... 7

ARGUMENT ..................................................................................... 8

   I.   DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE
      THE ALLEGATIONS IN THE COMPLAINT, IN
      CONJUNCTION WITH THE FINDINGS OF THE DELAWARE
      COURT, ESTABLISH THAT BONILLA IS A "FIDUCIARY"
      WITHIN THE MEANING OF SECTION 523(a)(4) ................ 8

      A.  The Standard Of Review And Irrelevance Of Collateral
           Estoppel To This Motion ........................................... 8

      B.  Defendant Was A "Fiduciary" For Purposes Of Section
           523(a)(4) ................................................................ 10

           1.  Section 523(a)(4) Encompasses Circumstances In Which
               A Debtor Owes Trust-Like Obligations Pursuant To
               State Common-Law ........................................... 11

           2.  As A Delaware Director, Defendant Owed Similar
               Trust-Type Obligations To The Shareholders Of The
               Delaware Holding Company ............................... 12

           3.  There Is A Trust Res And A Beneficiary In This Case ... 18

      C.  The In re Shultz Decisions ....................................... 20

           1.  The Decision In The Zachary Shultz Case Is Persuasive
               Precedent ....................................................... 20

           2.  Arthur Shultz Is Not Persuasive Authority And Is
               Actually Rejected By Defendant Himself ............. 22

CONCLUSION ................................................................................ 24


HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Amfac Mortgage Corp. v. Ariz. Mall of Tempe, Inc.*, 583 F.2d 426 (9th Cir.
5      1978) ............................................................................................................... 8

6  *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533 (Del. 1996) .................... 14

7  *Beneficial Indus. Loan Corp. v. Smith*, 170 F.2d 44 (3rd Cir. 1948) ................. 15

8  *Bornstein v. Snyder*, 923 F.2d 840 (1st Cir. 1990) ............................................. 17

9  *Bovay v. H.M. Byllesby & Co.*, 29 A. 2d 801 (Del. Ch. 1943) ........................... 15

10  *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808 (Del. 1944) .................................. 23

11  *Bowen v. Imperial Theaters, Inc.*, 13 Del.Ch. 120, 115 A. 918 (1922) .............. 15

12  *Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................. 8

13  *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934) ......................................... 20

14  *DeSantis v. Dixon*, 72 Ariz. 345, 236 P.2d 38 (1951) ......................................... 12

15  *Durning v. First Boston Corp.*, 815 F.2d 1265 (9th Cir. 1987) ....................... 4, 9

16  *Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001) ....................................... 13

17  *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160
18      (Del. 2002) ...................................................................................................... 15

19  *Grace v. Morgan*, No. Civ. A 03C05260JEB, 2004 WL 26858 (Del. Super.
        Jan. 6, 2004) ................................................................................................... 15

20  *Grogan v. Garner*, 498 U.S. 279 (1991) ............................................................. 9

21  *Guth v. Loft, Inc.*, 5 A.2d 503 (Del.Ch. 1939) ............................................... 13, 16

22  *Hynson v. Drummond Coal Co.*, 601 A.2d 570 (Del. Ch. 1991) ............... 2, 14, 22

23  *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708 (9th
        Cir. 2005) ........................................................................................................ 9
24
25  *In re Bennett*, 989 F.2d 779 (5th Cir. 1993) ...................................................... 11

26  *In re Briles*, 228 B.R. 462 (Bankr. S.D. Cal. 1998) .......................................... 10

27  *In re Cantrell*, 329 F.3d 1119 (9th Cir. 2003) .................................................... 14

28  *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del.Ch. 1996) ......... 6, 16

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

MPA OPP'N MOT. TO DISMISS 4TH CAUSE OF ACTION

-ii-

# TABLE OF AUTHORITIES

**Page(s)**

*In re Colton*, No. 05-56430-MM, 2007 WL 1615069 (Bankr. N.D. Cal. June 4, 2007) ............ 11

*In re Cook*, 263 B.R. 249 (Bankr. N.D. Iowa 2001) ............ 12

*In re Cowley*, 35 B.R. 526 (Bankr. D. Kan. 1983) ............ 18

*In re Cummins*, 166 B.R. 338 (Bankr. W.D. Ark. 1994) ............ 17

*In re Dawley*, 312 B.R. 765 (Bankr. E.D. Pa. 2004) ............ 10

*In re Digex, Inc. S'holders Litig.*, 789 A.2d 1176 (Del. Ch. 2000) ............ 13

*In re Galbreath*, 112 B.R. 892 (Bankr. S.D. Ohio 1990) ............ 17

*In re Hammarstrom*, 95 B.R. 160 (Bankr. N.D. Cal. 1989) ............ 3

*In re Hammond*, 98 F.2d 703 (2nd Cir. 1938) ............ 17

*In re Johnson*, 242 B.R. 283 (Bankr. E.D. Pa. 1999) ............ 18

*In re Jones*, 114 B.R. 917 (Bankr. N.D. Ohio 1990) ............ 17

*In re Lewis*, 97 F.3d 1182 (9th Cir. 1996) ............ 12, 16, 17

*In re Long*, 774 F.2d 875 (8th Cir. 1985) ............ 18

*In re Moskowitz*, 310 B.R. 21 (Bankr. E.D.N.Y. 2004) ............ 11, 12

*In re Sax*, 106 B.R. 534 (Bankr. N.D. Ill. 1989) ............ 18

*In re Shoe-Town, Inc. Stockholders Litig.*, No. C.A. No. 9483, 1990 WL 13475 (Del. Ch. Feb. 12, 1990) ............ 15, 22

*In re Snyder*, 101 B.R. 822 (Bankr. D. Mass. 1989) ............ 17, 21

*In re Stanifer*, 236 B.R. 709 (9th Cir. BAP 1999) ............ 11, 13, 18

*In re Sullivan*, 217 B.R. 670 (Bankr. D. Mass. 1998) ............ 12, 16, 17

*In re Teichman*, 774 F.2d 1395 (9th Cir. 1985) ............ 11

*Lewis v. Short (In re Short)*, 818 F.2d 693 (9th Cir. 1987) ............ 11

*Lofland v. Cahall*, 13 Del.Ch. 384, 118 A. 1 (1922) ............ 15

*Matter of Marchiando*, 13 F.3d 1111 (7th Cir. 1994) ............ 21

*Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994) ............ 17

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RASKIN

# TABLE OF AUTHORITIES

**Page(s)**

*Miramar Resources, Inc. v. Shultz (In re Arthur Shultz)*, 208 B.R. 723
   (Bankr. M.D. Fla. 1997) ........................................... 3, 19, 20, 23, 24

*Miramar Resources, Inc. v. Shultz (In re Zachary Shultz)*, 205 B.R. 952
   (Bankr. D.N.M. 1997) ........................................... *passim*

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.
   Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ........................ 4

*Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003) ...... 13

*Petty v. Penntech Papers, Inc.*, 347 A.2d 140 (Del. Ch. 1975) ......... 15, 22

*Prestancia Mgmt. Group, Inc. v. Virginia Heritage Found., II LLC*, No. Civ.
   A. 1032-S, 2005 WL 1364616 (Del. Ch. May 27, 2005) ................. 15

*Price v. Wilmington Trust Co.*, No. Civ. A. No. 12476, 1996 WL 451318
   (Del. Ch. Aug. 6, 1996) ........................................... 14

*Price v. Wilmington Trust Co.*, No. Civ. A. No. 12476, 1996 WL 560177
   (Del. Ch. Sept. 3, 1996) .......................................... 14

*Price v. Wilmington Trust Co.*, No. Civ. A. No. 12476, 1995 WL 317017
   (Del. Ch. May 19, 1995) ........................................... 22

*Ragsdale v. Haller*, 780 F.2d 794 (9th Cir. 1986) .................... 12

*Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del. Ch. 1989) ... 13

*Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985) ...................... 13

*Stegemeier v. Magness*, 728 A.2d 557 (Del. 1999) .................... 14

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) .......................... 13, 16

*U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383 (3rd Cir. 2002) ..... 4

*Vizcaino v. Microsoft Corp.*, 120 F.3d 1006 (9th Cir. 1997) ......... 14

## Statutes

Bankr. Code (11 U.S.C. §101, *et seq.*)
   §523(a)(4) ........................................................ *passim*
   §727(a)(2)(A) ..................................................... 7
   §727(a)(5) ........................................................ 7

8 Del. Code §102(b)(7) ............................................... 13

Fed. R. Civ. P. 12(b)(6) ............................................. 3, 8, 9

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

**INTRODUCTION**

The Delaware Court of Chancery found Debtor Hugo N. Bonilla ("Defendant") liable to Plaintiffs ATR-Kim Financial Corporation and ATR-Kim Eng Capital Partners, Inc. (collectively, "Plaintiffs" or "ATR") for approximately $24.5 million as a result of his breach of fiduciary duties as a director of a Delaware corporation in which Plaintiffs were the minority shareholder. The Court found Defendant had "conscious[ly] disregard[ed]" his duties as a director by turning a blind eye while the controlling shareholder stripped the company of its most valuable assets. Defendant does not challenge the validity of the Delaware judgment or the findings of the Delaware Court. Nor can he; that judgment was affirmed *in total* by the Delaware Supreme Court.

Rather, Defendant contends that the Fourth Claim for Relief in Plaintiffs' Adversary Complaint—which alleges that Defendant's debt to ATR is non-dischargeable under Section 523(a)(4)[1]—should be dismissed because Plaintiffs cannot establish that Defendant was a "fiduciary" for purposes of that Code section. Defendant's argument fails as a matter of law.

*First*, the premise of this argument—namely, that Plaintiffs must satisfy the doctrine of collateral estoppel at this procedural juncture—is flawed. Although the question of collateral estoppel may come into play at a later stage (such as on Plaintiffs' motion for summary judgment or at trial), the question on a *motion to dismiss* is not the future applicability of collateral estoppel, but rather whether the Complaint, together with its attachments, states a claim for relief when viewed in the light most favorable to Plaintiffs. As discussed below, Defendant has failed to meet his burden under this standard.

Moreover, even if the doctrine of collateral estoppel were relevant at this procedural juncture, Defendant's argument is still misplaced. Defendant contends that collateral estoppel cannot apply here because the issues decided in Delaware are not "identical" to those relevant in a non-dischargeability action brought under Section 523(a)(4). However,

---

[1]Unless otherwise indicated, all statutory references are to the Bankruptcy Code (the "Code") (11 U.S.C. §101, *et seq.*).

1   the fact that the Delaware court (unsurprisingly) did not make findings specific to Section
2   523(a)(4) in no way prevents this Court from relying on the findings that the Delaware court
3   *did* make in determining whether Defendant's debt is non-dischargeable.   Indeed, it is
4   exactly that approach that bankruptcy courts must take in assessing whether a prior judgment
5   debt is non-dischargeable.  *See, e.g., Miramar Resources, Inc. v. Shultz (In re Zachary*
6   *Shultz)*, 205 B.R. 952, 955 (Bankr. D.N.M. 1997) (hereinafter "*Zachary Shultz*") ("so long as
7   factual findings were made which permit that determination [under Section 523(a)(4)], this
8   Court is bound by those findings and is barred from proceeding with relitigation of the same
9   facts").

10      *Second*, the only substantive argument advanced in support of this motion—namely,
11   that Defendant is not a "fiduciary" under Section 523(a)(4) because he was not the trustee of
12   an "express" or "statutory" trust—is incorrect.  The concept of a "trustee" for purposes of
13   Section 523(a)(4) is not limited to cases in which there is an actual "trust agreement" or a
14   statute that literally calls someone a "trustee."  It also encompasses circumstances involving
15   "trust-type" relationships.   In ascertaining whether such trust-type relationship existed,
16   bankruptcy courts must examine the common-law of the state in which debt arose.

17      Delaware law gives rise to the fiduciary duties at issue in this case, and an examination
18   of Delaware case law reveals that Defendant's fiduciary obligations as a director of a
19   corporation are exactly the kind of "trust-type" duties contemplated by Section 523(a)(4).
20   Indeed, Delaware courts have held that "the fiduciary duty of corporate directors is a court
21   created duty that historically springs from equity's experience with *trusts and trustees*."
22   *Hynson v. Drummond Coal Co.*, 601 A.2d 570, 575 (Del. Ch. 1991) (emphasis added).
23   Consistent with this approach, Delaware courts historically have compared a director's
24   duties to those of a trustee and require directors to abide by exacting duties in their
25   relationship with the corporation and its shareholders.

26      The correlation between the duties of a corporate director and those of a trustee also
27   extends to the concepts of trust "res" and "beneficiary."  Where, as here, the debtor is a
28   corporate director, the trust "res" includes the assets of the corporation, and the beneficiaries

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  are the corporation and its shareholders. The Complaint and its attachments make plain that

2  the trust "res" in this case was the assets that had been stripped from the Delaware

3  corporation under Defendant's watch, and the "beneficiaries" were the corporation and

4  ATR, who, as the minority shareholder, had an indirect ownership interests in the corporate

5  assets.

6      *Finally*, Defendant's argument is inconsistent with *Zachary Shultz*, the only opinion to

7  have comprehensively considered whether a Delaware director is a "fiduciary" within the

8  meaning of Section 523(a)(4). After a careful review of Delaware law and controlling

9  precedent, that court concluded that Delaware directors *are* fiduciaries for purposes of

10 Section 523(a)(4) because, among other things, "[d]irectors of a [Delaware] corporation

11 stand in the position of trustees with their stockholders." *Zachary Shultz*, 205 B.R. at 959.

12 The only case that stands in contrast—*i.e.*, *Miramar Resources, Inc. v. Shultz (In re Arthur*

13 *Shultz)*, 208 B.R. 723 (Bankr. M.D. Fla. 1997) (hereinafter "*Arthur Shultz*")—is a decision

14 that even Defendant cannot completely endorse because it also concluded that a Delaware

15 director was a "fiduciary" under Section 523(a)(4), albeit on different grounds. As a result,

16 although Defendant purports to rely on *Arthur Schulz*, he is forced to spend a great deal of

17 effort attempting to qualify and explain away the portions of that decision that contradict his

18 position.

19     For all of these reasons, the Court should deny Defendant's motion in its entirety and

20 permit the parties to litigate the merits of Plaintiffs' Fourth Claim for Relief.[2]

21         **FACTUAL ALLEGATIONS IN COMPLAINT AND ITS ATTACHMENTS**

22     Because Defendant has brought this motion under Federal Rule of Civil Procedure

23 12(b)(6), all statements of material fact in the Complaint and its attachment must be "taken

24

---

25     [2]If the Court disagrees and is inclined to grant this motion in any respect, Plaintiffs
26 respectfully request an opportunity to file an amended Complaint to cure any deficiencies.
   *See In re Hammarstrom*, 95 B.R. 160, 161 n.1 (Bankr. N.D. Cal. 1989) ("It is well
27 established that a court should not grant a Rule 12(b)(6) motion without leave to amend, if it
   appears that the Plaintiff can amend the complaint to allege facts sufficient to state a claim
28 upon which relief can be granted").

MPA OPP'N MOT. TO DISMISS 4TH CAUSE OF ACTION

-3-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    as true and construed in the light most favorable to the plaintiff." *No. 84 Employer-*
2    *Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931
3    (9th Cir. 2003); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987); *see*
4    *also U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3rd Cir. 2002). The following
5    facts are taken from both the Complaint in this action and the Memorandum Opinion issued
6    by the Delaware Court of Chancery in *ATR-Kim Eng Financial Corporation, et al. v.*
7    *Carlos R. Araneta, et al.*, (Delaware Court of Chancery No. CIV. A. 489-A), a copy of
8    which is attached as Exhibit A to the Complaint and incorporated by reference therein.

9    I.    **THE INJURY TO ATR AND THE ENSUING DELAWARE LITIGATION.**

10        Defendant's judgment debt to ATR arises out of his role as a director in a Delaware
11    corporation (hereinafter the "Delaware Holding Company") in which ATR was a 10 percent
12    minority shareholder. *See* Compl. ¶¶11-14 & Ex. A at *3-*5. The Delaware Holding
13    Company was formed by Carlos Araneta ("Araneta"), a wealthy Philippine businessman
14    who operates an international family of courier and remittance companies bearing the initials
15    "LBC." *Id.* ¶¶10-11. Defendant is and, at all time relevant to this case, was president of
16    LBC Holdings USA Corporation and head of Araneta's operations in the United States. *Id.*
17    ¶10 & Ex. A at *20.

18        Beginning in 1999, Araneta entered into a series of business arrangements with ATR,
19    which culminated in ATR advancing him $3.922 million to participate in a Philippine
20    insurance venture. *See id.* ¶12 & Ex. A at *3. As a condition of this advancement, Araneta
21    formed the Delaware Holding Company, making Plaintiffs 10 percent shareholders and
22    retaining personal control over the remaining 90 percent. *Id.* ¶12 & Ex. A at *4. Araneta
23    then transferred into the Delaware Holding Company both his portion of the insurance
24    venture and also a group of LBC companies known as the "LBC Operating Companies." *Id.*
25    ¶12 & Ex. A at *10-*13. The LBC Operating Companies were the "primary" asset of the
26    Delaware Holding Company and had a book value of over $35 million. *Id.* ¶13 & Ex. A at
27    *13, *15. Upon formation of the Delaware Holding Company, "Araneta appointed and
28    dominated [its] board of directors, which consisted of himself, defendant Berenguer

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

MPA OPP'N MOT. TO DISMISS 4TH CAUSE OF ACTION
-4-

1  (Araneta's niece and the CFO of the LBC group of companies), and defendant Bonilla . . . ."

2  *Id.* Ex. A at *4; *see also* Compl. ¶14.

3       In November 2002, ATR decided to withdraw from the insurance venture with

4  Araneta. *Id.* ¶16 & Ex. A at *5. Although this decision was permissible under the terms of

5  the parties' agreements, Araneta felt aggrieved by it. *Id.* He reacted by stripping the

6  Delaware Holding Company of its only "valuable assets" (*id.* ¶17 & Ex. A at *4)—the LBC

7  Operating Companies—and by transferring them to members of his family without

8  informing ATR or permitting them to share *pro rata* in the proceeds. *Id.* ¶17 & Ex. A at

9  *13. As a result, ATR was left with a 10 percent interest in a company that was effectively a

10  shell corporation. *Id.*

11       After its falling out with Araneta, ATR went to great lengths to obtain information

12  about the financial state of the Delaware Holding Company. Among other things, it sent

13  demand letters to Araneta and his agents, seeking an opportunity to review the books and

14  records of the Company. *Id.* ¶19 & Ex. A at *6. Certain of these letters were copied to

15  Bonilla, who, on the instructions of Araneta, refused to respond to them. *Id.* Starved for

16  information (*id.* Ex. A at *6), ATR filed a compliance action in Delaware under Section 220

17  of the Delaware Corporations Code, seeking to obtain the requested records. *Id.* ¶20 &

18  Ex. A at *6. It was only after being ordered to do so by the Delaware courts that Araneta

19  turned over financial records to ATR. *Id.* Ex. A at *6. These records showed that, sometime

20  during the last nine months of 2003, Araneta had stripped the Delaware Holding Company

21  of its chief assets. *Id.* ¶20 & Ex. A at *6.

22       ATR filed suit against Araneta, Bonilla, and Berenguer in June 2004, alleging fraud

23  and breach of fiduciary duty. *Id.* ¶21 & Ex. A at *7. The case went to trial in the Delaware

24  Court of Chancery in August 2006 (*id.* ¶22) and on December 21, 2006, the Court issued a

25  54-page Memorandum Opinion, finding all three defendants liable for the injury to ATR. *Id.*

26  ¶23 & Ex. A at *21. The Court entered its Final Order of Judgment (the "Delaware

27  Judgment") on January 10, 2007, holding the defendants jointly and severally liable "in the

28  amount of **$24,490,422.50**," plus post-judgment interest accruing at a rate of 11.25 percent

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   per year. *Id.* ¶24 & Ex. B at 1 (emphasis in original).[3]

2   **II.    THE FINDINGS AGAINST BONILLA.**

3       Although Araneta was chiefly responsible for the harm to ATR, the Delaware Court

4   devoted a substantial discussion to the role played by the Defendant (and his co-director,

5   Berenguer) in the underlying action.    The Court began by noting that, as a director of a

6   Delaware corporation, Bonilla owed fiduciary duties to ATR, including the duty:

7   - "to monitor the potential that others within the organization will violate their [own]

8       duties" (Compl. Ex. A at *19);

9   - "'to attempt in good faith to assure that a corporate information and reporting

10      system, which the board considers to be adequate, exists'" (*id.* (quoting *In re*

11      *Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 970 (Del.Ch. 1996)

12      ("*Caremark*")); and

13  - to "'exercise a good faith judgment that the corporation's information and reporting

14      system is in concept and design adequate to assure the board that appropriate

15      information will come to its attention in a timely manner as a matter of ordinary

16      questions, so that it may satisfy its responsibility'" (*id.* (quoting *Caremark*, 698

17      A.2d at 970)).

18      The Court then found that Defendant (and his co-director Berenguer) had breached

19  those duties by failing to monitor Araneta's actions and by choosing "total fealty to

20  Araneta's conflicting interests instead" of their duty to the corporation and its shareholders.

21  Compl. Ex. A at *21. Specifically, the Court found that Bonilla was responsible for:

22  - "allow[ing] Araneta to do whatever he wanted, without any examination of whether

23      his conduct benefited the Delaware Holding Company and all of its stockholders,

24      rather than simply Araneta personally" (*id.* Ex. A at *1);

25  - treating "Araneta and the Delaware Holding Company [as] basically one and the

26

27  [3]The Court also awarded an additional $863,059.89 in attorney's fees and costs against
    Araneta, "in light of his egregious misconduct both before and during litigation of this

28  matter." Compl. Ex. B at 2.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

same and [taking] the word of Araneta as being the word of the company" (*id.* Ex. A at *20);

- never "question[ing] the wisdom of Araneta's actions nor insist[ing] that corporate procedures be followed" (*id.*);

- "**consciously** abandon[ing] any attempt to perform [his] duties independently and impartially, as [he was] required to do by law" (*id.* Ex. A at *21 (emphasis added));

- evincing a "**willingness** to serve the needs of [his] employer, Araneta, even when that meant intentionally abandoning the important obligations they had taken on to the Delaware Holding Company and its minority stockholder, ATR" (*id.* (emphasis added));

- "never [taking] any steps to recover the LBC Operating Companies once [he] realized that those assets were gone" (*id.*); and

- "act[ing] as—no other word captures it so accurately—[a] stooge[] for Araneta, seeking to please him and only him, and having no regard for [his] obligations to act loyally towards the corporation and all of its stockholders" (*id.* Ex. A at *1).

## III.  ALLEGATIONS OF THE PRESENT COMPLAINT.

Defendant filed a voluntary petition for Chapter 7 bankruptcy on March 16, 2007.  *See In re Hugo Bonilla*, United States Bankruptcy Court, Northern District of California, Docket #07-30309 (docket entry #1).  On July 23, 2007, ATR filed the instant adversary Complaint, seeking a declaration that Defendant was not entitled to a discharge because he had: (1) engaged in fraudulent transfers of real property within one year of the filing of the bankruptcy petition pursuant to Section 727(a)(2)(A) (*see* Compl. ¶¶63-65 (First Claim for Relief)); (2) failed to maintain books, documents, records and papers from which his financial condition or business transactions might be ascertained pursuant to Section 727(a)(3) (Second Claim for Relief); and (3) failure to explain satisfactorily the loss or deficiency of assets pursuant to Section 727(a)(5) (*see* Compl. ¶¶69-71 (Third Claim for Relief)).

In addition, in the Fourth Claim for Relief, Plaintiffs seek a determination that

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

Defendant's debt to ATR is non-dischargeable because it arises from "fraud or defalcation while acting in a fiduciary capacity," under Section 523(a)(4). Compl. ¶76. With respect to this claim for relief, Plaintiffs have alleged that

> 72. ATR incorporates by reference paragraphs 1-62 inclusive, as though fully set forth herein.

> 73. In his capacity as Director of a Delaware corporation, Bonilla owed fiduciary duties to ATR, the Delaware Holding Company's minority shareholder, that predated the debt in this case. Those pre-existing fiduciary duties imposed upon Bonilla the responsibility for safeguarding the value of the assets of the Delaware Holding Company and, thereby, preserving the value of ATR's interest as a minority shareholder in the Delaware Holding Company.

> 74. Further, as a director of a Delaware corporation, Bonilla stood in the position of a trustee for the shareholders of the Delaware Holding Company, including ATR. That trust relationship predated the debt owed by Bonilla to ATR and existed without reference to that debt.

> 75. Bonilla's failure—as found by the Delaware Chancery Court—to monitor Araneta's actions, to prevent him from removing assets from the Delaware Holding Company to his family members without consideration, or to take any steps to protect ATR's interest as a minority shareholder, facilitated and enabled Araneta's wrongful transfer of assets from the Delaware Holding Company, resulting in the misappropriation of funds held in a fiduciary capacity. Further, by failing to respond to ATR's discovery requests in the Delaware action, Bonilla failed properly to account for the investment ATR made in the Delaware Holding Company.

> 76. As a result of these actions, Bonilla's Judgment Debt to ATR arises from "fraud or defalcation while acting in a fiduciary capacity," within the meaning of 11 U.S.C. Section 523(a)(4) and therefore should be excepted from discharge. (Compl. ¶¶72-76)

## ARGUMENT

**I.   DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE THE ALLEGATIONS IN THE COMPLAINT, IN CONJUNCTION WITH THE FINDINGS OF THE DELAWARE COURT, ESTABLISH THAT BONILLA IS A "FIDUCIARY" WITHIN THE MEANING OF SECTION 523(a)(4).**

**A.   The Standard Of Review And Irrelevance Of Collateral Estoppel To This Motion.**

A complaint or cause of action should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Amfac Mortgage Corp. v. Ariz. Mall of Tempe, Inc.*, 583 F.2d 426, 429-30 (9th Cir. 1978). "All allegations of material fact are taken as true and construed in the light most favorable to

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    the non-moving party." *Durning*, 815 F.2d at 1267.

2    Defendant begins by couching his argument by reference to collateral estoppel.

3    According to Defendant, because Plaintiffs cannot meet one of the elements of that

4    doctrine—identicality of issues between the Delaware case and this case (*see* Defendant's

5    Memorandum of Points and Authorities Supporting Motion to Dismiss Complaint ("Def.

6    Br.") at 7:7-28)—they cannot state a cause of action under Section 523(a)(4). There are two

7    fundamental flaws with Defendant's approach.

8    *First*, Defendant's reliance on the doctrine of collateral estoppel is misplaced. It would

9    be one thing if Defendant were attempting to use the doctrine as a defense to the Complaint,

10   by showing that some issue central to this case already has been litigated and decided

11   *against* Plaintiffs in another proceeding. *See, e.g., Idaho Potato Comm'n v. G & T Terminal*

12   *Packaging, Inc.*, 425 F.3d 708, 713 n.3 (9th Cir. 2005) (noting that defensive collateral

13   estoppel operates "to preclude a plaintiff from relitigating an issue that the plaintiff

14   previously litigated unsuccessfully against a different party"). In this instance, by contrast,

15   Defendant's argument is that one of the central issues in this action—the existence of an

16   "express" or "technical" trust under Section 523(a)(4)—has *not been litigated or decided* in

17   a prior proceeding. Although collateral estoppel eventually may be grounds for granting

18   judgment to *Plaintiffs*, either on summary judgment or after trial (*see, e.g., Grogan v.*

19   *Garner*, 498 U.S. 279, 284 (1991) (noting that it is the *creditor* who would seek "to

20   minimize additional litigation by invoking collateral estoppel" in a non-dischargeability

21   suit)) and therefore Defendant's arguments may be relevant then, the alleged absence of

22   collateral estoppel does not entitle Defendant to a dismissal on the pleadings now. Put

23   another way, for purposes of the present motion, it is not the applicability of collateral

24   estoppel that matters, but rather whether the Fourth Claim for Relief, taken together with the

25   attachments to the Complaint, and viewed in the light most favorable to Plaintiffs, fails to

26   state a cause of action. *See* Fed. R. Civ. P. 12(b)(6).

27   *Second*, even if this were not the case and collateral estoppel *was* relevant to a

28   resolution of this motion, that doctrine is of no assistance to Defendant. Defendant's only

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    objection to application of the doctrine is that one of the issues in this case—the "trust" issue

2    under Section 523(a)(4)—is allegedly not "identical" to any of the issues decided in

3    Delaware. *See* Def. Br. at 7:23-28. But this can hardly come as a surprise. The question

4    before the Chancery Court in Delaware was whether the Defendant had breached his

5    fiduciary duties to Plaintiffs as a matter of state corporate law, not whether he was entitled to

6    a discharge under federal bankruptcy law. However, in answering the questions that were

7    properly before it, the Delaware court made a host of *factual* findings, none of which were

8    disturbed by the Delaware Supreme Court in its affirmance. It is those *factual findings*, in

9    conjunction with the bankruptcy and applicable non-bankruptcy law, that support the

10   determination that the Defendants' debt to Plaintiffs is non-dischargeable.    As one

11   bankruptcy court observed when confronted with virtually an identical situation,

12           [r]egardless of whether Judge Brooks [who had decided the case giving rise to the
             underlying debt] specifically concluded that Shultz [a corporate director] owed
13           Miramar [a Delaware corporation] a fiduciary duty which satisfies §523(a)(4), so
             long as factual findings were made which permit that determination, this Court is
14           bound by those findings and is barred from proceeding with relitigation of the
             same facts. (*Zachary Shultz*, 205 B.R. at 955)
15

16   *See also In re Dawley*, 312 B.R. 765, 776 (Bankr. E.D. Pa. 2004) ("I . . . reject the

17   Defendant's position that the failure of Judge McInerney to find Plaintiff liable for fraud or

18   embezzlement forecloses my doing so if her findings support the elements of fraud while

19   acting in a fiduciary capacity or embezzlement as construed under §523(a)(4)").

20       **B.    Defendant Was A "Fiduciary" For Purposes Of Section 523(a)(4).**

21       Section 523(a)(4) provides in relevant part that "[a] discharge under Section 727 . . .

22   does not discharge an individual debtor from any debt . . . for fraud or defalcation while

23   acting in a fiduciary capacity." 11 U.S.C. §523(a)(4). Defendant does not dispute that he

24   owes a debt to Plaintiffs or that the debt resulted from "defalcation"[4] while acting as a

25   co-director of the Delaware Holding Company.    Instead, he contends that he was not a

26   —————————————

27       [4]"Defalcation is broadly defined to include any behavior by a fiduciary, including
     innocent, negligent, and intentional defaults of fiduciary duty resulting in failure to provide a
28   complete accounting." *In re Briles*, 228 B.R. 462, 467 (Bankr. S.D. Cal. 1998).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  "fiduciary" within the meaning of Section 523(a)(4) because his duties as a co-director were

2  not imposed "pursuant to an express or statutory trust." Def. Br. at 8:10-11. Defendant then

3  proceeds to give examples of "express" and "statutory" trusts (see id. at 8:1-19), which he

4  asserts are inapposite to this case. Defendant's argument is flawed in several important

5  respects.

      **1.  Section 523(a)(4) Encompasses Circumstances In Which A Debtor Owes Trust-Like Obligations Pursuant To State Common-Law.**

8        Contrary to the premise of Defendant's argument, the term "fiduciary" is not limited to

9  cases in which there is a written trust agreement or a statute that specifically uses the term

10  "trust" or "trustee." Rather, courts both in the Ninth Circuit and throughout the country have

11  endorsed a more practical approach to Section 523(a)(4), recognizing that the terms

12  "express" or "technical" trust encompass those circumstances in which "trust-type"

13  obligations are imposed on a debtor pursuant to state common-law. See, e.g., In re

14  Teichman, 774 F.2d 1395, 1399 (9th Cir. 1985) ("state law takes on importance in

15  determining when a trust exists. The state may impose trust-like obligations on those

16  entering into certain kinds of contracts, and these obligations may make a contracting party a

17  trustee") (internal quotation marks omitted); In re Stanifer, 236 B.R. 709, 714 (9th Cir. BAP

18  1999) ("The 'technical' or 'express' trust requirement includes relationships in which trust-

19  type obligations are imposed pursuant to statute or common law"); In re Colton, No.

20  05-56430-MM, 2007 WL 1615069, at *3 (Bankr. N.D. Cal. June 4, 2007) ("in some

21  instances, a state statute or common law doctrine may impose trust-like obligations that are

22  sufficient to satisfy the requirements of an express trust"); cf. Lewis v. Short (In re Short),

23  818 F.2d 693, 695-96 (9th Cir. 1987) (holding that Washington common law imposed

24  trustee-like duties on partners of partnership); see also In re Bennett, 989 F.2d 779, 784-85

25  (5th Cir. 1993) ("most courts today . . . recognize that the 'technical' or 'express' trust

26  requirement is not limited to trusts that arise by virtue of a formal trust agreement, but

27  includes relationships in which trust-type obligations are imposed pursuant to statute or

28  common law"); In re Moskowitz, 310 B.R. 21, 30 (Bankr. E.D.N.Y. 2004) ("Technical or

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

MPA OPP'N MOT. TO DISMISS 4TH CAUSE OF ACTION
-11-

1   express trusts include relationships where trust-type obligations are imposed pursuant to
2   statute or common law"); *In re Cook*, 263 B.R. 249, 255 (Bankr. N.D. Iowa 2001) ("[t]he
3   'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a
4   formal trust agreement, but includes relationships in which trust-type obligations are
5   imposed pursuant to statute or common law"); *In re Sullivan*, 217 B.R. 670, 675 (Bankr. D.
6   Mass. 1998) ("A technical trust is a trust that is imposed by law and may arise either by
7   statute or common law").

8       *In re Lewis*, 97 F.3d 1182 (9th Cir. 1996) is illustrative. The issue there was whether
9   the bankrupt, a business partner of one of the creditors, was a "fiduciary" under Arizona law
10  for purposes of Section 523(a)(4) as a result of the business partnership.  The Court
11  examined the relevant Arizona statutes and concluded they were of no benefit to the
12  plaintiffs because the fiduciary duties mentioned therein arise "only when the partner derives
13  profits without consent of the partnership" and therefore were "the sort of trust *ex maleficio*
14  not included within the purview of §523(a)(4)."  *In re Lewis*, 97 F.3d at 1185 (internal
15  quotations and citation omitted).  The Court then considered language from Arizona case
16  law, which it found more closely approached the description of a "trustee" required by
17  Section 523(a)(4), in particular:

18      The relation of partnership is fiduciary in character, and imposes upon the
        members of the firm the obligation of the utmost good faith in their dealings with
19      one another with respect to partnership affairs, of acting for the common benefit
        of all the partners in all transactions relating to the firm business, and of
20      refraining from taking any advantage of one another by the slightest
        misrepresentation, concealment, threat or adverse pressure of any kind.  (*Id.* at
21      1186 (quoting *DeSantis v. Dixon*, 72 Ariz. 345, 236 P.2d 38, 41 (1951)).

22  Given this case and other similar cases, the Court held, "Arizona law imposes upon partners
23  a fiduciary duty within the meaning of section 523(a)(4)." *In re Lewis*, 97 F.3d at 1186; *see*
24  *also Ragsdale v. Haller*, 780 F.2d 794, 795-96 (9th Cir. 1986) (reaching same result under
25  California law).

26          **2.   As A Delaware Director, Defendant Owed Similar Trust-Type**
                   **Obligations To The Shareholders Of The Delaware Holding Company.**
27

28  Delaware law has historically imposed "trust-type" duties on its directors that are at

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    least as demanding as those recognized in *In re Lewis*.[5] The starting point for this analysis is

2    the fundamental principle of Delaware law "that directors are responsible for managing the

3    business and affairs of a Delaware corporation and, in exercising that responsibility, they are

4    charged with an unyielding fiduciary duty to the corporation and its shareholders."

5    *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257, 269 (Del. Ch. 1989) (internal

6    quotations omitted); *accord Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985); *see also*

7    *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 938 (Del. 2003) ("The fiduciary

8    duties of a director are unremitting and must be effectively discharged in the specific context

9    of the actions that are required with regard to the corporation or its stockholders as

10   circumstances change"); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.Ch. 1939) ("A public

11   policy, existing through the years, and derived from a profound knowledge of human

12   characteristics and motives, has established a rule that demands of a corporate . . . director,

13   peremptorily and inexorably, the most scrupulous observance of his duty, not only

14   affirmatively to protect the interests of the corporation committed to his charge, but also to

15   refrain from doing anything that would work injury to the corporation, or to deprive it of

16   profit or advantage which his skill and ability might properly bring to it, or to enable it to

17   make in the reasonable and lawful exercise of its powers").[6] Those "unyielding fiduciary

18   duties" include the duty of care and loyalty, and the subsidiary duty of good faith. *See Stone*

19   *v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Emerald Partners v. Berlin*, 787 A.2d 85,

20   90 (Del. 2001) (noting that the "fiduciary responsibilities do not operate intermittently"); *In*

21   *re Digex, Inc. S'holders Litig.*, 789 A.2d 1176, 1206 (Del. Ch. 2000) ("directors must at all

22

---

23   [5]Although the question of whether a relationship is a fiduciary one within the meaning
     of Section 523(a)(4) is an issue of federal law, "[t]he determination relies . . . upon whether

24   the requisite trust relationship exists under state law." *In re Stanifer*, 236 B.R. at 714. As
     Defendant himself recognizes (Def. Br. at 9:23-25), Delaware supplies the relevant law in

25   this case.

26   [6]The fiduciary duties of a Delaware director are also recognized by the statutes of that
     state. *See, e.g.*, 8 Del. Code §102(b)(7) (a certificate of incorporation may contain "[a]

27   provision eliminating or limiting the personal liability of a director to the corporation or its
     stockholders for monetary damages for breach of *fiduciary duty* as a director . . .") (emphasis

28   added).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    times abide by their fiduciary duties owed to the shareholders of the corporation").

2        These demanding fiduciary duties grow from the experience of Delaware courts

3    interpreting the law of trusts. "[T]he fiduciary duty of corporate directors is a court created

4    duty that historically springs from equity's experience with trusts and trustees."[7] *Hynson*,

5    601 A.2d at 575; *see also Zachary Shultz*, 205 B.R. at 958 ("[h]istorically, Delaware courts

6    have held corporate directors to high fiduciary standards and have even described the

7    fiduciary obligation in terms of a trust"). Although corporate directors in Delaware are not

8    trustees in a technical sense,[8] the courts of that state have long analogized their obligations to

9    those of trustees. As the Court of Chancery stated:

10

11        [7]That the fiduciary obligations of a Delaware director spring from the law of trusts
12    distinguishes this case from *In re Cantrell*, 329 F.3d 1119 (9th Cir. 2003), in which the
    Court held that California directors were not fiduciaries under Section 523(a)(4) because
13    their obligations arose out of the law of *agency*. *See id.* at 1126 (citing California cases).
    Delaware courts, by contrast, have rejected the notion that corporate directors are agents of
14    the corporation. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539-40 (Del.
    1996) ("Directors, in the ordinary course of their service as directors, do not act as agents of
15    the corporation . . . . An agent acts under the control of the principal. The board of directors
    of a corporation is charged with the ultimate responsibility to manage or direct the
16    management of the business and affairs of the corporation. . . . A board of directors, in
    fulfilling its fiduciary duty, controls the corporation, not *vice versa*) (citations and footnote
17    omitted); *accord Zachary Shultz*, 205 B.R. at 959 (holding that "it would be an analytical
    anomaly to treat corporate directors as agents of the corporation [under Delaware law] when
18    they are acting as fiduciaries of the stockholders in managing the business and affairs of the
    corporation"). This facet of Delaware law also has been recognized by the Ninth Circuit.
19    *See Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1021 (9th Cir. 1997) ("Under Delaware's
    corporations law, however, the board of directors directs the affairs of the business but is *not*
20    an agent of the corporation").

21        Further, although the Court in *In re Cantrell* relied on language from California cases
    to the effect that directors are "technically not trustees" (*see In re Cantrell*, 329 F.3d at 1126
22    (internal quotations omitted)), that language came from Delaware common law, and thus
    justifies a thorough analysis of Delaware law on this point.

23        [8]For example, for purposes of self-dealing (which is not an issue as to the Defendant in
    this case), Delaware law has different standards for corporate directors and trustees. *See*
24    *Stegemeier v. Magness*, 728 A.2d 557, 562 (Del. 1999) (noting that directors are not
    "equated" with trustees for purposes of self-dealing and can engage in self-dealing if their
25    actions are approved by the board or by the shareholders). Along those same lines, courts
    have held that the relationship between a corporate director and a shareholder is not as
26    "thoroughly rooted" in the concepts of reliance and trust as a pure trustor-trustee relationship
    might be. *Price v. Wilmington Trust Co.*, No. Civ. A. No. 12476, 1996 WL 451318, at *4
27    (Del. Ch. Aug. 6, 1996); *see also Price v. Wilmington Trust Co.*, No. Civ. A. No. 12476,
    1996 WL 560177, at *2 (Del.Ch.,1996) (noting that directors and trustees are different in the
28    *degree* of trust that the law requires).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

> Clearly directors of a corporation *stand in a position of trustees* with the stockholders, *Lofland v. Cahall*, 13 Del.Ch. 384, 118 A. 1 (1922); *Bowen v. Imperial Theaters, Inc.*, [] 13 Del.Ch. 120, 115 A. 918 (1922), and the utmost good faith and fair dealing are required of them, especially where their individual interests are concerned. (*Petty v. Penntech Papers, Inc.*, 347 A.2d 140, 143 (Del. Ch. 1975) (emphasis added))

*See also Beneficial Indus. Loan Corp. v. Smith*, 170 F.2d 44, 57 (3rd Cir. 1948) ("The right of a stockholder of a Delaware corporation to maintain a derivative suit on behalf of the corporation is based upon a breach of fiduciary duty by the directors or officers of the corporation. *The officers and directors of a Delaware corporation are trustees for its stockholders under Delaware law*") (emphasis added);[9] *see also In re Shoe-Town, Inc. Stockholders Litig.*, No. C.A. No. 9483, 1990 WL 13475, at *7 (Del. Ch. Feb. 12, 1990) (characterizing directors as "quasi trustees. . . . a director will be held as a trustee for the corporation he has undertaken to represent") (citations omitted). Thus, Delaware courts have held that "efforts by a fiduciary to escape a fiduciary duty, whether by a corporate director or officer *or other type of trustee*, should be scrutinized searchingly." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 168 (Del. 2002) (emphasis added); *see also Prestancia Mgmt. Group, Inc. v. Virginia Heritage Found., II LLC*, No. Civ. A. 1032-S, 2005 WL 1364616, at *6 (Del. Ch. May 27, 2005) ("[a] fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another. The relationship connotes a dependence. The traditional relationships recognized by equity as 'special' are express trustees and corporate officers and directors"); *Grace v. Morgan*, No. Civ. A 03C05260JEB, 2004 WL 26858, at *2 (Del. Super. Jan. 6, 2004) (holding that the "classic examples" of "a special relationship of trust [that] exist[s] between the parties sufficient to establish the fiduciary duty" include "the trustee responsible for the trust *res* for the beneficiary and the corporate officer or director responsible to

---

[9]*But see Bovay v. H.M. Byllesby & Co.*, 29 A. 2d 801, 804 (Del. Ch. 1943) (holding that directors are not trustees of an express trust "in the true sense of that term" and therefore can benefit from the statutes of limitations applicable to claims in a court of law, rather than equity).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    shareholders").

2        Viewed in this light, the "unyielding" fiduciary duties that a director of a Delaware

3    corporation owes to the corporation and its shareholders are exactly the kind of "trust-type"

4    obligations that Courts rely upon in applying Section 523(a)(4). *See In re Sullivan*, 217 B.R.

5    at 676 (holding that debtor-director was a fiduciary for purposes of Section 523(a)(4) where

6    relevant state law provided that the director's "duty is *in the nature* of a trust relationship")

7    (quotations omitted; emphasis added). Indeed, it is hard to imagine a meaningful difference

8    between the obligations imposed on the business partner in *In re Lewis*—e.g., acting in the

9    "the utmost good faith" toward each other (*In re Lewis*, 97 F.3d at 1186)—and those that are

10   imposed on corporate directors under Delaware case law. *See Guth*, 5 A.2d at 510 (requiring

11   "the most scrupulous observance of his duty, not only affirmatively to protect the interests of

12   the corporation committed to his charge, but also to refrain from doing anything that would

13   work injury to the corporation"). In both cases, the applicable case law recognized a

14   heightened responsibility, analogous to the law of trusts, that governs the actor's conduct.

15       It was exactly these "trust-type" obligations which gave rise to Defendant's judgment

16   debt in this case. The Delaware Court found that Defendant had breached his fiduciary

17   obligations to the corporation and to its minority shareholder—ATR—by failing to monitor

18   or question Araneta's conduct as required under Delaware corporate law. *See Compl. Ex. A*

19   at *19-*21 (citing the decisions in *Caremark*, 698 A.2d 959, and *Stone*, 911 A.2d at 370).

20   To put this finding in perspective, as the Delaware Court recognized, a violation of a

21   director's oversight liability can only arise if:

22       (a) the directors utterly failed to implement any reporting or information system
         or controls; or (b) having implemented such a system or controls, consciously
23       failed to monitor or oversee its operations thus disabling themselves from being
         informed of risks or problems requiring their attention. In either case, imposition
24       of liability requires a showing that the directors *knew that they were not
         discharging their fiduciary obligations*. Where directors fail to act in the face of
25       a known duty to act, *thereby demonstrating a conscious disregard for their
         responsibilities*, they breach their duty of loyalty by failing to discharge that
26       fiduciary obligation in good faith. (Compl. Ex. A at *19 (citing *Stone, 911 A.2d
         at 370 (emphases added; footnotes omitted))
27

28   In concluding that Defendant had breached these duty, the Delaware Court by necessity

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

MPA OPP'N MOT. TO DISMISS 4TH CAUSE OF ACTION

-16-

1   made some specific and stark findings against the Defendant, including finding that he had:

2   • "**consciously** abandoned any attempt to perform [his] duties independently and

3   impartially, as [he was] required to do by law" (*Id.* at *21 (emphasis added));

4   • evidenced a "**willingness** to serve the needs of [his] employer, Araneta, even when

5   that meant **intentionally** abandoning the important obligations they had taken on to

6   the Delaware Holding Company and its minority stockholder, ATR" (*id.* (emphasis

7   added)); and

8   • "chos[en] **total fealty** to Araneta's conflicting interests instead" of his duty "to be

9   loyal to the Delaware Holding Company" (*id.* (emphasis added)).

10  It was these serious and deliberate breaches of fiduciary duty that prompted the Delaware

11  court to conclude that Defendant was "jointly liable for Araneta's fiduciary violations." *Id.*

12  Under these circumstances, it can fairly be said—as Plaintiffs have alleged in the

13  Complaint—that Defendant "stood in the position of a trustee for the shareholders of the

14  Delaware Holding Company" (Compl. ¶74) and that the debt to Plaintiff arose out of the

15  breach of his trust-type obligations. *See In re Lewis*, 97 F.3d at 1186. Defendant's debt,

16  accordingly, is non-dischargeable under Section 523(a)(4).[10]

17

_____

18  [10]Although courts are not unanimous on this issue, numerous cases hold that corporate
directors are fiduciaries for purposes of Section 523(a)(4). *See, e.g., Meyer v. Rigdon*, 36

19  F.3d 1375, 1382 (7th Cir. 1994) ("In Indiana, a director owes a fiduciary duty to the
corporation and its shareholders. . . . Therefore, Rigdon was acting in a fiduciary capacity

20  with respect to the Bank and its shareholders"); *In re Hammond*, 98 F.2d 703, 705 (2nd Cir.
1938) ("The president of a private corporation has been held to be an 'officer' or a fiduciary

21  within the meaning of the clause under discussion . . . . It can scarcely be doubted, and is
not, we understand, disputed, that a director falls within the same category") (citation

22  omitted); *In re Snyder*, 101 B.R. 822, 835 (Bankr. D. Mass. 1989) ("to summarize, the Court
finds that the fiduciary duties of corporate directors under Massachusetts law satisfy the

23  requirements of section 523(a)(4) of the Bankruptcy Code"), *aff'd in part & rev'd in part on
other grounds sub nom. Bornstein v. Snyder*, 923 F.2d 840 (1st Cir. 1990); *see also In re*

24  *Sullivan*, 217 B.R. 670, 676 (Bankr. D. Mass. 1998) ("Since *Snyder*, corporate officers and
directors with fiduciary obligations under state law have consistently been found to be

25  fiduciaries under § 523(a)(4)"); *In re Cummins*, 166 B.R. 338, 354 (Bankr. W.D. Ark. 1994)
(holding that " a fiduciary relationship under section 523(a)(4) can be established where

26  there is a clear fiduciary duty on the part of corporate officers to a corporation with regard to
the proper treatment of corporate assets over which the corporate officer has control"); *In re*

27  *Jones*, 114 B.R. 917, 922 (Bankr. N.D. Ohio 1990) ("a corporate officer is a fiduciary of the
corporation within the meaning of Sec. 523(a)(4)"); *In re Galbreath*, 112 B.R. 892, 898-900

28  (Bankr. S.D. Ohio 1990) (holding that "the fiduciary relationship occupied by a corporate
(continued . . . )

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1

### 3.  There Is A Trust *Res* And A Beneficiary In This Case.

2    Defendant also contends that the "trust" requirements of Section 523(a)(4) are not

3    satisfied because no trust "res" or trust "beneficiary" has been identified. *See* Def. Br. at

4    14:12-24. Once again, Defendant is wrong. *First*, courts have held that in cases such as this,

5    in which a trust-type obligation is imposed pursuant to common-law, the trust res will be

6    "implied" by the Court in order to give effect to the Section 523(a)(4). *See In re Stanifer*,

7    236 B.R. at 715 (holding that the "trust res is implied" in an action under Section 523(a)(4)

8    brought against a fiduciary).

9    *Second*, and more importantly, there *is* an identifiable trust "res" in this case, namely,

10    the assets of the Delaware Holding Company that Defendant permitted Araneta to divert for

11    the personal use of the Araneta family. *See, e.g.*, Compl. Ex. A at *21 (holding that

12    Defendant never bothered to "check whether the Delaware Holding Company retained *its*

13    *primary assets* and never took any steps to recover the LBC Operating Companies once they

14    realized that those assets were gone") (emphasis added). In these circumstances, it is the

15    assets of the corporation itself that are considered the trust "res." *See, e.g., Zachary Shultz*,

16    205 B.R. at 959 ("the Court finds Shultz, as a director of Miramar, was under a fiduciary

17    obligation to the corporation for the management of the corporation and its assets, *which can*

18    *be considered to constitute the* res *of a technical trust*") (emphasis added); *In re Sax*, 106

19    B.R. 534, 539 (Bankr. N.D. Ill. 1989) ("By agreeing to become a director of the Bank,

20    Sweeney agreed to use the trust *res*, the Bank's resources, solely for the advantage of the

21    Bank and not for any personal gain").

22    Moreover, although those assets belonged to the corporation in the first instance, ATR,

23    as a minority shareholder, had an indirect ownership interest in them as well, at least to the

24

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

25    ( . . . continued)
director fall[s] within the scope of the term "fiduciary capacity" as it is used in Section
26    523(a)(4)"); *In re Cowley*, 35 B.R. 526, 528-29 (Bankr. D. Kan. 1983) ("it has long been
settled that a corporate officer is a "fiduciary" of the corporation, within the meaning of §
27    523(a)(4) and § 17(a)(4), its predecessor section under the Bankruptcy Act of 1898"). For
examples of cases holding to the contrary, see *In re Long*, 774 F.2d 875, 878-79 (8th Cir.
28    1985) and *In re Johnson*, 242 B.R. 283, 294 (Bankr. E.D. Pa. 1999).

extent that a diminution in the value of the assets would result in a corresponding diminution in the value of ATR's shareholdings. *See, e.g.*, Compl. Ex. A at *21 ("The major breach of fiduciary duty in this case is one that injured the Delaware Holding Company in the first instance and ATR secondarily as a minority stockholder"). Indeed, the Delaware court specifically described Plaintiffs' $3.922 million contribution to the Delaware Holding Company as an "investment" of "capital" in that company. *See, e.g.*, Compl. Ex. A at *21 (predicating the award "on the need to make ATR whole for the injury it suffered by entrusting its capital to the Delaware Holding Company"); *id.* at *4 ("[t]o protect *ATR's investment* in the LBC Operating Companies, the Undertaking Agreement granted ATR contractual protections . . .") (emphasis added); *id.* at *13 (discussing ATR's "minority equity investments"). And the Complaint itself alleges that "Bonilla failed properly to account for the investment ATR made in the Delaware Holding Company" by breaching his fiduciary obligations to them. *See* Compl. ¶75. Under these circumstances, there can be little doubt that the trust "res" in this case are the assets of the Delaware Holding Corporation, assets in which ATR had an indirect ownership interest as a minority shareholder and through its investment of capital.

*Finally*, as minority shareholders in the Delaware Holding Company, Plaintiffs were "beneficiaries" of the "trust res." *Cf. Arthur Shultz*, 208 B.R. at 729 ("pursuant to the Delaware Trust Fund Doctrine at the time of the July 20, 1991 meeting, the Defendant was a trustee of the corporation with the *res* being the corporate assets, [and] the beneficiary being the other directors *and the shareholders*") (emphasis added). To underscore the point, the Complaint in this litigation alleges that Defendant's "pre-existing fiduciary duties imposed upon [him] the responsibility for safeguarding the value of the assets of the Delaware Holding Company and, thereby, preserving the *value of ATR's interest as a minority shareholder* in the Delaware Holding Company." Compl. ¶73 (emphasis added); *see also id.* (alleging that Defendant failed "to take any steps to protect *ATR's interest* as a minority shareholder") (emphasis added). In a similar vein, the Delaware Court predicated its award "on the need to make ATR whole for the injury it suffered *by entrusting its capital* to the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   Delaware Holding Company, only to see that corporation impoverished by the defendants."

2   *Id.* Ex. A at *21 (emphasis added).   These allegations and findings make explicit what

3   should otherwise be obvious: Plaintiffs—minority shareholders in a company with only one

4   other shareholder—were beneficial owners of the corporate assets, assets that had been

5   entrusted to the directors of the corporation, including Defendant.

6       C.   The *In re Shultz* Decisions.

7           1.   The Decision In The *Zachary Shultz* Case Is Persuasive Precedent.

8       The *Zachary Shultz* case, 205 B.R. 952, is one of two[11] reported cases Plaintiffs have

9   found discussing whether a Delaware director is a fiduciary for purposes of Section

10  523(a)(4) and is by far the most persuasive authority on this topic.   The debtor in *Zachary*

11  *Shultz*, like the debtor here, served as a director of a Delaware corporation (Miramar, Inc.)

12  that had been improperly stripped of its assets.   *Id.* at 954.   Following liquidation of the

13  corporation, a body of independent directors sued Zachary Shultz (and other members of the

14  Shultz family who were also directors) on behalf of the corporation and obtained a judgment

15  against him for breach of fiduciary duty.   *Id.*   After Zachary Shultz filed for bankruptcy, the

16  corporation filed a non-dischargeability complaint and moved for summary judgment,

17  seeking a declaration that the debt was non-dischargeable under Section 523(a)(4).   The

18  central issue before the Court was whether the debtor, as a corporate director of a Delaware

19  corporation, was a "fiduciary" for purposes of Section 523(a)(4).

20      The Court held that he was.   It began by examining the origins of the "trust"

21  requirement in Section 523(a)(4), which it traced back to the Supreme Court's decision in

22  *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934).   There, the Supreme Court had held

23  that

24          [t]he statute [the predecessor of Section 523(a)(4)] speaks of technical trusts, and
            not those which the law implies from . . . contract.   The scope of the exception
25          [is] to be limited accordingly. . . .   It is not enough that, by the very act of
            wrongdoing out of which the contested debt arose, the bankrupt has become
26          chargeable as a trustee *ex maleficio*.   He must have been a trustee before the

27  ─────────────

28          [11]The other reported case, *Arthur Shultz*, is discussed, *infra*.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   wrong and without reference thereto. . . . *The language would seem to apply only
2   to a debt created by a person who was already a fiduciary when the debt was
    created. (Id.* at 333 (emphasis added))

3   The Court in *Zachary Shultz* next turned to the "numerous" decisions from around the

4   country in which the issue of "fiduciary" duties under Section 523(a)(4) had arisen. *See*

5   *Zachary Shultz*, 205 B.R. at 956-57 (discussing nine such cases). In each of these cases,

6   save one, the Court found that the corporate director in question had been treated as a

7   "fiduciary" for purposes of Section 523(a)(4). *See id.* The Court was particularly persuaded

8   by *In re Snyder*, 101 B.R. 822 (Bankr. D. Mass. 1989) *aff'd in part & rev'd in part on other*

9   *grounds sub nom. Bornstein v. Snyder*, 923 F.2d 840 (1st Cir. 1990), which held that the

10  "'the operative language'" of Section 523(a)(4) is "'the requirement that [the statute] only

11  applies to a debt created by a person who was already a fiduciary at the time the debt was

12  created.'" *Zachary Shultz*, 205 B.R. at 958 (quoting *In re Snyder*, 101 B.R. at 835); *accord*

13  *Matter of Marchiando*, 13 F.3d 1111, 1115-16 (7th Cir. 1994) ("The key to knitting the

14  cases into a harmonious whole is the distinction stressed in *Davis* and other cases between a

15  trust or other fiduciary relation that has an existence independent of the debtor's wrong and a

16  trust or other fiduciary relation that has no existence before the wrong is committed. A

17  lawyer's fiduciary duty to his client, *or a director's duty to his corporation's shareholders*,

18  pre-exists any breach of that duty, while in the case of a constructive or resulting trust there

19  is no fiduciary duty until a wrong is committed") (emphasis added).

20  Finally, the Court in *Zachary Shultz* turned to Delaware law. *See Zachary Shultz*, 205

21  B.R. at 958 ("Miramar is a Delaware corporation, and the Court will review Delaware law to

22  ascertain whether a basis exists for finding Shultz's status as a director of Miramar imposed

23  a fiduciary obligation sufficient to meet the strictures of §523(a)(4)"). On this point, the

24  Court's decision was particularly insightful:

25      Historically, Delaware courts have held corporate directors to high fiduciary
        standards and have even described the fiduciary obligation in terms of a trust.
26      Directors of a corporation are spoken of as its trustees; their acts are scanned in
        the light of those principles which define the relationship existing between a
27      trustee and a *cestui que trust*. . . . The law imposes upon the directors the duty of
        disposing of the shares in the interest of the corporation; the manner in which
28      they perform that duty must meet the exacting standards required of a fiduciary

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

acting in an office of trust and confidence . . . . More recent cases are in accord. Directors of a corporation stand in the position of trustees with their stockholders. *Petty v. Penntech Papers, Inc.*, 347 A.2d 140 (Del. Ch. 1975) (*Zachary Shultz*, 205 B.R. at 958-59) (citations omitted).

Based on these authorities, and on its finding that the fiduciary obligations at issue arose prior to the debt, the Court concluded that the debtor was a "fiduciary" for purposes of Section 523(a)(4) and that therefore his debt was non-dischargeable.[12] *Zachary Shultz*, 205 B.R. at 960 ("For the foregoing reasons, the Court grants summary judgment in favor of Miramar, Inc. and finds Zachary Shultz' debt to Miramar . . . is nondischargeable").

Here, as in *Zachary Shultz*, there is no dispute that Defendant's fiduciary obligations to Plaintiffs arose *prior to* the debt. In other words, this is not a case where Plaintiffs are seeking to rely on a constructive trust or a trust created "*ex maleficio*." *See, e.g.*, Compl. ¶73 ("In his capacity as Director of a Delaware corporation, Bonilla owed fiduciary duties to ATR, the Delaware Holding Company's minority shareholder, that predated the debt in this case"). And here, as in *Zachary Shultz*, the strictures of Delaware law imposed on the Defendant "trust-like" responsibilities in the discharge of his duties as a director. *See, e.g.*, *Hynson*, 601 A.2d at 575; *Petty*, 347 A.2d at 143; *In re Shoe-Town*, 1990 WL 13475, at *7; *Price v. Wilmington Trust Co.*, No. Civ. A. No. 12476, 1995 WL 317017, at *3 (Del. Ch. May 19, 1995). Finally, here, as in *Zachary Shultz*, the debtor breached those trust-like obligations by permitting the corporation to be stripped of its valuable assets. In short, *Zachary Shultz* is a powerful guide and persuasive authority for denying the pending motion to dismiss.

## 2. *Arthur Shultz* Is Not Persuasive Authority And Is Actually Rejected By Defendant Himself.

*Arthur Shultz* is the only other reported case Plaintiffs could find in which a bankruptcy court discussed whether a Delaware director was a "fiduciary" for purposes Section

---

[12] As these citations to Delaware law make clear, the Court in *Zachary Shultz* did not "dispense" with the trust requirements of Section 523(a)(4) as Defendant accuses it of doing (*see* Def. Br. at 13:5-6), much less fail to provide a "cogent" analysis of how Delaware law imposes trust obligations on its directors. *See id.* at 10:9-11.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    523(a)(4).[13]  In that case, the Court also concluded that a Delaware director *was* a fiduciary

2    for purposes of Section 523(a)(4).  However, the Court reached that conclusion based not on

3    the "trust-like" obligations imposed on directors under Delaware law, but rather on the

4    "Delaware Trust Fund" doctrine, pursuant to which directors of a corporation that is

5    insolvent or on the brink of insolvency owe trust obligations to the corporate enterprise.  *See*

6    *Arthur Shultz*, 208 B.R. at 729 (citing Delaware cases).  Although Defendant asserts that

7    *Arthur Shultz* was correctly decided as to the first issue, he is compelled to reject it as to the

8    second.  *Compare* Def. Br. at 10-11 (endorsing *Arthur Shultz*'s analysis of Delaware

9    fiduciary law) *with* Def. Br. at 12-13 (attempting to show that *Arthur Shultz*'s analysis of the

10   Delaware Trust Fund doctrine is incorrect).  As even Defendant cannot fully embrace the

11   decision in *Arthur Shultz*, this Court should also decline to do so.

12   There are, however, more substantive reasons for refusing to follow *Arthur Shultz*.

13   Although the Court held that the debtor's position as a director "does not per se make him a

14   trustee to the corporation" (*Arthur Shultz*, 208 B.R. at 729), its analysis lacked any real

15   substance.  In fact, it based its holding on a single quote to the effect that "'corporate officers

16   and directors, while technically not trustees, stand in a fiduciary relation to the corporation

17   and its stockholders.'"  *Id.* at 729 (quoting *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 813

18   (Del. 1944)).  The Court failed to delve any further into Delaware law, to examine any of the

19   Delaware authorities cited above, to consider any other non-dischargeability cases involving

20   corporate directors, or, most importantly, to consider whether the trust-like duties that are

21   undeniably imposed on Delaware directors satisfy the "fiduciary" standard under Section

22

23   [13]The two *Shultz* cases are related; Arthur Shultz and Zachary Shultz were brothers and
     co-directors of the Delaware corporation at issue, Miramar, Inc.  *See Zachary Shultz*, 205
24   B.R. at 954.  Each Shultz brother filed for Chapter 7 bankruptcy protection, one (Zachary) in
     New Mexico and the other (Arthur) in Florida.

25   In addition, the Shultz's father and co-director, William Shultz, Sr., also filed for
     bankruptcy.  In an unreported decision (which Plaintiffs have been unable to obtain), the
26   Bankruptcy Court for the Northern District of Texas apparently agreed with *Zachary Shultz*
     and concluded that William Shultz's debt was also non-dischargeable under Section
27   523(a)(4).  *See Arthur Shultz*, 208 B.R. at 726 n.2 (noting that the Texas court had granted
     "the Plaintiffs Motion for Summary Judgment in the Case involving William Shultz, Sr.").
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

523(a)(4).  Moreover, the Court did not examine or consider the rationale of the earlier-decided *Zachary Shultz* decision, much less attempt to show that it was wrong.  On the contrary, the Court appeared to accept the holding in *Zachary Shultz* and, in a conclusory footnote, simply distinguish it on the ground that the findings against Zachary Schultz indicated a "larger participation" by him than by his brother, Arthur.  *See Arthur Shultz*, 208 B.R. at 726 n.2.  Thus, analysis is altogether lacking.

The reason for the lack of analysis in *Arthur Shultz* is apparent:  such analysis was unnecessary.  Because the Court decided that the debtor was a "fiduciary" under Section 523(a)(4) *on alternative grounds*—namely, the applicability of the "Delaware Trust Fund" doctrine (*see Arthur Shultz*, 208 B.R. at 729-30)—it had no reason to engage in a searching exploration of Delaware fiduciary law or to reconcile its decision with *Zachary Shultz*.  In the end, this failure of analysis militates strongly against using *Arthur Shultz* as a precedent for determining whether Defendant was a "fiduciary" under Section 523(a)(4).

## CONCLUSION

For the reasons given above, the Court should deny Defendant's motion to dismiss the Fourth Claim for Relief.  Viewing the facts alleged in the Complaint, together with its attachments, in the light most favorable to Plaintiffs, it is apparent that Defendant has not and cannot demonstrate that the Fourth Claim for Relief fails to state a claim upon which relief can be granted.

DATED:  September 14, 2007.            Respectfully,

HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation

By: _____
                WILLIAM J. LAFFERTY

Attorneys for Plaintiffs ATR-KIM ENG
FINANCIAL CORPORATION and ATR-KIM
ENG CAPITAL PARTNERS, INC.

Entered on Docket
October 16, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



Signed and Filed: October 16, 2007

THOMAS E. CARLSON
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case No. 07-30309 TEC |
| HUGO NERY BONILLA, | ) Chapter 7 |
| Debtor. | ) |
| ATR-KIM ENG CAPITAL PARTNERS, INC., and ATR-KIM ENG FINANCIAL CORPORATION, | ) Adv. Proc. No. 07-3079 TC |
| Plaintiffs, | ) |
| vs. | ) |
| HUGO NERY BONILLA, | ) |
| Defendant. | ) |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FOURTH CLAIM FOR RELIEF**

On September 28, 2007, the court held a hearing on Defendant's Motion to Dismiss Plaintiffs' fourth claim for relief. Iain A. Macdonald appeared for Defendant. William J. Lafferty appeared for Plaintiffs.

ORDER DENYING DEFENDANT'S
MOTION TO DISMISS                    -1-

 
EXHIBIT ___E___

1     Upon due consideration, and for the reasons stated in the

2 accompanying memorandum, Defendant's motion is denied.

3                       **END OF ORDER**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER DENYING DEFENDANT'S
MOTION TO DISMISS               -2-

1

<u>Court Service List</u>

2

3

Iain A. Macdonald, Esq.
4   Law Offices of Macdonald & Associates
Two Embarcadero Center, Suite 1670
5   San Francisco, CA 94111-3930

6   Michael C. Fallon, Esq.
Law Offices of Michael C. Fallon
7   100 E Street, Suite 219
Santa Rosa, CA 95404

8
Michael J. Baker, Esq.
9   William J. Lafferty, Esq.
Matthew L. Beltramo, Esq.
10   Howard, Rice, Nemerovski, Canady,
 Falk & Rabkin
11   Three Embarcadero Center, 7th Floor
San Francisco, CA 94111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BAE SYSTEMS**

Bankruptcy Noticing Center
2525 Network Place, 3rd Floor
Herndon, Virginia 20171-3514

# CERTIFICATE OF SERVICE

District/off: 0971-3          User: dchambers          Page 1 of 1          Date Rcvd: Oct 16, 2007
Case: 07-03079               Form ID: pdfeoapc        Total Served: 2

The following entities were served by first class mail on Oct 18, 2007.
         +Michael C. Fallon, Esq.,    Law Offices of Michael C. Fallon,    100 E Street, Suite 219,
          Santa Rosa, CA 95404-4606
         +Michael J. Baker, Esq.,    William J. Lafferty, Esq.,    Matthew L. Beltramo, Esq.,
          Howard, Rice, Nemerovski, Canady, et. al,    Three Embarcadero Center, 7th Floor,
          San Francisco, CA 94111-4078

The following entities were served by electronic transmission.
NONE.                                                                        TOTAL: 0

         ***** BYPASSED RECIPIENTS *****
NONE.                                                                        TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.

First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.

Date: Oct 18, 2007          Signature:  _Joseph Speetjens_

**Entered on Docket**
**October 16, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



**Signed and Filed: October 16, 2007**



**THOMAS E. CARLSON**
**U.S. Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re | ) Case No. 07-30309 TEC |
| HUGO NERY BONILLA, | ) Chapter 7 |
| Debtor. | ) |
| _____ | ) |
| ATR-KIM ENG CAPITAL PARTNERS, INC., and ATR-KIM ENG FINANCIAL CORPORATION, | ) Adv. Proc. No. 07-3079 TC |
| Plaintiffs, | ) |
| vs. | ) |
| HUGO NERY BONILLA, | ) |
| Defendant. | ) |
| _____ | ) |

**MEMORANDUM RE DEFENDANT'S RULE 12(b)(6) MOTION**

Plaintiff obtained a $24.5 million judgment against Defendant in Delaware state court. That court found that Defendant, a corporate director, breached his duty of loyalty to Plaintiff, a minority shareholder, by failing to take any steps to monitor the operations of the corporation. The Delaware court held Defendant liable for the loss Plaintiff suffered when the majority

MEMORANDUM RE MOTION
TO DISMISS COMPLAINT                    -1-

EXHIBIT  E

1  shareholder transferred to himself substantially all of the
2  corporation's assets.

3      In the present action, Plaintiff seeks a determination that
4  Defendant's liability is nondischargeable under 11 U.S.C.
5  § 523(a)(4), because it arises from "defalcation while acting in a
6  fiduciary capacity". Defendant moves to dismiss that claim for
7  relief, contending that a corporate director is not a "fiduciary"
8  under section 523(a)(4).[1] For the reasons set forth below, the
9  motion is denied.

10     Whether a debtor is a fiduciary within the meaning of section
11 523(a)(4) is a question of federal law. Lewis v. Scott (In re
12 Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996). First, the debtor must
13 have been subject to the duties of a trustee before, and without
14 reference to, the wrongdoing that gave rise to the debt. Id.
15 Second, the duties imposed on the debtor must be those imposed on
16 the trustee of an express or technical trust. Id. at 1185-86 n.1.
17 Thus, there must be an identifiable trust res, identifiable
18 beneficiaries, and the debtor must be subject to the duties of
19 loyalty, good faith, and honesty in caring for the trust res.
20 Lewis, supra, 97 F.3d at 1186 n.1; Miramar Resources, Inc. v.
21 Shultz (In re Shultz), 208 B.R. 723, 728 (Bankr. M.D. Fla.
22 1997)(Shultz II).

23     Whether a debtor is subject to the duties just described is
24 primarily a matter of state law. Lewis, supra, 97 F.3d at 1185.
25 The requisite duties can be imposed by agreement, state statute, or

26 _____

27     [1] Plaintiff is not urging that the decision of the Delaware
   court be given issue-preclusive effect at this time. The findings
28 of fact in the state-court decision are treated as allegations for
   the purpose of the present motion.

MEMORANDUM RE MOTION
TO DISMISS COMPLAINT              -2-

1  state case law.  _Id._ at 1185-86.  The parties here agree that

2  Delaware law defines Defendant's duties as a corporate director.

3      Numerous Delaware decisions refer to directors as trustees,

4  and impose on directors the highest duties of loyalty, honesty, and

5  fair dealing in all matters concerning the management of corporate

6  assets.  _See_, _e.g._, Hynson v. Drummond Coal Co., Inc., 601 A.2d 570

7  (1991); Keenan v. Eshleman, 2 A.2d 904, 908 (1938).  Furthermore,

8  Delaware cases impose this fiduciary duty prior to, and without

9  reference to, any misconduct by the director.

10      It is not always necessary for [directors] to reap a
        personal profit or gain a personal advantage in order for
11      their actions in performance of their quasi trust to be
        successfully questioned.  Trustees owe not alone the duty
12      to refrain from profiting themselves at the expense of
        their beneficiaries.  They owe the duty of saving their
13      beneficiaries from loss.

14  Bodell v. General Gas & Electric Corp., 132 A. 442, 447 (1926).

15  Thus, Delaware case law clearly identifies the fiduciary duties of

16  a corporate director, the trust _res_ (all corporate assets), and the

17  beneficiaries of the trust (the corporation and its shareholders).

18      Delaware court decisions do not, however, equate corporate

19  directors with trustees in all respects.  The Bodell decision

20  quoted above refers to directors as "quasi" trustees.  _Id._  Another

21  Delaware decision notes that trustees differ from corporate

22  directors in that trustees usually occupy a caretaking role, while

23  directors are often required to take risks with the assets they

24  manage.  Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1134, 1148

25  (1994).  Yet another Delaware decision states that corporate

26  directors are not trustees in the strictest sense, because they do

27  not hold legal title to the property of the corporation.

28

MEMORANDUM RE MOTION
TO DISMISS COMPLAINT          -3-

1          The officers and directors of a corporation are
         fiduciaries but they are not real trustees.  They do not
2           hold the legal title to the corporate property.  They
         occupy a position of extreme trust and confidence toward
3           all interested parties, and exercise great powers in
         managing corporate affairs, but they are not trustees of
4           an express trust in the true sense of that term.

5  Bovay v. H.M. Byllesby & Co., 29 A.2d 801, 804 (1943) (citations

6  omitted); see also Shultz II, supra, 208 B.R. at 729 (Delaware

7  courts say directors are fiduciaries but "technically not

8  trustees").  The major authorities on trust law are in accord that

9  corporate directors occupy a trust-like position, but are not

10  trustees in the strict sense, because they do not directly hold

11  legal title for a beneficial owner.  Bogert & Bogert, Law of Trusts

12  & Trustees § 16 (2007); accord Restatement (Third) of Trusts §§ 2,

13  5(g) (2003).

14      The Ninth Circuit states "the fiduciary relationship must be

15  one arising from an *express or technical trust* that was imposed

16  before and without reference to the wrongdoing that caused the

17  debt." Lewis, supra, 97 F.3d at 1185 (emphasis added).  Does this

18  mean that in addition to preexisting the wrong, the fiduciary duty

19  must be identical to that of a trustee in every technical respect?

20      I conclude that the fiduciary duty must preexist the trust,

21  and must be *substantially similar* to the role of a trustee, in that

22  there must be a trust *res*, identifiable beneficiaries, and clear

23  notice of the duties of loyalty, honesty, and fair dealing toward

24  the beneficiaries in all matters affecting the trust *res*.  In

25  Lewis, the Ninth Circuit found partners to be fiduciaries under

26  section 523(a)(4) upon the basis of state-court decisions that

27  imposed on partners the duties of loyalty, honesty, and fair

28  dealing.  Id. at 1186.  One of the decisions Lewis relied upon

MEMORANDUM RE MOTION
TO DISMISS COMPLAINT          -4-

1  described the duties of a partner as merely "similar to a
2  trustee's," and the other decisions cited failed to use the term
3  trustee at all in describing the duties of a partner.[2]  In addition,
4  <u>Lewis</u> noted with approval language in Collier stating that the
5  duties of the fiduciary need only be "substantially similar" to
6  those imposed on trustees.

> "If state law clearly and expressly imposes trust
> obligations on managing partners of limited partnerships
> substantially similar to those imposed on trustees, i.e.,
> the duty of loyalty and the duty to deal with one another
> in good faith and with honesty, these fiduciary
> obligations meet the strict requirements of section
> 523(a)(4)".

11 <u>Id.</u> at 1186 n.1.

12       As noted above, the director of a corporation organized under
13  Delaware law is subject to duties substantially similar to those
14  imposed on the trustee of an express or technical trust, and those
15  duties arise before and without reference to any wrongdoing.  The
16  director of a Delaware corporation is therefore a fiduciary within
17  the meaning of section 523(a)(4).  <u>Miramar Resources, Inc. v.</u>
18  <u>Shultz (In re Shultz)</u>, 205 B.R. 952, 959 (Bankr. D. New Mex. 1997)
19  (Shultz I); <u>see</u> <u>Foster v. Lasagna</u>, 609 F.2d 392, 396 (9th Cir.
20  1979)(director of corporation organized under California law is a
21  fiduciary for purpose of section 523(a)(4)); <u>see</u> <u>also</u> <u>Nahman v.</u>
22  <u>Jacks (In re Jacks)</u>, 266 B.R. 728, 737 (9th Cir. BAP 2001)(same).

23       Defendant also argues that the Delaware judgment imposes
24  liability on him for acts that should be protected under the
25  business judgment rule.  In essence, this is an argument that the

26

27       [2] <u>Desantis v. Dixon</u>, 236 P.2d 38, 41 (Ariz. 1951) (does not
    refer to partner as trustee); <u>Jerman v. O'Leary</u>, 701 P.2d 1205,
28  1210 (Ariz. App. 1985)(same); <u>Carrasco v. Carrasco</u>, 422 P.2d 411,
    413 (Ariz. App. 1967)  (duty of partner "similar to a trustee's").

MEMORANDUM RE MOTION
TO DISMISS COMPLAINT              -5-

1  facts alleged do not amount to a "defalcation" within the meaning

2  of section 523(a)(4). A defalcation generally does not include the

3  poor exercise of business judgment in carrying out an act that the

4  fiduciary was authorized to perform. Blyler v. Hemmeter (In re

5  Hemmeter), 242 F.3d 1186, 1191 (9th Cir. 2001).

6      The facts alleged here, however, constitute a complete failure

7  to take any action to preserve the assets of the corporation, and

8  therefore go well beyond the poor exercise of business judgment.

9  The Delaware court found:

10     Bonilla . . . acted as . . . [a] stooge for Araneta,
       seeking to please him and only him, and having no regard
       for [Bonilla's] obligations to act loyally towards the
       corporation and all of its stockholders. Such behavior
       is not indicative of a good faith error in judgment; it
       reflects a conscious decision to approach one's role in a
       faithless manner by acting as a tool of a particular
       stockholder, rather than as an independent and impartial
       fiduciary honestly seeking to make decisions for the best
       interests of the corporation. . . . When required by
       [Bonilla's] office to be loyal to the Delaware Holding
       Company, Bonilla . . . chose total fealty to Araneta's
       conflicting interests instead.

17  ATR-Kim Eng Financial Corp. v. Araneta, 2006 WL 3783520 at 1, 21

18  (Del. Ch. 2006). Defendant's alleged acts are less like an

19  unfortunate choice in the purchase of stock than they are like

20  leaving a large amount of cash unguarded in a public place. As

21  such, the alleged facts represent the type of failure to account

22  for trust property that has traditionally been the hallmark of

23  defalcation. Otto v. Niles (In re Niles), 106 F.3d 1456, 1460-62

24  (9th Cir. 1997).

25                    **END OF MEMORANDUM**

26

27

28

MEMORANDUM RE MOTION
TO DISMISS COMPLAINT                              -6-

1    **<u>Court Service List</u>**

2

3
    Iain A. Macdonald, Esq.
4    Law Offices of Macdonald & Associates
    Two Embarcadero Center, Suite 1670
5    San Francisco, CA 94111-3930

6    Michael C. Fallon, Esq.
    Law Offices of Michael C. Fallon
7    100 E Street, Suite 219
    Santa Rosa, CA 95404
8
    Michael J. Baker, Esq.
9    William J. Lafferty, Esq.
    Matthew L. Beltramo, Esq.
10   Howard, Rice, Nemerovski, Canady,
     Falk & Rabkin
11   Three Embarcadero Center, 7th Floor
    San Francisco, CA 94111
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  MACDONALD & ASSOCIATES
   IAIN A. MACDONALD (SBN 051073)
2  HEATHER A. CUTLER (SBN 217837)
   Two Embarcadero Center, Suite 1670
3  San Francisco, CA  94111-3930
   Telephone: (415) 362-0449
4  Facsimile: (415) 394-5544

5  Attorneys for Defendant,
   HUGO NERY BONILLA
6

7

8                    UNITED STATES BANKRUPTCY COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 In Re:                              Case No. 07-30309

12 HUGO NERY BONILLA,                  Chapter 7

13            Debtor.                  Adv. Proc. No. 07-03079

14                                     MOTION TO RECONSIDER ORDER
   ATR-KIM ENG FINANCIAL              DENYING DEFENDANT'S MOTION TO
15 CORPORATION AND ATR-KIM ENG        DISMISS PLAINTIFF'S FOURTH
   CAPITAL PARTNERS, INC.,            CLAIM FOR RELIEF
16
              Plaintiffs,             Date:  December 14, 2007
17                                    Time:  9:30 a.m.
           vs.                        Place: 235 Pine Street
18                                           Courtroom No. 23
   HUGO NERY BONILLA,                        San Francisco, CA
19
              Defendant.              (Judge Carlson)
20

21                         INTRODUCTION

22         Defendant Hugo Nery Bonilla hereby moves for relief under Rule 59 of the Federal Rules of

23 Civil Procedure, incorporated by Bankruptcy Rule 9023, and requests that the court reconsider and

24 vacate its order denying Bonilla's motion to dismiss ATRs fourth claim for relief, entered on

25 October 16, 2007, in order to correct manifest errors of law, as follows:

26         First, this court committed manifest error of law by ruling that Delaware law imposes

27 fiduciary duties on corporate directors which are "substantially similar" to those held by trustees of

28 express or technical trusts. But Delaware law unambiguously *limits imposition of trustee duties on*

                                                                                      1

EXHIBIT ___G___

1    its corporate directors to certain circumstances, such as when a corporation becomes insolvent or

2    when directors have profited from breaches of their duties.  Moreover, the court's ruling cites no

3    Delaware law imposing higher duties on its corporate directors outside of the insolvency or

4    wrongdoing exceptions.  Accordingly, even under this court's own "substantially similar" test,

5    which is not the law of the Ninth Circuit, Bonilla was not a fiduciary under § 523(a)(4).

6         Second, this court erred committed manifest error of law by relying upon the matter of *Lewis*

7    *v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir. 1996), which ruled that Arizona *partners* are fiduciaries

8    under § 523(a)(4), rather than the Ninth Circuit's more relevant and recent decision in matter of *In re*

9    *Cantrell*, 329 F.3d 1119 (9th Cir. 2003), which held that California corporate *directors* are not

10   fiduciaries under § 523(a)(4) and refuted the applicability of prior case law holding that partners are

11   fiduciaries under § 523(a)(4).  Significantly, the *Cantrell* court did not analyze whether California

12   corporate directors have duties which are "substantially similar" to those of a trustee of an express or

13   technical trust.  Instead, *Cantrell* is grounded in clear authority from California's highest state court

14   that "strictly speaking, the relationship [between corporate officers and directors and the

15   shareholders] is not one of trust, but of agency."  *Cantrell* at 1126.  Considering that both ATRs and

16   Bonilla's briefs discuss *Cantrell*, it is not clear why the court overlooked this important decision.

17        This court's ruling also commits manifest error of law because it goes beyond the holding of

18   *Lewis*.  *Lewis* closely mirrors *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir. 1986), in which the Ninth

19   Circuit found that under California law, all partners are trustees over the assets of the partnership and

20   thus, that California partners are fiduciaries under § 523(a)(4).  *Lewis* found *uncontroverted* Arizona

21   state partnership law using language similar to California state partnership law and imposing

22   heightened fiduciary duties on Arizona partners.  *Lewis* at 1186.  Neither *Ragsdale* nor *Lewis* discuss

23   state law holding that partners are "technically not partners" or are "quasi-partners" to each other.

24        *Lewis* did not assert that it was expanding the Ninth Circuit's requirements under § 523(a)(4)

25   by adopting a "substantially similar" test, which is notable given that expanding the definition of

26   "fiduciary" as set down by the United States Supreme Court more than 100 years ago would be a

27   radical departure from this Circuit's law.  Moreover, it is notable that *no other cases* from the Ninth

28   Circuit since *Lewis* have applied a "substantially similar" test.  Rather, Ninth Circuit cases continue

2

1  to narrowly construe § 523(a)(4) by requiring that fiduciary duties must have been imposed pursuant

2  to an express or technical trust.

3        Accordingly, this court's decision to adopt a "substantially similar" test is an error of law

4  which radically departs from the law of this Circuit. Thus, grounds for reconsideration exist to

5  reconsider and reverse this court's order denying Bonilla's motion to dismiss ATRs fourth claim for

6  relief.

7                              HISTORY OF ACTION

8        On August 31, 2007, Bonilla filed a motion to dismiss ATRs fourth claim for relief, arguing

9  that ATR's complaint fails to state a claim upon which relief may be granted under § 523(a)(4)

10  because ATR did not and could not set forth facts that Bonilla was a fiduciary pursuant to an express

11  trust or technical trust. Memorandum of Points and Authorities Supporting Motion to Dismiss

12  Complaint ("Memo. Mtn. Dismiss"). Specifically, Bonilla's duties to ATR as a corporate director

13  fell within the realm of the broad and general definition of a fiduciary, which are not sufficient to

14  support a § 523(a)(4) claim.

15        ATR opposed the motion, arguing that "trust-like" duties imposed by state common-law are

16  sufficient to establish a claim under § 523(a)(4). Memorandum of Points and Authorities in

17  Opposition to Defendant's Motion to Dismiss Fourth Cause of Action Pursuant to Federal Rule of

18  Civil Procedure 12(b)(6) ("Opp.") at 11-12. ATR stated that its "trust-like duties" test is supported

19  by the *Lewis* decision and that Delaware law imposes trust-like duties on its corporate directors.

20  Opp. at 12:8-25, 12:28-16:14. ATR distinguished the *Cantrell* decision which determined that

21  California corporate directors are not fiduciaries under § 523(a)(4), on the grounds that duties

22  imposed on California corporate directors are grounded in agency law. Opp. at 14 n.7. In contrast,

23  the duties imposed on Delaware corporate directors are grounded in trust law. Opp. at 14 n.7. ATR

24  failed to explain that *Cantrell* did not make this distinction. Opp. at 14 n.7. Further, although the

25  *Cantrell* court "relied on language from California cases to the effect that directors are 'technically

26  not trustees' … that language came from Delaware common law." Opp. at 14 n.7.

27        Bonilla's reply brief refuted ATRs arguments, distinguishing *Lewis* on two grounds. First,

28  *Lewis* pertains to partners, who, in comparison with corporate directors, "are directly liable to each

MOTION FOR TO RECONSIDER ORDER DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S
FOURTH CLAIM FOR RELIEF

1  other to account for partnership property" and whose responsibilities and duties are different from

2  corporate directors in several material respects. Reply in Support of Motion to Dismiss Complaint

3  ("Reply") at 10:13-22, 12:28-13:16. Second, *Cantrell* refused to extend its rationale in *Ragsdale* and

4  *Lewis* to corporate directors. Reply at 10:23-11:6, 11 n.10.

5        On September 27, 2007, the court issued a tentative order granting Bonilla's motion to

6  dismiss. Tentative Ruling Re Motion to Dismiss § 523(A)(4) Claim ("Tentative Ruling"). In its

7  tentative ruling, the court correctly found that Delaware state law does not impose either express or

8  technical trust duties upon corporate directors. Tentative Ruling at 1:22-2:2. Further, a technical

9  trust does not apply because corporate directors do not hold title to the corporation's property.

10  Tentative Ruling at 2:2-9 (citing Bogert & Bogert, The Law of Trusts & Trustees § 16 (2007).

11        On September 28, 2007, the parties appeared before the court to argue the motion. On behalf

12  of ATR, William Lafferty, Esq. admitted that an express or technical trust did not exist to impose

13  fiduciary duties on Bonilla. Instead, he argued that denying Bonilla's motion would further

14  bankruptcy policy. Lafferty urged the court to adopt the reasoning of bankruptcy court decisions

15  which apply the "substantially similar" test, and stated that he believes that the law is headed in that

16  direction. Finally, Lafferty urged the court to consider the matter of *Woodstock Housing Corp.,*

17  *Plaintiff v. Felicia Johnson (In re Johnson)*, 242 B.R. 283 (Bankr. E.D. Penn. 1999). The court took

18  the matter under submission.

19        On October 16, 2007, the court issued its order, reversing its tentative ruling and denying

20  Bonilla's motion to dismiss. Order Denying Defendant's Motion To Dismiss Plaintiff's Fourth

21  Claim For Relief. The court's findings are set forth in its Memorandum Re Defendant's Rule

22  12(b)(6) Motion ("Memo."). The court appears to have changed its mind since its tentative ruling

23  upon further review of the parties' briefs rather than upon consideration of Lafferty's arguments at

24  the hearing, as the Memorandum does not discuss the issues mentioned by Lafferty at the hearing.

25        The Memorandum appears to state that Delaware law is in conflict on the issue of whether a

26  corporate director is a trustee: while the court found that "numerous Delaware decisions refer to

27  directors as trustees", the court also found that "Delaware court decisions do not, however, equate

28  corporate directors with trustees in all respects." Memo. at 3:3-4, 3:18-19. The only decision cited

4

1    from Delaware's highest court is *Keenan v. Eshleman*, 23 Del.Ch. 234, 2 A.2d 904, 908 (Del. 1938)

2    in which the Delaware Supreme Court states that defendant corporate officers are trustees. But this

3    court's Memorandum fails to address the fact that subsequent authority from the Delaware Supreme

4    Court, *Bovay v. H.M. Byllesby & Co.*, 27 Del.Ch. 381, 393, 38 A.2d 808 (1944), clarified that

5    directors are not trustees, but that under limited circumstances, such as upon a corporation's

6    insolvency or, as in the *Keenan* matter, upon their wrongdoing, directors may be imposed with

7    trustee duties. This court does not cite Delaware law imposing higher or trustee duties on its

8    corporate directors outside of the insolvency or wrongdoing exceptions.

9       In support its decision to adopt the "substantially similar" test, this court relied upon *In re*

10    *Lewis*, 97 F.3d 1182. Memo. at 4:24-5:11. The Memorandum states that *Lewis* was grounded in

11    "state-court decisions that imposed on partners the duties of loyalty, honesty, and fair dealing," case

12    law describing a partner's duties as similar to a trustee's, and statements in COLLIER ON

13    BANKRUPTCY that "the duties of the fiduciary need only be 'substantially similar' to those imposed

14    on trustees." Memo. at 4:2r-5:11. But by relying so heavily on *Lewis*, this court overlooked several

15    material facts, namely: (1) that *Lewis* does not state that pursuant to its decision, the Ninth Circuit is

16    now deviating from its established, narrow interpretation of "fiduciary" under § 523(a)(4) by

17    adopting a more expansive "substantially similar" test; (2) that even if Lewis adopted a

18    "substantially similar" test, then *Lewis* is an anomaly in the Ninth Circuit, as no other Ninth Circuit

19    case has applied this test; (3) that *Cantrell*, discussed in both parties' briefs, refused to extend its

20    decisions pertaining to partners under § 523(a)(4) to corporate directors; (4) that *Lewis* simply

21    followed its decision in *Ragsdale v. Haller* to fiduciary status on partners under § 523(a)(4); and (5)

22    that *Lewis* was grounded on uncontroverted Arizona partnership state law.

23      THE BANKRUPTCY COURT'S ORDER DENYING BONILLA'S MOTION TO
24    DISMISS COMMITS MANIFEST ERRORS OF LAW BECAUSE DELAWARE DOES NOT
     IMPOSE FIDUCIARY DUTIES ON CORPORATE DIRECTORS WHICH ARE
25    "SUBSTANTIALLY SIMILAR" TO THOSE OF A TRUSTEE AND BECAUSE THE COURT'S
     ADOPTION OF THE "SUBSTANTIALLY SIMILAR" TEST RADICALLY DEPARTS FROM
26    NINTH CIRCUIT PRECEDENT DEFINING "FIDUCIARY" UNDER §523(A)(4)

27       Pursuant to Rule 9023 of the Federal Rules of Bankruptcy Procedure and Rule 59(e) of the

28    Federal Rules of Civil Procedure, the court may reconsider its decision in order to correct a manifest

5

1   error of law. *In re Gutterman*, 239 B.R. 828, 830 (Bankr. N.D. Cal. 1999)(denying a motion by the

2   United States Trustee for reconsideration of the court's order granting the application of the debtors'

3   counsel for nunc pro tunc employment). A motion to reconsider "must be filed no later than 10 days

4   after entry of the judgment." Fed. R. Civ. Proc. 59(e).

5       A.    The Motion To Reconsider Is Timely

6       This motion to reconsider is timely. The court's order was entered on October 16, 2007, and

7   this motion is filed ten days later, on October 26, 2007.

8       B.    The Court Erred In Finding That Delaware Law Imposes Fiduciary Duties
            "Substantially Similar To Those Of The Trustee Of An Express Or Technical Trust"
9            Because Delaware Law *Limits* Imposition Of Trustee Duties To Circumstances
            Where The Corporation Is Insolvent Or Where The Directors Unlawfully Profited
10           From Their Breach Of Duty

11      This court incorrectly ruled and thus committed manifest error of law by ruling that under

12  Delaware law, a corporate director "is subject to duties substantially similar to those imposed on the

13  trustee of an express or technical trust." In fact, Delaware law does not impose trustee duties on

14  corporate directors unless the corporation is insolvent or in circumstances of wrongdoing by the

15  directors. Moreover, this court does not cite, nor is there any authority that Delaware corporate

16  directors have generally have higher fiduciary duties (outside of the insolvency or bad faith '

17  circumstances) which are similar to those of a trustee.

18      The only case cited in this court's decision from Delaware's highest court, the Delaware

19  Supreme Court, is *Keenan v. Eshleman*, 23 Del.Ch. 234, 2 A.2d 904, 908 (Del. 1938), which

20  imposed liability on corporate officers for their role in fraudulently paying management fees to the

21  managing corporation. But as explained in the Delaware Supreme Court's subsequent holding,

22  *Bovay v. H.M. Byllesby & Co.*, 27 Del.Ch. 381, 393, 38 A.2d 808 (Del. 1944), under Delaware law,

23  directors are in fact *not trustees*, but may become trustees under certain circumstances, such as upon

24  a corporation's insolvency or, as was the case in *Keenan*, upon wrongdoing by the directors. The

25  *Bovay* court explained that:

26      Clearly, it was not meant that directors of a corporation are trustees, in a strict and technical
27      sense, in all their relations with the corporation, its stockholders and creditors; but, as clearly,
        it was implied that they should be treated as such when they have unlawfully profited
28

6

MOTION FOR TO RECONSIDER ORDER DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S
FOURTH CLAIM FOR RELIEF

1    through breach of duty, and at the expense of the corporation.

2    *Bovay v. H.M. Byllesby & Co.*, 27 Del.Ch. 381, 393. The *Bovay* court explained that its

3    decision to impose trustee status on the defendant officers in *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5

4    A.2d 503, 510, was based on similar circumstances of wrongdoing. *Bovay v. H.M. Byllesby & Co.*,

5    27 Del.Ch. 381, 393-94.

6        This court extensively analyzed Delaware law and *Bovay* in the matter of *Decker v. Mitchell*

7    *(In re JTS Corp.)*, 305 B.R. 529, 536-40 (Bankr. N.D. Cal. 2003). *In re JTS Corp.* described the

8    occasions where Delaware law imposes heightened fiduciary duties on its corporate directors as the

9    "trust fund doctrine" and the "insolvency exception," and explained that neither doctrine truly

10    creates a trust, but are used by the Delaware courts as equitable remedies. *In re JTS Corp.* at 536-40.

11    *In re JTS Corp.* ruled that under Delaware law, a corporation's insolvency imposes upon directors a

12    fiduciary relationship to the corporation's creditors, which "is certainly one of loyalty, trust and

13    confidence, but it does not involve holding the insolvent corporation's assets in trust for distribution

14    ..." *Id.* at 539. *In re JTS Corp.* further found that while *Bovay* ruled that Delaware law "will treat

15    directors of corporations as trustees when directors have taken 'such advantage of their position of

16    trust as public policy could not tolerate'", subsequent Delaware law has not followed an

17    uncompromising trust fund doctrine. *In re JTS Corp.* at 538. Thus, even under Delaware's trust

18    fund doctrine and the insolvency exception, Delaware does not impose fiduciary duties on directors

19    pursuant to express or technical trust.

20        The Memorandum also did not cite Delaware authority which generally imposes heightened

21    duties on corporate directors. Indeed, as stated in *Prof'l Hockey Corp. v. World Hockey Ass'n* (1983)

22    143 Cal. App. 3d 410, 414, California and Delaware impose identical fiduciary duties on their

23    directors:

24        Delaware law adopts, as has California, the concept of the directors and/or trustees fiduciary
25        duty (*Guth v. Loft, Inc.* (1939) 23 Del.Ch. 255, 5 A.2d 503), including the duties of
         obedience, diligence and loyalty. Directors owe such duty in the management of corporate
26        affairs. In performance of their official duties directors are under obligations of trust and
         confidence to the corporation and its stockholders. Directors must act in good faith for the
27        interests of the corporation or its stockholders with due care and diligence and within the
         bounds of their authority. It is the duty of the director to see that a corporation keeps within
28        its corporate powers and obeys the laws. (19 Am.Jur.2d Corporations, § 1271, p. 677.) Under

                                                                                                    7

1    both California and Delaware law the duty of loyalty requires the directors/trustees not to act
2    in their own self-interest when the interest of their corporation will be damaged thereby.

3        Thus, Delaware law does not impose fiduciary duties on corporate directors which are

4    "substantially similar" to those imposed on a trustee pursuant to an express or technical trust.

5    Instead, Delaware imposes heightened fiduciary and trustee duties on directors in limited

6    circumstances and pursuant to a constructive trust or *ex maleficio*, neither of which are included

7    within the purview of § 523(a)(4). See *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986).

8    Accordingly, Delaware directors are not fiduciaries under § 523(a)(4). Thus, this court committed

9    manifest error in ruling that Delaware law imposes trustee duties on its corporate directors and that

10   Bonilla was thus a fiduciary under § 523(a)(4).

11       C.    The Court Erred In Relying On *In Re Lewis* And In Overlooking *In Re Cantrell*,
                Which Held That Corporate Directors Are Not Fiduciaries Under § 523(a)(4)

12       This court erred in relying upon the matter of *In re Lewis*, 97 F.3d 1182, which pertains to

13   whether *partners* are fiduciaries under § 523(a)(4), while overlooking and failing to distinguish the

14   more relevant and current decision from the Ninth Circuit, *In re Cantrell*, 329 F.3d 1119,[1] which

15   pertains to whether *corporate officers and directors* are fiduciaries under § 523(a)(4). Notably,

16   *Cantrell* did not apply a "substantially similar" test to determine whether the defendant was a

17   fiduciary under § 523(a)(4). Instead, *Cantrell* determined that California corporate directors are not

18   fiduciaries under § 523(a)(4) because California law, specifically the California Supreme Court's

19

20   [1] In response to Lafferty's assertion that the direction of the courts is to apply the "trust-like" duties test under §
     523(a)(4), and in response to ATR list of cases at page 17 n.10 of its opposition brief which hold that corporate directors
21   are fiduciaries under § 523(a)(4)(nearly all of which are more than 10 years old), the following is a list of a few recent
     cases which *do not hold* that directors are fiduciaries under § 523(a)(4): *Fain v. Webb (In re Webb)*, 349 B.R. 711, 717
22   (Bankr. Or. 2006)("Under Oregon law, a director and officer has a fiduciary obligation to the corporation, and, by
     extension, to the corporation's creditors and shareholders. However, this is not the sort of fiduciary relationship
23   contemplated by § 523(a)(4)"); *Dominie v. Jones (In re Jones)*, 306 B.R. 352, 357 (Bankr. N.D. Ala. 2004)("the duties
     owed by a corporate officer and controlling shareholder in a closely-held corporation to another officer and minority
24   shareholder are not those of a fiduciary within the meaning of § 523(a)(4)"); *Digital Commerce, Ltd. v. Sullivan (In re
     Sullivan)*, 305 B.R. 809, 825 (Bankr. W.D. Mich. 2004)(Michigan officers and directors are trustees with respect to
25   corporate assets and thus are not fiduciaries under § 523(a)(4)); *Cal-Micro, Inc. et al v. Cantrell (In re Cantrell)*, 329
     F.3d 1119 (9th Cir. 2003)(under California law, a corporate officer is not a "fiduciary" within the meaning of §
26   523(a)(4)); *Florida Dep't of Ins. v. Blackburn (In re Blackburn)*, 209 B.R. 4 (Bankr. M.D. Fla. 1997)(the general
     fiduciary duties owed to a corporation by its officers and directors are insufficient, by themselves, to support a claim that
27   the officers and directors stand in a "fiduciary capacity" to the corporation for purposes of § 523(a)(4));

28

1    decision in the matter of *Bainbridge v. Stoner*, 16 Cal. 2d 423, 106 P.2d 423 (Cal. 1940), holds that

2    corporate directors are not trustees. *In re Cantrell*, at 1126-27. *Bainbridge* ruled that directors are

3    not trustees despite the fact that directors were required to comply with § 2230 of the Civil Code,

4    forbidding trustees from taking part in transactions concerning the trust which are adverse to the

5    beneficiary. *Id.* at 428.

6        *Cantrell* distinguished several California cases stating that directors are trustees. *Id.* at 1126

7    n.4, 1128. First, *Cantrell* found that *Interactive Multimedia Artists, Inc. v. Superior Court*, 62 Cal.

8    App. 4th 1546 (1998), which states that "'the fiduciary duty of a controlling shareholder or director

9    to a minority shareholder is based on 'powers in trust'", is inapplicable because "this language is

10   ambiguous and could simply mean that directors and controlling shareholders have a general

11   fiduciary duty to act fairly with respect to corporate matters." *Cantrell*, at 1126 n.4. Further,

12   *Interactive Multimedia* did not mention *Bainbridge* and it is not likely that the *Interactive*

13   *Multimedia* court intended to contradict the state's highest court. *Id.* Next, the *Cantrell* court

14   dismissed the applicability of statements made in pre- *Bainbridge* cases. *Id.* "[T]he California

15   Supreme Court's ambiguous holding in *Bainbridge* that directors and officers are not trustees with

16   respect to corporate assets is the precedent that we must follow." *Id.*

17       *Cantrell* also distinguished *Ragsdale v. Haller (In re Ragsdale)*, 780 F.2d 794 (9th Cir.

18   1986), which ruled that "'California partners are fiduciaries within the meaning of § 523(a)(4).'"

19   *Cantrell* at 1127, citing *In re Ragsdale*, 780 F.2d at 796-97. The *Ragsdale* court's holding was

20   grounded in "several California cases that 'raised the duties of partners beyond those required by the

21   literal wording' of the California partnership statute." *Cantrell*, at 1127, citing *In re Ragsdale*, at

22   796. But whether California law holds that partners are trustees is not significant because of the

23   *Bainbridge* court's clear holding and because "California corporate law simply does not provide the

24   same trust relationship between corporate principals and the corporation." *Cantrell*, at 1127.

25       This court's ruling does not accord with *In re Cantrell* because, as explained herein,

26   Delaware law does not impose trustee duties on its corporate directors. Instead, the Delaware

27   Supreme Court clearly holds that trustee duties are imposed in limited circumstances under either a

28   constructive trust or *ex maleficio*.

9

1

2     D.  This Court's Ruling Radically Deviates From Established Ninth Circuit Precedent By
     Expanding The Definition Of Fiduciary Within The Meaning Of § 523(a)(4)

3     The court's "substantially similar" test deviates from established, historical and clear

4   authority from the United States Supreme Court and the Ninth Circuit and thus this court's adoption

5   of the test constitutes a manifest error of law. First, if this court bases its new test on *Lewis*, then it is

6   notable that *Lewis* did not state that it was adopting a "substantially similar" test, given that the test

7   expands on Ninth Circuit precedent, which narrowly construes § 523(a)(4). Adoption of this test

8   without explanation is also inexplicable since *Lewis* acknowledged that "the fiduciary relationship

9   must be one arising from an express or technical trust." *Lewis*, at 1185. It is unlikely that the Ninth

10  Circuit would have expanded the definition of "fiduciary" under § 523(a)(4), set down more than

11  150 years ago by the United States Supreme Court in *Chapman v. Forsyth*, 43 U.S. 202, 205, 11

12  L.Ed. 236 (1844), without explaining why it decided to adopt such a radical departure from the law.

13  Rather, *Lewis* appears to have mirrored the reasoning set forth in *Ragsdale*, that partners are

14  fiduciaries to each other under § 523(a)(4) based on clear state law.

15    Second, if *Lewis* adopted a "substantially similar" test, then it is an anomaly in this Circuit,

16  as no Ninth Circuit case has followed *Lewis* for this premise, and the United States Supreme Court

17  had certainly not adopted this expanded definition of fiduciary. Instead, as evidenced by *Cantrell*,

18  Ninth Circuit cases continue to comply with the express or technical trust requirement. Accordingly,

19  it is clear that this court's order denying Bonilla's motion to dismiss would be reversed on appeal.

20    E.  This Court's Ruling Contravenes Bankruptcy Policy

21    The court's order commits manifest error of law by contravening the overriding purpose of

22  bankruptcy laws: to provide debtor with comprehensive, much needed relief from burden of his

23  indebtedness by releasing him from virtually all his debts. This policy is furthered by the fact that

24  11 U.S.C. § 523(a) exceptions to discharge are narrowly construed against the creditor and in favor

25  of debtor. *In re Harrell* (Bankr. W.D. Tex. 1988) 94 BR 86, 18 BCD 913; *In re Calvo* (Bankr. M.D.

26  Fla. 1990) 111 BR 1003. Accordingly, the traditional application of § 523(a)(4) is quite narrow, as

27  explained in the following:

28     "[§ 523(a)(4) is aimed only at the express trust situation in which the debtor either expressly

                                    10

signified his intention at the outset of the transaction, or was clearly put on notice by some document in existence at the outset, that he was undertaking the special responsibilities of a trustee to account for his actions over and above the normal obligations that contracting parties have to each other in a commercial transaction."

*Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 160 (Bankr. Md. 1999), citing *Bamco 18 v. Reeves (in re Reeves)*, 124 B.R. 5, 10 (Bankr. D. N.H. 1990).

<u>CONCLUSION</u>

Based on the foregoing, and in order to correct the manifest errors of law contained in the court's order denying Bonilla's motion to dismiss ATRs fourth claim for relief, Bonilla asks this court to reconsider and to reverse its order, thereby dismissing ATRs fourth claim for relief.

Dated: October 26, 2007                           MACDONALD & ASSOCIATES

                              By:    _____
                                     Heather A. Cutler, Attorneys for Debtor,
                                     Hugo Nery Bonilla

11

1  MICHAEL J. BAKER (No. 56492)
   WILLIAM J. LAFFERTY (No. 120814)
2  LONG X. DO (No. 211439)
   HOWARD RICE NEMEROVSKI CANADY
3      FALK & RABKIN
   A Professional Corporation
4  Three Embarcadero Center, 7th Floor
   San Francisco, California 94111-4024
5  Telephone:   415/434-1600
   Facsimile:   415/217-5910
6
   Attorneys for Plaintiffs
7  ATR-KIM ENG FINANCIAL CORPORATION
   and ATR-KIM ENG CAPITAL PARTNERS,
8  INC.

9               UNITED STATES BANKRUPTCY COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13  In re                          | No. 07-30309

14  HUGO N. BONILLA,               | Chapter 7 Case

15         Debtor.                 | Adv. Proc. No. 07-03079

16                                 | Date:    December 14, 2007
    ATR-KIM ENG FINANCIAL          | Time:    9:30 a.m.
17  CORPORATION and ATR-KIM ENG    | Place:   235 Pine Street
    CAPITAL PARTNERS, INC.,        |          Courtroom 23
18                                 |          San Francisco, California
           Plaintiffs,            | Judge:   Hon. Thomas E. Carlson
19
         v.
20
    HUGO NERY BONILLA,
21
           Defendant.
22
        PLAINTIFFS' OPPOSITION TO THE DEFENDANT'S MOTION TO
23      RECONSIDER ORDER DENYING DEFENDANT'S MOTION TO
          DISMISS PLAINTIFF'S FOURTH CLAIM FOR RELIEF
24

25

26

27

28

EXHIBIT ___H___

1

## TABLE OF CONTENTS

2
Page

3   INTRODUCTION                                                                 1

4   THE COURT'S 12(B)(6) RULING                                                  2

5          A.   The Court Engages In A "Substantially Similar" Analysis To
                Determine Whether A Debtor Is A Fiduciary Under Section
6               523(a)(4).                                                        3

7          B.   The Court Determines That Delaware Law Imposes On
                Directors Duties That Are Substantially Similar To The
8               Duties Of A Trustee.                                             4

9   ARGUMENT                                                                     5

10     I.   RULE 59(E) DOES NOT PERMIT RECONSIDERATION OF AN
            INTERLOCUTORY ORDER DENYING A MOTION TO
11          DISMISS.                                                             5

12     II.  RULE 59 DOES NOT PERMIT A LOSING PARTY TO
            RESTATE OLD ARGUMENTS OR RAISE NEWLY-MINTED
13          ARGUMENTS HE COULD HAVE ASSERTED DURING THE
            PENDENCY OF THE UNDERLYING MOTION.                                   7

14         A.   Bonilla's Challenge To The Court's Adoption Of The
                "Substantially Similar" Standard Does Not Warrant
15              Reconsideration.                                                 8

16              1.   The "Substantially Similar" Analysis Was The Key
17                   Issue In Dispute And Was Extensively Briefed By The
                     Parties.                                                    8

18              2.   Bonilla's Current Arguments Against The Court's
19                   "Substantially Similar" Analysis Were Already, Or
                     Could Have Been, Raised Earlier.                            11

20         B.   Bonilla's Contention That Delaware Law Only Imposes
21              Trusts Ex Maleficio Does Not Warrant Reconsideration.           14

22              1.   Bonilla Relied On Bovay And In re JTS Corp. In His
                     MPA To Argue That Delaware Only Imposes Trusts On
23                   Corporate Directors Ex Maleficio.                          15

24              2.   Bonilla Again Relies On Bovay And In re JTS Corp. To
                     Make The Same Unpersusasive Arguments Asserted In
25                   His MPA.                                                   17

26  CONCLUSION                                                                  18

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

### Cases

*389 Orange Street Partners v. Arnold*, 179 F.3d 656 (9th Cir. 1999)    7

*American Fed'n of Gov't Employees Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007)    6

*Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461 (9th Cir. 1989)    6

*Bodell v. Gen. Gas & Elec. Corp.*, 132 A. 442 (Del. Ch. 1926)    4

*Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808 (Del. 1944)    2, 5, 14, 16

*Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529 (Bankr. N.D. Cal. 2003)    2, 5, 14, 16

*DeSantis v. Dixon*, 236 P.2d 38 (Ariz. 1951)    9, 10

*Dimarco-Zappa v. Cabanillas*, 238 F.3d 25 (1st Cir. 2001)    7

*Figueroa v. United States*, 7 F.3d 1405 (9th Cir. 1993)    6

*Foster v. Lasagna*, 609 F.2d 392 (9th Cir. 1979)    4

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160 (Del. 2002)    15

*Grace v. Morgan*, No. Civ. A 03C05260JEB, 2004 WL 26858 (Del. Super. Jan. 6, 2004)    15

*Guth v. Loft, Inc.*, 5 A.2d 503 (Del. Ch. 1939)    15

*Hawaii Stevedores, Inc. v. HT & T Co.*, 363 F. Supp. 2d 1253 (D. Haw. 2005)    7

*Horizon Lines, LLC v. United States*, 429 F. Supp. 2d 92 (D.D.C. 2006)    17

*Hynson v. Drummond Coal Co., Inc.*, 601 A.2d 570 (Del. Ch. 1991)    4, 15

*In re Bennett*, 989 F.2d 779 (5th Cir. 1993)    9

*In re Cantrell*, 329 F.3d 1119 (9th Cir. 2003)    *passim.*

*In re Colton*, No. 05-56430-MM, 2007 WL 1615069 (Bankr. N.D. Cal. June 4, 2007)    9

*In re Cook*, 263 B.R. 249 (Bankr. N.D. Iowa 2001)    9

*In re Heilman*, 241 B.R. 137 (Bankr. D. Md. 1999)    10

*In re Lewis*, 97 F.3d 1182 (9th Cir. 1996)    *passim.*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3   *In re Moskowitz*, 310 B.R. 21 (Bankr. E.D.N.Y. 2004) ...... 9

4   *In re Shoe-Town, Inc. Stockholders Litig.*, No. C.A. No. 9483, 1990 WL
    13475 (Del. Ch. Feb. 12, 1990) ...... 16

5
    *In re Stanifer*, 236 B.R. 709 (9th Cir. BAP 1999) ...... 9
6
    *In re Sullivan*, 217 B.R. 670 (Bankr. D. Mass. 1998) ...... 9
7
    *In re Teichman*, 774 F.2d 1395 (9th Cir. 1985) ...... 9
8
    *In re Washington Pub. Power Supply System Sec. Litig.*, 823 F.2d 1349 (9th
9   Cir. 1987) ...... 6

10  *JPMorgan Chase Bank v. Cook*, 322 F. Supp. 2d 353 (S.D.N.Y. 2004) ...... 13

11  *Keenan v. Eshleman*, 2 A.2d 904 (Del. 1938) ...... 4

12  *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877 (9th Cir. 2000) ...... 7, 14

13  *Lewis v. Short (In re Short)*, 818 F.2d 693 (9th Cir. 1987) ...... 9

14  *McAnaney v. Astoria Fin. Corp.*, 233 F.R.D. 285 (E.D.N.Y. 2005) ...... 7

15  *Miramar Resources, Inc. v. Arthur Shultz (In re Arthur Shultz)*, 208 B.R. 723
    (Bankr. M.D. Fla. 1997) ...... 3, 16
16
    *Miramar Resources, Inc. v. Shultz (In re Zachary Shultz)*, 205 B.R. 952
17   (Bankr. D.N.M. 1997) ...... 4, 12

18  *Nahman v. Jacks (In re Jacks)*, 266 B.R. 728 (9th Cir. B.A.P. 2001) ...... 4, 5

19  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Garber*, No. 94-5414 AWI
    DLB, 2007 WL 3407257 (E.D. Cal. Nov. 14, 2007) ...... 7
20
    *Nolan v. Heald College*, No. C05-03399 MJJ, 2007 WL 878946 (N.D. Cal.
21   Mar. 21, 2007) ...... 2, 7

22  *O'Toole By and Through O'Toole v. Olathe Dist. Schools Unified School
    Dist. No. 223*, 963 F. Supp. 1000 (D. Kan. 1997) ...... 14
23
    *Parrish v. Sollecito*, 253 F. Supp. 2d 713 (S.D.N.Y. 2003) ...... 14
24
    *Petty v. Penntech Papers, Inc.*, 347 A.2d 140 (Del. Ch. 1975) ...... 15
25
    *Prestancia Mgmt. Group, Inc. v. Virginia Heritage Found., II LLC*, No. Civ.
26   A. 1032-S, 2005 WL 1364616 (Del. Ch. May 27, 2005) ...... 15

27  *Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808 (9th Cir. 1981) ...... 5, 6

28  *Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ...... 15

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

PLFS.' OPPOSITION TO DEF.'S MOTION TO RECONSIDER

-iii-

1

# TABLE OF AUTHORITIES

2
Page(s)

3    *United States v. Martin*, 226 F.3d 1042 (9th Cir. 2000)                     6

4    *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111 (E.D. Cal.
5    2001)                                                                   7, 17

6                                  **Statutes**

7    11 U.S.C.
8    § 523(a)                                                                    12
     § 523(a)(4)                                                            *passim.*

9    28 U.S.C.
10   § 1291                                                                       6
     § 1738                                                                      12

11   Fed. R. Civ. P.
12   54(a)                                                                        6
     54(b)                                                                        6
     59(e)                                                             1, 5, 6, 7, 17

13

14                            **Other Authorities**

15   Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §2810.1
16   (1995)                                                                       6

17

18

19

20

21

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

**INTRODUCTION**

On October 16, 2007, this Court issued an order ("12(b)(6) Ruling") denying the debtor Hugo Nery Bonilla's ("Bonilla" or "Defendant") Motion to Dismiss ("12(b)(6) Motion") the Fourth Claim for Relief in the Complaint of Plaintiffs ATR-Kim Eng Financial Corp. and ATR-Kim Eng Capital Partners, Inc. (collectively, "ATR" or "Plaintiffs"). In the 12(b)(6) ruling, the Court held that a debt is nondischargeable pursuant to the provisions of 11 U.S.C. section 523(a)(4)—which excepts from discharge debts that arise from "defalcation while acting in a fiduciary capacity"—if applicable state law imposes upon the debtor duties that are "*substantially similar* to the role of a trustee." 12(b)(6) Ruling at 4:20-24 (emphasis in original) (citing *In re Lewis*, 97 F.3d 1182 (9th Cir. 1996). The Court also held that Defendant is a "fiduciary" within the meaning of section 523(a)(4) because "the director of a corporation organized under Delaware law is subject to duties substantially similar to those imposed on the trustee of an express or technical trust." *Id.* at 5:12-17.[1]

Notwithstanding the fact that the parties submitted a combined 55 pages of briefing (which contained more than 200 separate citations to case and statutory authorities) and that Bonilla's counsel chose not to make any arguments at the hearing on the 12(b)(6) Motion on September 28, 2007, Bonilla now wants a "do over" to reargue the same positions he took in his original briefs. Styled as a motion for reconsideration ("Motion to Reconsider"), Bonilla cites only Rule 59(e) of the Federal Rules of Civil Procedure as a basis for challenging the Court's 12(b)(6) Ruling. Rule 59(e), however, cannot provide the relief that Bonilla seeks. By its own terms, Rule 59(e) is applicable only to judgments or appealable interlocutory orders. The 12(b)(6) Ruling is neither, and therefore cannot be reconsidered under Rule 59(e), and the Motion to Reconsider must be denied on that basis alone.

Even were the Court to entertain Bonilla's Motion to Reconsider, he offers no sufficient cause to reconsider the Court's 12(b)(6) Ruling and come to a different

---

[1] These holdings in the Court's 12(b)(6) Ruling provide the basis for ATR's motion for summary judgment on its Fourth Claim for Relief to determine that Bonilla's judgment debt of over $24.5 million owed to ATR is nondischargeable.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

conclusion. Bonilla cannot satisfy any of the narrow bases for amending or altering an order under Rule 59(e)—*i.e.*, newly discovered evidence, an intervening change in controlling law or clear error by the Court. Instead, all the arguments Bonilla asserts are improper under Rule 59(e) because they were, or could have been, raised while the 12(b)(6) Motion was pending.

Bonilla's primary challenge to the Court's "substantially similar" analysis is based on *In re Cantrell*, 329 F.3d 1119 (9th Cir. 2003). However, this case was cited and fully discussed in Bonilla's prior briefs. This time around, Bonilla re-spins the case in a manner that not only fails to support his contentions but also contradicts his own earlier description of *In re Cantrell*'s holding. Furthermore, in quarreling with the Court's reliance on *In re Lewis*, 97 F.3d 1182 (9th Cir. 1996), Bonilla does not cite any new countervailing authority but merely offers his own self-serving (and inaccurate) interpretations of the case. Finally, to challenge the Court's holding that Delaware law imposes on corporate directors duties that are substantially similar to trustee duties, Bonilla asserts the same unpersuasive argument that he made in prior briefing, relying on the same two cases—*Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808 (Del. 1944), and *Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529 (Bankr. N.D. Cal. 2003).

As a district judge in this District Court stated recently, "it should not be supposed that [Rule 59(e)] is intended to give an unhappy litigant one additional chance to sway the judge." *Nolan v. Heald College*, No. C05-03399 MJJ, 2007 WL 878946, at *8 (N.D. Cal. Mar. 21, 2007). Bonilla's Motion to Reconsider does nothing more than seek a "second bite at the apple" and should be denied.

## THE COURT'S 12(B)(6) RULING

Plaintiffs' Fourth Claim for Relief seeks to except from discharge a judgment debt of over $24.5 million that Bonilla owes to ATR. This judgment debt arises from a Delaware state court judgment holding that Bonilla, as a director of a Delaware corporation, breached his fiduciary duty to ATR, a minority shareholder of the corporation. ATR's Fourth Claim

1    for Relief alleges that this judgment debt arises from "defalcation while acting in a fiduciary

2    capacity" and is nondischargeable under 11 U.S.C. section 523(a)(4).

3        In the 12(b)(6) Ruling, the Court stated "[w]hether a debtor is a fiduciary within the

4    meaning of section 523(a)(4) is a question of federal law." 12(b)(6) Ruling at 2 (citing *In re*

5    *Lewis*, 97 F.3d at 1185). Under federal law, according to the Court, "[t]he debtor must have

6    been subject to the duties of a trustee before, and without reference to, the wrongdoing that

7    gave rise to the debt, . . . the duties imposed on the debtor must be those imposed on the

8    trustee of an express or technical trust [and] there must be an identifiable trust *res*,

9    identifiable beneficiaries, and the debtor must be subject to the duties of loyalty, good faith,

10   and honesty in caring for the trust *res*." *Id.* (citing *In re Lewis*, 97 F.3d at 1185-86 and n.1;

11   *In re Arthur Shultz*, 208 B.R. 723, 728 (Bankr. M.D. Fla. 1997)).

**A.     The Court Engages In A "Substantially Similar" Analysis To Determine Whether A Debtor Is A Fiduciary Under Section 523(a)(4).**

14       Focusing on the Ninth Circuit's statement that "the fiduciary relationship must be one

15   arising from an express or technical trust" (*In re Lewis*, 97 F.3d at 1185), this Court under-

16   took a closer examination whether "this mean[s] that in addition to preexisting the wrong,

17   the fiduciary duty must be identical to that of a trustee in every technical respect[.]" *Id.* at 4.

18   The Court reasoned that section 523(a)(4) does not require such a strictly technical

19   application. The Court noted that *In re Lewis*, from which the "express or technical trust"

20   language comes, held partners to be fiduciaries under section 523(a)(4) upon the basis of

21   state-court decisions that imposed on partners the duties of loyalty, honesty, and fair dealing.

22   *Id.* (citing *In re Lewis*, 97 F.3d at 1186). The Court further observed that "[o]ne of the deci-

23   sions *In re Lewis* relied upon described the duties of a partner as merely 'similar to a trus-

24   tee's,' and the other decisions cited failed to use the term trustee at all in describing the

25   duties of a partner." *Id.* at 4-5 (citations omitted). Finally, the Court highlighted that the

26   Ninth Circuit in *In re Lewis* noted with approval language in Collier stating that the duties of

27   the fiduciary need only be "substantially similar" to those imposed on trustees. *Id.* (quoting

28   *In re Lewis*, 97 F.3d at 1186 n.1). The Court therefore "conclude[d] that the fiduciary duty

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1 [under section 523(a)(4)] must preexist the trust, and must be *substantially similar* to the role

2 of a trustee, in that there must be a trust *res*, identifiable beneficiaries, and clear notice of the

3 duties of loyalty, honesty, and fair dealing toward the beneficiaries in all matters affecting

4 the trust *res*." *Id.* at 4 (emphasis in original).

**B.    The Court Determines That Delaware Law Imposes On Directors Duties
That Are Substantially Similar To The Duties Of A Trustee.**

7 In determining whether Bonilla was subject to duties sufficient to deem him to be a

8 fiduciary under section 523(a)(4), the Court again relied on *In re Lewis* and held "[w]hether

9 a debtor is subject to the duties just described is primarily a matter of state law," and these

10 "requisite duties can be imposed by agreement, state statute, or state case law." *Id.* at 2-3

11 (citing *In re Lewis*, 97 F.3d at 1185-86). The Court thus looked to Delaware law to

12 determine the types of duties that are imposed on directors of Delaware corporations.

13 The Court found that "[n]umerous Delaware decisions refer to directors as trustees, and

14 impose on directors the highest duties of loyalty, honesty, and fair dealing in all matters

15 concerning the management of corporate assets," and "impose this fiduciary duty prior to,

16 and without reference to, any misconduct by the director." *Id.* at 3 (citing *Keenan v.*

17 *Eshleman*, 2 A.2d 904, 908 (Del. 1938); *Hynson v. Drummond Coal Co., Inc.*, 601 A.2d 570

18 (Del. Ch. 1991); *Bodell v. Gen. Gas & Elec. Corp.*, 132 A. 442, 447 (Del. Ch. 1926)). The

19 Court further noted, "Delaware case law clearly identifies the fiduciary duties of a corporate

20 director, the trust *res* (all corporate assets), and the beneficiaries of the trust (the corporation

21 and its shareholders)." *Id.*

22 The Court thus concluded that "the director of a corporation organized under Delaware

23 law is subject to duties substantially similar to those imposed on the trustee of an express or

24 technical trust, and those duties arise before and without reference to any wrongdoing," and

25 the "[t]he director of a Delaware corporation is therefore a fiduciary within the meaning of

26 section 523(a)(4)." *Id.* at 5 (citing *In re Zachary Shultz*, 205 B.R. 952, 959 (Bankr. D.N.M.

27 1997); *Foster v. Lasagna*, 609 F.2d 392, 396 (9th Cir. 1979) (director of corporation

28 organized under California law is a fiduciary for purpose of section 523(a)(4)); and *Nahman*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    *v. Jacks (In re Jacks)*, 266 B.R. 728, 737 (9th Cir. B.A.P. 2001) (same)).

2

3                                    **ARGUMENT**

4        By his Motion to Reconsider, Bonilla faults the Court for not specifically addressing *In*

5    *re Cantrell*, disagrees with the Court's "substantially similar" analysis based on *In re Lewis*

6    (*id.* at 10-11). and urges the Court to take another look at two cases—*Bovay* and *In re JTS*

7    *Corp.*—that he discussed and argued in a prior brief. Of course, Bonilla had ample

8    opportunity to assert all these arguments while the 12(b)(6) Motion was pending. He did in

9    fact raise these cases and some of these arguments in his prior briefs, and to the extent

10   arguments were not articulated or the cases not framed the way Bonilla would now like, he

11   could have refined his positions at the hearing on September 28, 2007, but his counsel chose

12   not to do so. Regardless, Rule 59(e) is not an avenue for him now to reargue issues that

13   were earlier briefed by the parties and considered and ruled upon by the Court.

14   **I.    RULE 59(E) DOES NOT PERMIT RECONSIDERATION OF AN**
         **INTERLOCUTORY ORDER DENYING A MOTION TO DISMISS.**

15

16       Bonilla gives short shrift to the procedural applicability of Rule 59(e) in seeking

17   reconsideration of the Court's 12(b)(6) Ruling. The rule states in full. "[a] motion to alter or

18   amend a judgment must be filed no later than 10 days after entry of the judgment." Fed. R.

19   Civ. Proc. 59(e). Bonilla claims to have satisfied the 10-day filing deadline because he filed

20   the Motion to Reconsider on October 26, 2007, and the Court issued the 12(b)(6) Ruling on

21   October 16, 2007. Motion to Reconsider at 6:5-7. However, Bonilla completely misses the

22   more important requirement of Rule 59(e)—that there be a "judgment"—which clearly is not

23   present.

24       Although the term "reconsideration" does not appear in Rule 59(e), the rule has been

25   interpreted to encompass a motion to reconsider certain court orders. *See* Wright, Miller &

26   Kane, *Federal Practice and Procedure: Civil 2d* §2810.1 (1995). However, Rule 59(e)

27   "clearly contemplates entry of judgment as a predicate to any motion." *Stephenson v.*

28   *Calpine Conifers II, Ltd.*, 652 F.2d 808, 812 (9th Cir. 1981), *overruled in part on other*

HOWARD
RICE
NEMEROSKI
CANADY
FALK
& RABKIN

1   grounds, *In re Washington Pub. Power Supply System Sec. Litig.*, 823 F.2d 1349, 1350-52,

2   1358 (9th Cir. 1987) (en banc). "[T]he requirement of a judgment as a prerequisite to

3   moving for reconsideration under Rule 59(e) protects against the specter of piecemeal

4   review." *Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 467 (9th Cir. 1989) (citing

5   *Stephenson*, 652 F.2d at 812). In *Stephenson*, the Ninth Circuit observed that "were we to

6   permit Rule 59(e) motions without entry of judgment, litigants could obtain appellate review

7   of partial judgments by simply appealing a Rule 59(e) order, completely bypassing the

8   requirements of Rule 54(b) and 28 U.S.C. §1291." *Stephenson*, 652 F.2d at 812.

9       Bonilla's Motion to Reconsider fails to satisfy the "judgment" requirement of Rule

10  59(e). A "judgment" includes final judgments and appealable interlocutory orders. *See*

11  *United States v. Martin*, 226 F.3d 1042, 1048 (9th Cir. 2000); *Balla*, 869 F.2d at 467 ("A

12  judgment 'includes a decree and any order from which an appeal lies.'") (quoting Fed. R.

13  Civ. P. 54(a)). The Court's 12(b)(6) Order, denying a motion to dismiss pursuant to Rule

14  12(b)(6) of the Federal Rules of Civil Procedure, is neither a final judgment nor an

15  appealable interlocutory order. *See American Fed'n of Gov't Employees Local 1 v.*

16  *Stone*, 502 F.3d 1027, 1039-40 (9th Cir. 2007) (stating "general rule that defendants are not

17  entitled to interlocutory appellate review of a district court's denial of a Rule 12(b)(6)

18  motion"); *Figueroa v. United States*, 7 F.3d 1405, 1408 (9th Cir. 1993) ("Ordinarily, the

19  denial of a 12(b)(6) motion is not a reviewable final order; it is only when a question of

20  immunity is involved that we use the collateral order doctrine to exercise jurisdiction.").

21      Rule 59(e) therefore does not permit Bonilla to seek reconsideration of the Court's

22  12(b)(6) Ruling, and his Motion to Reconsider should be denied due to this fatal procedural

23  shortcoming.

24  **II.    RULE 59 DOES NOT PERMIT A LOSING PARTY TO RESTATE OLD
           ARGUMENTS OR RAISE NEWLY-MINTED ARGUMENTS HE COULD**
25  **HAVE ASSERTED DURING THE PENDENCY OF THE UNDERLYING
           MOTION.**
26

27      A different result from that reached in the 12(b)(6) Ruling would not be warranted

28  even if the Court were to entertain Bonilla's Motion to Reconsider. Rule 59(e) "offers an

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    'extraordinary remedy, to be used sparingly in the interests of finality and conservation of

2    judicial resources.'" *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir.

3    2000) (citation omitted). "Under Rule 59(e), a Motion to Reconsider should not be granted,

4    absent highly unusual circumstances, unless the district court is presented with newly

5    discovered evidence, committed clear error, or if there is an intervening change in the

6    controlling law." *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999);

7    *see also Hawaii Stevedores, Inc. v. HT & T Co.*, 363 F. Supp. 2d 1253, 1269 (D. Haw. 2005)

8    ("[A] motion for reconsideration must set forth facts or law of a strongly convincing nature

9    to induce the court to reverse its prior decision.").

10        "Mere disagreement with a previous order is an insufficient basis for reconsideration."

11    *Hawaii Stevedores*, 363 F. Supp. 2d at 1269. "A party seeking reconsideration must show

12    more than a disagreement with the Court's decision, and recapitulation of the cases and

13    arguments considered by the court before rendering its original decision fails to carry the

14    moving party's burden." *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111,

15    1131 (E.D. Cal. 2001); *see also McAnaney v. Astoria Fin. Corp.*, 233 F.R.D. 285,

16    287 (E.D.N.Y. 2005) ("A Motion to Reconsider cannot be granted . . . solely on a party's

17    disagreement with the Court's ruling.") (citation omitted); *Nolan*, 2007 WL 878946 at *8

18    ("Whatever may be the purpose of Rule 59(e) it should not be supposed that it is intended to

19    give an unhappy litigant one additional chance to sway the judge"). Furthermore, "[a] Rule

20    59(e) motion may *not* be used to raise arguments or present evidence for the first time when

21    they could reasonably have been raised earlier in the litigation." *Kona Enters.*, 229 F.3d at

22    890 (emphasis in original). "Rule 59(e) 'does not provide a vehicle for a party to undo its

23    own procedural failures [or] allow a party to introduce new evidence or advance new

24    arguments that could and should have been presented to the district court prior to the

25    judgment.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Garber*, No. 94-5414 AWI DLB,

26    2007 WL 3407257, at *2 (E.D. Cal. Nov. 14, 2007) (quoting *Dimarco-Zappa v. Cabanillas*,

27    238 F.3d 25, 34 (1st Cir. 2001)).

28        Under these standards, Bonilla's Motion to Reconsider is not well taken. Rather than

PLFS.' OPPOSITION TO DEF.'S MOTION TO RECONSIDER

-7-

1   assert newly discovered evidence, cite an intervening change in controlling law or
2   demonstrate that the Court committed clear error, Bonilla's Motion to Reconsider offers
3   only restatements of his prior arguments or newly-minted (and unpersuasive) arguments on
4   issues already decided that Bonilla could have raised while the 12(b)(6) Motion was
5   pending.

### A.   Bonilla's Challenge To The Court's Adoption Of The "Substantially Similar" Standard Does Not Warrant Reconsideration.

8       Bonilla's primary contention in the Motion to Reconsider is that the Court erred by
9   conducting a "substantially similar" analysis to determine whether the fiduciary requirement
10  of section 523(a)(4) is met. *See* 12(b)(6) Ruling at 4-5. Bonilla asserts three challenges the
11  Court's analysis:  (1) the Court "overlook[ed] and fail[ed] to distinguish" *In re Cantrell*,
12  *supra*; (2) the Court misapplied *In re Lewis*, *supra*, because the case "did not state that it was
13  adopting a 'substantially similar' test"; and (3) the Court's ruling "contravene[es] the
14  overriding purpose of bankruptcy laws." *See* Motion to Reconsider at 8-11.

### 1.   The "Substantially Similar" Analysis Was The Key Issue In Dispute And Was Extensively Briefed By The Parties.

17      The central issue in dispute on Bonilla's 12(b)(6) Motion was whether, under
18  governing law, directors of a Delaware corporation are "acting in a fiduciary capacity"
19  within the meaning of section 523(a)(4).  In his memorandum of points and authorities
20  supporting the 12(b)(6) Motion ("Bonilla's MPA"), Bonilla argued that the fiduciary
21  relationship contemplated under section 523(a)(4) can only arise from a statutory or express
22  trust and cannot be based on a trust *ex maleficio*. Bonilla's MPA at 8-9. Acknowledging the
23  applicability of state law, Bonilla conceded, "[b]ecause Delaware was the state of
24  incorporation of the Delaware Holding Co. (Compl. at ¶12), Delaware state law determines
25  whether there was an express or statutory trust which imposed trust duties on Bonilla, as
26  meant by Section 523(a)(4)." *Id.* at 9:23-25. Purporting to cite Delaware law accurately,
27  Bonilla claimed that Delaware imposes on directors trust duties only under the Delaware
28  trust fund doctrine, when the corporation is insolvent or when the director has committed

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    misfeasance,. *Id.* at 9-12. Because such a trust arises *ex maleficio*, Bonilla claimed, "[i]t is

2    clear that Delaware law does not impose an express or statutory trust on corporate directors."

3    *Id.* at 9:25-26.

4         By contrast, in its opposition to Bonilla's 12(b)(6) Motion ("ATR's Opposition"), ATR

5    argued that the term "fiduciary" under section 523(a)(4) is not limited to cases in which

6    there is a written trust agreement or a statute that specifically uses the term "trust" or

7    "trustee." Citing cases in the Ninth Circuit and throughout the country, ATR contended that

8    the fiduciary requirement of section 523(a)(4) can be satisfied in "circumstances in which

9    'trust-type' obligations are imposed on a debtor pursuant to state common-law," that is, in

10   the Court's words, when state law imposes duties that are substantially similar to the duties

11   of a trustee. ATR's Opposition at 11-12.[2] As a primary example of this principle, ATR

12   emphasized *In re Lewis*, the same case the Court relied upon to engage in the "substantially

13   similar" analysis. *See id.* at 12. ATR noted that although *In re Lewis* involved partners, the

14   Ninth Circuit examined applicable Arizona law and observed "[t]he relation of partnership *is*

15   *fiduciary in character.*" *In re Lewis*, 97 F.3d at 1186 (quoting *DeSantis v. Dixon*, 236 P.2d

16

17        [2]Specifically, ATR cited *In re Teichman*, 774 F.2d 1395, 1399 (9th Cir. 1985) ("state
18   law takes on importance in determining when a trust exists. The state may impose trust-like
     obligations on those entering into certain kinds of contracts, and these obligations may make
19   a contracting party a trustee") (internal quotation marks omitted); *In re Stanifer*, 236 B.R.
     709, 714 (9th Cir. BAP 1999) ("The 'technical' or 'express' trust requirement includes
20   relationships in which trust-type obligations are imposed pursuant to statute or common
     law"); *In re Colton*, No. 05-56430-MM, 2007 WL 1615069, at *3 (Bankr. N.D. Cal. June 4,
21   2007) ("in some instances, a state statute or common law doctrine may impose trust-like
     obligations that are sufficient to satisfy the requirements of an express trust"); *cf. Lewis v.
22   Short (In re Short)*, 818 F.2d 693, 695-96 (9th Cir. 1987) (holding that Washington common
     law imposed trustee-like duties on partners of partnership); *see also In re Bennett*, 989 F.2d
23   779, 784-85 (5th Cir. 1993) ("most courts today . . . recognize that the 'technical' or
     'express' trust requirement is not limited to trusts that arise by virtue of a formal trust
24   agreement, but includes relationships in which trust-type obligations are imposed pursuant to
     statute or common law"); *In re Moskowitz*, 310 B.R. 21, 30 (Bankr. E.D.N.Y. 2004)
25   ("Technical or express trusts include relationships where trust-type obligations are imposed
     pursuant to statute or common law"); *In re Cook*, 263 B.R. 249, 255 (Bankr. N.D. Iowa
26   2001) ("[t]he 'technical' or 'express' trust requirement is not limited to trusts that arise by
     virtue of a formal trust agreement, but includes relationships in which trust-type obligations
27   are imposed pursuant to statute or common law"); *In re Sullivan*, 217 B.R. 670, 675 (Bankr.
     D. Mass. 1998) ("A technical trust is a trust that is imposed by law and may arise either by
28   statute or common law").

1   38, 41 (Ariz. 1951)) (emphasis added). Specifically, as the Ninth Circuit noted, Arizona law
2   imposes on partners "the obligation of the utmost good faith in their dealings with one
3   another with respect to partnership affairs, of acting for the common benefit of all the
4   partners in all transactions relating to the firm business, and of refraining from taking any
5   advantage of one another by the slightest misrepresentation, concealment, threat or adverse
6   pressure of any kind." *Id.*

7   Bonilla shifted his position in the reply to ATR's Opposition ("Bonilla's Reply"). In
8   his MPA, Bonilla had originally acknowledged that Delaware law determines whether a
9   director of a Delaware corporation is subject to the types of duties that would make him a
10  "fiduciary" under section 523(a)(4). *See* Bonilla's MPA at 9:23-25. However, in his Reply,
11  Bonilla relied on *In re Heilman*, 241 B.R. 137 (Bankr. D. Md. 1999), to argue that Delaware
12  state law is not necessarily relevant to this determination. *See* Bonilla's Reply at 6:3-6.
13  Under *In re Heilman*, according to Bonilla, section 523(a)(4) "requires that the relationship
14  itself be one that entails an express trust, foreclosing the possibility that an express trust may
15  be created as a creature of pure common law." *Id.* at 7:8-9. Acknowledging that the
16  "substantially similar" analysis advocated by ATR (and employed by this Court) "has been
17  followed by some courts," Bonilla nevertheless contended that "[t]he correct approach"
18  under *In re Heilman* "is to first analyze whether the relationship in itself is one that would
19  qualify as an express trust under Section 523(a)(4), and then to look to see whether such a
20  relationship exists under state law." *Id.* at 6:21-24. Based on his reliance on *In re Heilman*,
21  Bonilla thus argued that "[c]learly, the director-shareholder relationship is not one of express
22  trust." *Id.* at 9:4-5.

23  Nowhere in his Reply did Bonilla attempt to address the critical holding from *In re*
24  *Lewis*, which ATR and this Court relied upon, establishing that in the Ninth Circuit
25  applicable state law determines whether a debtor is subject to the types of duties that would
26  make him a fiduciary under section 523(a)(4). *See In re Lewis*, 97 F.3d at 1185. Bonilla
27  also never claimed that *In re Lewis* did not engage in a "substantially similar" analysis, as
28  ATR contended and as this Court ultimately determined. Bonilla instead only sought to

1    distinguish *In re Lewis* on its facts, emphasizing that it involved partners, not corporate

2    directors. *See id.* at 9-11 and 12-13.

3        The Court held a hearing on Bonilla's 12(b)(6) Motion on September 28, 2007.

4    Counsel for both sides appeared. ATR's counsel presented extensive oral argument that the

5    Court should follow the "substantially similar" analysis found in *In re Lewis* and that

6    Delaware law did indeed impose duties on corporate directors that are substantially similar

7    to the duties of a trustee. *See* Motion to Reconsider at 4:14-15 (recalling that ATR's counsel

8    "urged the court to adopt the reasoning of bankruptcy court decisions which apply the

9    'substantially similar' test" at the September 28 hearing). The Court gave Bonilla's counsel

10    the opportunity to respond, but he declined. Bonilla's counsel made no arguments at the

11    September 28 hearing.

### 2.    Bonilla's Current Arguments Against The Court's "Substantially Similar" Analysis Were Already, Or Could Have Been, Raised Earlier.

14        All three arguments that Bonilla seeks now to assert in the Motion to Reconsider

15    against the Court's "substantially similar" analysis were, or could have been, raised in his

16    prior briefs or at the September 28 hearing, and all were explicitly or implicitly rejected by

17    this Court. In his chief argument, Bonilla abandons *In re Heilman* (making no mention of it)

18    and instead relies on *In re Cantrell*, which he contends is "more relevant and current" than

19    *In re Lewis* and "did not apply a 'substantially similar' test to determine whether the

20    defendant was a fiduciary under §523(a)(4)." Motion to Reconsider at 8:12-17. Bonilla

21    never cited *In re Cantrell* in his prior briefs in this manner. To the contrary, on page 11 of

22    his Reply, Bonilla apparently conceded the <u>exact opposite</u>, stating "the court in *In re*

23    *Cantrell* . . . applied the 'trust-type duties' approach that ATR advocates." Bonilla's Reply

24    at 11:1-2. It is not surprising then that, in his prior briefs, Bonilla had not relied on *In re*

25    *Cantrell* to argue against the "substantially similar" analysis. Bonilla instead cited this case

26    in his MPA only as support for his collateral estoppel argument, a completely innocuous

27    proposition in the context of the 12(b)(6) Motion. *See* Bonilla's MPA at 7 (citing *In re*

28    *Cantrell* for the proposition that "collateral estoppel principles do indeed apply in discharge

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    proceedings pursuant to §523(a)" and that "28 U.S.C. §1738 requires [courts], as a matter of

2    full faith and credit, to apply the pertinent state's collateral estoppel principles"). And in his

3    Reply, Bonilla only tried to analogize *In re Cantrell*'s facts to this case noting that

4    "[a]lthough the court in *In re Cantrell* cited *Ragsdale* and applied the 'trust-type duties'

5    approach that ATR advocates, the court found that the nature of the relationship of corporate

6    principal to director was too dissimilar to an express trust to justify a denial of discharge

7    under 523(a)(4)." Bonilla's Reply at 11 and n.10.

8        This same argument by purported analogy from Bonilla's Reply is restated in the

9    Motion to Reconsider. Bonilla again argues that "*Cantrell* determined that California

10   corporate directors are not fiduciaries under §523(a)(4) because California law . . . holds that

11   corporate directors are not trustees." Motion to Reconsider at 8:17-9:2. As he did in his

12   Reply, Bonilla places too much weight on *In re Cantrell* and unjustifiably extends it beyond

13   its holding. Far from disapproving or overruling the "substantially similar" analysis

14   employed by *In re Lewis*, *In re Cantrell* cited and relied on the critical holding from *In re*

15   *Lewis* that "[w]hile the definition of 'fiduciary' is governed by federal law, we have relied in

16   part on state law to ascertain whether the requisite trust relationship exists." *In re Cantrell*,

17   329 F.3d at 1125 (citing *In re Lewis*, 97 F.3d at 1185). Accordingly, the Ninth Circuit in *In*

18   *re Cantrell* focused exclusively on California law and the types of duties that are imposed on

19   directors of California corporations. *Id.* at 1126-27. Resting its decision on a California

20   Supreme Court case, the Ninth Circuit held that a California corporate director is not a

21   fiduciary within the meaning of section 523(a)(4). *Id.* at 1128. By its own terms, *In re*

22   *Cantrell* has no application to this case because Bonilla was a director of a Delaware

23   corporation. Delaware law, not California law, determines whether Bonilla was subject to

24   the types of duties sufficient to satisfy the "fiduciary" requirement of section 523(a)(4).[3]

25

26   _____
       [3]Bonilla ignores the one published case that is most directly on point, *In re Zachary*
27   *Shultz*, 205 B.R. at 952. *In re Zachary Shultz* thoroughly examined Delaware law, found that
     Delaware law imposed duties on a director of a Delaware corporation that are substantially
28   similar to the duties of a trust and concluded that a Delaware corporate director is a
     fiduciary within the meaning of section 523(a)(4). *See id.* at 958-60. ATR discussed *In re*
                                                        (continued . . . )

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    The Court did not overlook *In re Cantrell*, and Bonilla's rehashed reliance on the case is not
2    a proper basis for reconsideration.    As one court has stated, "the re-arguing of the
3    applicability of [a case] in the guise of bringing 'overlooked' authority to the Court's
4    attention borders on the contumacious, as the question was extensively briefed by both
5    parties in the original submissions." *JPMorgan Chase Bank v. Cook*, 322 F. Supp. 2d 353,
6    356 (S.D.N.Y. 2004).

7        The same can be said of Bonilla's remaining two arguments against the Court's
8    "substantially similar" analysis—that the Ninth Circuit in *In re Lewis* did not explicitly
9    adopt a "substantially similar" test, and that the Court's 12(b)(6) Ruling contravenes the
10   purpose of bankruptcy law to narrowly construe section 523(a)(4) in order "to provide
11   debtor with comprehensive, much needed relief from burden of his indebtedness by
12   releasing him from virtually all his debts." *See* Motion to Reconsider at 10-11. Contrary to
13   Bonilla's claim that the Court engaged in the "substantially similar" analysis "without
14   explanation" (*id.* at 10:7-8), this Court clearly articulated why *In re Lewis* supports such
15   analysis. *See* 12(b)(6) Ruling at 4-5.  Bonilla does not cite much less question the
16   correctness of the Court's reasoning and does not address the numerous other cases
17   (including cases in the Ninth Circuit) cited by ATR demonstrating that courts apply the
18   "substantially similar" analysis in the context of section 523(a)(4). *See* footnote 1, *supra*.
19   Furthermore, Bonilla's reference to bankruptcy policy is superficial and unpersuasive.
20   Although bankruptcy law generally is intended to relieve debtors by discharging debts, it
21   also clearly recognizes 19 exceptions of nondischargeable debts. This Court applied sound
22   reasoning, based on applicable precedents and governing law, that Bonilla's judgment debt
23   to ATR falls squarely within the exception to discharge found at section 523(a)(4), debts as a
24   result of deprecation by a fiduciary. Bonilla may be displeased with the result, but the
25   Court's 12(b)(6) Ruling did not thwart bankruptcy policy or misapply section 523(a)(4).

26       ( . . . continued)
27   *Shultz* at length (*see* ATR's Opposition at 20-22) and this Court cited it in holding the
     director of a Delaware corporation is a fiduciary within the meaning of section 523(a)(4).
28   *See* 12(b)(6) Ruling at 5:15-18.

1   Notwithstanding the unpersuasiveness of these arguments, Bonilla could have raised

2   them earlier. It was clear that ATR relied heavily on *In re Lewis* specifically as precedent

3   for the "substantially similar" analysis. Bonilla just as clearly could have asserted the

4   arguments he hopes to make now in his Reply or at the September 28 hearing, but he chose

5   not to do so. Like his renewed reliance on *In re Cantrell*, Bonilla cannot quarrel with the

6   Court's "substantially similar" analysis based on arguments he could have raised earlier. *See*

7   *Kona Enters.*, 229 F.3d at 890 ("A Rule 59(e) motion may *not* be used to raise arguments or

8   present evidence for the first time when they could reasonably have been raised earlier in the

9   litigation.") (emphasis in original); *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y.

10  2003) ("A Rule 59(e) motion, however, is not intended as a vehicle for a party dissatisfied

11  with the Court's ruling to advance new theories that the movant failed to advance in

12  connection with the underlying motion, nor to secure a rehearing on the merits with regard to

13  issues already decided."); *O'Toole By and Through O'Toole v. Olathe Dist. Schools Unified*

14  *School Dist. No. 223*, 963 F. Supp. 1000, 1016 (D. Kan. 1997) ("[T]he court will not permit

15  the plaintiff to raise new arguments or attempt to bolster her previously unsuccessful

16  arguments in a motion to reconsider.").

17

18  **B.    Bonilla's Contention That Delaware Law Only Imposes Trusts *Ex Maleficio* Does Not Warrant Reconsideration.**

19  Bonilla also seeks to challenge the Court's holding that Delaware law imposes duties

20  on corporate directors that are substantially similar to the duties of a trustee. *See* 12(b)(6)

21  Ruling at 2:23-3:17 and 5:12-22. Relying on *Bovay.*, 38 A.2d at 808, and *In re JTS Corp.*,

22  305 B.R. at 529, Bonilla claims in the Motion to Reconsider that "Delaware imposes

23  heightened fiduciary and trustee duties on directors in limited circumstances and pursuant to

24  a constructive trust or *ex maleficio*, neither of which are included within the purview of

25  §523(a)(4)." *See* Motion to Reconsider at 6-8. This argument is a blatant attempt to rehash

26  an old argument (relying on the same cases) that Bonilla made in his MPA.

27

28

1.    **Bonilla Relied On *Bovay* And *In re JTS Corp.* In His MPA To Argue That Delaware Only Imposes Trusts On Corporate Directors *Ex Maleficio*.**

Following the contention that the "substantially similar" analysis was appropriate in its Opposition, ATR demonstrated that Delaware law did indeed impose on corporate directors duties that are substantially similar to those of a trustee. *See* ATR's Opposition at 12-17. According to ATR, "Delaware law has historically imposed 'trust-type' duties on its directors that are at least as demanding as those recognized in *In re Lewis*." *Id.* at 12-13. In particular, ATR noted that the Delaware courts have "demand[ed] of a corporate . . . director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers." *Id.* at 13 (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Ch. 1939)). Furthermore, ATR argued that those "unyielding fiduciary duties" include the duty of care and loyalty, and the subsidiary duty of good faith. *Id.* (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)). These duties, ATR contended, "grow from the experience of Delaware courts interpreting the law of trusts." *Id.* at 14.[4]

---

[4]ATR cited *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 168 (Del. 2002) ("efforts by a fiduciary to escape a fiduciary duty, whether by a corporate director or officer *or other type of trustee*, should be scrutinized searchingly") (emphasis added); *Hynson*, 601 A.2d at 575 ("[T]he fiduciary duty of corporate directors is a court created duty that historically springs from equity's experience with trusts and trustees"); *Petty v. Penntech Papers, Inc.*, 347 A.2d 140, 143 (Del. Ch. 1975) ("Clearly directors of a corporation *stand in a position of trustees* with the stockholders, [citations] and the utmost good faith and fair dealing are required of them, especially where their individual interests are concerned"); *Prestancia Mgmt. Group, Inc. v. Virginia Heritage Found., II LLC*, No. Civ. A. 1032-S, 2005 WL 1364616, at *6 (Del. Ch. May 27, 2005) ("[a] fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another. The relationship connotes a dependence. The traditional relationships recognized by equity as 'special' are express trustees and corporate officers and directors"); *Grace v. Morgan*, No. Civ. A 03C05260JEB, 2004 WL 26858, at *2 (Del. Super. Jan. 6, 2004) (holding that the "classic examples" of "a special relationship of trust [that] exist[s] between the parties sufficient to establish the fiduciary duty" include "the trustee responsible for the trust *res* for the beneficiary and the corporate officer or director responsible to (continued . . . )

1   Bonilla never directly challenged ATR's discussion of Delaware law and the trust-type

2   duties that are imposed on Delaware corporate directors. Bonilla's Reply failed to address

3   the particular Delaware cases cited by ATR, and the only discussion of Delaware law that

4   appears in Bonilla's prior briefs is found in his MPA. In his MPA, Bonilla argued that

5   Delaware law does not impose express or statutory trusts on corporate directors but only

6   imposes trusts *ex maleficio* pursuant to the Delaware trust fund doctrine. Bonilla's MPA at

7   9-10. Bonilla propounded two cases in support of this contention. According to Bonilla, the

8   first case, *In re Arthur Shultz*, 208 B.R. at 729, did not find that Delaware law imposes

9   express or statutory trusts on corporate officers and that an individual's "position as a

10  director does not per se make him a trustee to the corporation." *See id.* at 10-11. *In re*

11  *Arthur Shultz* held, nevertheless, that a Delaware corporate director is a fiduciary within the

12  meaning of section 523(a)(4) (*In re Arthur Shultz*, 208 B.R. at 729), but Bonilla downplayed

13  that holding. Bonilla also discussed *In re JTS Corp.*, which he claimed presented an analysis

14  of the Delaware trust fund doctrine as stated in *Bovay*, and found that "directors are not

15  trustees in a strict and technical sense but may be treated as such when they have 'unlawfully

16  profited through breach of duty, and at the expense of the corporation.'" Bonilla's MPA at

17  12.

18
19      **2.    Bonilla Again Relies On *Bovay* And *In re JTS Corp.* To Make The Same Unpersuasive Arguments Asserted In His MPA.**

20      Bonilla offers nothing new from *Bovay* and *In re JTS Corp.* On the contrary, he makes

21  the same argument regarding *Bovay* and *In re JTS Corp.* that he made in his MPA. *Compare*

22  Bonilla's MPA at 12:10-13 *with* Motion to Reconsider at 6:22-24; Bonilla's MPA at 12:4-24

23  *with* Motion to Reconsider at 7:6-19. In restating his arguments, Bonilla ignores the Court's

24  citations to other Delaware decisions and does not account for the Court's own consideration

25
26  ( . . . continued)
    shareholders"); and *In re Shoe-Town, Inc. Stockholders Litig.*, No. C.A. No. 9483, 1990 WL

27  13475, at *7 (Del. Ch. Feb. 12, 1990) (characterizing directors as "quasi trustees. . . . a director will be held as a trustee for the corporation he has undertaken to represent")

28  (citations omitted).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

of *Bovay* in reaching its conclusions. *See* 12(b)(6) Ruling at 3-4. Nor does Bonilla address the numerous Delaware cases cited by ATR showing that Delaware does impose on directors duties substantially similar to trustee duties. Bonilla wishes simply to reargue *Bovay* and *In re JTS Corp.* in a vacuum in hopes that the Court will change its mind on an issue that has already been decided against him. Rule 59(e) does not permit reconsideration for such a purpose. *See Westlands*, 134 F. Supp. 2d at 1131 ("recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden [on a motion for reconsideration]."); *Horizon Lines, LLC v. United States*, 429 F. Supp. 2d 92, 96-97 (D.D.C. 2006) (denying motion to reconsider where the movant's "arguments are basically a rehash of the arguments [it] presented at the summary judgment stage . . . . [and] merely disagrees with how the Court weighed the facts and interpreted the case law.").

## CONCLUSION

For the foregoing reasons, ATR urges that the Court deny Defendant's Motion to Reconsider.[5]

DATED:  November 30, 2007.

Respectfully,

HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation

By: _____/s/_____
WILLIAM J. LAFFERTY

Attorneys for Plaintiffs ATR-KIM ENG
FINANCIAL CORPORATION and ATR-KIM
ENG CAPITAL PARTNERS, INC.

---

[5] In the interest of economy, ATR has not individually addressed each argument contained in Bonilla's Motion to Reconsider, although all of them are unpersuasive. At the hearing on the Motion to Reconsider, ATR will be prepared to address any additional issues that arise.

1  MICHAEL J. BAKER (No. 56492)
   WILLIAM J. LAFFERTY (No. 120814)
2  LONG X. DO (No. 211439)
   HOWARD RICE NEMEROVSKI CANADY
3      FALK & RABKIN
   A Professional Corporation
4  Three Embarcadero Center, 7th Floor
   San Francisco, California  94111-4024
5  Telephone:   415/434-1600
   Facsimile:   415/217-5910
6
   Attorneys for Plaintiffs
7  ATR-KIM ENG FINANCIAL CORPORATION
   and ATR-KIM ENG CAPITAL PARTNERS,
8  INC.

9              UNITED STATES BANKRUPTCY COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13  In re                          | No. 07-30309

14  HUGO N. BONILLA,               | Chapter 7 Case

15           Debtor.               | Adv. Proc. No. 07-03079

16  ─────────────────────────────
    ATR-KIM ENG FINANCIAL          | Date:     December 14, 2007
17  CORPORATION and ATR-KIM ENG    | Time:     9:30 a.m.
    CAPITAL PARTNERS, INC.,        | Place:    235 Pine Street
18                                 |           Courtroom 23
              Plaintiffs,          |           San Francisco, California
19                                 | Judge:    Hon. Thomas E. Carlson
        v.
20
    HUGO NERY BONILLA,
21
              Defendant.
22  ─────────────────────────────

23     **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY
        JUDGMENT ON THE FOURTH CLAIM FOR RELIEF;**
       **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**
24
       **[REQUEST FOR JUDICIAL NOTICE and DECLARATION OF LONG X. DO
25                  SUBMITTED CONCURRENTLY]**

26

27

28

(margin text) HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN

EXHIBIT ___I___

# TABLE OF CONTENTS

| | Page |
|---|---|
| NOTICE OF MOTION AND MOTION | 1 |
| MEMORANDUM OF POINTS AND AUTHORITIES | 2 |
| INTRODUCTION | 2 |
| FACTUAL BACKGROUND | 3 |
| A. PROCEDURAL HISTORY. | 3 |
| 1. The Delaware Action. | 3 |
| 2. The Instant Bankruptcy Proceedings. | 4 |
| B. THE INJURY TO ATR AS A MINORITY SHAREHOLDER OF THE DELAWARE HOLDING COMPANY. | 6 |
| 1. Araneta and Bonilla. | 6 |
| 2. Araneta and ATR's Joint Venture in the Pre-Need Insurance Business. | 6 |
| 3. Formation of the Delaware Holding Company. | 7 |
| 4. Looting of the Delaware Holding Company. | 7 |
| 5. Bonilla's Breach of Fiduciary Duty to ATR. | 9 |
| ARGUMENT | 11 |
| I. THE FINDINGS OF THE DELAWARE CHANCERY COURT DEMONSTRATE THAT BONILLA'S JUDGMENT DEBT TO ATR AROSE FROM "DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY," AND IS NONDISCHARGEABLE. | 11 |
| A. Bonilla was Acting in a Fiduciary Capacity within the Meaning of Section 523(a)(4). | 11 |
| B. Bonilla Committed Defalcation While Acting as a Fiduciary to ATR. | 14 |
| II. THE FINDINGS OF THE DELAWARE CHANCERY COURT ARE ENTITLED TO PRECLUSIVE EFFECT IN THIS ADVERSARY PROCEEDING. | 15 |
| CONCLUSION | 18 |

1

## TABLE OF AUTHORITIES

2

Page(s)

3

### Cases

4

*Bodell v. Gen. Gas & Elec. Corp.*, 132 A. 442 (Del. Ch. 1926)     12

5

*Bugna v. McArthur (In re Bugna)*, 33 F.3d 1054 (9th Cir. 1994)     11, 16, 17

6

*Carrasco v. Carrasco*, 422 P.2d 411 (Ariz. App. 1967)     13

7

*Desantis v. Dixon*, 236 P.2d 38 (Ariz. 1951)     13

8

*Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)     16

9

*Garrett v. City and County of San Francisco*, 818 F.2d 1515 (9th Cir. 1987)     17

10

*Gayden v. Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798 (9th Cir. 1995)     15

11

*Grogan v. Garner*, 498 U.S. 279 (1991)     16

12

*Hynson v. Drummond Coal Co., Inc.*, 601 A.2d 570 (Del. Ch. 1991)     12

13

*In re Briles*, 228 B.R. 462 (Bankr. S.D. Cal. 1998)     15

14

*In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996)     14

15

*In re Chapman*, 125 B.R. 284 (Bankr. S.D. Cal. 1991)     11

16

*In re Moore*, 186 B.R. 962 (Bankr. N.D. Cal. 1995)     16

17

*In re Short*, 818 F.2d 693 (9th Cir. 1986)     11

18

*In re Zachary Shultz*, 205 B.R. 952 (Bankr. M.D. Fla. 1997)     18

19

*Jerman v. O'Leary*, 701 P.2d 1205 (Ariz. 1985)     13

20

*Keenan v. Eshleman*, 2 A.2d 904 (Del. Ch. 1938)     12

21

*Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir. 1996)     12, 13

22

*M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513 (Del. S. Ct. 1999)     16

23

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985)     16

24

*Miramar Res., Inc. v. Shultz (In re Shultz)*, 208 B.R. 723 (Bankr. M.D. Fla. 1997)     12

25

*Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923)     16

26

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006)     14

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

*West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636
    (Del. Ch. 2006)    16

## Statutes

11 U.S.C. §523(a)(4)    passim

28 U.S.C. §1738    3, 15, 16

Fed. R. Bankr. P. Rule 7056    1

Fed. R. Civ. P. Rule 56    1

BLR
    1001-2    2
    7007-1    1
    7007-1(b)    1
    9013    1
    9013-1(c)    1
    9013-3    1

Civ. LR 56-2    1

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on December 14, 2007, at 9:30 a.m., in Courtroom 23 of the Honorable Thomas E. Carlson, United States Bankruptcy Judge, located at 235 Pine Street, San Francisco, California, Plaintiffs ATR-Kim Eng Financial Corporation and ATR-Kim Eng Capital Partners, Inc. (collectively "Plaintiffs" or "ATR"), will and hereby do move for summary judgment against Defendant Hugo Nery Bonilla, the debtor in the above-captioned Chapter 7 case ("Debtor," "Defendant" or "Bonilla"), with respect to the Fourth Claim for Relief set forth in Plaintiff's Complaint, to declare a $24,490,422.50 judgment debt, plus post-judgment interest of $490,647.16, of the Debtor nondischargeable pursuant to 11 U.S.C. §523(a)(4). The Motion is brought pursuant to Federal Rules of Civil Procedure, Rule 56, applicable herein pursuant to Federal Rules of Bankruptcy Procedure, Rule 7056.

The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice (the "RJN") and the Declaration of Long X. Do submitted concurrently herewith, the record in this case to the extent properly considered in connection with this Motion, the arguments of counsel at the hearing on the Motion, and any other matters properly brought before the Court.

**PLEASE TAKE FURTHER NOTICE** that Bankruptcy Local Rules ("BLR") 7007-1 and 9013 prescribe the procedures to be followed and that:

(1)    any opposition to the Motion must be filed with the Court and served by first class mail on appropriate parties (including counsel for Plaintiffs at the address set forth above) at least fourteen (14) days prior to the scheduled hearing on the Motion (BLR 7007-1(b) and 9013-3);

(2)    unless the Court expressly orders otherwise, response papers shall not exceed twenty five (25) pages of text and, if exceeding ten (10) pages of text, shall also include a table of contents and a table of authorities (BLR 9013-1(c)); and

(3)    unless required by the assigned Judge, no separate statement of undisputed facts or joint statement of undisputed facts shall be submitted (Civil Local Rule 56-2, made

1  applicable by BLR 1001-2).

2                    **MEMORANDUM OF POINTS AND AUTHORITIES**

3                                    **INTRODUCTION**

4         The relief sought in this Motion by Plaintiffs ATR-Kim Eng Financial Corporation and

5  ATR-Kim Eng Capital Partners, Inc. (collectively, "ATR" or "Plaintiffs") flows naturally

6  from the Court's holdings in its "Memorandum re Defendant's Rule 12(b)(6) Motion," filed

7  on October 16, 2007 (the "12(b)(6) Ruling"), that Hugo Nery Bonilla, the debtor in the

8  above-captioned Chapter 7 case ("Debtor," "Defendant" or "Bonilla"), committed defalca-

9  tion while acting in a fiduciary capacity.  In the 12(b)(6) Ruling, the Court denied the

10  Debtor's motion to dismiss the Fourth Claim for Relief in ATR's Complaint, which asserts

11  that a judgment debt Bonilla owes to ATR is nondischargeable under Chapter 5 of the

12  United States Bankruptcy Code, because it arises from "defalcation while acting in a

13  fiduciary capacity."  11 U.S.C. §523(a)(4).

14         Bonilla's judgment debt arises from his role as a director of a Delaware corporation

15  called PMHI Holdings Corp. (the "Delaware Holding Company") in which ATR was a 10

16  percent minority shareholder.  In the Delaware Chancery Court, ATR sued Bonilla and the

17  two other directors of the Delaware Holding Company—Carlos R. Araneta ("Araneta") and

18  Liza Berenguer ("Berenguer")—for breaches of fiduciary duty arising from Araneta's

19  wrongful liquidation of the Delaware Holding Company's most valuable assets to the detri-

20  ment of Plaintiffs.  After a trial, the Delaware Chancery Court found that Araneta's actions

21  amounted to self-dealing and a breach of his duty of loyalty to ATR, as a minority share-

22  holder of the Delaware Holding Company.  Bonilla and Berenguer, according to the Dela-

23  ware Chancery Court, also breached their fiduciary duty to ATR by failing to monitor

24  Araneta's misconduct, protect ATR's interests, or stop Araneta from liquidating the Dela-

25  ware Holding Company's assets without informing or compensating Plaintiffs.  The Dela-

26  ware Chancery Court concluded that Bonilla, Araneta and Berenguer were jointly and

27  severally liable to ATR for damages in the amount of approximately $24.5 million, plus

28  post-judgment interest.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

In the 12(b)(6) Ruling this Court held as a matter of law that the findings of the Delaware Chancery Court amounted to defalcation by Bonilla as a fiduciary within the meaning of section 523(a)(4). In so holding, the Court treated the Delaware Chancery Court's findings as allegations accepted to be true, as the Court must for purposes of a Rule 12(b)(6) motion. By this Motion, ATR requests that the Court accept these findings as true and indisputable under the doctrine of collateral estoppel and the provisions of 28 U.S.C. §1738, which require that a federal court give "full faith and credit" (28 U.S.C. §1738) to state court judgments. The Delaware Chancery Court's findings that Bonilla breached his fiduciary duty to ATR cannot be relitigated in this adversary proceeding because the issue was fully litigated in Delaware, forms the basis of ATR's Fourth Claim for Relief, was essential to the Delaware Chancery Court's judgment and was made final when the Delaware Supreme Court affirmed the judgment of the Delaware Chancery Court. The Court accordingly should grant ATR's Motion and enter summary judgment on the Fourth Claim for Relief in ATR's favor, finding Bonilla's judgment debt to ATR to be nondischargeable under section 523(a)(4).

## FACTUAL BACKGROUND

### A.  PROCEDURAL HISTORY.

#### 1.  The Delaware Action.

On June 3, 2004, ATR commenced an action in the Delaware Chancery Court against Bonilla, Araneta and Berenguer—the directors of the Delaware Holding Company—entitled *ATR-Kim Eng Financial Corp., et al. v. Carlos R. Araneta, Hugo Bonilla, et al.*, C.A. No. 489-N (Del. Ch. 2006) ("Delaware action"). RJN Ex. 1 at *7. ATR asserted claims for damages against the directors of the Delaware Holding Company for breaches of their fiduciary duty to ATR, which was a 10 percent minority shareholder in the company.

After a trial of the Delaware action, on December 11, 2006, the Delaware Chancery Court issued a 54-page Memorandum Opinion articulating its findings of facts and conclusions of law. *See* RJN Ex. 1. As further detailed below, the Delaware Chancery Court found that Araneta "breached his duty of loyalty by impoverishing the Delaware Holding

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    Company for his own personal enrichment." *Id.* at *1. Bonilla and Berenguer were found

2    also to have breached their fiduciary duties to ATR because of their complicity in Araneta's

3    misfeasance: "Having assumed the important fiduciary duties that come with a directorship

4    in a Delaware corporation, Bonilla and Berenguer acted as—no other word captures it so

5    accurately—stooges for Araneta, seeking to please him and only him, and having no regard

6    for their obligations to act loyally towards the corporation and all of its stockholders." *Id.*

7    The Order of Final Judgment in the Delaware action ("Final Judgment") was entered on

8    January 10, 2007. RJN Ex. 2. In the Final Judgment, the Delaware Chancery Court held

9    Bonilla, Araneta and Berenguer jointly and severally liable for damages to ATR in the

10   amount of $24,490,422.50, plus post-judgment interest accruing at a rate of 11.25 percent

11   per annum. RJN Ex. 2 at 1. The Final Judgment is now final for all purposes.[1]

**2.    The Instant Bankruptcy Proceedings.**

13       On January 29, 2007, ATR entered the Final Judgment of the Delaware Chancery

14   Court in California in Alameda County Superior Court, as a sister-state judgment. *See* RJN

15   Ex. 4. On March 16, 2007, Bonilla filed a voluntary petition (the "Petition") in this Court

16   under Chapter 7 of the United States Bankruptcy Code. The amount of post-judgment inter-

17   est accruing from the date of the Delaware Chancery Court's Final Judgment to the date

18   Bonilla filed his Petition is $490,647.16. Declaration of Long X. Do ¶2.

19       ATR timely filed the instant adversary Complaint on July 23, 2007 (Docket No. 1).

20   ATR seeks a declaration that Defendant is not entitled to a discharge because he:

21   (1) engaged in fraudulent transfers of real property within one year of the filing of the bank-

22   ruptcy petition pursuant to Section 727(a)(2)(A) (*see* Compl. ¶¶63-65 (First Claim for

23   Relief)); (2) failed to maintain books, documents, records and papers from which his

24   financial condition or business transactions might be ascertained pursuant to Section

25

26       [1]The Delaware Supreme Court affirmed the Final Judgment in a two-page summary
decision entered on June 14, 2007. *See* RJN Ex. 3. Specifically, the Delaware Supreme
27   Court held that "the final judgment of the Court of Chancery should be affirmed on the basis
of and for the reasons assigned by the Court of Chancery in its [Memorandum Opinion]
28   decision dated December 21, 2006." *Id.* at 1-2.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   727(a)(3) (*see* ¶¶66-68 (Second Claim for Relief)); and (3) failed to explain satisfactorily the

2   loss or deficiency of assets pursuant to Section 727(a)(5) (*see* Compl. ¶¶69-71 (Third Claim

3   for Relief)).  Additionally, in the Fourth Claim for Relief, the subject of this Motion, ATR

4   seeks a determination that Defendant's judgment debt arising from the Delaware action is

5   nondischargeable because it arises from "fraud or defalcation while acting in a fiduciary

6   capacity," under section 523(a)(4).  Compl. ¶76.  In its Complaint, ATR alleges:

7        73.  In his capacity as Director of a Delaware corporation, Bonilla owed
         fiduciary duties to ATR, the Delaware Holding Company's minority shareholder,
8        that predated the debt in this case.  Those pre-existing fiduciary duties imposed
         upon Bonilla the responsibility for safeguarding the value of the assets of the
9        Delaware Holding Company and, thereby, preserving the value of ATR's interest
         as a minority shareholder in the Delaware Holding Company.
10
         74.  Further, as a director of a Delaware corporation, Bonilla stood in the
11       position of a trustee for the shareholders of the Delaware Holding Company,
         including ATR.  That trust relationship predated the debt owed by Bonilla to
12       ATR and existed without reference to that debt.

13       75.  Bonilla's failure—as found by the Delaware Chancery Court—to
         monitor Araneta's actions, to prevent him from removing assets from the Dela-
14       ware Holding Company to his family members without consideration, or to take
         any steps to protect ATR's interest as a minority shareholder, facilitated and
15       enabled Araneta's wrongful transfer of assets from the Delaware Holding Com-
         pany, resulting in the misappropriation of funds held in a fiduciary capacity.
16       Further, by failing to respond to ATR's discovery requests in the Delaware
         action, Bonilla failed properly to account for the investment ATR made in the
17       Delaware Holding Company.

18       76.  As a result of these actions, Bonilla's Judgment Debt to ATR arises
         from "fraud or defalcation while acting in a fiduciary capacity," within the
19       meaning of 11 U.S.C. Section 523(a)(4) and therefore should be excepted from
         discharge. (Compl. ¶¶73-76)
20

21      On August 31, 2007, Bonilla filed a motion to dismiss ATR's Fourth Claim for Relief

22   pursuant to Rule 12(b)(6).  *See* Docket No. 8.  After briefing and a hearing on September 28,

23   2007, the Court issued its 12(b)(6) Ruling and accompanying Order Denying Bonilla's

24   12(b)(6) Motion.  *See* Docket Nos. 15 & 16, respectively.  The Court held, as a matter of

25   law, that the facts alleged in ATR's Fourth Claim for Relief "represent the type of failure to

26   account for trust property that has traditionally been the hallmark of defalcation," and that

27   Bonilla's misconduct as a director of the Delaware Holding Company was committed as a

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   fiduciary of ATR within the meaning of section 523(a)(4).  12(b)(6) Ruling at 5, 6.[2]

2   **B.    THE INJURY TO ATR AS A MINORITY SHAREHOLDER OF THE DELAWARE HOLDING COMPANY.**

4   The findings of the Delaware Chancery Court are summarized as follows.[3]

5   **1.    Araneta and Bonilla.**

6   Carlos Araneta is a wealthy Filipino businessman who operates an international family

7   of courier and remittance companies bearing the initials "LBC."  RJN Ex. 1 at *3-*4.

8   Araneta "dominate[s] and control[s] LBC and is the ultimate manager for the thousands of

9   employees working for LBC and the hundreds of locations owned by LBC around the

10  globe." *Id.* at *3.  Defendant Bonilla is the President of LBC Holdings USA Corporation

11  and various related LBC companies located and operating in the United States. *Id.* at *3 n.2

12  and *4.

13  **2.    Araneta and ATR's Joint Venture in the Pre-Need Insurance Business.**

14  Beginning in 1999, Araneta entered into a series of business arrangements with ATR

15  designed to create a joint enterprise to purchase a controlling interest in a corporation (the

16  "Pre-Need Company") that sold "pre-need" insurance policies designed to cover expenses

17  (such as health and educational costs) that buyers of such policies expected to face in the

18  future. *Id.* at *3.  The parties saw "potential synergies in this industry between ATR's finan-

19  cial acumen and LBC's logistical network, which was well-positioned to attract Filipino

20  customers who had traditionally purchased these policies." *Id.*  ATR and Araneta executed

21  two contracts—an "Undertaking Agreement" and a "Joint Venture Agreement"—that set out

22  the terms of their joint venture relationship and, among other things, laid the groundwork for

23  incorporation of the Delaware Holding Company. *Id.*  Pursuant to their agreements, ATR

24  and Araneta acquired equal shares that together totaled 80 percent of stock of the Pre-Need

26  [2]For the Court's convenience, a copy of the 12(b)(6) Ruling is attached as Exhibit A to the Declaration of Long X. Do.

27  [3]Section B of the Factual Background is based entirely on the findings of the Delaware Chancery Court in its December 21, 2006, Memorandum Opinion.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  Company. *Id.* Further part to their agreements, ATR advanced approximately $3.922 mil-

2  lion to Araneta to cover his share of the purchase price of the Pre-Need Company. *Id.*

3          3.    **Formation of the Delaware Holding Company.**

4       In return for the advance from ATR, Araneta pledged, in the Undertaking Agreement,

5  to contribute his LBC companies and his newly acquired interest in the Pre-Need Company

6  to the Delaware Holding Company and to issue ATR a 10 percent minority interest in the

7  Delaware Holding Company. *Id.* After incorporation of the Delaware Holding Company in

8  January 2000, Araneta presented ATR with 3,000 of its shares while personally retaining

9  control over the residual 27,000 shares. *Id.* at *4. The Delaware Holding Company's chief

10  assets consisted of the LBC companies that Araneta had contributed, which had a stated

11  value of $35 million. *Id.* at *1. Araneta appointed and dominated the Delaware Holding

12  Company's board of directors, which consisted of himself, Bonilla and Berenguer (Araneta's

13  niece and the chief financial officer of a number of his LBC companies). *Id.* at *4.

14          4.    **Looting of the Delaware Holding Company.**

15       In November 2002, ATR decided to withdraw from the insurance venture with

16  Araneta. *Id.* at *5. Although this decision was permissible under the terms of the parties'

17  agreements, Araneta felt aggrieved by it. *Id.* Araneta's hostility towards ATR affected his

18  management of the Delaware Holding Company adversely to ATR. *Id.* He withheld infor-

19  mation from ATR about the Delaware Holding Company, effectively closed the lines of

20  communication with ATR and stripped the Delaware Holding Company of its only "valuable

21  assets" (*id.* at *4) by transferring the LBC companies out of the Delaware Holding Company

22  to members of Araneta's family without informing ATR or permitting ATR to share *pro rata*

23  in the proceeds. At page *6 of its Memorandum Opinion, the Delaware Chancery Court

24  detailed Araneta's actions as follows:

25         In the months that followed [ATR's decision to withdraw from the insurance
       venture], ATR repeatedly requested information on the condition of the Delaware

26         Holding Company in which it still had nearly $4 million invested. But Araneta
       summarily rebuffed those requests. Araneta testified that any request ATR made

27         for information during the entire 2003 calendar year went ignored because he was
       "no longer talking to them because [he was] upset with Mr. Arnaiz [the head of

28         ATR]." Throughout the first half of that year, lawyers in the Philippines

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

exchanged letters regarding the "ongoing fight" between Araneta and Amaiz, but were unable to resolve the matter.

Fed up, ATR, through its attorneys, sent a formal books and records demand letter to Araneta on July 18, 2003. In that letter, ATR exercised its right as a stockholder of a Delaware corporation to request financial statements of the Delaware Holding Company as well as documents showing the Delaware Holding Company's ownership of the [LBC companies] and Araneta's interest in the Pre-Need Company. In hopes of a response, ATR sent additional demand letters to the Delaware Holding Company's corporate secretary at its registered address and to Araneta's attorney in the Philippines on the same day as it sent its letter to Araneta. These additional demand letters sought to review the Delaware Holding Company's stock ledger, the records of all business transactions of the corporation, and the minutes of every meeting of the stockholders and directors of the Delaware Holding Company since its incorporation.

[FN. 22] ATR copied Araneta's son, his lawyer, and the head of LBC's U.S. operations, defendant Bonilla, on this demand.

Each of ATR's demand letters warned that ATR would file suit to protect its interests if its demands were denied. Yet, even knowing legal action was imminent, Araneta testified that he was "so angry with Mr. Amaiz" that he "ignored these letters" and prevented ATR from gaining the information it sought. Starved for information, ATR filed an action under *8 Del. C.* § 220 in this court on October 27, 2003. But still irked by ATR's decision to sell its interest in [the pre-need insurance company], Araneta "deliberately ignored" that lawsuit and instructed Bonilla not to provide the requested information.

[FN. 28] Specifically, when discussing the § 220 litigation with Bonilla, Araneta told him, "Don't mind it."

Only after being ordered by this court to turn over the records requested by ATR did Araneta do so. On January 14, 2004, Araneta produced a "Compliance" that purported to include all available documents but totaled only nine pages and failed to include many essential corporate papers. The nine pages that Araneta did produce, however, included three documents that caused ATR great concern. Those documents–two balance sheets and a purported resolution of the board of directors–led ATR to believe that Araneta had conducted a de facto (and non-pro rata) liquidation of the Delaware Holding Company's assets and that Araneta was attempting to escape responsibility for that act . . . . These financial statements indicated that during the last nine months of 2003 Araneta stripped the Delaware Holding Company of the LBC [companies].

*Id.* at *6.

Araneta offered numerous excuses and purported justifications for his liquidation of the Delaware Holding Company at the trial in Delaware. Based on the evidence presented at trial, the Delaware Chancery Court rejected each of Araneta's defenses (see *id.* at *7-*14), variously characterizing them as "implausible excuses" (*id.* at *7), "brazen and abundant falsehoods" (*id.*), "appalling" (*id.*), "self-serving and untruthful" (*id.* at *13) and "ridiculous"

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

(*id.* at \*16). Finding the evidence of Araneta's misfeasance "clear, and Araneta's attempts to distort that reality only make his conduct less tolerable," the Delaware Chancery Court concluded that Araneta, as a director of the Delaware Holding Company, breached his fiduciary duty—specifically, his duty of loyalty—to ATR. The Delaware Chancery Court found that "Araneta used his majority control and effective dominion over the Delaware Holding Company and its board of directors to engage in a course of unfair dealing that resulted in a de facto liquidation of corporate assets that enriched the Araneta family at the expense of the Delaware Holding Company and ATR." *Id.* at \*17.

### 5. Bonilla's Breach of Fiduciary Duty to ATR.

Although Araneta was found to be chiefly responsible for the harm to ATR arising from the liquidation of the Delaware Holding Company, the Delaware Chancery Court devoted substantial attention to the role played by Bonilla and his liability to ATR for breach of his own fiduciary duty as a director of the Delaware Holding Company (as well as that of his co director, Berenguer).

Bonilla was a director of the Delaware Holding Company at all relevant times. *See id.* at \*9. The Delaware Chancery Court found that Bonilla breached his fiduciary duty—specifically, his duty of loyalty—to ATR by consciously failing to monitor Araneta's misconduct, to protect ATR's interests, or to stop Araneta from liquidating the Delaware Holding Company's assets. Following are the Delaware Chancery Court's findings supporting these conclusions, from pages \*19-\*22 of its Memorandum Opinion.

> Under Delaware law, it is fundamental that a director cannot act loyally towards the corporation unless she tries-*i.e.*, makes a genuine, good faith effort-to do her job as a director. [Citation.] One cannot accept the important role of director in a Delaware corporation and thereafter consciously avoid any attempt to carry out one's duties.

> One of the most important duties of a corporate director is to monitor the potential that others within the organization will violate their duties. Thus, "a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board considers to be adequate, exists." [Citation.] Obviously, such a reporting system will not remove the possibility of illegal or improper acts, but it is the directors' charge to "exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary questions, so that

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  it may satisfy its responsibility." [Citation.] Thus, as the [Delaware] Supreme
2  Court recently stated:

3  > *Caremark* articulates the necessary conditions predicate for director
>  oversight liability: (a) the directors utterly failed to implement any
4  > reporting or information system or controls; or (b) having imple-
>  mented such a system or controls, consciously failed to monitor or
5  > oversee its operations thus disabling themselves from being informed
>  of risks or problems requiring their attention. In either case, imposi-
6  > tion of liability requires a showing that the directors knew that they
>  were not discharging their fiduciary obligations. Where directors fail
7  > to act in the face of a known duty to act, thereby demonstrating a con-
>  scious disregard for their responsibilities, they breach their duty of
>  loyalty by failing to discharge that fiduciary obligation in good faith.
8  > [Citation.]

9  From the testimony of the directors of the Delaware Holding Company, it is
   apparent that no reporting system was in place and that no other information sys-
10 tems or controls were ever considered, let alone implemented, by the Delaware
   Holding Company's board of directors. They did not even have regular board
11 meetings. As a result, the directors were often unaware of corporate activities-
   despite how easy that would have been given the Delaware Holding Company's
12 modest size . . . . Bonilla confirmed this fact, explaining that when the Delaware
   Holding Company's name was changed from LBC Global, Corp. to PMHI
13 Holdings, Corp., he was never informed about the change, never voted to approve
   it, and did not even know what the initials PMHI in the new corporate name stood
14 for at the time he signed the certificate of amendment as the corporation's
   authorized agent. [Citation.] Even when corporate activities involved them
15 directly—as in the case of their supposed resignations from the board of
   directors—neither Berenguer nor Bonilla questioned the wisdom of Araneta's
16 actions nor insisted that corporate procedures be followed. [Citation.]

17 Moreover, both Berenguer and Bonilla testified that they entirely deferred to
   Araneta in matters relating to the Delaware Holding Company . . . . Bonilla, the
18 head of Araneta's U.S. operations . . . explain[ed] that to him Araneta and the
   Delaware Holding Company were basically one and the same and that he took the
19 word of Araneta as being the word of the company. [Citation.] Moreover, when
   pressed regarding whether he would undertake an independent inquiry if told to
20 act by Araneta, Bonilla responded, "Why should I ask him all these questions?
   He's telling me they have already agreed . . . . It's not like I'm going to go out
21 there and check on him, doesn't make sense." [Citation.]

22 Based on these failures, neither Berenguer nor Bonilla can be said to have upheld
   their fiduciary obligations. Although it was Araneta who ran amok by emptying
23 the Delaware Holding Company of its major assets, the other directors [Bonilla
   and Berenguer] did nothing to make themselves aware of this blatant misconduct
24 or to stop it.

25 Put in plain terms, it is no safe harbor to claim that one was a paid stooge for a
   controlling stockholder. Berenguer and Bonilla voluntarily assumed the fiduciary
26 roles of directors of the Delaware Holding Company. For them to say that they
   never bothered to check whether the Delaware Holding Company retained its
27 primary assets and never took any steps to recover the LBC Operating Companies
   once they realized that those assets were gone is not a defense. To the contrary, it
28 is a confession that they consciously abandoned any attempt to perform their

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   duties independently and impartially, as they were required to do by law. Their
2   behavior was not the product of a lapse in attention or judgment; it was the pro-
    duct of a willingness to serve the needs of their employer, Araneta, even when
3   that meant intentionally abandoning the important obligations they had taken on
    to the Delaware Holding Company and its minority stockholder, ATR.

4   When required by their office to be loyal to the Delaware Holding Company,
5   Bonilla and Berenguer chose total fealty to Araneta's conflicting interests instead.
    Consequently, I find them jointly liable for Araneta's fiduciary obligations.

6   RJN Ex. 1 at *19-*21.

7   All of the defendants [Araneta, Bonilla and Berenguer] will be jointly and sever-
8   ally liable for the amount of the judgment.

9   *Id.* at *22.

10      The Delaware Chancery Court's Final Judgment holds, "[h]aving been found jointly

11  and severally liable for their breaches of fiduciary duty, judgment is entered against defen-

12  dants Carlos R. Araneta, Hugo Bonilla and Liza Berenguer in the amount of

13  **$24,490,422.50**." RJN Ex. 2 at 1.

14                          ARGUMENT

15  I.   **THE FINDINGS OF THE DELAWARE CHANCERY COURT
         DEMONSTRATE THAT BONILLA'S JUDGMENT DEBT TO ATR AROSE**
16       **FROM "DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY,"
         AND IS NONDISCHARGEABLE.**
17

18      A judgment debt that arises from "defalcation while acting in a fiduciary capacity" is

19  nondischargeable under 11 U.S.C. §523(a)(4). "To prevail in a § 523(a)(4) action, the credi-

20  tor must establish that (1) a fiduciary relationship existed and (2) a defalcation occurred." *In*

21  *re Chapman*, 125 B.R. 284, 287 (Bankr. S.D. Cal. 1991) (citing *In re Short*, 818 F.2d 693

22  (9th Cir. 1986)); *see also Bugna v. McArthur (In re Bugna)*, 33 F.3d 1054, 1057 (9th Cir.

23  1994). As this Court determined in denying Bonilla's motion to dismiss the Fourth Claim

24  for Relief, the Delaware Chancery Court's findings detailing Bonilla's breach of his fiduci-

25  ary duty to ATR meet these two requirements.

26      A.   **Bonilla was Acting in a Fiduciary Capacity within the Meaning of Section
             523(a)(4).**
27

28      The Court's 12(b)(6) Ruling establishes as a matter of law that the director-shareholder

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   relationship between Bonilla (as a director of the Delaware Holding Company) and ATR (as

2   a minority shareholder of the Delaware Holding Company) constitutes a fiduciary relation-

3   ship within the meaning of section 523(a)(4). Whether a debtor is a fiduciary under section

4   523(a)(4) is a question of federal law. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th

5   Cir. 1996). "The broad, general definition of 'fiduciary' is inapplicable in the dischargeabil-

6   ity context." *Id.* Instead, as this Court noted in the 12(b)(6) Ruling, to be held to be a fidu-

7   ciary under section 523(a)(4), the "debtor must have been subject to the duties of a trustee

8   before, and without reference to, the wrongdoing that gave rise to the debt," "the duties

9   imposed on the debtor must be those imposed on the trustee of an express or technical trust,"

10  and "there must be an identifiable trust *res*, identifiable beneficiaries, and the debtor must be

11  subject to the duties of loyalty, good faith, and honesty in caring for the trust *res*." 12(b)(6)

12  Ruling at 2 (citing *In re Lewis*, 97 F.3d at 1185-86 and n.1; *Miramar Res., Inc. v. Shultz (In*

13  *re Shultz)*, 208 B.R. 723, 728 (Bankr. M.D. Fla. 1997)). In determining whether a debtor

14  was subject to these types of duties, a court looks to applicable state law. *See* 12(b)(6)

15  Ruling at 2 ("Whether a debtor is subject to the duties just described is primarily a matter of

16  state law") (citing *In re Lewis*, 97 F.3d at 1185)).

17      The Court looked to Delaware law to determine whether Bonilla, as a director of a

18  Delaware corporation, was subject to the types of duties described above that would make

19  him a fiduciary under section 523(a)(4). As the Court stated, "[n]umerous Delaware

20  decisions refer to directors as trustees, and impose on directors the highest duties of loyalty,

21  honesty, and fair dealing in all matters concerning the management of corporate assets," and

22  "impose this fiduciary duty prior to, and without reference to, any misconduct by the

23  director." *Id.* at 3 (citing *Hynson v. Drummond Coal Co., Inc.*, 601 A.2d 570 (Del. Ch.

24  1991); *Keenan v. Eshleman*, 2 A.2d 904, 908 (Del. Ch. 1938); *Bodell v. Gen. Gas & Elec.*

25  *Corp.*, 132 A. 442, 447 (Del. Ch. 1926)). The Court thus concluded, "Delaware case law

26  clearly identifies the fiduciary duties of a corporate director, the trust *res* (all corporate

27  assets), and the beneficiaries of the trust (the corporation and its shareholders)." *Id.*

28      Recognizing that the Ninth Circuit mentions "the fiduciary relationship must be one

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    arising from an express or technical trust" (*In re Lewis*, 97 F.3d at 1185), this Court under-

2    took a closer examination whether "this mean[s] that in addition to preexisting the wrong,

3    the fiduciary duty must be identical to that of a trustee in every technical respect." *Id*. at 4.

4    Holding that section 523(a)(4) does not require such a strictly technical construction, the

5    Court "conclude[d] that the fiduciary duty [under section 523(a)(4)] must preexist the trust,

6    and must be *substantially similar* to the role of a trustee, in that there must be a trust *res*,

7    identifiable beneficiaries, and clear notice of the duties of loyalty, honesty, and fair dealing

8    toward the beneficiaries in all matters affecting the trust *res*." *Id*. at 4 (emphasis in original).

9    The Court noted that the decision in *In re Lewis*, from which the "express or technical trust"

10   language comes, held partners to be fiduciaries under section 523(a)(4) upon the basis of

11   state-court decisions that imposed on partners the duties of loyalty, honesty, and fair dealing.

12   *Id*. (citing *In re Lewis*, 97 F.3d at 1186). The Court further observed that "[o]ne of the deci-

13   sions *In re Lewis* relied upon described the duties of a partner as merely 'similar to a trus-

14   tee's,' and the other decisions cited failed to use the term trustee at all in describing the

15   duties of a partner." *Id*. at 5 (citing *Desantis v. Dixon*, 236 P.2d 38, 41 (Ariz. 1951); *Jerman*

16   *v. O'Leary*, 701 P.2d 1205, 1210 (Ariz. 1985); *Carrasco v. Carrasco*, 422 P.2d 411, 413

17   (Ariz. App. 1967)). Finally, the Court highlighted that the Ninth Circuit in *In re Lewis* noted

18   with approval language in Collier stating that the duties of the fiduciary need only be "sub-

19   stantially similar" to those imposed on trustees. *Id*. (quoting *In re Lewis*, 97 F.3d at 1186

20   n.1).

21        Reiterating its finding that "the director of a corporation organized under Delaware law

22   is subject to duties substantially similar to those imposed on the trustee of an express or

23   technical trust, and those duties arise before and without reference to any wrongdoing," the

24   Court held as a matter of law that "[t]he director of a Delaware corporation is therefore a

25   fiduciary within the meaning of section 523(a)(4)." *Id*. In other words, Bonilla was acting

26   as a fiduciary within the meaning of section 523(a)(4) when he breached his fiduciary duty

27   to ATR, as determined by the Delaware Chancery Court.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

**B.    Bonilla Committed Defalcation While Acting as a Fiduciary to ATR.**

The Court's 12(b)(6) Ruling also establishes as a matter of law that, in breaching his fiduciary duty to ATR as determined by the Delaware Chancery Court, Bonilla committed defalcation within the meaning of section 523(a)(4). As the Court recognized in its 12(b)(6) Ruling, Delaware law imposes on corporate directors such as Bonilla "the highest duties of loyalty, honesty, and fair dealing in all matters concerning the management of corporate assets." 12(b)(6) Ruling at 3. To be sure, as the Delaware Chancery Court stated, "[o]ne of the most important duties of a corporate director is to monitor the potential that others within the organization will violate their duties. Thus, 'a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board considers is adequate, exists.'" RJN Ex. 1 at *19 (quoting *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996)). "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

By way of summary, therefore, the Delaware Chancery Court found Bonilla breached his fiduciary duty to ATR by:

(1)    "allow[ing] Araneta to do whatever he wanted, without any examination of whether his conduct benefited the Delaware Holding Company and all of its stockholders, rather than simply Araneta personally" (RJN Ex. 1 at *1);

(2)    treating "Araneta and the Delaware Holding Company [as] basically one and the same and [taking] the word of Araneta as being the word of the company" (*id.* at *20);

(3)    never "question[ing] the wisdom of Araneta's actions nor insist[ing] that corporate procedures be followed" (*id.*);

(4)    "consciously abandon[ing] any attempt to perform [his] duties independently and impartially, as [he was] required to do by law" (*id.* at *21);

(5)    evincing a "willingness to serve the needs of [his] employer, Araneta, even when

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    that meant intentionally abandoning the important obligations they had taken on

2    to the Delaware Holding Company and its minority stockholder, ATR" (*id.*);

3    (6)    "never [taking] any steps to recover the LBC Operating Companies once [he]

4    realized that those assets were gone" (*id.*); and

5    (7)    "act[ing] as—no other word captures it so accurately—[a] stooge[] for Araneta,

6    seeking to please him and only him, and having no regard for [his] obligations to

7    act loyally towards the corporation and all of its stockholders" (*id.* at *1).

8    Bonilla's breach of his fiduciary duty to ATR amounts to defalcation within the

9    meaning of section 523(a)(4), which "is broadly defined to include any behavior by a fiduci-

10    ary, including innocent, negligent, and intentional defaults of fiduciary duty resulting in fail-

11    ure to provide a complete accounting." *In re Briles*, 228 B.R. 462, 467 (Bankr. S.D. Cal.

12    1998). This Court so held in its 12(b)(6) Ruling, finding as a matter of law that Bonilla's

13    misconduct, as determined by the Delaware Chancery Court, "constitute a complete failure

14    to take any action to preserve the assets of the corporation . . . [and] represent the type of

15    failure to account for trust property that has traditionally been the hallmark of defalcation."

16    12(b)(6) Ruling at 6.

17    **II.    THE FINDINGS OF THE DELAWARE CHANCERY COURT ARE
         ENTITLED TO PRECLUSIVE EFFECT IN THIS ADVERSARY**
18    **PROCEEDING.**

19    In denying Bonilla's motion to dismiss ATR's Fourth Claim for Relief, the Court

20    treated the Delaware Chancery Court's findings relating to Bonilla's breach of fiduciary duty

21    as true for purposes of a Rule 12(b)(6) motion. *See* 12(b)(6) Ruling at 2 n.1. The Court

22    observed that "Plaintiff is not urging that the decision of the Delaware court be given issue-

23    preclusive effect at this time." *Id.* By this Motion, ATR now requests that the Court give

24    preclusive effect to the findings of the Delaware Chancery Court's Memorandum Opinion.

25    The case law compels application of collateral estoppel here.

26    The preclusive force of a state-court judgment is mandated by the statutory require-

27    ment that the federal courts accord such judgments "full faith and credit." 28 U.S.C. §1738;

28    *see also Gayden v. Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798, 801 (9th Cir. 1995). It is

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  also rooted in the longstanding rule precluding federal-court review of state-court judgments

2  known as the *Rooker-Feldman* doctrine. *See Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923);

3  *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) (federal court pre-

4  cluded from exercising jurisdiction over collateral attack on state court judgment, even when

5  state court judgment may be in error). The doctrine of collateral estoppel (also referred to as

6  issue preclusion) applies in the bankruptcy courts, and specifically applies in nondischarge-

7  ability proceedings such as the instant adversary proceeding. *Grogan v. Garner*, 498 U.S.

8  279, 284-85 & n.11 (1991) ("We now clarify that collateral estoppel principles do indeed

9  apply in discharge exception proceedings pursuant to [11 U.S.C.] § 523(a)"); *Bugna*, 33 F.3d

10  at 1056-57 (applying collateral estoppel in adversary proceeding under 11 U.S.C.

11  §523(a)(4)).

12  In determining the collateral estoppel effect of the Delaware Chancery Court's Memo-

13  randum Opinion and Final Judgment, this Court must apply Delaware's law of collateral

14  estoppel. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379-82 (1985)

15  (holding 28 U.S.C. §1738 "directs a federal court to refer to the preclusion law of the State

16  in which judgment was rendered"); *In re Moore*, 186 B.R. 962, 968 (Bankr. N.D. Cal. 1995)

17  ("[A] federal court must give a state court judgment the same preclusive effect it would

18  receive in that state"). Under Delaware law, "the doctrine of collateral estoppel provides

19  repose by preventing the relitigation of an issue of fact previously decided. The test for

20  applying the collateral estoppel doctrine requires that (1) a question of fact essential to the

21  judgment (2) be litigated and (3) determined (4) by a valid and final judgment." *M.G.*

22  *Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. S. Ct. 1999); *see also West Coast*

23  *Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 643 (Del. Ch. 2006) ("Issue

24  preclusion applies if: (1) the issue sought to be precluded is the same as that involved in the

25  prior action; (2) that issue was actually litigated; (3) the issue was determined by a final and

26  valid judgment; and (4) the determination was essential to the prior judgment").[4]

27

28  [4]To the extent that California law of collateral estoppel applies because ATR has
(continued . . .)

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE FOURTH CLAIM FOR RELIEF

-16-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1    All of the elements for application of collateral estoppel are met here. In the Delaware

2  action, ATR asserted a claim directly against Bonilla for breach of fiduciary duty, namely, a

3  corporate director's duty of loyalty to the corporation's stockholders. Based on the evidence

4  presented at trial, the Delaware Chancery Court found that Bonilla did in fact breach his

5  fiduciary duty to ATR. Bonilla's breach of his fiduciary duty to ATR was litigated through

6  trial and was essential to the Delaware Chancery Court's Memorandum Opinion and Final

7  Judgment. The Memorandum Opinion and Final Judgment are now final, having been

8  affirmed by the Delaware Supreme Court. *See* RJN Ex. 3.

9    In this adversary proceeding, the same breach of Bonilla's fiduciary duty to ATR found

10  by the Delaware Chancery Court forms the basis of ATR's Fourth Claim for Relief. The

11  Fourth Claim for Relief alleges:

12      Bonilla's failure—as found by the Delaware Chancery Court—to monitor
13      Araneta's actions, to prevent him from removing assets from the Delaware
        Holding Company to his family members without consideration, or to take any
        steps to protect ATR's interest as a minority shareholder, facilitated and enabled
14      Araneta's wrongful transfer of assets from the Delaware Holding Company,
        resulting in the misappropriation of funds held in a fiduciary capacity . . . . As a
15      result of these actions, Bonilla's Judgment Debt to ATR arises from "fraud or
        defalcation while acting in a fiduciary capacity," within the meaning of 11 U.S.C.
16      Section 523(a)(4) and therefore should be excepted from discharge. (Compl.
        ¶¶75-76)
17

18  Accordingly, the Delaware Chancery Court's findings that Bonilla breached his fiduciary

19  duty to ATR bars Bonilla from relitigating that issue in this adversary proceeding.

20    It is irrelevant that the Delaware Chancery Court did not specifically find that Bonilla

21  committed defalcation while acting in a fiduciary capacity within the meaning of the Bank-

22  ruptcy Code. As one bankruptcy court has noted:

23    _____

24      (. . . continued)
    entered the Delaware Chancery Court's Final Judgment as a sister-state judgment in
25  California, the same analysis would be required. California's law of collateral estoppel is
    materially the same as that of Delaware. *See Bugna*, 33 F.3d at 1057 ("Under [California]
26  law, collateral estoppel bars relitigation when '(1) the issue decided in the prior action is
    identical to the issue presented in the second action; (2) there was a final judgment on the
27  merits; and (3) the party against whom estoppel is asserted was a party . . . to the prior
    adjudication'") (quoting *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1520
28  (9th Cir. 1987)).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1   [R]egardless of whether Judge Brooks [who had decided the case giving rise to
the underlying debt] specifically concluded that Shultz [a corporate director]
2   owed Miramar [a Delaware corporation] a fiduciary duty which satisfies
§532(a)(4), so long as factual findings were made which permit that determina-
3   tion, this Court is bound by those findings and is barred from proceeding with
relitigation of the same facts. (*In re Zachary Shultz*, 205 B.R. 952, 955 (Bankr.
4   M.D. Fla. 1997))

5   What matters, instead, is that the findings of the Delaware Chancery Court, considered

6   in conjunction with applicable bankruptcy and Delaware law, lead to the determination that

7   Bonilla's judgment debt is nondischargeable under section 523(a)(4).  As noted above, this

8   Court has already decided the legal component of that determination in its 12(b)(6) Ruling.

9   The factual component of that determination was made by the Delaware Chancery Court and

10  is entitled to preclusive effect here.  Accordingly, ATR is entitled to summary judgment on

11  its Fourth Claim for Relief that Bonilla's judgment debt to ATR in the amount of

12  $24,490,422.50, plus accrued post-judgment interest of $490,647.16, is nondischargeable

13  pursuant to 11 U.S.C. §523(a)(4).

14  ### CONCLUSION

15  For the foregoing reasons, ATR urges that the Court grant its Motion for Summary

16  Judgment on the Fourth Claim for Relief.

17

18  DATED: November 15, 2007.

19                                      Respectfully,

20                                      MICHAEL J. BAKER
                                        WILLIAM J. LAFFERTY
21                                      LONG X. DO
                                        HOWARD RICE NEMEROVSKI CANADY
22                                          FALK & RABKIN
                                        A Professional Corporation
23

24                                      By: _____
                                            WILLIAM J. LAFFERTY
25

26                                      Attorneys for Plaintiffs ATR-KIM ENG
                                        FINANCIAL CORPORATION and ATR-KIM
27                                      ENG CAPITAL PARTNERS, INC.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

Entered on Docket
December 20, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



Signed and Filed: December 17, 2007

_____
THOMAS E. CARLSON
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case No. 07-30309 TEC |
| HUGO NERY BONILLA, | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| ATR-KIM ENG CAPITAL PARTNERS, INC., | ) Adv. Proc. No. 07-3079 TC |
| and ATR-KIM ENG FINANCIAL CORPORATION, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| HUGO NERY BONILLA, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM RE DEFENDANT'S MOTION FOR RECONSIDERATION AND
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I.  Motion for Reconsideration

Defendant seeks reconsideration of the denial of his motion to dismiss Plaintiffs' fourth cause of action for failure to state a claim upon which relief can be granted.  In so moving, Defendant

MEMO. RE DEFENDANT'S MTN
FOR RECONSID. AND PLAINTIFFS'
MTN. FOR SUMM. JUDG.          -1-

EXHIBIT   J

1 | contends that this court made a manifest error of law in
2 | determining that the director of a Delaware corporation is a
3 | "fiduciary" within the meaning of section 523(a)(4) of the
4 | Bankruptcy Code.

5 |     Defendant first argues that this court did not give proper
6 | deference to the decision of the Ninth Circuit in <u>Cal-Micro, Inc.,</u>
7 | <u>v. Cantrell (In re Cantrell)</u>, 329 F.3d 1119 (9th Cir. 2003).
8 | Because <u>Cantrell</u> relied upon a California Supreme Court decision
9 | stating that a corporate officer is an agent rather than a trustee
10 | under California law, I find <u>Cantrell</u> to be of little relevance to
11 | the present case involving a Delaware director.

12 |     Defendant next argues that the decisions of the Delaware
13 | Supreme Court imposing trustee-like duties on corporate directors
14 | are inapposite because they involved instances in which the
15 | corporation was insolvent or the director improperly benefitted
16 | from the act in question.  This argument is unpersuasive for two
17 | reasons.

18 |     First, Defendant cites no Delaware decision holding that a
19 | corporate director has trustee-like duties *only* where the
20 | corporation is insolvent or the director benefits.  At the same
21 | time, a decision of the Delaware Chancery Court imposed trustee-
22 | like duties on corporate directors where there was no showing of
23 | insolvency or improper benefit.  <u>Bodell v. General Gas & Electric</u>
24 | <u>Corp.</u>, 132 A. 442, 447 (Del. Ch. 1926).

25 |     Second, a recent decision of the Delaware Supreme Court holds
26 | that the fiduciary duties owed shareholders are the same as those
27 | owed creditors upon insolvency.

28 |

**MEMO. RE DEFENDANT'S MTN
FOR RECONSID. AND PLAINTIFFS'
MTN. FOR SUMM. JUDG.**        -2-

1          It is well settled that directors owe fiduciary
     duties to the corporation.  When a corporation is
2    *solvent*, those duties may be enforced by its
     shareholders, who have standing to bring *derivative*
3    actions on behalf of the corporation because they are the
     ultimate beneficiaries of the corporation's growth and
4    increased value.  When a corporation is *insolvent*,
     however, its creditors take the place of the shareholders
5    as the residual beneficiaries of any increase in value.

6          Consequently, the creditors of an *insolvent*
     corporation have standing to maintain derivative claims
7    against directors on behalf of the corporation for
     breaches of fiduciary duties.  The corporation's
8    insolvency "makes the creditors the principal
     constituency injured by any fiduciary breaches that
9    diminish the firm's value."  Therefore, equitable
     considerations give creditors standing to pursue
10   derivative claims against the directors of an insolvent
     corporation.  Individual creditors of an insolvent
11   corporation have the same incentive to pursue valid
     derivative claims on its behalf that shareholders have
12   when the corporation is solvent.

13   North American Catholic Educational Programming Foundation, Inc.,

14   v. Gheewalla, 930 A.2d 92, 101-02 (Del. 2007) (emphasis and

15   quotations in original)(footnotes omitted).  In this context, the

16   Delaware decisions holding that directors become trustees for

17   creditors upon insolvency become direct support for the conclusion

18   that directors are trustee for shareholders while the corporation

19   is solvent.

20        Defendant argues finally that this court erred in relying upon

21   the "substantially similar" test stated in Lewis v. Scott (In re

22   Lewis), 97 F.3d 1182 (9th Cir. 1996), asserting that Lewis is an

23   "anomaly" among Ninth Circuit decisions otherwise interpreting

24   section 523(a)(4) very narrowly.  This court is persuaded that the

25   functional approach of Lewis is sound.  Reliance on formalistic

26   taxonomy has lead the Ninth Circuit to the somewhat curious

27   conclusion that a director of a California corporation is a

28

MEMO. RE DEFENDANT'S MTN
FOR RECONSID. AND PLAINTIFFS'
MTN. FOR SUMM. JUDG.              -3-

1 | fiduciary for creditors when the corporation is insolvent,[1] but is
2 | not a fiduciary for the director's prime constituents,
3 | shareholders, when the corporation is not insolvent.[2] North
4 | American Catholic, decided by the court most widely recognized for
5 | its expertise in corporate governance, suggests that a functional,
6 | interest-based approach is appropriate for any analysis of the
7 | fiduciary duties of a director under Delaware law.

8 |

9 | II.  Plaintiffs' Motion for Summary Judgment

10 |     Plaintiffs seek summary judgment on their fourth cause of
11 | action based on the preclusive effect of the Chancery Court
12 | judgment.  Defendant contends that issue preclusion is
13 | inappropriate because the factual issues relevant to the fourth
14 | cause of action are not identical to those decided in the state-
15 | court action.  This argument is unpersuasive.

16 |     This court having decided that Defendant is a "fiduciary" as a
17 | matter of law, the relevant fact question under section 523(a)(4)
18 | is whether his wrongful acts amounted to a "defalcation."  The
19 | state court made detailed findings to the effect that Defendant
20 | consciously failed to take the minimum steps legally required of
21 | him as a director to protect corporate assets.  These findings
22 | represent a finding of defalcation:  Defendant, while acting in a
23 | fiduciary capacity was unable to account for property placed under

24 | _____

25 |     [1] Lawrence T. Lasagna, Inc. v. Foster, 609 F.2d 392, 396 (9th
     Cir. 1979)(director of insolvent corporation organized under
26 | California law is fiduciary for purposes of section 35(a)(4),
     predecessor to section 523(a)(4)); Nahman v. Jacks (In re Jacks),
27 | 266 B.R. 728, 737 (9th Cir. BAP 2001).

28 |     [2] Cantrell, 329 F.3d at 1127.

MEMO. RE DEFENDANT'S MTN
FOR RECONSID. AND PLAINTIFFS'
MTN. FOR SUMM. JUDG.                    -4-

1 | his charge, and the property was lost due to Defendant's failure to
2 | follow the instructions imposed upon him by law regarding the
3 | protection of that property.  See <u>Otto v. Niles (In re Niles)</u>, 106
4 | F.3d 1456, 1460-62 (9th Cir. 1997).
5 | **END OF MEMORANDUM**

MEMO. RE DEFENDANT'S MTN
FOR RECONSID. AND PLAINTIFFS'
MTN. FOR SUMM. JUDG.                    -5-

1 | <u>**Court Service List**</u>

2

3 | Iain A. Macdonald, Esq.
Law Offices of Macdonald & Associates
4 | Two Embarcadero Center, Suite 1670
San Francisco, CA 94111-3930
5

Michael C. Fallon, Esq.
6 | Law Offices of Michael C. Fallon
100 E Street, Suite 219
7 | Santa Rosa, CA 95404

8 | Michael J. Baker, Esq.
William J. Lafferty, Esq.
9 | Matthew L. Beltramo, Esq.
Howard, Rice, Nemerovski, Canady,
10 | Falk & Rabkin
Three Embarcadero Center, 7th Floor
11 | San Francisco, CA 94111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Entered on Docket
January 02, 2008
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



Signed and Filed: January 02, 2008

THOMAS E. CARLSON
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 07-30309 TEC |
| HUGO NERY BONILLA, | Chapter 7 |
| Debtor. | |
| ATR-KIM ENG CAPITAL PARTNERS, INC., and ATR-KIM ENG FINANCIAL CORPORATION, | Adv. Proc. No. 07-3079 TC |
| Plaintiffs, | |
| vs. | Date: January 18, 2008<br>Time: 9:30 a.m.<br>Crtm: 235 Pine St., 23rd Fl.<br>San Francisco, CA |
| HUGO NERY BONILLA, | |
| Defendant. | |

**ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION AND GRANTING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON FOURTH CAUSE OF ACTION**

The court held a hearing on December 14, 2007 on Defendant's

Motion to Reconsider Order Denying Defendant's Motion to Dismiss

Plaintiff's Fourth Cause of Action and on Plaintiffs' Motion for

Summary Judgment on Fourth Cause of Action.  William J. Lafferty

appeared for Plaintiffs.  Iain A. Macdonald appeared for Defendant.

ORDER DENYING DEF.'S MTN FOR RECONSID.
AND GRANTING PLAINTIFFS' MTN. FOR
PARTIAL SUMM. JUDG.                    -1-

EXHIBIT __K__

1    Upon due consideration, and for reasons stated on the record
2  at the hearing and in the accompanying memorandum, the court hereby
3  orders as follows.

4    (1) Defendant's motion for reconsideration is denied.

5    (2) The court grants Plaintiffs' motion for summary judgment
6  on the fourth claim for relief and determines that the
7  $24,981,069.66 judgment entered on January 10, 2007 in Delaware
8  Court of Chancery Case No. CIV.A. 489 is excepted from discharge
9  under 11 U.S.C. § 523(a)(4).

10    (3) The court will enter a separate partial judgment on the
11  fourth claim for relief, and will direct entry of final judgment as
12  to this claim.

13    (4) Upon stipulation of the parties on the record at the
14  hearing, the court establishes the following schedule regarding
15  Defendant's Motion for Stay Pending Appeal of the Partial Judgment:

16    (a) Defendant shall file and serve a Motion for Stay on or
17  before January 4, 2008.

18    (b) Plaintiffs shall file and serve a response to the Motion
19  on or before January 14, 2008.

20    (c) A hearing on the motion for stay pending appeal is set for
21  January 18, 2008 at 9:30 a.m.

22                    **END OF ORDER**

23

24

25

26

27

28

ORDER DENYING DEF.'S MTN FOR RECONSID.
AND GRANTING PLANTIFFS' MTN. FOR
PARTIAL SUMM. JUDG.                    -2-

1                          <u>Court Service List</u>

2

3

   Iain A. Macdonald, Esq.
4  Law Offices of Macdonald & Associates
   Two Embarcadero Center, Suite 1670
5  San Francisco, CA 94111-3930

6  Michael C. Fallon, Esq.
   Law Offices of Michael C. Fallon
7  100 E Street, Suite 219
   Santa Rosa, CA 95404

8
   Michael J. Baker, Esq.
9  William J. Lafferty, Esq.
   Matthew L. Beltramo, Esq.
10 Howard, Rice, Nemerovski, Canady,
    Falk & Rabkin
11 Three Embarcadero Center, 7th Floor
   San Francisco, CA 94111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Entered on Docket**
**January 02, 2008**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



1

2          **Signed and Filed: January 02, 2008**

3

4          _____

           **THOMAS E. CARLSON**
5          **U.S. Bankruptcy Judge**

6

7

8                  UNITED STATES BANKRUPTCY COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   In re                          )   Case No. 07-30309 TEC
                                     )
     HUGO NERY BONILLA,              )   Chapter 7
12                                   )
                                     )
13                    Debtor.        )
                                     )
14   _____)
     ATR-KIM ENG CAPITAL PARTNERS, INC., )   Adv. Proc. No. 07-3079 TC
15   and ATR-KIM ENG FINANCIAL       )
     CORPORATION,                    )
16                                   )
                      Plaintiffs,    )
17                                   )
           vs.                       )
18                                   )
                                     )
19   HUGO NERY BONILLA,              )
                                     )
20                                   )
                      Defendant.     )
21   _____)

22   **PARTIAL SUMMARY JUDGMENT ON FOURTH CAUSE OF ACTION AND RULE 54(b)**
                              **CERTIFICATION**
23
          The court held a hearing on December 14, 2007 on Defendant's
24
     Motion to Reconsider Order Denying Defendant's Motion to Dismiss
25
     Plaintiff's Fourth Cause of Action and on Plaintiffs' Motion for
26
     Summary Judgment on Fourth Cause of Action.  William J. Lafferty
27
     appeared for Plaintiffs.  Iain A. Macdonald appeared for Defendant.
28

     PARTIAL SUMMARY JUDGMENT AND RULE 54(b)
     CERTIFICATION                    -1-

EXHIBIT ___L___

1    Upon due consideration, and for reasons stated on the record
2  at the hearing and in the accompanying memorandum, the court hereby
3  enters partial summary judgment as follows.
4    (1) Summary judgment is entered on Plaintiffs' fourth claim
5  for relief that the $24,981,069.66 judgment entered on January 10,
6  2007 in Delaware Court of Chancery Case No. CIV.A. 489 is excepted
7  from discharge under 11 U.S.C. § 523(a)(4).
8    (2) Pursuant to Federal Rule of Civil Procedure 54(b),
9  incorporated by Fed. R. Bankr. Proc. 7054(a), the court having
10 determined that there is no just reason for delay, the court
11 expressly directs immediate entry of final judgment on Plaintiffs'
12 fourth claim for relief.
13            **END OF PARTIAL SUMMARY JUDGMENT**
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PARTIAL SUMMARY JUDGMENT AND RULE 54(b)
CERTIFICATION                    -2-

1

<u>Court Service List</u>

2

3

Iain A. Macdonald, Esq.
4  Law Offices of Macdonald & Associates
Two Embarcadero Center, Suite 1670
5  San Francisco, CA 94111-3930

6  Michael C. Fallon, Esq.
Law Offices of Michael C. Fallon
7  100 E Street, Suite 219
Santa Rosa, CA 95404
8

Michael J. Baker, Esq.
9  William J. Lafferty, Esq.
Matthew L. Beltramo, Esq.
10  Howard, Rice, Nemerovski, Canady,
Falk & Rabkin
11  Three Embarcadero Center, 7th Floor
San Francisco, CA 94111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MACDONALD & ASSOCIATES
IAIN A. MACDONALD (State Bar No. 051073)
HEATHER A. CUTLER (State Bar No. 217837)
Two Embarcadero Center, Suite 1670
San Francisco, CA  94111-3930
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Appellant,
HUGO NERY BONILLA

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In Re:<br><br>HUGO NERY BONILLA,<br><br>        Debtor. | District Case No. CV 08-1062 SC |
| ATR-KIM ENG FINANCIAL CORPORATION AND ATR-KIM ENG CAPITAL PARTNERS, INC.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>HUGO NERY BONILLA,<br><br>        Defendant. | Adv. Proc. No. 07-03079<br><br>Bankruptcy Case No. 07-30309<br><br>Chapter 7<br><br>CERTIFICATE OF SERVICE |

     I, the undersigned, state that I am employed in the City and County of San Francisco, State of

California; that I am over the age of eighteen years and not a party to the within action; that my

business address is Two Embarcadero Center, Suite 1670, San Francisco, California, 94111-3930.

     On the date hereon, I served the foregoing document(s) described as:

REQUEST OF APPELLANT HUGO NERY BONILLA FOR CERTIFICATION
OF APPEAL TO THE NINTH CIRCUIT COURT OF APPEAL; and

NOTICE OF REQUEST OF APPELLANT HUGO NERY BONILLA
FOR CERTIFICATION OF APPEAL TO THE NINTH CIRCUIT COURT OF APPEAL

on the following on this 26th day of February, 2008, at San Francisco, California:

William J. Lafferty, Esq.
Howard Rice Nemerovski Canady
 Falk & Rabkin, 7th Floor
Three Embarcadero Center
San Francisco, CA  94111-4024

___ **(By Personal Service)** By causing a true copy if said document(s), enclosed in a sealed envelope and addressed below, to be hand delivered.

_X_ **(By First Class U.S. Mail)** By causing a true copy if said document(s), enclosed in a sealed envelope addressed as below and with postage thereon fully prepared, to be placed in United States mail at San Francisco, California.

___ **(By Federal Express)** By causing a true copy if said document(s), enclosed in appropriate packaging and addressed as below and with delivery fee thereon fully prepaid, to be delivered to a Federal Express.

___ **(By Facsimile)** By causing a true copy if said document(s),to be transmitted by facsimile copying machine to telephone numbers shown below, known by or represented to me to be the receiving telephone number for facsimile copy transmission of the parties/persons/ firms listed below.  The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court, at whose direction the service was made and that the foregoing is true and correct.

/s/
_____
Shirley P. Pathross

CERTIFICATE OF SERVICE

2